1    RICHARD M .WILLIAMS (SBN 68032)
     GREGORY M. GENTILE (SBN 142424)
2    J. MARK THACKER (SBN 157182)
     ROPERS, MAJESKI, KOHN & BENTLEY
3    80 North First Street
     San Jose, CA  95113
4    Telephone:    (408) 287-6262
     Facsimile:    (408) 918-4501
5
     Attorneys for Defendant
6    GLOBAL EQUITY LENDING, INC.

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10

11   DOLORES A. ARREGUIN, for herself        CASE NO.  C 07 6026 MHP
     and other members of the general public
12   similarly situated,                     **DECLARATION OF GREGORY M.
                                             GENTILE IN SUPPORT OF DEFENDANT
13                   Plaintiff,              GLOBAL EQUITY LENDING, INC.'S
                                             SUPPLEMENTAL BRIEF**
14   v.

15   GLOBAL EQUITY LENDING, INC., a
     Georgia Corporation; and DOES 1 through  Complaint filed:   November 29, 2007
16   10, Inclusive,

17                   Defendant.

18

19        I, Gregory M. Gentile, declare:

20        1.      I am one of the attorneys of record for Defendant GLOBAL EQUITY LENDING,

21   INC. ("GLOBAL").  I make this Declaration in support of GLOBAL's supplemental brief

22   submitted in support of its motion to compel binding arbitration pursuant to contract and motion

23   to dismiss.

24        2.      Attached hereto as Exhibit A is a true and correct copy of the transcript of

25   proceedings before the Honorable Marilyn Hall Patel on March 17, 2008 in which the Court

26   ordered the parties to engage in limited depositions.

27        3.      Attached hereto as Exhibit B is a true and correct copy of the relevant deposition

28   transcript pages of Plaintiff DOLORES ARREGUIN, with said deposition taken on May 12,

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1   2008.

2        4.    Attached hereto as Exhibit C is a true and correct copy of the relevant deposition

3   transcript pages of GLOBAL's designated PMK Eric Pennington, with said deposition taken on

4   May 13, 2008.

5        5.    Attached hereto as Exhibit D is a true and correct copy of the relevant deposition

6   transcript pages of GLOBAL EQUITY LENDING employee Sandra Croteau, with said

7   deposition taken on May 13, 2008.

8        6.    Attached hereto as Exhibit E and marked as Exhibit 1 to Plaintiff DOLORES

9   ARREGUIN's deposition, is a true and correct copy of the GLOBAL EQUITY LENDING, INC.

10  Mortgage Loan Originator Employment Agreement which GLOBAL contends was electronically

11  executed by Plaintiff on April 2, 2002.

12       7.    Attached hereto as Exhibit F and marked as Exhibit 2 to Plaintiff DOLORES

13  ARREGUIN's deposition is a true and correct copy of the World Lending Group Inc. Mortgage

14  Loan Originator Employment Agreement to which Plaintiff testified that she manually signed on

15  July 19, 2002.

16       8.    Attached hereto as Exhibit G and marked as part of Exhibit 3 to the deposition of

17  Plaintiff DOLORES ARREGUIN and Bates stamped GEL-012 through GEL-016 is a true and

18  correct copy of a World Leadership Group Inc. Associate Membership Agreement also bearing

19  DOLORES ARREGUIN's signature and dated July 19, 2002.  Plaintiff testified that she also

20  manually signed this Agreement (Plaintiff's deposition, pages 80-81, Exhibit B attached hereto).

21  This Agreement also contains at Paragraph V a section for Arbitration of Grievances and in

22  Paragraph IX.K. also provides for venue in either Gwinnett County, Georgia or Cobb County,

23  Georgia.

24       I declare under penalty of perjury that the foregoing is true and correct, and if called upon

25  as a witness, I could competently testify thereto.  Executed on June 9, 2008 at San Jose,

26  California.

27  _____

28  GREGORY M. GENTILE

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

**EXHIBIT A**

Arreguin 3-17-08.txt

1.

1 Pages 1 - 10

2                          UNITED STATES DISTRICT COURT

3                        NORTHERN DISTRICT OF CALIFORNIA

4                  BEFORE THE HONORABLE MARILYN HALL PATEL

5 DOLORES A. ARREGUIN, for herself    )
  and other members of the general    )
6 public similarly situated,          )
                                       )
7              Plaintiff,              )
                                       )
8   VS.                                )   No. C 07-6026 MHP
                                       )
9 GLOBAL EQUITY LENDING, INC., a       )
  Georgia Corporation; and DOES 1      )
10 through 10, Inclusive,              )
                                       )   San Francisco, California
11             Defendant.             )   Monday
                                       )   March 17, 2008
12 _____)   2:17 p.m.

13                          TRANSCRIPT OF PROCEEDINGS

14 APPEARANCES:

15 For Plaintiff:          LAW OFFICES OF HERBERT HAFIF
                           269 West Bonita Avenue
16                         Claremont, California  91711-4784
                      BY:  FARRIS E. AIN, ESQUIRE
17
   For Defendant:          Ropers, Majeski, Kohn & Bentley
18                         80 North First Street
                           San Jose, California  95113
19                    BY:  MARK THACKER, ESQUIRE
                           RICHARD M. WILLIAMS, ESQUIRE
20

21

22 Reported By:            Katherine A. Powell, CSR #5812, RPR, CRR
                           Official Reporter - U.S. District Court

23

24

25

Page 1

Arreguin 3-17-08.txt

2

1                    P R O C E E D I N G S
2  MARCH 17, 2008                          2:17 P.M.
3
4            THE CLERK:  Calling Civil 07-6026, Dolores Arreguin
5  versus Global Equity Lending.
6            THE COURT:  May I have your appearances, please.
7            MR. AIN:  Good afternoon, Your Honor.
8            Farris Ain, Law Offices of Herbert Hafif, for the
9  plaintiff and the class.
10           THE COURT:  Good afternoon.
11           MR. THACKER:  Good afternoon, Your Honor.
12           Mark Thacker on behalf of the defendant Global Equity
13  Lending.
14           MR. WILLIAMS:  And Rick Williams, Your Honor,
15  Mr. Thacker's partner on behalf of the same party.
16           THE COURT:  Yes, good afternoon.
17           MR. WILLIAMS:  Good afternoon.
18           THE COURT:  Is there an actual signed, as with a
19  signature as opposed to, you know, an online entry of the name
20  which is treated as a signature, et cetera, of Ms. Arreguin
21  with respect to any of the employment, quote, agreements,
22  including any subsequent ones, I guess, that may have occurred,
23  where there were form selection clauses and/or arbitration
24  clauses?
25           MR. THACKER:  No, Your Honor.

Arreguin 3-17-08.txt

3

1    The only documents that we could -- that my client
2 could locate were the ones that were on the Web site into which
3 she would have had to log into and confirm her acceptance by
4 clicking the "I Accept" button and moving on from there.

5    THE COURT:  And there was only one, and that was
6 pre-employment in April of '02?

7    MR. THACKER:  There was that one and subsequent ones,
8 as well, that annually there would be a renewal or a revision
9 in some aspect of the overall contract.

10    But as we stated in the declaration, Your Honor, in
11 each one of those the form selection clause and the arbitration
12 provision remained unchanged from the first date.

13    THE COURT:  But, also, with respect to those, those
14 were post-employment, where the -- the only post-employment
15 documents, right, you're talking about the subsequent ones
16 after the April 2002?

17    MR. THACKER:  Yes, Your Honor.  The subsequent ones
18 would be after she initially accepted employment and began
19 working for, at the time, World Lending and then subsequently
20 Global Equity.

21    THE COURT:  Do you have a record of the online
22 signatures in each of those cases?

23    MR. THACKER:  Your Honor, I went around with my
24 client on this.  We produced all the documents we had, attached
25 to the motion.  The only thing I can say is that in order for

Arreguin 3-17-08.txt

4

1 Ms. Arreguin to continue to perform her employment
2 responsibilities and duties with respect to communicating with
3 her employer back in Georgia, transmitting loans, loan
4 information, would be with the user name and password that she
5 would have been given when she first accepted the employment
6 agreement, and which were confirmed each subsequent time that
7 she was asked to sign the revised agreement.

8          THE COURT:  Now, her employment began in July of '02.
9 When did she accept employment?

10         MR. THACKER:  Well --

11         THE COURT:  Sometime between that April date and July
12 date, I gather.

13         MR. THACKER:  The April date would have, I believe,
14 been the date that she would have either accepted or put out
15 her proposal for employment.  She -- she signed onto the
16 Web site, accepted the agreement.  And then it was
17 subsequent -- or, rather, it was World Lending or Global Equity
18 that reviewed the agreement, reviewed the information, did a
19 quick background check, and then accepted her as an employee.

20         So, actually, she started the process and Global
21 Equity agreed, if you will, formed the employment agreement as
22 of July, the July date.

23         THE COURT:  The July date?

24         And she says, as I understand it, she didn't sign
25 anything?

Arreguin 3-17-08.txt

⚥                                                               5

1          MR. AIN:  That's correct, Your Honor.

2          THE COURT:  Does she acknowledge that she clicked on

3  and understood that she was agreeing to this agreement?

4          MR. AIN:  I do not believe so, Your Honor.  I've

5  spent a good portion of this morning reviewing all these

6  documents, and I'm just as confused as the Court.

7          Because in the first declaration submitted, the

8  testimony states that she agreed to this agreement in July --

9  or in April of 2002.  However, the second declaration

10  submitted, where they attempt to clarify these documents, they

11  attached the Web sites which they now purport were signed in

12  October of 2002.  And I'm kind of confused about all that.  We

13  should get an explanation.

14          THE COURT:  I think what we need to do is clear up

15  the confusion.  I know I can go to the issue of the form

16  selection clause and, you know, are you here or in Georgia or

17  what happened as a result, you know.  But I think we've got to

18  really nail down whether she accepted the terms of this

19  employment agreement, and then we go to that second question.

20          So I think what we're going to have to do -- and I'm

21  not trying to weasel out of this, at this point, but I just

22  think that it makes for a better record when we figure out what

23  we should do, to have her deposition.  And I assume on her side

24  we wouldn't need any other deposition.  And her deposition

25  hasn't been taken yet, has it?

Arreguin 3-17-08.txt

♀                                                              6

1          MR. THACKER:  No, Your Honor.

2          MR. WILLIAMS:  No.

3          MR. AIN:  No.

4          THE COURT:  And then we have a deposition of one

5   or -- I don't know if there needs to be more.  I would say at

6   this point of one, whether it's Mrs. -- is it Croteau, or

7   however you say Croteau?

8          MR. THACKER:  Croteau.

9          THE COURT:  Croteau.  Somewhere in the neighborhood,

10  but not there.  Her deposition.  And I would give you one more,

11  if you find out after you depose her that there's somebody else

12  who might be a person most knowledgeable.

13         MR. AIN:  Okay, Your Honor.

14         THE COURT:  Okay.

15         MR. AIN:  Your Honor, if I may speak to this issue in

16  hopes that we could avoid these depositions.  When we started

17  out looking at this Exhibit A that's attached, it clearly says

18  on the page 1 that this is not an employment contract.  And,

19  basically, what it is, it's as if one of the law clerks was to

20  submit a resume.  That's what this is.  It's an application

21  process where you're submitting your information and your

22  interest in taking the job.  This is where at some point,

23  hypothetically, she would have checked one of these boxes, if

24  she ever did.

25         THE COURT:  Well, and the question is:  Did she ever?

Arreguin 3-17-08.txt

♀

1 And what does she remember?  And what do they have and

2 remember?

3          And I think it's better just to do it.  We're going

4 to do it that way.  You can't avoid that.  Because there are

5 other things she claimed she signed.  I want to see the whole

6 record before we start deciding where this case is and what

7 we're doing.

8          MR. THACKER:  Okay.

9          MR. AIN:  Okay.

10          MR. WILLIAMS:  Very good.

11          MR. THACKER:  Makes sense, Your Honor.

12          THE COURT:  How long do you think it would take to do

13 that?

14          MR. THACKER:  The employer, as you know, Your Honor,

15 is in Georgia.  Although, certainly within 60 days, I think.

16 And I don't know Ms. Arreguin's schedule.  Perhaps sooner, but

17 certainly within 60 days.

18          THE COURT:  Do it within 60 days.  And then you get

19 back any supplemental pleadings to this motion.  We don't renew

20 the motion.  Just file supplemental declarations.  I don't need

21 any more briefing.  What I need are declarations.

22          If you want to just summarize in something not to

23 exceed three to five pages.  I guess if I say five it means

24 five, right?  That was silly.  But five pages.  But you've

25 already briefed the issue.  Unless there is some new case that

Arreguin 3-17-08.txt

♀                                                                      8

1 comes down the pike or whatever, then just that not to exceed

2 five pages to review what has been submitted.

3          And discuss it and then submit the declarations or

4 depositions -- well, deposition extracts is what I really want.

5 But since there are going to be very few depositions, give me

6 the entire deposition, and then reference in whatever you're

7 submitting, whether it be by way of declaration or memo, pages

8 and lines and really what you think are important.  I will

9 probably read the whole thing.

10          MR. WILLIAMS:  Point of clarification, if I might.

11          THE COURT:  Yes.

12          MR. WILLIAMS:  I presume you want us, in these

13 depositions, to limit the questioning to this issue, the

14 contract issue --

15          THE COURT:  Yes.

16          MR. WILLIAMS:  -- and not go into the other issues of

17 the case.

18          THE COURT:  Not go into the other issues.

19          MR. WILLIAMS:  We can do that later.

20          THE COURT:  Right.  Exactly.  This is without

21 prejudice to further deposition on the merits.

22          MR. AIN:  Very good.

23          THE COURT:  Okay.

24          MR. AIN:  Thank you, Your Honor.

25          MR. WILLIAMS:  Thank you, Judge.

Arreguin 3-17-08.txt

1          THE COURT:  Now, the day back here would be -- how

2  about if you give them 30 days beyond the 60.  So completion of

3  the depositions by 60 days would be?

4          THE CLERK:  May 16th.

5          THE COURT:  16th.

6          MR. WILLIAMS:  That works.

7          THE COURT:  And then back in here middle of June.

8  What date?

9          THE CLERK:  June 23rd.

10         THE COURT:  June 23rd, at 2 o'clock, with submissions

11  two weeks in advance of that.

12         THE CLERK:  June 9th.

13         THE COURT:  By June 9th.  Okay.

14         MR. WILLIAMS:  Very good.

15         THE COURT:  Simultaneous.

16         MR. AIN:  Thank you.

17         MR. THACKER:  Thank you, Your Honor.

18         MR. WILLIAMS:  Thank you, Judge.  Appreciate it.

19         THE COURT:  Thank you.

20         (At 2:27 p.m. the proceedings were adjourned.)

21                          -   -   -   -

22

23

24

25

Arreguin 3-17-08.txt

♀                                                                                       10

1

2                   CERTIFICATE OF REPORTER

3        I, KATHERINE A. POWELL, Official Reporter for the

4  United States Court, Northern District of California, hereby

5  certify that the foregoing proceedings in C 07-6026 MHP,

6  Dolores A. Arreguin vs. Global Equity Lending, Inc. were

7  reported by me, a certified shorthand reporter, and were

8  thereafter transcribed under my direction into typewriting;

9  that the foregoing is a full, complete and true record of said

10 proceedings as bound by me at the time of filing.

11       The validity of the reporter's certification of said

12 transcript may be void upon disassembly and/or removal

13 from the court file.

14

15              _____

16              Katherine A. Powell, CSR 5812, RPR, CRR

17                   Thursday, April 17, 2008

18

19

20

21

22

23

24

25
♀=

# EXHIBIT B

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DOLORES A. ARREGUIN, for
herself and other members of
the general public similarly
situated,

        Plaintiffs,

   vs.

GLOBAL EQUITY LENDING, INC.,
a Georgia Corporation; and
DOES 1 through 10, Inclusive,

       Defendants.



No. C 07-06026

**CERTIFIED**
**COPY**

_____

DEPOSITION OF DOLORES A. ARREGUIN

San Francisco, California

Monday, May 12, 2008

Reported by:
KATHY NELSON
CSR No. 9796

JOB No. 88170

1          Q     All right.  Let me show you what we will mark

2     as Exhibit A -- or Exhibit 1 to this deposition.  And

3     this document is basically titled "Global Equity

4     Lending, Inc., Mortgage Loan Originator Employment

5     Agreement," and it's Bates-stamped -- and this is for us

6     attorneys, when I say "Bates-stamped" -- GEL001 through

7     GEL006.  He's got a copy there.  I see he's marked it

8     up, but that's his.

9              I'm going to just hand her this, Farris, but

10    first let's mark it as Exhibit 1.

11              (Deposition Exhibit 1 marked.)

12    BY MR. GENTILE:

13         Q     I want you to take a look at this document,

14    ma'am, what we've marked as Exhibit 1.

15         A     Okay.

16         Q     Have you ever seen Exhibit 1 before?

17         A     You know, they produced a lot of documents,

18    but at what time frame are you asking me?

19         Q     Well, thank you.  Did you ever see this

20    document, Exhibit 1, in or around the April 2002 time

21    frame?

22         A     The answer is no.

23         Q     Okay.  How do you know that?

24         A     Because Global Equity Lending, the name

25    itself -- two things tell me that.  Number one, they

1  weren't even an entity in the state of California,

2  because I looked them up, until August.  We weren't

3  signing documents for a company that wasn't already an

4  entity.  They weren't even established yet.  And the

5  second thing is Global Equity Lending, the name itself

6  came about a year and a half afterwards, and they --

7  they were thinking of Global Preferred Lending, and they

8  changed it to Global Equity Lending, which was a

9  complete surprise to us when they actually changed over.

10      Q    It seems like you had some inside information?

11      A    Well, I'm the senior marketing director.

12      Q    I'm sorry?

13      A    I was the senior marketing director.

14      Q    And you were senior marketing director for

15  World Leadership Group; is that correct?

16      A    Yes -- well, no, for Global Equity Lending, I

17  guess.

18      Q    Okay.  I understand that.  I'm just trying to

19  understand the sequence of events.  We do know that in

20  or around April 2002, you were working for World

21  Leadership Group?

22      A    No, I was not working for -- no.  They just

23  had us sign up.  There was an argument of Hubert

24  Humphrey, his old company -- and I belonged to the old

25  company, World Financial Group.  He had a big argument

27

DOLORES A. ARREGUIN                                                05/12/08

1        Q      So looking at Exhibit 1, it's your testimony

2   that you never saw this document in or around April

3   2002?

4        A      Correct.

5        Q      Did you ever go into a Web site, in or around

6   April 2002, and see any document similar to what we've

7   marked as Exhibit 1?

8        A      The answer would be no.

9        Q      Okay.  If you look at the last --

10  second-to-last page of Exhibit 1, which is GEL005, do

11  you see that -- do you see that there are a couple of

12  boxes that have been marked with an X?

13       A      I do.

14       Q      Okay.  And it's your testimony that you never

15  marked those boxes at all?

16       A      I've never seen this contract -- or I don't

17  recall seeing this contract at all.

18       Q      Okay.  Now, there's a difference between

19  saying "I've never seen this contract" as opposed to

20  you don't recall seeing this contract.

21       A      Well, I would say I've never seen this

22  document, because Global Equity Lending was not alive

23  and well in that year.  That name was not out there.

24       Q      So it's your position, then, because that

25  company was not alive and well in April 2002, this

29

DOLORES A. ARREGUIN                                    05/12/08

```
1   document wouldn't have existed in April 2000- --
2        A    Exactly.
3        Q    Okay.  So if Global Equity Lending was in
4   existence in or around April 2002, this document could
5   have existed; is that right?
6        A    It -- I've never seen it.
7        Q    Okay.  I think I understand your testimony.
8   Let me ask you something.  If you look at the next page
9   of this document, which we've labeled as Exhibit 1, it's
10  GEL006.  Do you see that?  And I take it your testimony
11  is the same with respect to the two boxes that are up at
12  the upper part of the document which are X'd?  Is that
13  correct, that you never checked those boxes?
14       A    I -- this is not familiar to me at all because
15  of the title of the document.  We were not Global Equity
16  Lending at that time.
17       Q    Okay.  But my testimony was -- strike that.
18            My question to you was, you never checked
19  those boxes?
20       A    No.
21       Q    Okay.  And if you look toward the middle part
22  of the page, where it says "Printed Name: Dolores
23  Arreguin," 4/2/02, 3:07:51, that name -- that's your
24  name, correct?
25       A    That's my name.
```

30

DOLORES A. ARREGUIN                          05/12/08

1      Q    Okay.  But your testimony is that you never

2  typed your name in this document?

3      A    No.  Yes, no.

4      Q    The question is, you didn't -- you're saying

5  you never typed your name on this page of this document?

6      A    Not on this -- this, what they call, agreement

7  with Global Equity Lending, no.

8      Q    Had you ever done that previously, as to any

9  of the other entities, like World Leadership Group or

10 World Financial Group?

11     A    World Leadership Group -- you know, I don't

12 know how we initially signed up.  That's the only thing.

13 So I don't know what they put out there.  They had so

14 many agreements.  I mean, things were called agreements,

15 contracts, policies, manuals, terms and conditions.

16         I mean -- you know, they used to have a saying

17 that -- and I don't mean to shoot at anybody, but they

18 had a saying in the beginning that -- in the beginning,

19 you know, usually people get a target and then they

20 shoot, right?  Well, Hubert doesn't.  He just shoots

21 first and then looks for the target.  That was the

22 saying in the beginning.  In other words, he just starts

23 haphazardly.  That's kind of how this all began,

24 haphazardly, the whole program.  It was so -- you know,

25 you didn't know what you were doing, really, you just

31

DOLORES A. ARREGUIN                              05/12/08

1    information?

2         A    Well, I can't assume it because it wasn't

3    there.  It just wasn't.

4         Q    All right.  So I think I understand what your

5    testimony is.  Because Global Equity Lending, Inc., was

6    not in existence in April 2002, then you could not have

7    gone into a Web site and looked at any information with

8    respect to Global Equity Lending?

9         A    Yeah.  State of California didn't approve them

10   until August of 2002.

11        Q    And from what I understand, your testimony is

12   Exhibit 1 -- you never saw Exhibit 1 on April 2, 2002?

13        A    No, no.

14        Q    And you never went into a Web site for Global

15   Equity Lending, Inc., in April 2002, and looked at a

16   document that was similar to Exhibit 1?

17        A    No, no.

18        Q    And you never typed in your name on this

19   document that we've marked as Exhibit 1, correct?

20        A    Correct.

21        Q    I don't mean to be argumentative, but do you

22   have any idea as to how your name appeared on the final

23   page of this document, Exhibit 1?

24        A    Does this look like the same page of World

25   Leadership Group?  Is this identical to that page?

36

DOLORES A. ARREGUIN                        05/12/08

1     Q    I don't know.  We're going to get to that in a
2  minute.
3     A    Okay.  I would compare the two.  This is not
4  something I even remember seeing, Global Equity Lending.
5     Q    So you have no recollection?
6     A    No.
7          MR. GENTILE:  All right.  Let's move on to --
8  we'll mark as Exhibit 2 a document that we have
9  Bates-stamped as GEL021 through GEL025.
10          Let's mark this as Exhibit 2, please.
11          (Deposition Exhibit 2 marked.)
12  BY MR. GENTILE:
13     Q    Go ahead, Ms. Arreguin, and take a look at
14  Exhibit 2, please.  Let me know when you're finished.
15          And just for the record, that document,
16  Exhibit 2, is World Lending Group, Inc., Mortgage Loan
17  Originator Employment Agreement.  That's marked as
18  Exhibit 2.
19          Let me know when you're finished reviewing --
20     A    I am.
21     Q    -- the document.
22          And you've looked at it, correct?
23     A    I've looked at it.
24     Q    Have you ever seen Exhibit 2 before?
25     A    You know, my signature is on there, so I must

37

1    have seen it.  But did I understand it?  Probably not.

2         Q    Let me ask you something.  Going back -- we're

3    looking at Exhibit 2.  I think you went to page -- or

4    the final page of the document, which is Bates-stamped

5    as GEL025.  Do you see that?

6         A    Yes.

7         Q    Okay.  Now, I think you indicated that this is

8    your signature on the document --

9         A    Yes.

10         Q    -- correct?

11         A    Yes.

12         Q    And it looks like it's dated 7/19/02?

13         A    Yes.

14         Q    And I assume that -- it says "Print Name," and

15    it's "Dolores Arreguin" --

16         A    Uh-huh.

17         Q    -- correct?

18         A    Yes.

19         Q    All right.  So it's fair to say that you

20    signed the document?

21         A    It's fair to say that I probably signed this

22    document.

23         Q    Okay.  And on July 19th, 2002?

24         A    It's dated.

25         Q    All right.  And this is for World Lending

38

1    Group, Inc., correct?

2         A    Correct.

3         Q    And what was your understanding -- back up

4    here.  How did you come to sign Exhibit 2?

5         A    I can't recall how -- I can't recall how we

6    did this.  Whether it was downloaded, whether it was

7    given to us, I don't even know.

8         Q    Okay.  Let me back up here.  When you say

9    "we," you're using the plural.

10        A    Me, me.

11        Q    All right.  You.

12        A    I do not know how I would have got ahold of

13   this document.  Whether it was downloaded, whether it

14   was given to me, whether it was sent to me, I don't

15   recall.

16        Q    Okay.  And at the time you signed this

17   document, July 2002, were you still working for World

18   Financial Group?

19        A    I -- no.

20        Q    Just so I understand, that's the securities

21   insurance entity.

22        A    The answer would be no, I'm sure I wasn't.

23        Q    You were not?

24        A    I don't believe I was.

25        Q    Okay.  Where were you living at the time you

39

DOLORES A. ARREGUIN                        05/12/08

1      A      According to the company, that's my
2   appointment date.
3      Q      Okay.  And you said you got some kind of an
4   approval letter?
5      A      I believe I did.
6      Q      Do you remember when you got that, ma'am?
7      A      7/29.
8      Q      Okay.  So you signed the contract with World
9   Lending Group on 7/19/02?
10     A      But you're not officially appointed until you
11  get an appointment letter.  That means they have gone
12  through background and did some stuff.
13     Q      They check you out?
14     A      Check you out.
15     Q      All right.  And then on or around July 29,
16  2002, you got some kind of approval letter where they
17  checked you out?  You did all the stuff you needed to
18  do.  I think you were talking earlier about this stuff
19  right here.
20     A      Right.
21     Q      This is the --
22     A      Right, right.
23     Q      We can look at that in a bit.  This is the
24  employment history document that was produced, et
25  cetera.  It has all the information.

42

DOLORES A. ARREGUIN                    05/12/08

```
1        A    It all went together.  It looks like it's all ...
2    manual.
3        Q    Then you basically filled out all of those
4    forms --
5        A    Send the money.
6        Q    -- send the money, submit it to the entity,
7    right, and then you get the approval letter?
8        A    Right.
9        Q    That's how it worked?
10       A    I believe that's how it worked.
11       Q    What I want to do is go back here.  Tell me
12   how you obtained Exhibit 2.
13       A    I can't recall.  I can't recall.
14       Q    Okay.  You don't recall if you obtained it
15   through the mail?
16       A    Exactly.
17       Q    You don't recall if you --
18       A    If someone handed it to me.
19       Q    You don't recall that either?
20       A    I don't.
21       Q    You don't recall if you got it on a computer?
22       A    I don't.
23       Q    But in any event, it ended up coming into your
24   hands?
25       A    Right.
```

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

DOLORES A. ARREGUIN                          05/12/08

1      Q    Did you ask for it or was it just given to

2    you?

3      A    You know, I wish I could remember if someone

4    actually walked me through and hired me, but I don't

5    recall anybody doing that to me.

6      Q    So it's fair to say you don't recall the

7    mechanics?

8      A    I don't recall the little details of that.  I

9    don't.  I'm sorry.

10     Q    But at some point at least, either on or

11   before July 19, 2002, you did obtain Exhibit 2, right?

12   You had to, because you signed it.

13     A    I signed it.  I had to receive it at some time

14   around 7/19.

15     Q    All right.  And you don't recall who gave it

16   to you?

17     A    I don't.

18     Q    You don't recall how you obtained it?

19     A    I don't.

20     Q    What did you do when you got Exhibit 2?

21     A    You just filled all the stuff out and sent the

22   money.

23     Q    Okay.

24     A    That's it.

25     Q    But you filled out all the forms.  And maybe

                                                          44

1    we can go through this if you want.  Maybe you can take

2    a look at these documents right here -- there's a stack

3    of them here -- and tell me what forms.  We're going to

4    put Exhibit 2 aside for a second, Mrs. -- Ms. Arreguin.

5    I apologize.

6         A    Dolores.

7         Q    If you can go through those documents that

8    I've handed to you and just tell me -- just pull out

9    those documents that you believe you filled out in

10   concert with Exhibit 2.

11        A    There you go.  This says "World Leadership

12   Group," signed 7/19/02.  So why they put my date of

13   April, I don't know, in World Leadership Group.  This

14   one says 7/19/02, so that would be wrong.

15        Q    I just want you to go through those documents

16   and pull out those documents that you had to complete.

17        A    I'm going to guess that everything that says

18   "World Leadership Group" and "World Lending Group" was a

19   package.  It seems to me, it would have been.

20        Q    Have you pulled out all the documents,

21   Ms. Arreguin?

22        A    I don't know who this is, this lady that

23   signed the document on the same day I signed it because

24   there was no World Leadership Group people around me --

25        Q    Okay.

45

1    A    -- unless it was faxed and they signed it that

2  same day, but I don't know who that person is.  I don't

3  recognize her.  She's not part of -- I'm going to assume

4  that this is the package, the hiring packet.  I don't

5  know, though.

6    Q    Okay.  I understand that.  I'm just asking you

7  to pull out the documents that you believe you completed

8  in order to get your pre-approval letter.

9    A    I don't know.  You know, I recognize this.  I

10  recognize my signature.

11        MR. AIN:  Pull out the ones you think were

12  from that date.

13        THE WITNESS:  Okay.  I don't know about this.

14        MR. AIN:  This one?

15        THE WITNESS:  I don't know about those, if

16  they were part of this.  I just can only go by my

17  signature.

18        MR. AIN:  Let's keep them in order.

19        THE WITNESS:  Okay.  I can only go by my

20  signature.

21        MR. AIN:  And this one -- presuming the one

22  that begins 12 through 16?

23        THE WITNESS:  12 through 16.  Whoever

24  recruited me was AA1411.  There's your person.  Carlton

25  Enloe probably was the man who recruited me and had me

46

1    sign all this stuff.

2    BY MR. GENTILE:

3        Q    I'm sorry.  What is his name?

4            MR. AIN:  Go ahead and answer his name.

5            THE WITNESS:  AA1411 had to be Carlton Enloe.

6    BY MR. GENTILE:

7        Q    Carlton Enloe?

8        A    My guess, because he's the recruiter ID, right

9    there.  He would have given me all this.  There you go.

10   I don't even think it was downloaded.  He probably just

11   handed me everything.

12       Q    All I want you to do right now, Ms. Arreguin,

13   is just pull out those documents that you believe you

14   had to complete in order to get your approval letter.

15           MR. AIN:  This one -- I presume what she's

16   trying to do here is anything that's labeled July 19th

17   of '02, which would be 12 through 16 --

18           This one, correct?

19           THE WITNESS:  Right.

20           MR. AIN:  This one looks like it's from that

21   date.

22           THE WITNESS:  Uh-huh.

23           MR. AIN:  Let's keep them in order.  Bates

24   stamp 10, that looks like it's from that date.

25           THE WITNESS:  Uh-huh.

47

1          MR. AIN:  This?

2          THE WITNESS:  Yeah, correct.

3          MR. AIN:  This is pretty much all of them,

4     Counsel.  This too, yeah.

5          MR. GENTILE:  Why don't we just put them in a

6     nice little stack there.

7          MR. AIN:  Yes.  I think also -- let me make

8     sure.  Okay.  I'll keep the agreements together.  But

9     these all look like they are from that date.

10    BY MR. GENTILE:

11        Q    So what I'm going to hand you, then, are all

12    these documents that I'm going to mark as a group

13    exhibit to the deposition.

14        A    Okay.

15        Q    All of those documents that you have in your

16    hand, which we're going to mark as a group exhibit

17    to -- it's going to be marked as Exhibit 3, would have

18    been documents that you would have had to have completed

19    in order to get your pre-approval letter in order to go

20    to work for World Lending Group, Inc., right?

21        A    I believe so.

22        MR. GENTILE:  Okay.  Let's have her mark

23    those, please.

24        MR. AIN:  Do you want me to put them --

25        MR. GENTILE:  You do what you've got to do.

48

1    It's okay.

2              MR. AIN:  I'm just going to move the ones that

3    are -- that's Bates-stamped 7 through 34.

4              MR. GENTILE:  Okay.

5              MR. AIN:  7 through 34.

6              MR. GENTILE:  I'll give that to the court

7    reporter and she'll mark them.

8              MR. AIN:  Sure.

9              (Deposition Exhibit 3 marked.)

10   BY MR. GENTILE:

11        Q    All right.  In any event, Exhibit 3 -- you

12   signed several of the documents in Exhibit 3, and those

13   were documents that ultimately you had to complete?

14        A    Yes.

15        Q    All right.  Now, then you said on or about

16   July 29th, you received a pre-approval letter -- or an

17   approval letter?

18        A    An appointment letter.

19        Q    An appointment letter.

20        A    Appointment letter.

21        Q    Let me show you -- we'll mark this next in

22   order.  We may as well get this done now.

23              That's going to be Ms. Arreguin's declaration

24   in support of opposition to motion to dismiss.  I think

25   this was dated February 14th, 2008.

49

DOLORES A. ARREGUIN                           05/12/08

1        Q    Okay.

2        A    I was told I had to join under him.

3        Q    Okay.

4        A    And I didn't know him.

5        Q    Would he have been your up --

6        A    He would have been considered my director.

7        Q    Okay.  I understand.  So he basically was, for

8    lack of a better term, a recruiter?

9        A    Yes.

10       Q    Did he give you the documents that we've

11   marked as Exhibit 3 in order for you to execute them?

12       A    I would say he would be the most likely to

13   give me, but I don't know.  I didn't work very long

14   under him.

15       Q    All right.  I'm not interested in that right

16   now.  Would it also be fair to say that Mr. Enloe also

17   gave you what we've marked as Exhibit 2, the World

18   Lending Group agreement?

19       A    He could have, yes.

20       Q    It sounds consistent, right?

21       A    It would be a package, I would assume.

22       Q    And do you have any recollection,

23   Ms. Arreguin, when he gave those documents to you?

24       A    7/19/02.

25       Q    Okay.  Is that a firm date for you?  You know

51

1    that for sure?

2         A     I signed it on that date.

3         Q     Okay.

4         A     That's when I received it, obviously.

5         Q     Okay.  Could you have received it earlier?

6         A     I couldn't recollect that at all.

7         Q     You can't recollect?

8         A     No.

9         Q     So you could have received it earlier?

10        A     He might have said "come in and sign

11   everything out," and I did it that day.

12        Q     Do you have any recollection of what Mr. Enloe

13   told you about these documents?

14        A     Nothing.

15        Q     Okay.  You don't have a recollection?

16        A     I don't have a recollection.

17        Q     Okay.  And when you got the documents, you

18   signed them, right?

19        A     I would have just filled it out.

20        Q     You would fill it out?

21        A     To go to work.

22        Q     Now, going to Exhibit 2, which is the World

23   Lending Group mortgage loan originator employment

24   agreement, you understood that, when you signed this

25   document, Exhibit 2, it was a contract?

                                                          52

1    work for the company, I had to join World Leadership

2    Group.  That wasn't an option.  So we weren't given

3    options.  You know, do you want to look at it?  Do you

4    agree with it?  Do you have a question about it?  Do you

5    have a problem with it?  I don't think that was ever

6    given to us.

7         Q    Did you take the time at all to look at any of

8    the paragraphs in Exhibit 2?

9         A    I think the way everyone said was, "There's

10   nothing in this contract that's any different than any

11   other contract you ever signed."

12        Q    Do you recall that being said to you?

13        A    No, but it was said quite a bit out there.

14        Q    Okay.  Well, what I want to know is, with

15   respect to Exhibit 2, were you told not to read it?

16        A    Only if he was rushing me through the process,

17   and that happened also.

18        Q    Do you recall that he rushed you through the

19   process?

20        A    I don't recall how we signed it.

21        Q    So you can tell me right now you don't recall

22   the circumstances of you signing --

23        A    That is true.

24        Q    -- Exhibit 2?

25        A    That is true.

54

1    Q    You just recall signing it?

2    A    I recall filling it out and signing it, but I

3    don't recall the conditions.

4    Q    Okay.  When you say "the conditions," the

5    conditions of your signing it, correct?

6    A    Yes.

7    Q    But in any event, you'll agree with me that

8    Exhibit 2 was not provided to you vis-a-vis the

9    computer, it was handed to you, more than likely, by

10   Mr. Enloe?

11   A    Because it's handwritten, I'm assuming it was

12   handed to me.  It's a handwritten thing.

13   Q    Okay.  Now, one second, Ms. Arreguin.  Maybe I

14   asked this question before.  But when you worked for --

15   when you were working for World Financial Group selling

16   securities and insurance, did you sign a similar

17   contract to Exhibit 2?

18   A    I cannot say I did or I didn't because it's

19   too many years ago.

20   Q    Okay.

21   A    I have no idea.

22   Q    It's a fair statement.

23   A    Yeah.

24   Q    Given the fact we're talking six to seven

25   years ago, you don't have a firm recollection?

55

1        A      When they changed the name.

2        Q      All right.

3        A      There was a big battle between World Savings

4   and World Leadership Group over the name -- World

5   Lending Group.  It was a big, big deal, lawsuit.  And I

6   don't know what happened.  My understanding -- this is

7   the story they told us, that World Savings actually lost

8   that, but we're going to change our name anyway.

9        Q      But in any event -- I'm just trying to

10  understand, ma'am -- World Lending Group, Inc., then

11  became Global Equity Lending, Inc.?

12       A      Yes.

13       Q      Same company, though, right?

14       A      Yes.

15       Q      It basically changed the name, at least in

16  your mind, right?

17       A      In my mind.

18       Q      All right.  So when you went to work for World

19  Lending Group, Inc., you worked for them until about

20  2003, correct?

21       A      Yes.

22       Q      And then you ended up working for Global

23  Equity Lending, Inc.?

24       A      The name changed.

25       Q      The name changed.  So basically the same

58

1    companies?

2         A    Yes.

3         Q    Okay.  Did you sign any agreement at all for

4    Global Equity Lending, Inc., when the name changed?

5         A    I couldn't tell you when or where or how, but

6    I can only say that, throughout the whole entire

7    process, they would shoot something on your Web site and

8    it would say "the new agreement," "the new terms and

9    condition," "the new policy."  Whatever it was that came

10   on your computer as you logged in, if you didn't sign

11   "yes," you would not get in.  So at what time they

12   changed the contract or agreement or a policy or term

13   and condition?  I mean, at the end, they were sending me

14   all kinds of stuff that I just didn't even agree with.

15   I couldn't even sign them anymore.

16        Q    This is 2003, right?

17        A    During the whole process.

18        Q    All right.  I just want to back up.  After

19   2003, you started working for Global Equity Lending?

20        A    The name changed.

21        Q    Okay.  The name changed.  And you don't have a

22   recollection of your signing an agreement with Global

23   Equity -- let me finish now.  You're anticipating.

24   That's okay.  We all do that.  But you don't have a

25   recollection around 2003 of signing an agreement with

59

```
 1   Global Equity Lending, Inc.?

 2        A    I do not.

 3        Q    But you said that occasionally you would see

 4   things pop up on your computer, correct?

 5        A    Exactly.

 6        Q    Were you given -- let me ask you something.

 7             Were you given any kind of password or

 8   anything in order to get into the Global Equity -- or

 9   World Lending Group, Inc., or Global Equity Lending,

10   Inc., sites?

11        A    We were all given a code number.

12        Q    A code number.  What did the code number do?

13        A    It identified you as that person with a

14   password.

15        Q    So it allowed you to get into the site.  Do

16   you remember what your code number is?

17        A    AF0099, because I -- yes, Air Force 0099.

18   Great number.  I was retired from the air force.

19        Q    AF0099.  Let me make sure I got that right

20   here.  What is it?  AF --

21        A    Air Force 0099.

22        Q    So that way, you would never forget?

23        A    Yeah.  That was a good one for me.

24        Q    And you were assigned that --

25        A    Code number.
```

                                                              60

1  paid?

2      A    Then they started charging you -- I think it

3  was $75 a year to keep your membership --

4      Q    Okay.

5      A    -- even though you were supposed to be an

6  employee.

7      Q    Okay.

8      A    That's when a lot of people started dropping

9  out.  Forget it.

10     Q    I'm trying to understand now.  At least from

11 your testimony, your association begins with World

12 Lending Group in 2002, July, and it continues to when

13 you -- through the name change to Global Equity Lending,

14 correct?

15     A    Right.

16     Q    And then ends -- I believe it's in around

17 2007, when you leave that business; is that right?

18     A    I believe I resigned, July.

19     Q    You resigned.

20     A    Something like that.

21     Q    And periodically would you have to re-sign

22 documents?

23     A    For what?

24     Q    To maintain your relationship with Global

25 Equity Lending.

1          A       -- how I did this whole package.

2          Q       Okay.  So you could have reviewed it, but you

3     just don't have a recollection?

4          A       I don't have a recollection.

5          Q       Do you know what an arbitration clause is?

6          A       Well, if you have some differences, you

7     arbitrate.

8          Q       Okay.  Did you -- was that your understanding

9     of what an arbitration clause was in July 2002?

10         A       No, I --

11         Q       You had a different understanding?

12         A       I had no understanding of arbitration.

13         Q       Okay.

14         A       I've never had an arbitration problem, I don't

15    think, that we had to arbitrate.

16         Q       You never went to arbitration?

17         A       Right.

18         Q       All right.  You ever own a home?

19         A       Yes.

20         Q       Did you go through the process of buying a

21    home --

22         A       Yes.

23         Q       -- through a real estate agent?

24         A       Yes.

25         Q       Were you ever given an option to check an

68

1    MR. GENTILE:  Oh, yes.

2    (Record read as follows:

3     "Question:  And had your real estate

4    agent ever explained to you what an

5    arbitration clause was?")

6    THE WITNESS:  No, I don't recall --

7 BY MR. GENTILE:

8  Q All right.

9  A -- that being a topic of conversation when we

10 were buying.  In fact, we actually bought the property,

11 and then -- from a realtor, and then built a house, so

12 there was no -- that I recall --

13  Q Okay.  Understood.

14  A -- conversation about that.

15  Q All right.  Now, if you look at Exhibit 2,

16 Bates-stamped document GEL023, what I'm going to look at

17 there is a paragraph 7.1.

18    You see that it says "Arbitration of

19 Grievances"?  Do you see that?

20  A Uh-huh.

21  Q Okay.  You can say yes or no.

22  A Yes.  I'm sorry.

23  Q All right.  From what you're telling me, is

24 you never reviewed this part of the contract before you

25 signed it?

70

1      A    Let me just read it for one second.

2      Q    Sure.

3      A    Well, I'm a little confused on this.  It says,

4  "The parties agree that, except as specifically provided

5  to the contrary in this Agreement, any controversy,

6  claim or dispute arising out of or relating to this

7  Agreement between the Loan Originator, on the one part,

8  and WLG" -- so what does that mean?  Oh, this is the

9  World Lending Group?

10     Q    Right, it's World Lending Group.  That's what

11  I'm asking you.

12     A    Okay.  Did I recall that?

13     Q    Yeah.

14     A    I don't recall specifically looking at any of

15  these paragraphs --

16     Q    Okay.

17     A    -- or concentrating on them.

18     Q    So you just didn't pay attention to it; is

19  that right?

20     A    It might have been, in the moment, maybe

21  someone was talking to me while I was signing.  You

22  know, "Get this done so we can get your number right

23  away."  You know, I don't know.

24     Q    And likewise, I think if you turn the page,

25  where it says -- paragraph 11, it says "Governing Law."

71

1    It says, "The enforcement of this Agreement shall be

2    governed by the laws of the State of Georgia and venue

3    shall be in Cobb County or Gwinnett County Superior

4    Court; State of Georgia."  Do you see that, ma'am?

5         A     Yeah.  I have no knowledge of that,

6    specifically anyone pointing that out to me or that that

7    might make a difference.

8         Q     Okay.  I understand that.  I think if we look

9    at what we've marked as Exhibit A --

10             MR. AIN:  1.

11   BY MR. GENTILE:

12        Q     -- or 1 -- I'm sorry -- that has, also, an

13   arbitration provision in 7.1.  Do you see that?  I think

14   that's Bates-stamped 004.

15        A     Yes.

16        Q     You see that, correct?

17        A     I see it.

18        Q     All right.  Do you see Section 11, in that

19   same document, where it says "Governing Law"?

20        A     Uh-huh, right.

21        Q     Okay.

22        A     I see it now.

23        Q     All right.  I understand your testimony is you

24   never saw this on 4/2/02?

25        A     No.

72

1    Q    Okay.  But you'll note that the language

2  between the two agreements are the same?

3    A    They look the same, yes.

4    Q    And looking at Exhibit 2 -- I just want to

5  make sure for the record we have it clear -- at the last

6  page of Exhibit 2, Ms. Arreguin, Bates-stamped GEL00 --

7  I'm sorry -- 025 --

8         MR. AIN:  Bless you.

9         MR. GENTILE:   Thank you.

10   Q    -- you see where it says "You must check the

11  following acknowledgments to continue"?  Do you see

12  that?

13   A    Uh-huh.

14   Q    You checked those?

15   A    I'm sure I did.

16   Q    Those are your check marks, correct?

17   A    I'm sure I did.

18   Q    Okay.  And do you recall when you were

19  assigned the ID AF0099?

20   A    Probably 7/29.

21   Q    Okay.  And you used --

22   A    I don't know.  I don't know.

23   Q    You used that continuously, though, right?

24   A    Yes.

25   Q    When was the first time that you closed a

73

1    director of HR.

2        Q    Who executed your appointment letter that's

3    attached to Exhibit 4?

4        A    Do I have one there?  I do.  Andy Woodman.  He

5    was the president.

6        Q    Okay.

7        A    I knew him real well.  President of World

8    Lending Group.

9        Q    If we look at -- I want to pull out some --

10   there is a document here.  I'm not going to pull it out,

11   but let's just take a look.  In our packet of documents

12   that's marked as Exhibit 3, there is a document that

13   begins with Bates stamp GEL012.  I want you to take a

14   look at that, please.

15       A    Okay.

16       Q    Just let me know when you're done looking at

17   it.  I want to make sure you're familiar with the

18   document.

19       A    Okay.

20       Q    And that document is called "World Leadership

21   Group, Inc., Associate Membership Agreement."  Do you

22   see that?

23       A    Yes, I do.

24       Q    Okay.  And how did you come to get the World

25   Leadership Group, Inc., Associate Membership Agreement?

80

```
 1        A    I have no idea.  You know, again, maybe it was
 2   given to me, because it's signed the same date as the
 3   World Lending Group.  So my start date on this would
 4   have also been 7/19/02.  I didn't recognize that.
 5   Because they always had me in the computer as starting
 6   World Leadership Group in April.  But this doesn't say
 7   that, does it?
 8        Q    Now, if you look at what has been
 9   Bates-stamped as GEL016 -- and counsel will help you
10   locate that --
11        A    Okay.
12        Q    -- that's page 5 of the World Leadership
13   Group, Inc., Associate Membership Agreement, correct?
14        A    Right.
15        Q    I assume that's your name, Dolores Arreguin --
16        A    Uh-huh.
17        Q    -- that's printed there, correct?
18        A    Yes.
19        Q    Did you print that?
20        A    It seems so, yes.
21        Q    Is that your signature?
22        A    It seems so, yes.
23        Q    And it's dated July 19th, 2002?
24        A    Right.
25        Q    And you don't recall how you came to get this
```

**EXHIBIT C**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

DELORES A. ARREGUIN, for
herself and other members
of the general public
similarly situated,

Plaintiff,

vs.                                                 Case No. C 07 6026

GLOBAL EQUITY LENDING,
INC., a Georgia
Corporation, and DOES 1
through 10, Inclusive,

Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~

# DEPOSITION OF

## ERIC DAVID PENNINGTON

May 13, 2008
2:54 p.m.

Suite 200
2475 Northwinds Parkway
Alpharetta, Georgia

Valerie N. Almand, RPR, CRR, CCR-B-531

HAND RECEIVED
RMKB SJ OFFICE
Matter #_____

MAY 29 2008

CALENDARED_____ FILED BY_____
CORR _____ PLDG      DISC 11:30
OTHER

Eric David Pennington                                    May 13, 2008

2

1                  A P P E A R A N C E S   O F   C O U N S E L

2       On behalf of the Plaintiff (via

3       videoconference):

4            LAW OFFICES OF HERBERT HAFIF, APC

5            FARRIS E. AIN, Esquire

6            269 West Bonita Avenue

7            Claremont, California 91711

8            909.624.1671

9            farris.ain@hafif.com

10      On behalf of the Defendants (via

11      videoconference):

12           ROPERS, MAJESKI, KOHN & BENTLEY, PC

13           GREGORY M. GENTILE, Esquire

14           80 North 1st Street

15           San Jose, California  95113

16           408.287.6262

17           ggentile@ropers.com

18           MERRITT & TENNEY, LLP

19           WILLIAM H. McCLEAN, Esquire

20           Suite 500

21           200 Galleria Parkway

22           Atlanta, Georgia  30339

23           770.952.6650

24           770.952.0028 (facsimile)

25           wmclean@merritt-tenney.com

Eric David Pennington                              May 13, 2008

51

1        MR. GENTILE:  Okay.

2        (Recess.)

3    Q.  (By Mr. Ain)  Eric, do you have any

4    knowledge with regard to Ms. Arreguin's

5    review and signing of the employment

6    agreement that we've been referring to as the

7    wet signature?

8    A.  I do not have any personal knowledge

9    of Ms. Arreguin's signing of the document.

10       Q.  And just a follow-up question just

11   to be clear:  You don't have any knowledge of

12   any facts surrounding the circumstance under

13   which she signed this agreement where she was

14   and who she was with.

15       A.  I do not.

16       Q.  Okay.  And as far as the electronic

17   signature, you do not know which document she

18   would have reviewed and accepted during her

19   application process in April of 2002 to July

20   of 2002, if any.

21       A.  The process described by Ms. Croteau

22   is an accurate process.  What I can't do is

23   just say that that was the exact process on

24   April 8th of 2002, for example.  But she

25   describes a process accurately, and it was on

Eric David Pennington                          May 13, 2008

52

1    or about the time period in question.

2        Q.  Do you have any specific knowledge

3    with regard to the application process that

4    Ms. Arreguin went through?

5        A.  I do know that --

6        Q.  Specifically whether -- go ahead.

7        A.  I do know that Ms. Arreguin

8    electronically signed a contract.

9        Q.  Do you know what contract that is?

10       A.  No.  On the technical side what we

11   have is a date down to the millisecond that

12   the contract was accepted.  It would then be

13   the responsibility of our client to say,

14   "Here's the contract that existed on that

15   date."

16       Q.  Okay.  Now, do you also understand

17   that what was produced without an electronic

18   signature on it is not the correct contract,

19   GEL -- we're referring to GEL 001 through

20   006?

21       A.  I don't have any personal knowledge

22   on how this was produced, who produced it and

23   the accuracy of this document.

24       Q.  But it is your belief that such an

25   employment agreement would have existed in

**EXHIBIT D**



Certified Copy

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

DELORES A. ARREGUIN, for
herself and other members
of the general public
similarly situated,

        Plaintiff,

  vs.                          Case No. C 07 6026

GLOBAL EQUITY LENDING,
INC., a Georgia
Corporation, and DOES 1
through 10, Inclusive,

        Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~

## DEPOSITION OF

## SANDRA CROTEAU

May 13, 2008
1:55 p.m.

Suite 200
2475 Northwinds Parkway
Alpharetta, Georgia

Valerie N. Almand, RPR, CRR, CCR-B-531

HAND RECEIVED
RMKB SJ OFFICE
Matter # _____

MAY 29 2008

CALENDARED _____
CORR _____   FILED BY _____
OTHER _____   PLDG _____   DISC _____

Sandra Croteau                                          May 13, 2008

2

1                    APPEARANCES OF COUNSEL

2    On behalf of the Plaintiff (via
3    videoconference):
4         LAW OFFICES OF HERBERT HAFIF, APC
5         FARRIS E. AIN, Esquire
6         269 West Bonita Avenue
7         Claremont, California 91711
8         909.624.1671
9         farris.ain@hafif.com

10   On behalf of the Defendants (via
11   videoconference):
12        ROPERS, MAJESKI, KOHN & BENTLEY, PC
13        GREGORY M. GENTILE, Esquire
14        80 North 1st Street
15        San Jose, California  95113
16        408.287.6262
17        ggentile@ropers.com

18        MERRITT & TENNEY, LLP
19        WILLIAM H. McCLEAN, Esquire
20        Suite 500
21        200 Galleria Parkway
22        Atlanta, Georgia  30339
23        770.952.6650
24        770.952.0028 (facsimile)
25        wmclean@merritt-tenney.com

Sandra Croteau                                    May 13, 2008

42

1    Q.  (By Mr. Ain)  Sandra, at the time in

2    April of 2002 who was the employer?  Would it

3    have been World Equity Lending or would it

4    have been World Lending Group?

5    A.  World Lending Group was the name of

6    the company, when I came in in 2003.  And,

7    again, we changed our name to Global Equity

8    Lending.

9    Q.  Okay.  Now, looking at this document

10   do you know why Global Equity Lending is

11   written there at the top of that page if the

12   company name didn't change until after 2003?

13   A.  How we keep our electronic

14   signatures, this was -- obviously it was an

15   error.  The Global Equity Lending agreement

16   should have been World Lending Group

17   agreement.  This was clearly an error.

18         I thought this was the earliest

19   version of the document, since I came in at

20   2003, and that's the document that we had

21   sent over.

22   Q.  Okay.  Okay.  Now, this document, is

23   this how it would have been retrieved with

24   Dolores Arreguin's printed name on it and

25   dated 2002?

54

1    went on to Page 2 as described in this

2    particular paragraph; do you?

3        A.    I believe this is the application

4    question page, and that may be in question at

5    that time in 2002.  We may not have had that

6    up there.

7        Q.    Do you have any specific knowledge

8    of whether Dolores went through this

9    application process that you described in

10   these paragraphs that I had you read, or was

11   that just simply based on what the process

12   was in January of '03?

13       A.    Well, what I have is the report

14   showing me that she electronically signed the

15   agreement, which means she would have gone

16   through and clicked off A through D on Page

17   10 of her agreement by the report that I got

18   that she started the sign-up in April of

19   2002.

20       Q.    And when you say the agreement,

21   which agreement are you referring to?  Is

22   that the one that we were -- that was

23   attached to your Exhibit A of your

24   declaration as what we have now described as

25   GEL 1 through 6?

Sandra Croteau                                     May 13, 2008

55

1          MR. GENTILE:  Or otherwise known as

2     Global Equity Lending, Inc. Mortgage

3     Loan Originator Employment Agreement,

4     correct?

5          A.  Could you ask that question again

6  now that I have it in front of me, please?

7          (Whereupon, the record was read by

8     the reporter as requested.)

9          A.  As we talked about, that was not the

10  correct agreement.  I thought at the time it

11  was, but it was not.

12          Q.  Okay.  Can I draw your attention to

13  document GEL 21 through 25 again?

14          Sandra, this is the correct

15  agreement for that time frame of when Dolores

16  was applying for a job; do you agree with

17  that?

18          A.  Yes.

19          MR. GENTILE:  I'm going to just make

20     sure we have -- let's make sure we have

21     a clear record here.

22          When you're talking about the

23     agreement you're talking about the World

24     Lending Group, Inc. Mortgage Loan

25     Originator Employment Agreement Bates

Sandra Croteau                                      May 13, 2008

56

1       stamped GEL 021 through 025, is that
2       correct, Mr. Ain?
3              MR. AIN:  Correct.
4              MR. GENTILE:  Okay.  I just want to
5       make sure we're all on the same page
6       here.
7              Q.  (By Mr. Ain)  Sandra, this document
8       was physically signed July 19th, 2002.  And I
9       want to ask you now, are you sure that
10      Dolores would have went through the
11      application process on the Internet as you
12      described in your declaration or is it
13      possible that this document was physically
14      provided to her, signed and sent back, as
15      opposed to clicking a submit on the website
16      the way things are today?
17             MR. GENTILE:  I'm going to object as
18             vague and ambiguous and ask you to break
19             it down.  That's compound.  Please.
20             MR. AIN:  Okay, fair enough.
21             Q.  Sandra, is it possible that Dolores
22      did not check the "I agree" on the website
23      when she was applying for a job and actually
24      was provided with this document to physically
25      sign?  If you could answer.

P A U L S O N

Sandra Croteau                                          May 13, 2008

57

1        A.  I don't believe it could be possible

2   because we wouldn't have been able to

3   register her date and signature if she did

4   not click that "I accept" on line.

5             But obviously I was not there

6   physically to see her do it, so I'm not sure

7   what you're asking me.

8        Q.  Do you know whether Dolores was

9   provided with an application packet by an

10  individual of the name of Carl Inlow?

11       A.  I have no knowledge of that.  I

12  don't know.

13       Q.  Okay.  Let me take a quick

14  two-minute break and I think I'm done.

15            (Recess.)

16       Q.  Sandra, is there anything else that

17  you left out that you know about Delores's

18  application process that she went through

19  back in July of 2002?

20       A.  I can't think of anything.

21            MR. GENTILE:  Object, vague and

22       ambiguous.

23       Q.  Go ahead and answer.

24       A.  I can't think of anything.

25       Q.  Other than what you've provided in

**EXHIBIT E**

# Global Equity Lending, Inc.
## Mortgage Loan Originator Employment Agreement

This Mortgage Loan Originator Employment Agreement ("Agreement"), made and entered into effective as of the date of execution by the parties hereto, is by and between Global Equity Lending, Inc., a Georgia corporation (hereinafter "GEL"), and the undersigned individual (hereinafter "Loan Originator"):

# RECITALS

WHEREAS, GEL is engaged in the activity of originating loans evidenced by notes ("Notes") and secured by mortgages ("Mortgages") on real property (hereinafter the Mortgages and Notes are collectively referred to as "Loans") for mortgage lenders and is desirous of employing Loan Originator to obtain and prepare loan applications and other materials from prospective borrowers ("Applicants");

WHEREAS, Loan Originator is desirous of becoming employed by GEL to assist GEL in obtaining and preparing loan applications and other materials from Applicants;

NOW, THEREFORE, in consideration of mutual promises of and benefits to be derived by the parties GEL, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, GEL hereby agrees to employ Loan Originator, and Loan Originator hereby agrees to be employed by GEL, subject to the following terms and conditions:

1. **Loan Originator's Duties, Responsibilities, Limitations on Authority.**

   1.1    Generally. Loan Originator shall use his or her best efforts to originate real estate loans on GEL's behalf by contacting the public and members of the real estate profession. All originations shall be done in a prudent manner and shall conform to the standards required by GEL as well as all state, federal and local regulations and statutes. In particular, Loan Originator covenants that he or she shall comply with the Federal Equal Credit Opportunity Act and its Regulation B, the Fair Housing Act, the Home Mortgage Disclosure Act and its Regulation C, the Federal Truth-in-Lending Act and Regulation Z, and the Real Estate Settlement Procedures Act and its Regulation X. Loan Originator understands and agrees that Loan Originator has an obligation to all Applicants to ensure that Applicants are fully advised of the various loan options available to them prior to obtaining and submitting an application to GEL. Loan Originator shall counsel each Applicant by analyzing the Applicant's income and debt and pre-qualifying the Applicant to determine what the Applicant can afford; consulting with the Applicant about home financing, including advising Applicant about different loan products, closing costs, and monthly payments; assisting in collecting from Applicant financial information (including tax returns and bank statements) necessary for the application process; maintaining regular contact with Applicant, GEL and others between the time the application is submitted to GEL and the loan closing in order to apprise Applicant of the status of the application and to gather any additional information as needed. As to all applications which are accepted for processing, Loan Originator voluntarily agrees to complete the application (including taking information from Applicants and assisting Applicants in filling out the application), submit the application to GEL, and assist in attaining such supplementary information as may be requested of Loan Originator by the processing agent in the event the Applicant does not respond to the processing agent's information requests in a timely manner. Loan Originator will only utilize the E-MAPsm and E-1003sm loan origination tools and pipeline reporting tools (Collectively the Mortgage Closing System) to submit applications, track activities relating to applications, and communicate the status of the applications.

   1.2    Compliance With GEL Rules and Guidelines. The Loan Originator agrees to comply with all rules and guidelines set forth in the Mortgage Loan Originator Agreement Rules and Guidelines ("Rules and Guidelines") and other written policies, instructions and procedures, either now existing or as issued from time to time by GEL, which by this reference are made part of this Agreement. The Rules and Guidelines are those rules and guidelines published in writing from time to time by GEL to its Loan Officers containing certain additional requirements imposed on GEL Loan Officers as part of their contractual relationship with GEL and other matters affecting GEL Loan Officers. GEL also publishes policies and procedures of GEL and the operational rules and regulations required by the various regulatory agencies.

EXHIBIT: 1
WITNESS: Aragon
DATE: 5/12/08
Kathy Nelson, CSR #9796

GEL-001

1.3    Business Cards. Advertising. Loan Originator shall have the authority to represent through business cards, announcements, or other documents, that Loan Originator is an employee of GEL performing mortgage loan origination services. GEL will provide such advertising and promotional materials as it deems appropriate. Loan Originator shall not engage in any additional advertising or use any marketing materials that are not approved in advance and shall submit such advertising or marketing materials to GEL for approval before circulating them to the public. Due to Branch Office registration requirements in several states, only cell phone numbers, ESA numbers, etc. may be used on any personalized advertising you may request.

1.4    Other Contractual Affiliations. Subject to the provisions of this Paragraph 1.4, Loan Originator may engage in other business activities to the extent such other activities do not interfere or conflict with Loan Originator's employment duties hereunder. Notwithstanding the foregoing, during the term of this Agreement, Neither Loan Originator nor any of Loan Originator's immediate family shall not, except with respect to Exempt Business Activities (as defined in Section 5.4 hereof), if any: i) be associated with, be a representative of, or enter into a contractual agreement of any kind with any other mortgage brokerage or mortgage banking firm; ii) maintain any mortgage broker license; or iii) originate any real estate loans except on behalf of GEL unless specifically approved in writing by GEL. Loan Originator or any of Loan Originator's immediate family members agrees to immediately notify GEL in writing if Loan Originator acquires or obtains any interest in or affiliation with any other mortgage brokerage or mortgage banking firm, or engages in any employment relating to the origination of real estate loans, either directly or indirectly, whether alone or with any person or entity other than GEL. Loan Originator shall immediately notify GEL if Loan Originator becomes involved in any activity that would create the possibility of a conflict of interest on the part of Loan Originator with respect to GEL or any services offered by or on behalf of GEL.

1.5    No Other Authority. Except as set forth in this Paragraph 1, Loan Originator shall not have any authority, and shall under no circumstances hold himself or herself out to any person as having any authority, to represent or obligate GEL in any manner. Loan Originator shall not contact Investors, Lenders, Mortgage Insurers, State regulators, or Federal regulators in the conduct of their GEL activities.

2.    Compensation. For all services to be rendered hereunder, Loan Originator shall be paid on a commission basis only, in the amounts and at the times set forth on GEL's published commission schedules as amended from time to time. Loan Originator's compensation shall be paid in accordance with GEL's normal commission payroll practices in effect from time to time and shall be reported on Federal form W-2 as employee compensation, subject to FICA, FUTA, and income tax withholding as required by federal, state, and local laws. Loan Originator agrees that, where required by law, he or she shall disclose to customers all the fees that Loan Originator will be paid for services rendered in connection with this Agreement in a form approved by GEL and in accordance with state and federal regulations. GEL shall, in its sole and absolute discretion, have the right to change, modify, alter, or decrease any commissions payable pursuant to this Agreement; provided, however, that any changes, modifications, alterations, or decreases shall be effective only on a prospective basis. Except as set forth above, Loan Originator shall not be entitled to receive any other compensation or benefits from GEL of any kind or nature.

3.    Term and Termination. This Agreement shall commence on the date of execution of this Agreement and shall continue until it is terminated in accordance with the provisions hereof. This written Agreement is terminable at will by either party upon advance written notice of seven (7) days. This Agreement shall also terminate by operation of law or upon the death or disability of Loan Originator. Upon termination of this Agreement, except as otherwise provided hereunder and except as to commissions earned by Loan Originator prior to the effective date of termination, which shall be paid by GEL to Loan Originator within a reasonable period of time, the parties shall have no further rights or obligations with respect to each other. GEL may terminate this Agreement immediately if Loan Originator breaches any of the requirements contained in sections 1.1, 1.2, 4, 5, 6.1, 6.2, 6.3, 6.4, or 13.

4.    Loan Applications. Programs. GEL, in its sole discretion, may reject any application for reasons of its own business convenience, and nothing herein shall be construed to require the processing of any loan application presented by Loan Originator. GEL shall have the sole discretion of determining what loan programs it will offer and what Loans it will make. All Loans shall be closed in the name of GEL or such other names as GEL shall determine.

5.    Representations. Loan Originator agrees that at all times during the term of this Agreement that Loan Originator shall devote such time and effort as are necessary to faithfully perform to the best of Loan Originator's ability Loan Originator's duties and responsibilities hereunder. Loan Originator specifically represents to GEL that by entering into this Agreement, Loan Originator does not and will not conflict with or violate any other agreement or understanding to which the Loan Originator is a party, or any law, regulation, or order, including but not limited to any disciplinary orders or requirements of any regulatory agency to which the Loan Originator is subject. Loan Originator agrees that Loan Originator is and will

continue to be in compliance with all applicable state and federal laws, rules and regulations governing the business contemplated by this Agreement. Loan Originator will comply with the state laws concerning mortgage originations in the states where Loan Originator solicits applications. Loan Originator acknowledges that GEL maintains links to law summaries and on its web site and affirmatively confirms Loan Originator's duty to know and understand these laws.

6.   **Covenants.**

   6.1   **General.** Loan Originator acknowledges and agrees that GEL is the owner of the rights to all Applicants placing Loans through GEL, and that these Applicants comprise a substantial part of the goodwill of GEL. To protect the business and goodwill of GEL and all confidential information belonging to GEL, the parties have agreed to a limited period of non-competition, non-solicitation, and to a nondisclosure of confidential information following termination of this Agreement. Such limitations relate solely to the business of GEL, and to GEL's Applicants, however, and are not intended to prevent Loan Originator from rendering mortgage origination services, if Loan Originator so desires.

   6.2   **Non-Competition.** Upon termination of this Agreement, Loan Originator agrees that for a period of one (1) year following such termination Loan Originator will not, without the written consent of GEL, directly or indirectly solicit or accept loan applications from, or perform any of the services Loan Originator performed within the scope of this Agreement for, any Applicant or GEL employee (other than Loan Originator's Exempt Persons as hereinafter defined) with whom Loan Originator had personal contact or established a business relationship during the term of this Agreement. Exempt Persons shall consist of: (i) any persons, identified by name and city and state of residence, and with respect to whom Loan Originator provides written documentation as of the date of execution of this Agreement establishing that such persons are existing customers of Loan Originator, and (ii) any persons, identified by name and city and state of residence, and with respect to whom Loan Originator provides written documentation as of the date of execution of this Agreement establishing that such persons are contractually affiliated with Loan Originator, and who thereafter become Loan Originators of GEL within thirty (30) days from the date of this Agreement.

   6.3   **Confidential and Proprietary Information.** Loan Originator acknowledges that, in the course of Loan Originator's employment with GEL pursuant to this Agreement, Loan Originator will become acquainted with confidential information belonging to GEL. This information relates to persons, firms, and corporations that are or may become customers, financing entities, or accounts of GEL during the term of this Agreement; this provision includes the names of all customers, lenders, rates, and requirements. Loan Originator will not, without the written consent of GEL, disclose or make any use of such confidential information. All Loans placed and all GEL records of Applicants or of any company business, whether prepared by Loan Originator during the term of this Agreement or otherwise coming into Loan Originator's possession and control, shall remain and be the exclusive property of GEL and be surrendered to GEL upon termination of this Agreement. Loan applications, files, forms and other documentation procured during the term of this Agreement are the property of GEL and shall not be removed from the present premises or control of GEL without its express written consent. Any such loan application, files, or documents, shall be surrendered to GEL immediately upon the termination of this Agreement.

   6.4   **Organizing Competitive Business/Soliciting GEL Loan Originators or Employees.** Except for an Exempt Business Activity, Loan Originator agrees that during the term of this Agreement, Loan Originator will not directly or indirectly undertake the planning or organizing of any business activity competitive with the work Loan Originator performs as an employee pursuant to the terms of this Agreement. Loan Originator agrees that Loan Originator will not, for a period of two (2) years following termination of this Agreement, directly or indirectly, solicit any of GEL's independent contractors, loan officers or employees, with whom Loan Originator during the term of this Agreement had personal contact (but excluding any of Loan Originator's Exempt Persons) to work for Loan Originator or any other competitive company. "Exempt Business Activity" shall mean any business activity with respect to which Loan Originator provides written documentation as of the date of execution of this Agreement establishing that Loan Originator is already engaged in such business activity, and that, to the reasonable satisfaction of GEL, in such business activity Loan Originator does not originate the types of Loans offered by GEL.

   6.5   **Indemnification.** Loan Originator shall indemnify GEL for and hold it harmless from and against any and all claims, losses, liabilities, damages, taxes, penalties, fines, forfeitures, reasonable legal fees and expenses, judgments, and other costs and expenses that GEL may sustain arising from any claim, demand, defense or assertion based on or grounded upon, or resulting from a breach of any representation, warranty, or covenant by Loan Originator under this Agreement. This indemnity shall survive the termination of this Agreement.

7.   **Arbitration of Grievances.**

7.1    General. The Parties agree that, except as specifically provided to the contrary in this Agreement, any controversy, claim or dispute arising out of or relating to this Agreement ("Grievance"), between the Loan Originator, on the one part, and GEL and/or any of its officers and employees, or any of them, on the other part shall be resolved exclusively by arbitration in accordance with this Paragraph 7. For purposes of this Paragraph 7, the terms "Party" and "Parties" include GEL, the Loan Originator and other officers and employees of GEL. All Grievances, unresolved in the normal course of business, to the extent that any Party wishes to pursue the matter further, shall be resolved by arbitration in accordance with the Commercial Arbitration Rules ("Rules") of the American Arbitration Association then in effect, except that, or in addition to such Rules: I) in order to assure neutrality and impartiality of the arbitrator(s), and to preserve the confidentiality of proprietary information, the arbitrator(s) shall not be any present or past owner, officer, director, employee, consultant, contractor, agent, attorney or other representative of any mortgage company, mortgage broker, mortgage banker, or of any affiliate of any of them; II) the locale where the arbitration shall be held is the principal business location of GEL in Norcross, Georgia; III) a transcript shall be made on the proceeding; and IV) the arbitrator's(s') award shall state their findings of fact and conclusions of law. The award, including such findings and conclusions may be reviewed, vacated, modified or corrected upon application or petition of any Party brought within thirty (30) days after the date of the award, by a court of competent jurisdiction, provided that in addition to the grounds stated in the United States Arbitration Code, 9 U.S.C. § 1, and following, or in any other applicable law or statute, the court may also vacate, modify or correct the award if the conclusions of law are contrary to law, or if the findings of fact are not supported by the facts (as determined by whether there was any pertinent and material evidence to support the findings). Otherwise, or in compliance with the court's review, the decision of the arbitrator(s) shall be final and binding. Judgment upon the award rendered by the arbitrator(s), or judgment upon the award as reviewed by the court, may be entered in any court having jurisdiction thereof.

7.2    Waiver of Litigation. The Parties acknowledge and agree that they are engaged in, and that this Agreement evidences transactions involving interstate commerce and that, except as specifically provided to the contrary in this Agreement, this Paragraph 7 is and shall be the Parties' exclusive remedy for any Grievance arising out of or relating to this Agreement, or the breach thereof. Except as specifically provided to the contrary in this Agreement, the Parties expressly waive the right to litigate in a judicial forum all Grievances and waive the right to trial by jury. The Parties further agree that the findings of fact issued by the arbitrator(s), as reviewed, if applicable, shall be binding on them in any subsequent arbitration, litigation or other proceeding.

7.3    No Condition Precedent to Action and Power of Arbitrators. Anything herein or elsewhere contained to the contrary notwithstanding, GEL shall not be required to negotiate, arbitrate or litigate as a condition precedent to taking any action under this Agreement. The Parties expressly authorize the Arbitrator(s) to fashion and award any type of remedy that could be awarded by a court, including such equitable or extraordinary remedies as temporary and permanent injunctive relief.

7.4    Extraordinary Relief. The Parties agree that GEL has the right to seek preliminary and temporary restraining orders, injunctions and other extraordinary relief (such orders, injunctions and other relief referred to as "Extraordinary Relief") under Paragraph 6 of this Agreement without complying with this Paragraph 7. Without limitation, the Parties agree that the requirements for good faith arbitration under this Paragraph 7 do not preclude GEL from seeking in an arbitral or in a judicial forum, or in both, Extraordinary Relief to protect its rights under Paragraph 6 of this Agreement. This Paragraph 7 shall not be deemed to preclude or narrow the judicial or arbitral powers regarding Extraordinary Relief.

8.    Assignment. This Agreement may be assigned by GEL in the event of a bona fide sale or transfer of ownership or control of the business to another person or entity; provided however, that the assignee shall assume all obligations of GEL herein, in which case GEL shall be released of any further liability to the Loan Originator hereunder. The personal character and skill of the Loan Originator are a material inducement to GEL to enter into this Agreement, and any attempt by Loan Originator to assign this Agreement or to assign any rights (including the right to receive commissions) which Loan Originator may have hereunder shall be null and void, and such attempt to assignment shall be considered a repudiation and termination of this Agreement by Loan Originator.

9.    Amendment. This is the entire Agreement of the parties and any amendment or modification thereof shall be in writing and signed by both parties. This Agreement is binding upon the parties, their heirs and assigns.

10.    Waiver. The waiver by GEL of any breach or default by Loan Originator shall not operate or be construed as waiver of any subsequent breach or default by Loan Originator.

2

11.    Governing Law. The enforcement of this Agreement shall be governed by the laws of the State of Georgia and venue shall be in Cobb County or Gwinnett County Superior Court, State of Georgia.

12.    Severability. The provisions of this Agreement are severable, and if one or more provisions thereof are found to be unenforceable in whole or in part, the remaining provisions and any partially enforceable provisions will nevertheless be binding and enforceable to the full extent of the law.

13.    Fiduciary Obligation / Consequences of Loan Fraud. Loan Originator acknowledges that GEL, as a licensed mortgage lender/broker, may bear the responsibility to third parties for all actions of its employees. Loan Originator hereby acknowledges and agrees that Loan Originator is responsible for the content and quality of each application taken and each Loan submitted to GEL. Loan Originator understands that the submission of a loan application containing false information is a crime and that loan fraud includes, but is not limited to submission of inaccurate information, including false statements on loan application(s) and falsification of documents purporting to substantiate credit, employment, deposit and asset information, personal information including identity, ownership/non-ownership of real property; forgery of partially or predominantly accurate information; incorrect statements regarding current occupancy or intent to maintain minimum occupancy as stated in the security instrument; lack of due diligence by Loan Originator, including failure to obtain all information required by the application and failure to request further information as dictated by borrower's response to other questions; unquestioned acceptance of information or documentation which is known, should be known, or should be suspected to be inaccurate; simultaneous or consecutive processing of multiple owner occupied loans from one applicant supplying different information on each application; allowing an applicant or interested third-party to "assist" with the processing of the loan; Loan Originator's non-disclosure of relevant information. Loan Originator acknowledges that fraudulent loans cannot be sold into the secondary market and, if sold, will require repurchase by GEL and fraudulent loans damage GEL's contractual agreements with its investors and mortgage insurance providers. If Loan Originator participates in loan fraud of any kind, the following is a list of a few of the potential consequences that may result to Loan Originator: criminal prosecution; immediate termination of this Agreement; loss of lender access due to exchange of information between lenders, mortgage insurance companies, including submission of information to Investors (FHLMC/FNMA), police agencies, and the Department of Financial Institutions; civil action by GEL; civil action by applicant/borrower or other parties to the transaction.

14.    New Employee Training Certification Fee. As part of the application process, I acknowledge that I will pay a $125.00 training certification fee. This fee is payable by credit card (Visa, Master Card, American Express, or Discover) to Global Equity Lending, Inc. I acknowledge and understand that this fee is non-refundable. I acknowledge and understand that I am responsible for any additional state licensing/registration fees, if any. I acknowledge and understand that I am responsible for fees pertaining to pre-licensing training, education and continuing education.

15.    Previous Agreements. This Agreement supersedes any and all previous agreements between the parties hereto.

IN WITNESS WHEREOF, the parties have executed this Agreement by affixing their signatures thereto.

### New Loan Originator's Acknowledgements

You must check the following acknowledgments to continue:

☒    A.    My becoming an employee of Global Equity Lending will not violate the terms of or interfere with any contract, agreement or business relationship that I have or have had with any third party, including without limitation, World Financial Group, Inc..

☒    B.    Upon becoming an employee of Global Equity Lending, I will not engage in any business practice or behavior, nor will I take any action, which will result in any violation of any restrictions or covenants to which I am subject pursuant to any agreement to which I was previously a party, including, without limitation, any agreement with World Financial Group, Inc.

☒    C.    Global Equity Lending, its officers, directors, shareholders and employees have not induced me in any way whatsoever to terminate any contract, agreement or business relationship that I presently have or have had with any third party, including without limitation, any agreement with World Financial Group, Inc.

☒    D.    I understand that these acknowledgments constitute a part of my Global Equity Lending, Inc., Mortgage Loan Originator Employment Agreement to which I am bound and are material representations upon which Global Equity Lending shall rely in its acceptance of my Mortgage Loan Originator Employment Agreement.

**Printed Name: Dolores Arreguin**

**Date: 4/2/2002 3:07:51 PM**

By typing my full name and clicking "I Accept" below I signify my acceptance of the Global Equity Lending New Loan Originator's Acknowledgments.

GEL-006

**EXHIBIT F**



EXHIBIT: 3
WITNESS: _Arreguin_
DATE: _5/12/08_
Kathy Nelson, CSR #9796

# WORLD LENDING GROUP, INC.
## MORTGAGE LOAN ORIGINATOR EMPLOYMENT AGREEMENT

This Mortgage Loan Originator Employment Agreement ("Agreement"), made and entered into effective as of the date of execution by the parties hereto, is by and between World Lending Group, Inc., a Georgia corporation (hereinafter "WLG"), and the undersigned individual (hereinafter "Loan Originator");

### RECITALS

WHEREAS, WLG is engaged in the activity of originating loans evidenced by notes ("Notes") and secured by mortgages ("Mortgages") on real property (hereinafter the Mortgages and Notes are collectively referred to as "Loans") for mortgage lenders and is desirous of employing Loan Originator to obtain and prepare loan applications and other materials from prospective borrowers ("Applicants");

WHEREAS, Loan Originator is desirous of becoming employed by WLG to assist WLG in obtaining and preparing loan applications and other materials from Applicants;

NOW, THEREFORE, in consideration of mutual promises of and benefits to be derived by the parties WLG, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, WLG hereby agrees to employ Loan Originator, and Loan Originator hereby agrees to be employed by WLG, subject to the following terms and conditions:

1. **Loan Originator's Duties, Responsibilities, Limitations on Authority.**

   1.1 **Generally.** Loan Originator shall use his or her best efforts to originate real estate loans on WLG's behalf by contacting the public and members of the real estate profession. All originations shall be done in a prudent manner and shall conform to the standards required by WLG as well as all state, federal and local regulations and statutes. In particular, Loan Originator covenants that he or she shall comply with the Federal Equal Credit Opportunity Act and its Regulation B, the Fair Housing Act, the Home Mortgage Disclosure Act and its Regulation C, the Federal Truth-in-Lending Act and Regulation Z, and the Real Estate Settlement Procedures Act and its Regulation X. Loan Originator understands and agrees that Loan Originator has an obligation to all Applicants to ensure that Applicants are fully advised of the various loan options available to them prior to obtaining and submitting an application to WLG. Loan Originator shall counsel each Applicant by analyzing the Applicant's income and debt and pre-qualifying the Applicant to determine what the Applicant can afford; consulting with the Applicant about home financing, including advising Applicant about different loan products, closing costs, and monthly payments; assisting in collecting from Applicant financial information (including tax returns and bank statements) necessary for the application process; maintaining regular contact with Applicant, WLG and others between the time the application is submitted to WLG and the loan closing in order to apprise Applicant of the status of the application and to gather any additional information as needed. As to all applications which are accepted for processing, Loan Originator voluntarily agrees to complete the application (including taking information from Applicants and assisting Applicants in filling out the application), submit the application to WLG, and assist in attaining such supplementary information as may be requested of Loan Originator by the processing agent in the event the Applicant does not respond to the processing agent's information requests in a timely manner.

   1.2 **Compliance With WLG Rules and Guidelines.** The Loan Originator agrees to comply with all rules and guidelines set forth in the Mortgage Loan Originator Agreement Rules and Guidelines ("Rules and Guidelines") and other written policies, instructions and procedures, either now existing or as issued from time to time by WLG, which by this reference are made part of this Agreement. The Rules and Guidelines are those rules and guidelines published in writing from time to time by WLG to its Loan Officers containing certain additional requirements imposed on WLG Loan Officers as part of their contractual relationship with WLG and other matters affecting WLG Loan Officers. WLG also publishes policies and procedures of WLG and the operational rules and regulations required by the various regulatory agencies.

   1.3 **Business Cards, Advertising.** Loan Originator shall have the authority to represent through business cards, announcements, or other documents, that Loan Originator is an employee of WLG performing mortgage loan origination services. WLG will provide such advertising and promotional materials as it deems appropriate. Loan Originator shall not engage in any additional advertising or use any marketing materials that are not approved in advance shall first submit such advertising or marketing materials to WLG for approval before circulating them to the public.

1.4 <u>Other Contractual Affiliations.</u> Subject to the provisions of this Paragraph 1.4, Loan Originator may engage in other business activities to the extent such other activities do not interfere or conflict with Loan Originator's employment duties hereunder. Notwithstanding the foregoing, during the term of this Agreement, Loan Originator shall not, except with respect to Exempt Business Activities (as defined in Section 6.4 hereof), if any: i) be associated with, be a representative of, or enter into a contractual agreement of any kind with any other mortgage brokerage or mortgage banking firm; ii) maintain any mortgage broker license; or iii) originate any real estate loans except on behalf of WLG. Loan Originator agrees to immediately notify WLG in writing if Loan Originator acquires or obtains any interest in or affiliation with any other mortgage brokerage or mortgage banking firm, or engages in any employment relating to the origination of real estate loans, either directly or indirectly, whether alone or with any person or entity other than WLG. Loan Originator shall immediately notify WLG if Loan Originator becomes involved in any activity that would create the possibility of a conflict of interest on the part of Loan Originator with respect to WLG or any services offered by or on behalf of WLG.

1.5 <u>No Other Authority.</u> Except as set forth in this Paragraph 1, Loan Originator shall not have any authority, and shall under no circumstances hold himself or herself out to any person as having any authority, to represent or obligate WLG in any manner.

2. <u>Compensation.</u> For all services to be rendered hereunder, Loan Originator shall be paid on a commission basis only, in the amounts and at the times set forth on WLG's published commission schedules as amended from time to time. Loan Originator's compensation shall be paid in accordance with WLG's normal commission payroll practices in effect from time to time and shall be reported on Federal form W-2 as employee compensation, subject to FICA, FUTA, and income tax withholding as required by federal, state, and local laws. Loan Originator agrees that, where required by law, he or she shall disclose to customers all the fees that Loan Originator will be paid for services rendered in connection with this Agreement in a form approved by WLG and in accordance with state and federal regulations. WLG shall, in its sole and absolute discretion, have the right to change, modify, alter, or decrease any commissions payable pursuant to this Agreement; provided, however, that any changes, modifications, alterations, or decreases shall be effective only on a prospective basis. Except as set forth above, Loan Originator shall not be entitled to receive any other compensation or benefits from WLG of any kind or nature.

3. <u>Term and Termination.</u> This Agreement shall commence on the date of execution of this Agreement and shall continue until it is terminated in accordance with the provisions hereof. This written Agreement is terminable at will by either party upon advance written notice of seven (7) days. This Agreement shall also terminate by operation of law or upon the death or disability of Loan Originator. Upon termination of this Agreement, except as otherwise provided hereunder and except as to commissions earned by Loan Originator prior to the effective date of termination, which shall be paid by WLG to Loan Originator within a reasonable period of time, the parties shall have no further rights or obligations with respect to each other.

4. <u>Loan Applications, Programs.</u> WLG, in its sole discretion, may reject any application for reasons of its own business convenience, and nothing herein shall be construed to require the processing of any loan application presented by Loan Originator. WLG shall have the sole discretion of determining what loan programs it will offer and what Loans it will make. All Loans shall be closed in the name of WLG or such other names as WLG shall determine.

5. <u>Representations.</u> Loan Originator agrees that at all times during the term of this Agreement that Loan Originator shall devote such time and effort as are necessary to faithfully perform to the best of Loan Originator's ability Loan Originator's duties and responsibilities hereunder. Loan Originator specifically represents to WLG that by entering into this Agreement, Loan Originator does not and will not conflict with or violate any other agreement or understanding to which the Loan Originator is a party, or any law, regulation, or order, including but not limited to any disciplinary orders or requirements of any regulatory agency to which the Loan Originator is subject. Loan Originator agrees that Loan Originator is and will continue to be in compliance with all applicable state and federal laws, rules and regulations governing the business contemplated by this Agreement.

6. <u>Covenants.</u>

6.1 <u>General.</u> Loan Originator acknowledges and agrees that WLG is the owner of the rights to all Applicants placing Loans through WLG, and that these Applicants comprise a substantial part of the goodwill of WLG. To protect the business and goodwill of WLG and all confidential information belonging to WLG, the parties have agreed to a limited period of non-competition, non-solicitation, and to a nondisclosure of confidential information following termination of this Agreement. Such limitations relate solely to the business of WLG, and to WLG's Applicants, however, and are not

GEL-022

intended to prevent Loan Originator from rendering mortgage origination services, if Loan Originator so desires.

6.2 Non-Competition. Upon termination of this Agreement, Loan Originator agrees that for a period of one (1) year following such termination Loan Originator will not, without the written consent of WLG, directly or indirectly solicit or accept loan applications from, or perform any of the services Loan Originator performed within the scope of this Agreement for, any Applicant or WLG employee (other than Loan Originator's Exempt Persons as hereinafter defined) with whom Loan Originator had personal contact or established a business relationship during the term of this Agreement. Exempt Persons shall consist of: (i) any persons, identified by name and city and state of residence, and with respect to whom Loan Originator provides written documentation as of the date of execution of this Agreement establishing that such persons are existing customers of Loan Originator, and (ii) any persons, identified by name and city and state of residence, and with respect to whom Loan Originator provides written documentation as of the date of execution of this Agreement establishing that such persons are contractually affiliated with Loan Originator, and who thereafter become Loan Originators of WLG within thirty (30) days from the date of this Agreement.

6.3 Confidential and Proprietary Information. Loan Originator acknowledges that, in the course of Loan Originator's employment with WLG pursuant to this Agreement, Loan Originator will become acquainted with confidential information belonging to WLG. This information relates to persons, firms, and corporations that are or may become customers, financing entities, or accounts of WLG during the term of this Agreement; this provision includes the names of all customers, lenders, rates, and requirements. Loan Originator will not, without the written consent of WLG, disclose or make any use of such confidential information. All Loans placed and all WLG records of Applicants or of any company business, whether prepared by Loan Originator during the term of this Agreement or otherwise coming into Loan Originator's possession and control, shall remain and be the exclusive property of WLG and be surrendered to WLG upon termination of this Agreement. Loan applications, files, forms and other documentation procured during the term of this Agreement are the property of WLG and shall not be removed from the present premises or control of WLG without its express written consent. Any such loan application, files, or documents, shall be surrendered to WLG immediately upon the termination of this Agreement.

6.4 Organizing Competitive Business/Soliciting WLG Originators or Employees. Except for an Exempt Business Activity, Loan Originator agrees that during the term of this Agreement, Loan Originator will not directly or indirectly undertake the planning or organizing of any business activity competitive with the work Loan Originator performs as an employee pursuant to the terms of this Agreement. Loan Originator agrees that Loan Originator will not, for a period of two (2) years following termination of this Agreement, directly or indirectly, solicit any of WLG's independent contractors, loan officers or employees, with whom Loan Originator during the term of this Agreement had personal contact (but excluding any of Loan Originator's Exempt Persons) to work for Loan Originator or any other competitive company. "Exempt Business Activity" shall mean any business activity with respect to which Loan Originator provides written documentation as of the date of execution of this Agreement establishing that Loan Originator is already engaged in such business activity, and that, to the reasonable satisfaction of WLG, in such business activity Loan Originator does not originate the types of Loans offered by WLG.

6.5 Indemnification. Loan Originator shall indemnify WLG for and hold it harmless from and against any and all claims, losses, liabilities, damages, taxes, penalties, fines, forfeitures, reasonable legal fees and expenses, judgments, and other costs and expenses that WLG may sustain arising and/or resulting from any claim, demand, defense or assertion based on or grounded upon, or resulting from a breach of any representation, warranty, or covenant by Loan Originator under this Agreement. This indemnity shall survive the termination of this Agreement.

7. Arbitration of Grievances.

7.1 General. The Parties agree that, except as specifically provided to the contrary in this Agreement, any controversy, claim or dispute arising out of or relating to this Agreement ("Grievance"), between the Loan Originator, on the one part, and WLG and/or any of its officers and employees, or any of them, on the other part shall be resolved exclusively by arbitration in accordance with this Paragraph 7. For purposes of this Paragraph 7, the terms "Party" and "Parties" include WLG, the Loan Originator and other officers and employees of WLG. All Grievances, unresolved in the normal course of business, to the extent that any Party wishes to pursue the matter further, shall be resolved by arbitration in accordance with the Commercial Arbitration Rules ("Rules") of the American Arbitration Association then in effect, except that, or in addition to such Rules: i) in order to assure neutrality and impartiality of the arbitrator(s), and to preserve the confidentiality of proprietary information, the arbitrator(s) shall not be any present or past owner, officer, director, employee, consultant, contractor, agent, attorney or other representative of any mortgage company, mortgage broker, mortgage banker, or of any affiliate of any of them; ii) the locale where the arbitration shall be held is the principal business location of WLG in Norcross, Georgia; iii) a transcript shall be made on the proceeding; and iv) the

arbitrator's(s') award shall state their findings of fact and conclusions of law. The award, including such findings and conclusions may be reviewed, vacated, modified or corrected upon application or petition of any Party brought within thirty (30) days after the date of the award, by a court of competent jurisdiction, provided that in addition to the grounds stated in the United States Arbitration Code, 9 U.S.C. § 1, and following, or in any other applicable law or statute, the court may also vacate, modify or correct the award if the conclusions of law are contrary to law, or if the findings of fact are not supported by the facts (as determined by whether there was any pertinent and material evidence to support the findings). Otherwise, or in compliance with the court's review, the decision of the arbitrator(s) shall be final and binding. Judgment upon the award rendered by the arbitrator(s), or judgment upon the award as reviewed by the court, may be entered in any court having jurisdiction thereof.

    7.2  Waiver of Litigation. The Parties acknowledge and agree that they are engaged in, and that this Agreement evidences transactions involving, interstate commerce and that, except as specifically provided to the contrary in this Agreement, this Paragraph 7 is and shall be the Parties' exclusive remedy for any Grievance arising out of or relating to this Agreement, or the breach thereof. Except as specifically provided to the contrary in this Agreement, the Parties expressly waive the right to litigate in a judicial forum all Grievances and waive the right to trial by jury. The Parties further agree that the findings of fact issued by the arbitrator(s), as reviewed, if applicable, shall be binding on them in any subsequent arbitration, litigation or other proceeding.

    7.3  No Condition Precedent to Action and Power of Arbitrators. Anything herein or elsewhere contained to the contrary notwithstanding, WLG shall not be required to negotiate, arbitrate or litigate as a condition precedent to taking any action under this Agreement. The Parties expressly authorize the Arbitrator(s) to fashion and award any type of remedy that could be awarded by a court, including such equitable or extraordinary remedies as temporary and permanent injunctive relief.

    7.4  Extraordinary Relief. The Parties agree that WLG has the right to seek preliminary and temporary restraining orders, injunctions and other extraordinary relief (such orders, injunctions and other relief referred to as "Extraordinary Relief") under Paragraph 6 of this Agreement without complying with this Paragraph 7. Without limitation, the Parties agree that the requirements for good faith arbitration under this Paragraph 7 do not preclude WLG from seeking in an arbitral or in a judicial forum, or in both, Extraordinary Relief to protect its rights under Paragraph 6 of this Agreement. This Paragraph 7 shall not be deemed to preclude or narrow the judicial or arbitral powers regarding Extraordinary Relief.

    8.  Assignment. This Agreement may be assigned by WLG in the event of a bona fide sale or transfer of ownership or control of the business to another person or entity; provided however, that the assignee shall assume all obligations of WLG herein, in which case WLG shall be released of any further liability to the Loan Originator hereunder. The personal character and skill of the Loan Originator are a material inducement to WLG to enter into this Agreement, and any attempt by Loan Originator to assign this Agreement or to assign any rights (including the right to receive commissions) which Loan Originator may have hereunder shall be null and void, and such attempt to assignment shall be considered a repudiation and termination of this Agreement by Loan Originator.

    9.  Amendment. This is the entire Agreement of the parties and any amendment or modification thereof shall be in writing and signed by both parties. This Agreement is binding upon the parties, their heirs and assigns.

    10.  Waiver. The waiver by WLG of any breach or default by Loan Originator shall not operate or be construed as waiver of any subsequent breach or default by Loan Originator.

    11.  Governing Law. The enforcement of this Agreement shall be governed by the laws of the State of Georgia and venue shall be in Cobb County or Gwinnett County Superior Court, State of Georgia.

    12.  Severability. The provisions of this Agreement are severable, and if one or more provisions thereof are found to be unenforceable in whole or in part, the remaining provisions and any partially enforceable provisions will nevertheless be binding and enforceable to the full extent of the law.

    13.  Fiduciary Obligation. Loan Originator acknowledges that WLG, as a licensed mortgage lender/broker, may bear the responsibility to third parties for all actions of its employees. Loan Originator hereby acknowledges and agrees that Loan Originator is responsible for the content and quality of each application taken and each Loan submitted to WLG. Loan Originator understands that the submission of a loan application containing false information is a crime and that loan fraud includes, but is not limited to submission of inaccurate information, including false statements on loan

**3**

application(s) and falsification of documents purporting to substantiate credit, employment, deposit and asset information, personal information including identity, ownership/non-ownership of real property; forgery of partially or predominantly accurate information; incorrect statements regarding current occupancy or intent to maintain minimum occupancy as stated in the security instrument; lack of due diligence by Loan Originator, including failure to obtain all information required by the application and failure to request further information as dictated by borrower's response to other questions; unquestioned acceptance of information or documentation which is known, should be known, or should be suspected to be inaccurate; simultaneous or consecutive processing of multiple owner occupied loans from one applicant supplying different information on each application; allowing an applicant or interested third-party to "assist" with the processing of the loan; Loan Originator's non-disclosure of relevant information. Loan Originator acknowledges that fraudulent loans cannot be sold into the secondary market and, if sold, will require repurchase by WLG and fraudulent loans damage WLG's contractual agreements with its investors and mortgage insurance providers. If Loan Originator participates in loan fraud of any kind, the following is a list of a few of the potential consequences that may result to Loan Originator: criminal prosecution; immediate termination of this Agreement; loss of lender access due to exchange of information between lenders, mortgage insurance companies, including submission of information to investors (FHLMC/FNMA), police agencies, and the Department of Financial Institutions; civil action by WLG; civil action by applicant/borrower or other parties to the transaction.

    14.  <u>Previous Agreements</u>. This Agreement supersedes any and all previous agreements between the parties hereto.

    IN WITNESS WHEREOF, the parties have executed this Agreement by affixing their signatures thereto.

New Loan Originator's Acknowledgments

You must check the following acknowledgments to continue:

*    A.    My becoming an employee of World Lending Group will not violate the terms of or interfere with any contract, agreement or business relationship that I have or have had with any third party, including without limitation, World Financial Group, Inc..

*    B.    Upon becoming an employee of World Lending Group, I will not engage in any business practice or behavior, nor will I take any action, which will result in any violation of any restrictions or covenants to which I am subject pursuant to any agreement to which I was previously a party, including, without limitation, any agreement with World Financial Group, Inc.

*    C.    World Lending Group, its officers, directors, shareholders and employees have not induced me in any way whatsoever to terminate any contract, agreement or business relationship that I presently have or have had with any third party, including without limitation, any agreement with World Financial Group, Inc.

*    D.    I understand that these acknowledgments constitute a part of my World Lending Group, Inc., Mortgage Loan Originator Employment Agreement to which I am bound and are material representations upon which World Lending Group shall rely in its acceptance of my Mortgage Loan Originator Employment Agreement.

ASSOCIATE:                          WORLD LENDING GROUP, INC.

*Delores Arregui*                      By: _____
Print Name

_____
Signature

Date: 7-19-02

**EXHIBIT G**

# WORLD LEADERSHIP GROUP, INC.
## Associate Membership Agreement

**THIS AGREEMENT** is made by and between **WORLD LEADERSHIP GROUP, INC.** (hereinafter referred to as "WLG"), and the undersigned individual (hereinafter referred to as the "Associate").

**WHEREAS**, the Associate desires to become a member of WLG's sales force (hereinafter referred to as "World Leadership Group" and further defined herein) which will be composed of a group of individuals ("members") who enter into agreements with WLG pursuant to which they become authorized to engage in the business of selling Products and Services offered by WLG; and

**WHEREAS**, WLG has established a contractual relationship with one or more companies (collectively, the "Preferred Companies", or individually, a "Preferred Company") authorizing WLG or the members of "World Leadership Group" to market and sell various Products and Services and to recommend and designate members of "World Leadership Group" for appointment with the Preferred Companies as independent sales representatives with respect to such various Products and Services; and

**WHEREAS**, WLG is continually recruiting new members to "World Leadership Group" and desires to have the Associate become a member of "World Leadership Group" by entering into a written agreement with the Associate which establishes and defines the terms and conditions of the Associate's membership in "World Leadership Group";

**NOW, THEREFORE**, in consideration of the premises, the mutual promises and covenants in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, and intending to be legally bound hereby, WLG and the Associate agree as follows:

## I. Membership in "World Leadership Group"

The Associate hereby agrees to become a member of "World Leadership Group" and to abide by the terms and conditions of membership as hereinafter set forth in this Agreement.

## II. Associate's Duties As A Member

A. As a member of "World Leadership Group" the Associate promises that he/she will do the following:

1. Use his/her best efforts to sell and promote the sale of the Products and Services;
2. Preserve the good name and reputation of "World Leadership Group" and WLG and not do anything that will damage the name and reputation of "World Leadership Group" or WLG;
3. Comply with all rules and guidelines set forth in the Associate Agreement Rules and Guidelines and other instructions and procedures, either now existing or as issued from time to time by WLG.
4. Comply with all of the terms and conditions of any contract(s) into which Associate enters with WLG, the Preferred Companies, or any companies with which WLG is or may hereafter become affiliated, directly, indirectly, through common ownership, by contractual agreement, or otherwise ("WLG Affiliated Companies"). For purposes of this Agreement, any reference hereinafter made to WLG shall be deemed to constitute a reference to all of the WLG Affiliated Companies;
5. Participate in the training that will be provided to "World Leadership Group";
6. Refrain from selling or soliciting for sale any Products and Services of a Preferred Company until the Associate receives written notice from WLG or the Preferred Company that the Associate has been approved to market such Products and Services; and
7. Execute such further agreements and obtain such licenses that WLG determines to be required for the Associate to be lawfully authorized to sell any of the Products and Services.

B. The Associate understands and acknowledges that WLG is in the business of building "World Leadership Group" to provide Products and Services to the consuming public and "World Leadership Group" is a valuable asset of WLG. The Associate acknowledges that WLG owns all rights in and to the following: (i) "World Leadership Group", which, for purposes of this Section II.B., includes all persons (other than the Associate's Exempt Persons) who have in force independent contractor agreements with WLG and all such agreements; (ii) the identities of and all lists of the members comprising "World Leadership Group"; and (iii) the identities of and all lists of the customers (other than the Associate's Exempt Persons) produced by "World Leadership Group" ("Customers") (even though the Associate may not have recruited any of the members or produced any of the Customers) which constitute property owned solely by WLG. Except as to the Associate's Exempt Persons, Associate agrees that Associate shall have no proprietary interest in, or ownership of, any Customers, other Associates of WLG including Downline Associates, or Products or Services. WLG shall have exclusive proprietary interest in, or ownership, of all Customers, and contractual relationships with other Associates and the Preferred Companies.

C. As a member of "World Leadership Group", the Associate is not an employee of WLG or "World Leadership Group". Instead, the Associate's relationship with WLG is that of an independent contractor. Nothing in this Agreement shall be construed to constitute the Associate as a partner, employee or agent of WLG, nor shall WLG, the Preferred Companies or the Associate have any authority, except as expressly provided herein, to bind the other; it being the intention that each shall remain an independent contractor responsible for his/her own actions. Subject to all applicable local, state and federal laws and regulations, this Agreement, Associate Agreement Guidelines, Rules, and other instructions and procedures published by WLG, and any contract(s) between the Associate and the Preferred Companies, the Associate shall conduct and control his/her business activities, work hours, selection of Customers, office location and sales methods. Even though a state license or form may designate the Associate as an "employee" of WLG or the Preferred Companies, such designation will not change the fact that by definition and by practice the Associate is an independent contractor. As an independent contractor, the Associate shall be responsible for paying any and all federal, state, city or other taxes that may become payable with respect to any compensation the Associate may receive under the terms of this Agreement.

**D.**    Associate shall promptly pay all expenses relating to the performance of Associate's duties under this Agreement, including but not limited to indebtedness to WLG. Associate shall be solely responsible for all of his/her expenses, including but not limited to travel, entertainment, office, signs, telephone, education, dues, subscriptions, licenses, etc., and shall receive no remuneration or reimbursement of any nature whatsoever other than the commissions referred to herein. Company shall not provide any facilities, furniture, or equipment to Associate. Associate shall provide his/her own office, telephone, supplies, transportation, and all other facilities which Associate may deem necessary.

**E.**    Associate shall supervise the WLG-related activities of Associate's Downline Associates and use Associate's best efforts and continuing diligence in directing Associate's Downline Associates to comply with their respective associate membership agreements with WLG and in training and providing assistance to Associate's Downline Associates, all in accordance with WLG policies and procedures, including those contained in the Associate Agreement Rules and Guidelines. Associate's fulfillment of such supervisory and training responsibilities is an essential requirement of Associate's compliance with this Agreement.

**F.**    Associate shall, if required by state law to sell Products and Services, obtain the appropriate license in each jurisdiction in which and from which Associate solicits, offers or obtains applications and orders for purchase of Products and Services and in each jurisdiction, where required by law, in which and from which Associate receives Override Compensation. Associate will bear the cost of all initial and renewal fees for licensing and registrations. Associate will make payment as instructed by WLG.

**G.**    Associate shall maintain accurate and current records of all transactions entered into pursuant to this Agreement. Such books and records shall conform to the requirements of federal and state laws, the rules and regulations of appropriate regulatory agencies and the policies and procedures of WLG. Associate shall maintain an accurate and current file of all commission statements and other records and correspondence received from WLG and notify WLG in writing within thirty (30) days after WLG making available such statements, records and correspondence, or any of them, is inconsistent with Associate's records or, in the opinion of Associate, not accurate. As to any statements, records or correspondence furnished by or on behalf of WLG to Associate, if Associate does not furnish WLG with written objections or corrections within thirty (30) days of after WLG makes available such statements, then Associate shall be deemed to have approved such statements, records and correspondence as to any matter not objected to or corrected, and to have released WLG from liability and responsibility for all matter contained therein.

**H.**    Associate shall not use sales material of any kind which has not been approved in writing by WLG for such use, including but not limited to any type of form letter or correspondence. Without the prior written approval of WLG, Associate shall not use any form of media, including but not limited to the Internet, electronic mail (email), radio, newspaper, television, letters, business cards, letterhead, or photocopies, to promote sales. The Associate promises not to use the name "World Leadership Group" in conjunction with any notation indicative of a business organization, such as "Corporation", "& Company", "Ltd.", "Inc.", or "& Associates", unless the Associate is specifically granted written permission from WLG to do so. The Associate may not appropriate the name "WLG" or "World Leadership Group" for use in any corporate name, joint venture or partnership.

**I.**    All activities conducted by Associate under this Agreement shall be conducted in accordance with all applicable laws. Associate also has the duty to faithfully abide by the rules and regulations set forth in the Associate Agreement Rules and Guidelines that may be issued from time to time, and other instructions, procedures, etc. published by WLG, as amended from time to time, and all applicable bulletins or memoranda issued by the Preferred Companies. Associate shall immediately advise WLG of any action or fact whatsoever which comes to Associate's knowledge which may possibly constitute a violation of any applicable laws or regulations with respect to WLG, Associate or any party who is, has been, or may be doing business with WLG. The Associate's failure to comply with, or failure to cause his/her Downline Associates to comply with, any Associate Agreement Rule constitutes a material breach of this Agreement.

**J.**    In the event that WLG contracts with one or more insurance companies to provide WLG and its independent contractors with group plans for errors and omissions and fidelity insurance coverage, the Associate will be required to participate in these group plans and monthly insurance premiums will be deducted by WLG from commissions due to Associate. If Associate's commissions are insufficient to cover the monthly insurance premiums, then WLG shall have the right to direct any WLG Affiliate to offset such deficit against any earned commissions due to Associate, or, at the option of WLG, Associate may be billed for the total amount of accrued insurance premiums and such amount will be paid in full by Associate within 15 days of the billing date, otherwise this Agreement will be terminated. WLG specifically reserves the right to modify insurance premiums charged without prior notice.

**K.**    Associate shall not take, undertake or engage, directly or indirectly, in any Prohibited Actions.

**L.**    Associate acknowledges and agrees that all supplies, including but not limited to memoranda, visual aids, manuals, training materials, recruitment materials, vendor materials and brochures, furnished by WLG to Associate are and shall be the property of WLG and shall be returned promptly to WLG upon demand.

**M.**    Associate shall comply with the terms, conditions and restrictions on use contained in any and all license or other contractual agreements between third party owners of any computer software and WLG or any WLG Affiliate, pursuant to which WLG or a WLG Affiliate has obtained the right to use such computer software. Associate further agrees to comply with the terms of any license or other contractual agreement into which Associate is required to enter with any third party computer software owner.

**N.**    Associate shall not violate the Covenants.

## III. Associate's Compensation

**A.**  The Associate acknowledges and understands that the Associate earns income only from the sale of the Products and Services and no income is earned by or paid to Associate for recruiting. The Associate's sole compensation under and during the term of this Agreement shall be commissions paid by, or caused to be paid by, WLG pursuant to this Agreement and paid in the manner provided in, and subject to the terms and conditions contained in, those Associate Agreement Guidelines and commission schedules which are published by WLG from time to time. The Preferred Companies are generally not obligated to pay the Associate any money. There is no guarantee that the Associate will be financially rewarded solely by virtue of becoming a member of "World Leadership Group".

**B.**  WLG will publish Associate Agreement Guidelines and commission schedules from time to time which relate to sales position designations, performance standards, commission rates of WLG or the Preferred Companies and other matters affecting the terms of the members' compensation. WLG may, from time to time, in the exercise of its sole discretion, and without notice, increase or decrease the rates and amounts of commissions or the sales position of Associate; provided, however, that any such changes may be prospective only, but may affect any new business and any commissions earned thereafter on existing business.

**C.**  Associate acknowledges and agrees that Associate's commissions are a share of WLG's commissions and Associate's commissions are earned by, and shall be payable to, Associate only after all of the following have occurred: i) the order or application for Products and Services submitted by Associate is accepted and approved by WLG at its principal office, or by an approved WLG designee; ii) actual payment for the same has been made by and received from the Customer; and iii) WLG has actually received payment from a Preferred Company, if applicable, of WLG's commission (subject to WLG's refund rights set forth in Section III.F. of this Agreement.

**D.**  Any money and value owed by Associate to WLG, any debt, any Debit Balance, and any money and value which has been advanced or credited by or on behalf of WLG or a WLG Affiliate to, or for the benefit of, Associate, represents a loan and may be offset and deducted by WLG from any commissions or other money or value then or thereafter owed by WLG to Associate pursuant to this Agreement or owed by any WLG Affiliate to Associate. WLG is hereby authorized by Associate to deduct from commissions due the amount of any commissions paid to Associate in connection with any payment or amount that WLG refunds to Associate's Customer.

**E.**  All Debit Balances shall be repaid immediately by Associate upon notice thereof to Associate by WLG or a WLG Affiliate. Any Debit Balances not paid within thirty (30) days from the effective date of such notice shall bear interest from the end of such thirty (30) days at a rate equal to the maximum legal rate of interest provided by applicable law. From time to time in its sole discretion, WLG or a WLG Affiliate may cause a reduction in all or any portion of the Associate's Debit Balance in any of the following ways: i) by applying any commissions or other forms of compensation payable to the Associate by WLG or a WLG Affiliate to reduce the Associate's Debit Balance; or ii) by exercising any other legal rights and remedies available to WLG or a WLG Affiliate, including any rights or remedies that are included in Associate Agreement Guidelines and Rules. The Associate is also obligated to repay WLG or WLG Affiliates for the Debit Balances of any of Associate's Downline Associates. If a Downline Associate does not pay his Debit Balance either after ninety (90) days from the effective date of notice by WLG or a WLG Affiliate to Downline Associate, or immediately upon termination of that Downline Associate's Associate Membership Agreement with WLG or other contractual agreement with a WLG Affiliate, then that Downline Associate's Debit Balance, and the interest and other liabilities in connection therewith, shall Roll Up to Associate and become in all respects part of Associate's Debit Balance for which Associate and such Downline Associate shall be jointly and severally liable for payment to WLG or a WLG Affiliate.

**F.**  In the exercise of its sole discretion, WLG reserves the right to, and may, refund to any Customer all or any part of payments made by Customer, and Associate agrees to promptly reimburse WLG for its expenses in connection therewith. Associate further agrees to promptly repay WLG all commissions by Associate with respect to any refunds to Customers, and WLG is hereby authorized to deduct from any other commission due or that may become due to Associate hereunder, the amount due WLG for any such expenses or commissions to be repaid by Associate.

**G.**  Except as set forth above in Sections III.A., Associate shall receive no other compensation of any kind whatsoever under this Agreement. Associate will not receive any fringe benefits under this Agreement whatsoever, including but not limited to insurance benefits, disability income, paid vacation, expense reimbursement or retirement benefits unless otherwise specifically provided for in this Agreement.

## IV. Term and Termination

**A.**  This Agreement shall continue in effect until Termination.

**B.**  Upon the Termination of this Agreement, all unpaid commissions earned by Associate prior to the effective date of Termination of this Agreement shall be paid by WLG to Associate within a reasonable period of time. No further compensation, other than the commissions earned as of the effective date of Associate's Termination, shall be payable to Associate under this Agreement after Termination. However, WLG or any WLG Affiliate shall have the right to offset against any commissions due to Associate the amount of any Debit Balance, indebtedness owed by Associate to WLG or to any WLG Affiliate, or any charges made by WLG or a WLG Affiliate to Associate occasioned by improper activity, breach of this Agreement, or the amount of any Indemnified Loss. Upon Termination of this Agreement, any debt or Debit Balances then or thereafter outstanding, and any debt or Debit Balances that may thereafter exist, shall without notice immediately become due and payable and shall bear interest at the highest rate permitted under applicable law until paid. Associate shall promptly surrender to WLG all books and records relating to WLG including but not limited to all applications and payments which Associate may have in his/her possession or under his/her control at the time of Termination.

## V. Arbitration of Grievances

The Parties agree that, except as specifically provided to the contrary in this Agreement, any Grievance shall be resolved exclusively by Good Faith Arbitration. For purposes of this Article V, the terms "Party" and "Parties" include WLG, the Associate and the Corporate People.

## VI. Extraordinary Relief

The Associate acknowledges that WLG would suffer extremely costly and irreparable harm, loss and damage if any of the provisions of this Agreement are violated by the Associate. The Associate agrees that WLG shall be entitled to seek Extraordinary Relief to temporarily enjoin violations by the Associate of this Agreement and that WLG may seek Extraordinary Relief in the federal and state courts of the State of Georgia, in any court of competent jurisdiction outside the State of Georgia, as well as in Good Faith Arbitration and if justice requires, in more than one of them, all without having to first comply with the requirements of Article V. The specifics of this Article VI shall not be deemed to preclude or narrow the judicial or arbitral powers regarding Extraordinary Relief.

## VII. Associate's Promise to Indemnify and Assign

**A.** The Associate agrees to indemnify and hold harmless, from and against any and all Indemnified Losses which are incurred, sustained, suffered, or assessed against the Indemnified Party, or all or any combination thereof, because of, arising out of or as a result of any acts or omissions, including but not limited to a breach of Section II. N. or any breach of Associate's contract(s) with Preferred Companies, by the Associate and also any of Associate's Downline Associates. The Indemnified Party shall be entitled to use counsel of its own choosing, shall be entitled to determine the validity of the Indemnified Loss and shall not be required to notify the Associate of the existence or progress of any claims or Indemnified Loss as a condition precedent to requiring payment by the Associate to the Indemnified Party for an Indemnified Loss.

**B.** To secure the Associate's promise of indemnification and the Associate's obligation to repay his/her Debit Balance or his/her Downline Members' Debit Balances, the Associate hereby assigns to WLG, and grants, and agrees to, from time to time, execute any additional instruments or documents necessary to perfect, a continuing security interest to WLG in, all commissions (or advances thereon) otherwise payable to this Associate by WLG, to the extent necessary to satisfy WLG for any such Indemnified Loss or any such Debit Balance obligations. This assignment is given to WLG to secure the Associate's obligations as set forth above and elsewhere in this Agreement. WLG has the right to withhold commissions in connection with this indemnity in such amount as WLG determines in its sole discretion.

## VIII. Representations and Warranties

**A.** The Associate expressly represents and warrants that the Associate has the authority to enter into this Agreement and that the Associate is not and will not, by virtue of entering into this Agreement and consummating the transactions contemplated hereby, or otherwise, be in breach of, violate, or interfere with, any other contract, agreement, or business relations which the Associate has or had with any third party, company, agency, association, firm, person, corporation, or other entity.

**B.** Associate has not engaged in nor will engage in any business practice or behavior nor has taken nor will take any action which has or will result in any violation of any restrictions or covenants to which the Associate is subject pursuant to any agreement to which the Associate was heretofore a party.

## IX. Miscellaneous

**A.** All capitalized terms used but not otherwise defined herein shall have the meaning set forth in that certain Glossary and Explanation of Terms published by WLG and in effect as of the date of this Agreement, a copy of which Associate acknowledges receipt. The Glossary and Explanation of Terms are contractual supplements to this Agreement that are binding on the Associate and by this reference are made part of this Agreement. Any changes to the Glossary and Explanation of Terms shall be effective as of the date of general publication by WLG.

**B.** If any term of this Agreement controverts the express, or in the opinion of WLG's counsel, the intended provisions of any applicable regulatory authority or court decision, then said term shall be governed by said regulatory provision or decision and the subject term of this Agreement shall be deemed automatically amended or deleted as the case pertains. Should such amendment or deletion materially affect the substance of this Agreement, then this Agreement shall be subject to immediate termination upon written notice to the other party.

**C.** The Associate understands that the eligibility requirements for certain sales position designations, as well as the obligations that are imposed upon the Associate in such positions, shall be as are published from time to time and that said requirements may be changed from time to time, by WLG, and that such designations are within the sole discretion of WLG.

**D.** All notices or demands hereunder shall be sent either by certified mail, return receipt requested, postage and certified fees prepaid or by overnight courier service, addressed as follows: if to WLG, addressed to Administrator of Contracts, World Leadership Group, Inc., at its then principal home office address in Georgia; if to an officer, director or employee of WLG, then addressed to that person c/o World Leadership Group, Inc.; and if to the Associate, addressed to him/her at the address provided in WLG Application Package. For purposes of this Agreement, the Associate shall maintain only one address at a time (the "Associate's Principal Address"), and shall immediately notify WLG of any change in the Associate's Principal Address.

**E.** The failure or delay by any party to insist upon strict performance of the terms and conditions of this Agreement shall not be deemed a waiver of any subsequent breach or default in the terms hereof. Any waiver must be in writing and signed by the party granting the waiver.

**F.** Titles and headings of sections and subsections of this Agreement are for convenience and are not intended to encompass all of the provisions therein or to interpret such provisions.

**G.** If any part, section, clause, paragraph, term or provision of this Agreement shall be found to be void or unenforceable by any court or arbitration of competent jurisdiction, such finding shall have no effect upon any other part, section, clause, paragraph, term or provision of this Agreement.

**H.** The Associate may not assign any rights or delegate any duties under this Agreement except as expressly provided herein. WLG may, from time to time, desire to assign to its affiliates or others all or a part of its rights and obligations hereunder (a "future assignment"); and the Associate consents and agrees to any such future assignment and agrees that, after any such future assignment, WLG shall be released from all obligations and liabilities so assigned, so long as such obligations and liabilities are assumed by the assignee.

**I.**    If any Party hereto commences an action or arbitration to enforce any of the provisions hereof, the prevailing Party in such action shall be entitled to an award of its reasonable attorneys' fees and all costs and expenses incurred in connection therewith.

**J.**    This Agreement, including any Associate Agreement Rules constitutes the entire agreement and understanding between the parties hereto, unless another agreement is executed simultaneously with or subsequent to this Agreement by the parties which makes specific reference to this Agreement and expressly supplements or modifies this Agreement. No change, amendment, termination or attempted waiver of any of the provisions hereof shall be binding upon WLG unless in writing and signed by WLG.

**K.**    Since the parties acknowledge that significant aspects of performance of this Agreement will occur in the State of Georgia, even though the business activities of the Associate may occur anywhere authorized, provisions of this Agreement (other than the provisions pertaining to the Covenants and Article II, Section N, as to which the parties do not specify an agreed upon choice of law) will be governed and construed under the laws of Georgia. If conflict or choice of law rules would choose a law of another jurisdiction, each party waives such rules and agrees (other than with respect to the Covenants and Article II, Section N) the substantive law of Georgia shall nonetheless govern. The parties agree that, without waiver of their rights and obligations under Section V., unless expressly provided to the contrary in this Agreement, the state and federal courts of Georgia shall have exclusive jurisdiction of any litigation between the parties and the Associate expressly submits to the jurisdiction and venue of the federal and state courts sitting in Gwinnett County, Georgia or Cobb County, Georgia with respect to any such litigation.

**L.**    The Associate agrees that WLG shall have the right to run credit, employment and other financial and background investigations on the Associate at any time WLG deems useful, whether such investigation is conducted by WLG or by an outside service or third party. The Associate consents to such investigations and consents to the disclosure of any person or entity to WLG of any financial, background and employment information conducted by WLG or by an outside service or third party.

**M.**    As a condition to becoming a member of "World Leadership Group", the Associate understands that the Associate is not required to purchase any of the Products and Services and is not required to pay WLG or the Preferred Companies any consideration except for the administrative fee to process his/her application for membership. Further, the Associate is not required to enter into any contract with WLG or the Preferred Companies in order to purchase any Products and Services.

**N.**    The Associate irrevocably consents to and forever authorizes the use by WLG or anyone authorized by WLG, its legal representatives or assigns, the absolute and unqualified right to use all photographs in which the Associate has appeared for WLG and reproductions thereof, in which the Associate has been included in whole or part, made through any media without inspection or approval of the finished product or use to which it may be applied, in any manner WLG may desire, factually or fictionally, including the right to make adaptations of said material of every and any kind and character. For such purpose WLG may adopt, arrange, change, dramatize, make musical versions of, interpolate in, transpose, add to, and subtract from such photographs and reproductions to such extent as WLG, in its sole discretion, may desire, and in any language; and, further to obtain copyright in all countries on such use by WLG of such material in any form and upon any and all adaptations thereof to renew such copyrights. The Associate releases and discharges WLG, its assigns, agents, or licensees from any and all claims and demands that the Associate may have, which arise out of or in connection with the use of such photographs or reproductions, including but not limited to, any and all claims of libel, slander, and invasion of privacy. The Associate further releases WLG, its assigns, agents, or licensees from any liability of alterations, optical illusion or faulty mechanical reproduction. The Associate is over eighteen years of age and has read the above authorization and release prior to its execution.

**O.**    The Associate acknowledges that any changes to this Agreement, the Glossary and Explanation of Terms, Agreement Rules and Agreement Guidelines, or compensation schedule may be published by WLG by posting such changes to the WLG Internet site. Any changes shall become effective as of the date of posting.

By the Associate's signature below, the Associate: (i) signifies his or her acceptance to all of the terms, and conditions and restrictions contained or referenced in this Agreement (ii) agrees that upon acceptance by WLG the Agreement shall be a valid and enforceable agreement between Associate and WLG, and (iii) consents to the record of the execution of this Agreement being maintained in electronic form.

ASSOCIATE:                                        WORLD LEADERSHIP GROUP, INC.

_Dolores Arreguin_

Print Name

_[signature]_                                    By: _____

Signature

Date:    7-19-07

GEL-016