# EXHIBIT 1

ARRE0512

1

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3

 4   DOLORES A. ARREGUIN, for
     herself and other members of
 5   the general public similarly
     situated,
 6
                 Plaintiffs,
 7
         vs.                          No. C 07-06026
 8
     GLOBAL EQUITY LENDING, INC.,
 9   a Georgia Corporation; and
     DOES 1 through 10, Inclusive,
10
                 Defendants.
11
12   _____

13

14

15         DEPOSITION OF DOLORES A. ARREGUIN

16            San Francisco, California

17              Monday, May 12, 2008

18

19

20

21   Reported by:
     KATHY NELSON
22   CSR No. 9796

23   JOB No. 88170

24

25
```

2

```
 1              UNITED STATES DISTRICT COURT
```

ARRE0512
2                    NORTHERN DISTRICT OF CALIFORNIA

3

4    DOLORES A. ARREGUIN, for
     herself and other members of
5    the general public similarly
     situated,
6
                    Plaintiffs,
7
          vs.                              No. C 07-06026
8
     GLOBAL EQUITY LENDING, INC.,
9    a Georgia Corporation; and
     DOES 1 through 10, Inclusive,
10
                    Defendants.
11    ─────────────────────────────────────────

12

13

14

15          Deposition of DOLORES A. ARREGUIN, taken on

16    behalf of the Defendant, at 201 Spear Street, Suite

17    1000, San Francisco, California, beginning at 10:40 a.m.

18    and ending at 12:59 p.m., on Monday, May 12, 2008,

19    before KATHY NELSON, Certified Shorthand Reporter

20    No. 9796.

21

22

23

24

25


                                                              3


1    APPEARANCES:

2

3    For Plaintiff Dolores A. Arreguin:

4          LAW OFFICES OF HERBERT HAFIF
           BY:  FARRIS E. AIN
                              Page 2

ARRE0512

```
 5      Attorney at Law
        269 West Bonita Avenue
 6      Claremont, California  91711
        (909) 624-1671
 7

 8  For Defendant Global Equity Lending, Inc.:

 9      ROPERS MAJESKI KOHN & BENTLEY
        BY:  GREGORY M. GENTILE
10      Attorney at Law
        80 North First Street
11      San Jose, California  95113
        (408) 287-6262
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

⬚

4

```
 1                      INDEX

 2  WITNESS                        EXAMINATION

 3  DOLORES A. ARREGUIN

 4

 5          BY MR. GENTILE              5

 6

 7
```

ARRE0512

8

9                           EXHIBITS

10   DEPOSITION                                          PAGE

11   1   Global Equity Lending, Inc., Mortgage Loan       26
         Originator Employment Agreement; 6 pages
12
     2   World Lending Group, Inc., Mortgage Loan         37
13       Originator Employment Agreement; 5 pages

14   3   Series of documents, the first of which is       49
         entitled "Employment History"; 28 pages
15
     4   Declaration of Plaintiff Dolores A. Arreguin     50
16       in Support of Opposition to Motion to
         Dismiss for Improper Venue and Motion to
17       Compel Arbitration; 8 pages

18   5   Series of documents, the first of which is       93
         entitled "Federal Truth-in-Lending
19       Disclosure Statement"; 2 pages

20

21

22

23

24

25



                                                        5


1        San Francisco, California, Monday, May 12, 2008

2                   10:40 a.m. - 12:59 p.m.

3

4              DOLORES A. ARREGUIN,

5    having been administered an oath, was examined and

6    testified as follows:

7

8                       EXAMINATION

9    BY MR. GENTILE:

10       Q    Good morning, ma'am.  Would you state your

                         Page 4

ARRE0512

11  name for the record, please.

12      A    Dolores Arreguin.

13      Q    And do you have a middle initial,

14  Ms. Arreguin?

15      A    A for Ann.

16      Q    Ms. Arreguin, have you ever given a deposition

17  before?

18      A    Yes.

19      Q    Approximately how many times?

20      A    Oh, in a lifetime, two, three.

21      Q    Two to three times?

22      A    Yeah.

23      Q    Have you -- when was the last time you gave a

24  deposition?

25      A    I'm going to say maybe four years ago.


                                                        6


1       Q    Okay.  I assume you've spoken to Mr. Ain about

2   what a deposition is about; am I correct?

3       A    Farris?

4       Q    Yes.

5       A    Yes.

6       Q    I'll call him Mr. Ain while we're on the

7   record.

8       A    Okay.  I didn't know that.

9       Q    Okay.  Let me go through the ground rules so

10  we're all on the same page here, because as a layperson,

11  you're entitled to know what we're going to do here,

12  what the rules are with respect to a deposition, what

13  our expectations are of you today.

ARRE0512

14        As you know, as I said, my name is Gregory

15   Gentile.   I represent Global Equity Lending, the

16   defendant in the case.   This is the defendant that you

17   have sued in this action.

18        Everything we say today is being taken down by

19   this person to my right, who is a certified court

20   reporter.   She will be -- at the end -- or within a

21   couple of weeks of this deposition, there will be a

22   booklet prepared which will have my questions and your

23   answers to my questions, and any comments from your

24   counsel, in that booklet.   You will be given an

25   opportunity to review that testimony, which is what you

7

1   are going to be giving today.   You have the right to

2   make changes to that testimony.

3        Do you understand that, ma'am?

4        A    I do.

5        Q    Okay.   Even though you say something today, if

6   you go back and read your testimony in a couple of weeks

7   and you said, well, I really didn't mean to say that; I

8   should have said this, you can change that.

9        A    Okay.

10       Q    Now, that has some implications, Ms. Arreguin.

11   Is it Ms. or Mrs.?

12       A    Ms.

13       Q    Ms. Arreguin.   If you make changes and it's a

14   substantive change, like you change an answer from a

15   "no" to a "yes," I can comment on those changes if we

16   ever go to trial in this case or if we have an issue

ARRE0512

17  with the judge with respect to this discrete issue, so
18  it's important that you try to get your answers as best
19  as you can today.
20          Do you understand that, ma'am?
21      A   I do.
22      Q   Okay.  Now, in concert with that, we're not
23  interested in guesses or speculation.  We'll be asking
24  you questions about things that happened four or five,
25  six years ago.  That's a long time ago.  Some people

8

1   don't remember; most people don't.  To the extent you
2   don't remember or don't recall, you can tell me that.
3   What I don't want you to do is to guess or speculate.
4           You understand what a guess or speculation is
5   as opposed to an estimate; is that correct?
6       A   Yeah, I'll try.
7       Q   And that's all we're asking you to do.  You
8   are under oath today, so everything we say is basically
9   taken down by this person and it is -- basically, you've
10  been given an admonition to tell the truth, the best you
11  can.
12          Do you understand that, ma'am?
13      A   I do.
14      Q   Okay.  You know your answers have to be
15  verbal.  Shakes of the head, nods, grunts, groans, it
16  just doesn't do it.  She can only take down verbal
17  responses, as well as my verbal questions.
18          Given the nature of the proceeding, I and you
19  have to wait until the question is completed, and I have

Page 7

ARRE0512

20   to wait until your answer is completed before I speak,

21   otherwise we're stepping on one another and we don't

22   have a complete record.

23       A     I understand.

24       Q     Okay.  Great.  And of course you are

25   definitely -- at any time you want to stop, you want to

9

1    talk to Mr. Ain, you can do that, or if you want to use

2    the restroom, get a drink of water.  This is not a trial

3    by fire.  I don't anticipate going for a long time here.

4    I want you to be comfortable as best you can.

5            Do you understand that, ma'am?

6        A     I do.

7        Q     Are you under any medication today that would

8    inhibit you from answering the questions the best you

9    can?

10       A     No.

11       Q     Okay.  One thing that I want to make sure we

12   do, and I want to get this out at the outset, is

13   sometimes you will have a tendency to anticipate what

14   I'm going to ask.  Wait until I finish my question

15   before you do.  You don't want to jump the gun, all

16   right?

17       A     I understand.

18       Q     If there is a question that I ask you and that

19   question is not understandable to you, I want you to

20   tell me, otherwise I'm just going to assume,

21   Ms. Arreguin, that you understand my question.  Is that

22   correct?

ARRE0512

23      A    I understand.

24      Q    Okay.  We're ready to go then.  You're

25  presently represented by an attorney to your right here,

                                                          10

1   and that's Mr. Ain, correct?

2       A    Uh-huh, yes.

3       Q    All right.  Did you review any documents prior

4   to today's deposition in preparation for today's

5   deposition?

6       A    The three documents.  The Global Equity

7   Lending mortgage agreement, the W -- World Lending

8   Group, and the World Leadership Group document.

9       Q    I'm sorry, ma'am.  Would those be what we've

10  termed as contracts or agreements?

11      A    Whose term -- who termed them?

12      Q    Well, let me ask the question.  Maybe it's a

13  little easier if I show you.

14           You said you reviewed some documents before

15  today's deposition.

16      A    Uh-huh.

17      Q    And one of the documents you said you reviewed

18  was a document entitled "Global Equity Employment

19  Agreement."  I want to make sure we're on the same page

20  here.

21      A    Yes.

22      Q    You reviewed this document; is that correct?

23      A    I did.

24      Q    Okay.  And that's okay.  If you feel you want

25  to look at it, it's all right.

ARRE0512

11

```
 1       A    Yes.

 2       Q    And I think you said you also looked at this

 3  document as well.  And this is called a World Lending

 4  Group, Inc. --

 5       A    Yes.

 6       Q    -- employment agreement?

 7       A    Yes.

 8       Q    You saw that as well.

 9            I'm going to show you another document.  We

10  haven't marked any of these yet.  This is called a World

11  Leadership Group, Inc., associate membership agreement.

12            Do you see that, ma'am?

13       A    Yes.

14       Q    Have you seen that document before?

15       A    I believe I have.

16       Q    And did you review --

17       A    I'm --

18       Q    -- that -- I'm sorry.

19       A    You know, yes.  Yes, I reviewed it.

20       Q    So you reviewed all three of these documents,

21  correct?

22       A    Yes.

23       Q    Did you have a chance to review your

24  declaration that you submitted as part of the

25  plaintiff's opposition to the motion to vacate -- motion
```

12

ARRE0512

1    to compel arbitration?

2        A    That answer would probably be no.

3        Q    Okay.  So we have that here.  All right.

4             Now, a couple of things.  Are you married?

5        A    No.

6        Q    There is an individual, whose name appears on

7    some of the headers of the faxed documents that I've

8    seen, and his name is Mike Arreguin.

9        A    That's my son.

10       Q    Okay.  That's your son.  And do you live with

11   Mike Arreguin?

12       A    I do.

13       Q    Where do you reside, ma'am?

14       A    In Citrus Heights.

15       Q    Do you have a physical address?

16       A    7995 Oak Avenue, Citrus Heights, California.

17       Q    And how long have you resided at that address,

18   ma'am?

19       A    Less than one month.

20       Q    And prior to residing there, where did you

21   live?

22       A    Physical address?

23       Q    Yes, ma'am.

24       A    5121 Garfield Avenue, Sacramento.

25       Q    And how long did you live at the Garfield

                                                          13

1    Avenue address?

2        A    I believe four years.

3        Q    So that would take us back to, I would assume,
                         Page 11

ARRE0512

4    2004, is that right, or thereabouts?

5       A    Yes.

6       Q    In or around the beginning of 2002, where were

7    you living then?

8       A    I believe with my daughter, 6520 --

9    65-something Main Avenue, Orangevale, California.

10      Q    Let me see if I can cut to the chase.  Your

11   declaration -- and I'll show you this -- it says that,

12   "To the best of my recollection, on April 2, 2002, I was

13   working as a licensed insurance agent for World

14   Financial Group."  And I'll just show that to you,

15   ma'am.

16           What I'm trying to understand is where were

17   you residing at the time you were working for World

18   Financial Group?

19      A    It could have been at Brett Avenue.  There was

20   a period of time between my daughter and moving to Brett

21   Harte, and then I moved back with my daughter, so it

22   could have been Brett Harte Court in Roseville.

23      Q    Where is Roseville, Ms. Arreguin?

24      A    In Placer County.

25      Q    Okay.  What was the -- do you remember what

                                                          14

1    the physical address was?

2       A    I just remember Brett Harte Court.

3       Q    Okay.  Was that a house or an apartment?

4       A    It's a house.

5       Q    So it's a fair statement that at or around the

6    time you were working for World Financial Group, you

                        Page 12

ARRE0512

 7   were living at a house on Brett Harte Court?

 8       A    Yes.

 9       Q    Okay.  And that's in Placerville?

10       A    Placer County.

11       Q    Placer County.

12       A    That would be in Roseville, I believe,

13   California.  I'm not sure of the lines, but I believe it

14   was Roseville.

15       Q    If I'm not mistaken, I think that's -- I think

16   it's north of Sacramento, but I'm not entirely sure.

17       A    Roseville is north.

18       Q    All right.  Are you presently employed?

19       A    No.

20       Q    And at one time you were employed by Global

21   Equity Lending; is that correct?

22       A    Yes.

23       Q    And when were you employed by Global Equity

24   Lending?

25       A    Well, we had to first be World Leadership

                                                         15

 1   Group.  We had to join World Leadership Group.  So you

 2   were asking first --

 3       Q    Yeah.  Let me rephrase the question.

 4       A    Okay.

 5       Q    Let me reask the question.

 6       A    Yeah.

 7       Q    My question was, when were you employed by

 8   Global Equity Lending?

 9       A    It's a hard question for me to answer because
                          Page 13

ARRE0512

10   World Leadership Group is first.

11        Q    Okay.

12        A    You have to join the parent company to become

13   part of Global Equity Lending, for whatever reason.  I

14   don't know.

15        Q    Okay.  Let's go back then.  Thank you for the

16   clarification.  At some point in time, you joined what

17   you call a parent company --

18        A    Right.

19        Q    -- called World Leadership Group; is that

20   right?

21        A    That's true.

22        Q    Okay.  When did you join World Leadership

23   Group?

24        A    I'm going to put out there -- I think it said

25   April 2002.  I believe that's what my thing said on

16

1    their -- on their -- you know, my joining as a mortgage

2    employee, my joining as the parent -- the parent

3    company, and I believe it said April of 2002.

4         Q    Okay.  So at least it's your understanding --

5    your testimony that you joined World Leadership Group in

6    or around April 2002 --

7         A    Yeah.

8         Q    -- to the best of your recollection?

9         A    Yeah.

10        Q    All right.

11        A    I believe they told us that was a 1099, or

12   10099, whatever it is, 1099.
                    Page 14

ARRE0512

13    Q    What did you do for World Leadership Group?

14    A    We didn't do anything.  We just had to join.

15    Q    Okay.  You joined the company?

16    A    Yeah, you had to.

17    Q    So it was a requirement for you to join World

18   Leadership Group --

19    A    Absolutely.

20    Q    -- in order to join Global Equity Lending?

21    A    Yes.

22    Q    All right.  And how did you know that?

23    A    Well, they told us.  It was also -- they told

24   us you couldn't belong to their company unless you

25   joined World Leadership Group first.

                                                    17

1    Q    Let me just take it back here.  When you say

2   "they told us," "they" is very broad.  Who is "they"?

3    A    It would probably be the company.  I don't

4   know who -- it's been too long ago, who told us, but

5   throughout the whole procedure -- throughout the whole

6   entire time of four years or six years, you had to join

7   the parent company, period.  That was not a choice.

8    Q    Okay.  I'm just trying to understand the

9   process here.  So what you're telling me is you had to

10   join World Leadership Group in order to join Global

11   Equity Lending?

12    A    Yes.

13    Q    And you joined World Leadership Group, at

14   least by your recollection, in or around April 2002?

15    A    I believe so.

ARRE0512

16    Q    And how did you come to join World Leadership
17  Group?
18    A    I think you just signed up on-line, and then
19  you had to send some money in.
20    Q    Okay.
21    A    I think signing up on-line was -- they weren't
22  automated in the beginning.
23    Q    Well, do you distinctly recall signing up
24  on-line to join World Leadership Group?
25    A    I do.

18

1    Q    And maybe you can just give me some --
2    A    I'm trying to recall that I did, you know, but
3  I believe that's how.  We signed your name, I think.  I
4  can't even remember, honestly.  It was so long ago.
5    Q    We're talking about six years ago?
6    A    Yeah, it was a long time ago.  It's hard to
7  remember how we did that.
8    Q    Okay.  But you have a recollection of signing
9  up on-line for World Leadership Group?
10    A    What that means is you put your name in and
11  that's it.  That would be it.
12    Q    And when you did that, you would have done it
13  vis-a-vis computer, right?
14    A    I'm sure that's true.
15    Q    All right.  We say "on-line," but "on-line" to
16  me means computer.
17    A    That's true.
18    Q    I'm still one of those old dinosaur types
Page 16

ARRE0512

19    who --

20        A    They didn't really have the capability of

21    sign-up on-line.  It was, you know, put your name in if

22    you're interested, or whatever.  I don't remember.  We

23    had to do something on-line, but it wasn't -- they were

24    not automated, really.

25        Q    So you didn't get a --

19

1        A    Maybe we just went to the Web site, you know.

2        Q    I don't want to step on your testimony.  I'm

3    waiting until you've finished.

4        A    I'm done.

5        Q    Okay.  Do you recall going to the Web site to

6    sign up for World Leadership Group?

7        A    I think they told us to go to

8    worldleadership.com, something like that, and I think

9    that's -- maybe it was just to review, because they

10    weren't automated in the beginning.

11        Q    And when you say they were not automated in

12    the beginning, what do you mean, Ms. Arreguin?

13        A    They just had a Web site.

14        Q    Okay.  And you said something about typing

15    your name in?

16        A    See, I can't recall that, honestly.  I can't

17    say that because I can't remember how we did that.  They

18    might have just said to go to the Web site and look at

19    the Web site, worldleadershipgroup.com, whatever it is,

20    worldleadership.com.  It's been too long.

21        Q    It's fair to say that you don't have a

ARRE0512

22    distinct recollection of how that all came about?

23    A    I don't.

24    Q    Because this is six years ago; is that right?

25    A    Right.

20

1    Q    And you would have done that through a

2    computer at home or a computer at an office site?

3    A    At an office.

4    Q    Okay.  And what type of office was this?

5    A    World Financial Group office.

6    Q    All right.  Tell me a little bit about what

7    World Financial Group is about.

8    A    That was the previous company, and we had our

9    insurance license, our security license, and Hubert --

10    that was his old company and he sold it.

11    Q    You're talking about Hubert Humphrey?

12    A    Yes.  He sold that company.

13    Q    So it's fair to say that, prior to April 2002,

14    you had an office in which you were working for World

15    Financial Group --

16    A    Yes.

17    Q    -- is that correct?

18    A    Yes.

19    Q    Okay.  And what did you do for World Financial

20    Group?

21    A    We did securities and insurance.  I had my

22    license.

23    Q    So you have an insurance license?

24    A    And a securities license.

Page 18

ARRE0512

25      Q      Is that Series 7?

21

1      A      663; 663.

2      Q      Okay.  And you were doing work where you were

3 selling securities and insurance for World Financial

4 Group?

5      A      Yes.

6      Q      Okay.  And when did you start doing that?

7      A      Oh, I can't recollect the date.

8      Q      That's a fair answer.

9      A      Yeah, I can't.

10      Q      But in any event, when you looked through the

11 World Leadership Group Web site, it was at the office of

12 the World Financial Group, correct?

13      A      Yes.

14      Q      And at that point -- at that time, you were

15 employed or you were a representative for World

16 Financial Group selling securities and insurance?

17      A      Yes.

18      Q      All right.  Did you ever -- when you commenced

19 your relationship with World Leadership Group in or

20 around April 2002, did you review any document that, to

21 you, purported to be a contract with that company?

22      A      No.

23      Q      You don't recall doing that?

24      A      No.

25      Q      When you went on-line to look at the Web site

ARRE0512

22

1    for World Leadership Group in or around April 2002, did
2    you review any documents that purported to be a
3    contract?
4         A    No.
5         Q    Okay.
6         A    I don't think they had the capability.
7         Q    Okay.  And how do you know that, that they
8    didn't have the capability?
9         A    All you do is go to the Web site and look at
10   what they had, reviewed the Web site, like any Web site.
11   When you went to sign up, that would be a different
12   thing.  They would let you in, but you had to pay money
13   before that.
14        Q    Did you sign up with World Leadership Group?
15        A    I can't recall exactly when.
16        Q    Ms. Arreguin, just so I understand -- I don't
17   want to get mixed up with terminology -- when you say
18   "sign up," I want to make sure you and I are on the same
19   page.  What do you mean when you say "sign up"?
20        A    The things I reviewed looked like the sign-up.
21   That is the sign-up, the -- I would say they would
22   ask -- not that.  Not those.  At the bottom, you had
23   some -- my social.
24             MR. AIN:  Those over there?
25             THE WITNESS:  Yeah, those.  Those look like

&#9633;

23

1    the sign-up.

ARRE0512
2   BY MR. GENTILE:

3        Q    Okay.  All right.

4        A    That would be the sign-up.

5        Q    Let me just show you one document here.  This

6   was something that was produced by Global Equity Lending

7   in their supplemental disclosure.  Just as a -- I may

8   not even use this as an exhibit.  I just wanted to show

9   you.  It has an employment history here, for instance.

10       A    Uh-huh.

11       Q    Do you see that?

12       A    I do.

13       Q    And that document that I've just shown you is

14  Bates-stamped GEL007.  Do you see that, ma'am?

15       A    I do.

16       Q    Is that your handwriting on that document?

17       A    It looks like my handwriting.

18       Q    And from your understanding -- I'm not trying

19  to put words in your mouth, Ms. Arreguin.  Your

20  understanding is the term "sign up" means that you

21  signed these documents, documents similar to this?

22       A    You'd fill them out.

23       Q    Okay.  And how did you come about filling out

24  those documents?  Were they downloaded from the web

25  site?

⬚

                                                        24

1        A    I can't recall, but I don't know how else I

2   would get them unless someone sent them to me or brought

3   them to me or -- I don't know.

4        Q    Okay.

Page 21

ARRE0512

5    A    That, I can't recall.

6    Q    Okay.  You have no recollection?

7    A    But you do -- on this document, it does say

8    "World Financial Group," then it goes to ComUnity

9    Lending, and I crossed out "World Leadership Group" and

10    started that after -- you know, the date, time frame,

11    that was in July, 19 July, working for ComUnity Lending.

12    I had to cross out "World Leadership Group" because we

13    didn't belong -- we didn't do anything for them.

14    Q    When you signed up for World Leadership Group,

15    in or around April --

16    A    I'm not sure, but I think -- I think it's on

17    their -- their recording thing, in April, for World

18    Leadership Group, which was the 1099 company.  I think

19    they put April.

20    Q    Okay.

21    A    And they put mortgage employee, July 29th.

22    Q    Okay.

23    A    That's what I know.

24    Q    Okay.  Let me ask you this.

25    A    Why they would have done April, I have no idea

⬚

25

1    why unless -- I don't know.

2    Q    Well, perhaps Mr. Ain will get to that

3    tomorrow when the Global people are deposed.  But my

4    question to you is, when you filled out this form, and

5    this is GEL007 --

6    A    Well, they just marked it.  That's not how the

7    forms came.

Page 22

ARRE0512

8       Q     I'm sorry?

9       A     Those forms didn't say "GEL."

10             MR. AIN:  No, no.

11   BY MR. GENTILE:

12       Q     Yeah, that's understood.  Those are my forms.

13       A     Okay.

14       Q     But in any event, when you filled out this

15   form in or around whenever you did, at least, more than

16   likely, you believe you would have downloaded it from

17   the Web site?

18       A     That's a possibility, yes.

19       Q     Okay.  And you would have obtained those forms

20   through the computer while you were working for World

21   Leadership Group; is that right?

22       A     If they had that -- if they had that

23   capability.  I don't know.  I can't recall.

24       Q     You just don't recall?

25       A     I can't recall.

26

1       Q     All right.  Let me show you what we will mark

2   as Exhibit A -- or Exhibit 1 to this deposition.  And

3   this document is basically titled "Global Equity

4   Lending, Inc., Mortgage Loan Originator Employment

5   Agreement," and it's Bates-stamped -- and this is for us

6   attorneys, when I say "Bates-stamped" -- GEL001 through

7   GEL006.  He's got a copy there.  I see he's marked it

8   up, but that's his.

9             I'm going to just hand her this, Farris, but

10   first let's mark it as Exhibit 1.

ARRE0512
11          (Deposition Exhibit 1 marked.)

12     BY MR. GENTILE:

13          Q     I want you to take a look at this document,

14     ma'am, what we've marked as Exhibit 1.

15          A     Okay.

16          Q     Have you ever seen Exhibit 1 before?

17          A     You know, they produced a lot of documents,

18     but at what time frame are you asking me?

19          Q     Well, thank you.  Did you ever see this

20     document, Exhibit 1, in or around the April 2002 time

21     frame?

22          A     The answer is no.

23          Q     Okay.  How do you know that?

24          A     Because Global Equity Lending, the name

25     itself -- two things tell me that.  Number one, they

                                                    27

1     weren't even an entity in the state of California,

2     because I looked them up, until August.  We weren't

3     signing documents for a company that wasn't already an

4     entity.  They weren't even established yet.  And the

5     second thing is Global Equity Lending, the name itself

6     came about a year and a half afterwards, and they --

7     they were thinking of Global Preferred Lending, and they

8     changed it to Global Equity Lending, which was a

9     complete surprise to us when they actually changed over.

10          Q     It seems like you had some inside information?

11          A     Well, I'm the senior marketing director.

12          Q     I'm sorry?

13          A     I was the senior marketing director.

                              Page 24

ARRE0512

14    Q    And you were senior marketing director for

15    World Leadership Group; is that correct?

16    A    Yes -- well, no, for Global Equity Lending, I

17    guess.

18    Q    Okay.  I understand that.  I'm just trying to

19    understand the sequence of events.  We do know that in

20    or around April 2002, you were working for World

21    Leadership Group?

22    A    No, I was not working for -- no.  They just

23    had us sign up.  There was an argument of Hubert

24    Humphrey, his old company -- and I belonged to the old

25    company, World Financial Group.  He had a big argument

28

1    because he sold the company and didn't leave the people

2    in charge, the main people in charge.  They all got mad

3    at him.  We went to the convention and they wouldn't let

4    him talk.  We were all there when all that occurred.

5    And then all of a sudden Hubert said, "You're going to

6    change over.  You need to change over by" -- and I

7    believe it was June or July time frame, if you're going

8    to move over, you know.

9    Q    When you say "change over" --

10    A    Leave World Financial Group and come with me

11    in the new company.

12    Q    But initially, though, you were with --

13    A    World Financial Group.

14    Q    -- World Financial Group?

15    A    I was still getting statements from World

16    Financial Group in April -- May time frame.

Page 25

ARRE0512

17      Q    And then you ended up going over to World

18   Leadership Group?

19      A    When he said we're going to start a company,

20   and then the company -- you couldn't do loans.  You

21   couldn't do anything.  They weren't set up.  And come

22   July was when you could actually sign up for the

23   company.  We had to do -- if we had a loan, it would be

24   through ComUnity Lending, which is Cali Leasing, and I

25   haven't, so --


                                                                    29


 1      Q    So looking at Exhibit 1, it's your testimony

 2   that you never saw this document in or around April

 3   2002?

 4      A    Correct.

 5      Q    Did you ever go into a Web site, in or around

 6   April 2002, and see any document similar to what we've

 7   marked as Exhibit 1?

 8      A    The answer would be no.

 9      Q    Okay.  If you look at the last --

10   second-to-last page of Exhibit 1, which is GEL005, do

11   you see that -- do you see that there are a couple of

12   boxes that have been marked with an X?

13      A    I do.

14      Q    Okay.  And it's your testimony that you never

15   marked those boxes at all?

16      A    I've never seen this contract -- or I don't

17   recall seeing this contract at all.

18      Q    Okay.  Now, there's a difference between

19   saying "I've never seen this contract" as opposed to

ARRE0512
20  you don't recall seeing this contract.

21       A    Well, I would say I've never seen this

22  document, because Global Equity Lending was not alive

23  and well in that year.  That name was not out there.

24       Q    So it's your position, then, because that

25  company was not alive and well in April 2002, this

30

1   document wouldn't have existed in April 2000- --

2        A    Exactly.

3        Q    Okay.  So if Global Equity Lending was in

4   existence in or around April 2002, this document could

5   have existed; is that right?

6        A    It -- I've never seen it.

7        Q    Okay.  I think I understand your testimony.

8   Let me ask you something.  If you look at the next page

9   of this document, which we've labeled as Exhibit 1, it's

10  GEL006.  Do you see that?  And I take it your testimony

11  is the same with respect to the two boxes that are up at

12  the upper part of the document which are X'd?  Is that

13  correct, that you never checked those boxes?

14       A    I -- this is not familiar to me at all because

15  of the title of the document.  We were not Global Equity

16  Lending at that time.

17       Q    Okay.  But my testimony was -- strike that.

18            My question to you was, you never checked

19  those boxes?

20       A    No.

21       Q    Okay.  And if you look toward the middle part

22  of the page, where it says "Printed Name: Dolores

Page 27

ARRE0512

23    Arreguin," 4/2/02, 3:07:51, that name -- that's your

24    name, correct?

25         A    That's my name.


                                                        31


1         Q    Okay.  But your testimony is that you never

2    typed your name in this document?

3         A    No.  Yes, no.

4         Q    The question is, you didn't -- you're saying

5    you never typed your name on this page of this document?

6         A    Not on this -- this, what they call, agreement

7    with Global Equity Lending, no.

8         Q    Had you ever done that previously, as to any

9    of the other entities, like World Leadership Group or

10   World Financial Group?

11        A    World Leadership Group -- you know, I don't

12   know how we initially signed up.  That's the only thing.

13   So I don't know what they put out there.  They had so

14   many agreements.  I mean, things were called agreements,

15   contracts, policies, manuals, terms and conditions.

16             I mean -- you know, they used to have a saying

17   that -- and I don't mean to shoot at anybody, but they

18   had a saying in the beginning that -- in the beginning,

19   you know, usually people get a target and then they

20   shoot, right?  Well, Hubert doesn't.  He just shoots

21   first and then looks for the target.  That was the

22   saying in the beginning.  In other words, he just starts

23   haphazardly.  That's kind of how this all began,

24   haphazardly, the whole program.  It was so -- you know,

25   you didn't know what you were doing, really, you just

ARRE0512

32

1    did it.

2        Q    Okay.  When you say "you didn't know what you

3    were doing, you just did it" --

4        A    Yeah.  A lot of those agreements or terms and

5    conditions, they plop up on your Web site and you

6    couldn't get in your Web site unless you accepted or

7    said "yes," or typed your name in.  They would block you

8    from that.

9        Q    Let me back up now.  I just want to go back to

10   World Leadership Group, who you were employed with at

11   one time.

12       A    No, that's a 1099.  That's not an employee.

13       Q    But you were working for World Leadership?

14       A    I wasn't working until July.  I was working

15   for ComUnity Lending, like I said, on that thing.

16   ComUnity Lending -- Unity -- was the ones that were

17   doing loans.

18       Q    I'm sorry.  I keep saying "World Leadership

19   Group" --

20       A    Yeah.

21       Q    -- and I apologize.  That wasn't my intent.

22   World Financial Group.

23       A    World Financial Group, yes.  I had my license

24   with them.

25       Q    Okay.  And you don't recall signing up with

33

ARRE0512

1   World Financial Group?

2        A    Oh, of course I did.

3        Q    You did do that?

4        A    I'm sure I did.  Again, that's too many years

5   ago, but World Financial Group was already set up.

6        Q    And that would have been on-line?  Is that

7   right, Ms. Arreguin?

8        A    Yeah.  We're talking years ago, though, yes.

9   World Financial Group is the company I had my insurance

10  license with.

11       Q    All right.

12            THE WITNESS:  He's getting them all --

13  BY MR. GENTILE:

14       Q    I'm trying to keep them straight here.  I'm

15  not trying to confuse you.  And if I am, I want you to

16  stop me and say "wait a minute," please.  Tell me, okay?

17       A    Yeah.

18       Q    All right.  But World Financial Group, you did

19  sign up with them at one time, right?

20       A    Yeah, one time.

21       Q    That was the only way you would have been able

22  to do work with them, right?

23       A    Sure.

24       Q    And you would have signed up with them

25  on-line, right?

⬚

34

1        A    World Financial Group?

2        Q    Right.

3        A    I think they --

Page 30

ARRE0512

 4     Q     You don't recollect?

 5     A     I don't recall how I signed up with World

 6   Financial Group.  Too many years.

 7     Q     But during the time you were working for World

 8   Financial Group -- which would have been in the April

 9   2002 time frame, right?

10     A     I was existing.  I don't know that I was

11   doing -- but I think I was, yes.

12     Q     Okay.

13     A     I was attending their meetings.  I was -- you

14   know, I believe I was.

15     Q     And you would have been working out of an

16   office for World Financial Group?

17     A     Right, absolutely.

18     Q     And you would have had a computer in that

19   office, right?

20     A     Absolutely.

21     Q     And you would have had the opportunity to go

22   into that computer to download and upload documents,

23   right?

24     A     Sure.

25     Q     And to the extent you wanted to learn anything

☐

                                                              35

 1   about World Financial Group or any of the other

 2   companies of that -- in that sister/brother

 3   relationship, you could do that on a computer, right?

 4     A     World Financial Group, yes.

 5     Q     Or any of the other companies, like World

 6   Leadership Group?

                         Page 31

ARRE0512

```
 7       A     No, separate companies.  You couldn't go to --

 8  they were separate companies.  Hubert was starting a new

 9  company and these people stayed behind.  No, you

10  couldn't do that.  You might be able to go to the Web

11  site, you know, if there was a Web site.  I don't

12  remember.

13       Q     Actually, Ms. Arreguin, that's what I was

14  talking about.  You could go into the Web site from your

15  computer --

16       A     Sure.

17       Q     -- when you were working for World Financial

18  Group --

19       A     Sure.

20       Q     -- and you could learn about World Leadership

21  Group, right?

22       A     Yes.

23       Q     Likewise, if -- assuming Global Equity Lending

24  was in existence in April 2002, which you said it

25  wasn't, you could still go into the computer and look at
```

36

```
 1  information?

 2       A     Well, I can't assume it because it wasn't

 3  there.  It just wasn't.

 4       Q     All right.  So I think I understand what your

 5  testimony is.  Because Global Equity Lending, Inc., was

 6  not in existence in April 2002, then you could not have

 7  gone into a Web site and looked at any information with

 8  respect to Global Equity Lending?

 9       A     Yeah.  State of California didn't approve them
```

Page 32

ARRE0512

10    until August of 2002.

11        Q    And from what I understand, your testimony is

12    Exhibit 1 -- you never saw Exhibit 1 on April 2, 2002?

13        A    No, no.

14        Q    And you never went into a Web site for Global

15    Equity Lending, Inc., in April 2002, and looked at a

16    document that was similar to Exhibit 1?

17        A    No, no.

18        Q    And you never typed in your name on this

19    document that we've marked as Exhibit 1, correct?

20        A    Correct.

21        Q    I don't mean to be argumentative, but do you

22    have any idea as to how your name appeared on the final

23    page of this document, Exhibit 1?

24        A    Does this look like the same page of World

25    Leadership Group?  Is this identical to that page?

37

1        Q    I don't know.  We're going to get to that in a

2    minute.

3        A    Okay.  I would compare the two.  This is not

4    something I even remember seeing, Global Equity Lending.

5        Q    So you have no recollection?

6        A    No.

7            MR. GENTILE:  All right.  Let's move on to --

8    we'll mark as Exhibit 2 a document that we have

9    Bates-stamped as GEL021 through GEL025.

10            Let's mark this as Exhibit 2, please.

11            (Deposition Exhibit 2 marked.)

12    BY MR. GENTILE:

Page 33

ARRE0512

```
13     Q    Go ahead, Ms. Arreguin, and take a look at
14   Exhibit 2, please.  Let me know when you're finished.
15          And just for the record, that document,
16   Exhibit 2, is World Lending Group, Inc., Mortgage Loan
17   Originator Employment Agreement.  That's marked as
18   Exhibit 2.
19          Let me know when you're finished reviewing --
20     A    I am.
21     Q    -- the document.
22          And you've looked at it, correct?
23     A    I've looked at it.
24     Q    Have you ever seen Exhibit 2 before?
25     A    You know, my signature is on there, so I must
```

38

```
 1   have seen it.  But did I understand it?  Probably not.
 2     Q    Let me ask you something.  Going back -- we're
 3   looking at Exhibit 2.  I think you went to page -- or
 4   the final page of the document, which is Bates-stamped
 5   as GEL025.  Do you see that?
 6     A    Yes.
 7     Q    Okay.  Now, I think you indicated that this is
 8   your signature on the document --
 9     A    Yes.
10     Q    -- correct?
11     A    Yes.
12     Q    And it looks like it's dated 7/19/02?
13     A    Yes.
14     Q    And I assume that -- it says "Print Name," and
15   it's "Dolores Arreguin" --
```
                              Page 34

ARRE0512

16    A    Uh-huh.

17    Q    -- correct?

18    A    Yes.

19    Q    All right.  So it's fair to say that you

20  signed the document?

21    A    It's fair to say that I probably signed this

22  document.

23    Q    Okay.  And on July 19th, 2002?

24    A    It's dated.

25    Q    All right.  And this is for World Lending

39

1    Group, Inc., correct?

2      A    Correct.

3      Q    And what was your understanding -- back up

4    here.  How did you come to sign Exhibit 2?

5      A    I can't recall how -- I can't recall how we

6    did this.  Whether it was downloaded, whether it was

7    given to us, I don't even know.

8      Q    Okay.  Let me back up here.  When you say

9    "we," you're using the plural.

10    A    Me, me.

11    Q    All right.  You.

12    A    I do not know how I would have got ahold of

13  this document.  Whether it was downloaded, whether it

14  was given to me, whether it was sent to me, I don't

15  recall.

16    Q    Okay.  And at the time you signed this

17  document, July 2002, were you still working for World

18  Financial Group?

ARRE0512

19    A    I -- no.

20    Q    Just so I understand, that's the securities

21    insurance entity.

22    A    The answer would be no, I'm sure I wasn't.

23    Q    You were not?

24    A    I don't believe I was.

25    Q    Okay.  Where were you living at the time you

40

1    signed this document?

2    A    Brett Harte Court, I believe.

3    Q    Okay.  Were you employed at the time you

4    signed Exhibit 2?

5    A    Employed?  No.

6    Q    Were you working for someone?

7    A    No.

8    Q    So you were not working for anyone?

9    A    Not working for anybody.

10    Q    And at some point, I assume, based on your

11    answer, that you terminated your relationship with World

12    Financial Group?

13    A    At some time, yeah.  I don't know when.

14    Q    Okay.  And then there was a period of time in

15    which you were not working between the time you

16    terminated your relationship with World Financial Group

17    and the time you executed Exhibit 2?

18    A    There was a time when we could -- when we

19    initially started -- they introduced us to Cali Leasing,

20    ComUnity Lending, and I did a loan through them, I

21    believe.  I believe I got -- and that was ComUnity

ARRE0512

22    Lending.  That is the interim.  Because we couldn't do

23    loans with that company.

24         Q     "That company" being?

25         A     World Lending Group.

41

1          Q     Okay.

2          A     We couldn't do loans yet, so we had to do

3     loans through ComUnity Lending from -- in other words,

4     World Financial Group and ComUnity Lending kind of

5     overlapped a little bit until I moved over to World

6     Lending Group.

7          Q     Okay.  When did you move over to World Lending

8     Group?

9          A     My date says July 29th, '02.

10         Q     So based on the date on Exhibit 5 -- I mean

11    Exhibit 2, that's when you understand you started to

12    work for World Lending Group?

13              MR. AIN:  The date is the 19th.

14              MR. GENTILE:  Yeah, thank you.

15         Q     You said the 29th.

16         A     The 29th.

17         Q     You said the 29th.  The contract there says

18    the 19th.

19         A     This isn't a final until you get an

20    appointment letter and you get approved for your

21    background and everything.

22         Q     And did that happen?

23         A     Yeah, it must have, because I got a date of

24    7/29.

ARRE0512

25    Q    7/29?

42

1    A    According to the company, that's my
2    appointment date.
3    Q    Okay.  And you said you got some kind of an
4    approval letter?
5    A    I believe I did.
6    Q    Do you remember when you got that, ma'am?
7    A    7/29.
8    Q    Okay.  So you signed the contract with World
9    Lending Group on 7/19/02?
10    A    But you're not officially appointed until you
11    get an appointment letter.  That means they have gone
12    through background and did some stuff.
13    Q    They check you out?
14    A    Check you out.
15    Q    All right.  And then on or around July 29,
16    2002, you got some kind of approval letter where they
17    checked you out?  You did all the stuff you needed to
18    do.  I think you were talking earlier about this stuff
19    right here.
20    A    Right.
21    Q    This is the --
22    A    Right, right.
23    Q    We can look at that in a bit.  This is the
24    employment history document that was produced, et
25    cetera.  It has all the information.

ARRE0512

43

1     A     It all went together.  It looks like it's all
2     manual.
3     Q     Then you basically filled out all of those
4     forms --
5     A     Send the money.
6     Q     -- send the money, submit it to the entity,
7     right, and then you get the approval letter?
8     A     Right.
9     Q     That's how it worked?
10     A     I believe that's how it worked.
11     Q     What I want to do is go back here.  Tell me
12     how you obtained Exhibit 2.
13     A     I can't recall.  I can't recall.
14     Q     Okay.  You don't recall if you obtained it
15     through the mail?
16     A     Exactly.
17     Q     You don't recall if you --
18     A     If someone handed it to me.
19     Q     You don't recall that either?
20     A     I don't.
21     Q     You don't recall if you got it on a computer?
22     A     I don't.
23     Q     But in any event, it ended up coming into your
24     hands?
25     A     Right.

44

1     Q     Did you ask for it or was it just given to

ARRE0512

2    you?

3        A    You know, I wish I could remember if someone

4    actually walked me through and hired me, but I don't

5    recall anybody doing that to me.

6        Q    So it's fair to say you don't recall the

7    mechanics?

8        A    I don't recall the little details of that.  I

9    don't.  I'm sorry.

10       Q    But at some point at least, either on or

11   before July 19, 2002, you did obtain Exhibit 2, right?

12   You had to, because you signed it.

13       A    I signed it.  I had to receive it at some time

14   around 7/19.

15       Q    All right.  And you don't recall who gave it

16   to you?

17       A    I don't.

18       Q    You don't recall how you obtained it?

19       A    I don't.

20       Q    What did you do when you got Exhibit 2?

21       A    You just filled all the stuff out and sent the

22   money.

23       Q    Okay.

24       A    That's it.

25       Q    But you filled out all the forms.  And maybe

⸫

45

1    we can go through this if you want.  Maybe you can take

2    a look at these documents right here -- there's a stack

3    of them here -- and tell me what forms.  We're going to

4    put Exhibit 2 aside for a second, Mrs. -- Ms. Arreguin.

ARRE0512

5   I apologize.

6        A    Dolores.

7        Q    If you can go through those documents that

8   I've handed to you and just tell me -- just pull out

9   those documents that you believe you filled out in

10  concert with Exhibit 2.

11       A    There you go.  This says "World Leadership

12  Group," signed 7/19/02.  So why they put my date of

13  April, I don't know, in World Leadership Group.  This

14  one says 7/19/02, so that would be wrong.

15       Q    I just want you to go through those documents

16  and pull out those documents that you had to complete.

17       A    I'm going to guess that everything that says

18  "World Leadership Group" and "World Lending Group" was a

19  package.  It seems to me, it would have been.

20       Q    Have you pulled out all the documents,

21  Ms. Arreguin?

22       A    I don't know who this is, this lady that

23  signed the document on the same day I signed it because

24  there was no World Leadership Group people around me --

25       Q    Okay.

46

1        A    -- unless it was faxed and they signed it that

2   same day, but I don't know who that person is.  I don't

3   recognize her.  She's not part of -- I'm going to assume

4   that this is the package, the hiring packet.  I don't

5   know, though.

6        Q    Okay.  I understand that.  I'm just asking you

7   to pull out the documents that you believe you completed

Page 41

ARRE0512

8   in order to get your pre-approval letter.

9       A    I don't know.  You know, I recognize this.  I

10   recognize my signature.

11           MR. AIN:  Pull out the ones you think were

12   from that date.

13           THE WITNESS:  Okay.  I don't know about this.

14           MR. AIN:  This one?

15           THE WITNESS:  I don't know about those, if

16   they were part of this.  I just can only go by my

17   signature.

18           MR. AIN:  Let's keep them in order.

19           THE WITNESS:  Okay.  I can only go by my

20   signature.

21           MR. AIN:  And this one -- presuming the one

22   that begins 12 through 16?

23           THE WITNESS:  12 through 16.  Whoever

24   recruited me was AA1411.  There's your person.  Carlton

25   Enloe probably was the man who recruited me and had me


                                                    47


1   sign all this stuff.

2   BY MR. GENTILE:

3       Q    I'm sorry.  What is his name?

4           MR. AIN:  Go ahead and answer his name.

5           THE WITNESS:  AA1411 had to be Carlton Enloe.

6   BY MR. GENTILE:

7       Q    Carlton Enloe?

8       A    My guess, because he's the recruiter ID, right

9   there.  He would have given me all this.  There you go.

10   I don't even think it was downloaded.  He probably just

ARRE0512

11  handed me everything.

12      Q    All I want you to do right now, Ms. Arreguin,

13  is just pull out those documents that you believe you

14  had to complete in order to get your approval letter.

15          MR. AIN:  This one -- I presume what she's

16  trying to do here is anything that's labeled July 19th

17  of '02, which would be 12 through 16 --

18          This one, correct?

19          THE WITNESS:  Right.

20          MR. AIN:  This one looks like it's from that

21  date.

22          THE WITNESS:  Uh-huh.

23          MR. AIN:  Let's keep them in order.  Bates

24  stamp 10, that looks like it's from that date.

25          THE WITNESS:  Uh-huh.

                                                        48

1           MR. AIN:  This?

2           THE WITNESS:  Yeah, correct.

3           MR. AIN:  This is pretty much all of them,

4   Counsel.  This too, yeah.

5           MR. GENTILE:  Why don't we just put them in a

6   nice little stack there.

7           MR. AIN:  Yes.  I think also -- let me make

8   sure.  Okay.  I'll keep the agreements together.  But

9   these all look like they are from that date.

10  BY MR. GENTILE:

11      Q    So what I'm going to hand you, then, are all

12  these documents that I'm going to mark as a group

13  exhibit to the deposition.

                        Page 43

ARRE0512

14    A    Okay.

15    Q    All of those documents that you have in your

16  hand, which we're going to mark as a group exhibit

17  to -- it's going to be marked as Exhibit 3, would have

18  been documents that you would have had to have completed

19  in order to get your pre-approval letter in order to go

20  to work for World Lending Group, Inc., right?

21    A    I believe so.

22        MR. GENTILE:  Okay.  Let's have her mark

23  those, please.

24        MR. AIN:  Do you want me to put them --

25        MR. GENTILE:  You do what you've got to do.

[]

49

1  It's okay.

2        MR. AIN:  I'm just going to move the ones that

3  are -- that's Bates-stamped 7 through 34.

4        MR. GENTILE:  Okay.

5        MR. AIN:  7 through 34.

6        MR. GENTILE:  I'll give that to the court

7  reporter and she'll mark them.

8        MR. AIN:  Sure.

9        (Deposition Exhibit 3 marked.)

10  BY MR. GENTILE:

11    Q    All right.  In any event, Exhibit 3 -- you

12  signed several of the documents in Exhibit 3, and those

13  were documents that ultimately you had to complete?

14    A    Yes.

15    Q    All right.  Now, then you said on or about

16  July 29th, you received a pre-approval letter -- or an

ARRE0512

17  approval letter?

18      A    An appointment letter.

19      Q    An appointment letter.

20      A    Appointment letter.

21      Q    Let me show you -- we'll mark this next in

22  order.  We may as well get this done now.

23          That's going to be Ms. Arreguin's declaration

24  in support of opposition to motion to dismiss.  I think

25  this was dated February 14th, 2008.

                                                        50

1              (Deposition Exhibit 4 marked.)

2   BY MR. GENTILE:

3       Q    If you would look at Exhibit 4, Ms. Arreguin,

4   and tell me if the attached page to the declaration is

5   the appointment letter.

6       A    Uh-huh, it looks like it.

7       Q    So that's the appointment letter; is that

8   right?

9       A    It looks like it, yes.

10      Q    That's dated -- I'm sorry.

11      A    7/29/02.

12      Q    Okay.  Great.

13      A    Yes.

14      Q    All right.  I just wanted to understand the

15  sequence here.  Now, you had mentioned, just a little

16  earlier, that a Carlton Enloe --

17      A    I -- you know, he -- I don't know where he is

18  or what he is, but an interesting person.

19      Q    You said he was a recruiter?

ARRE0512

| | | |
|---|---|---|
| 20 | A | He -- see, I was told to join under him.  I |
| 21 | | was told I had to join under him because -- |
| 22 | Q | Join what, please? |
| 23 | A | Join this company. |
| 24 | Q | World Lending Group? |
| 25 | A | Yeah. |

51

| | | |
|---|---|---|
| 1 | Q | Okay. |
| 2 | A | I was told I had to join under him. |
| 3 | Q | Okay. |
| 4 | A | And I didn't know him. |
| 5 | Q | Would he have been your up -- |
| 6 | A | He would have been considered my director. |
| 7 | Q | Okay.  I understand.  So he basically was, for |
| 8 | | lack of a better term, a recruiter? |
| 9 | A | Yes. |
| 10 | Q | Did he give you the documents that we've |
| 11 | | marked as Exhibit 3 in order for you to execute them? |
| 12 | A | I would say he would be the most likely to |
| 13 | | give me, but I don't know.  I didn't work very long |
| 14 | | under him. |
| 15 | Q | All right.  I'm not interested in that right |
| 16 | | now.  Would it also be fair to say that Mr. Enloe also |
| 17 | | gave you what we've marked as Exhibit 2, the World |
| 18 | | Lending Group agreement? |
| 19 | A | He could have, yes. |
| 20 | Q | It sounds consistent, right? |
| 21 | A | It would be a package, I would assume. |
| 22 | Q | And do you have any recollection, |

Page 46

ARRE0512
23    Ms. Arreguin, when he gave those documents to you?

24        A    7/19/02.

25        Q    Okay.  Is that a firm date for you?  You know

52

1    that for sure?

2        A    I signed it on that date.

3        Q    Okay.

4        A    That's when I received it, obviously.

5        Q    Okay.  Could you have received it earlier?

6        A    I couldn't recollect that at all.

7        Q    You can't recollect?

8        A    No.

9        Q    So you could have received it earlier?

10        A    He might have said "come in and sign

11    everything out," and I did it that day.

12        Q    Do you have any recollection of what Mr. Enloe

13    told you about these documents?

14        A    Nothing.

15        Q    Okay.  You don't have a recollection?

16        A    I don't have a recollection.

17        Q    Okay.  And when you got the documents, you

18    signed them, right?

19        A    I would have just filled it out.

20        Q    You would fill it out?

21        A    To go to work.

22        Q    Now, going to Exhibit 2, which is the World

23    Lending Group mortgage loan originator employment

24    agreement, you understood that, when you signed this

25    document, Exhibit 2, it was a contract?

Page 47

ARRE0512

53

```
 1      A    Well, it said "agreement."

 2      Q    Okay.

 3      A    But I don't know the difference.  I'm not an

 4  attorney.  I don't know if it's a contract, agreement,

 5  or policy manual, whatever it is, term condition.

 6      Q    All right.  You'll admit it's about --

 7  what? -- five pages, I think?

 8      A    I believe so.

 9      Q    It looks like something like that.  Did you

10  read the document?

11      A    We would not have really read the document.

12  We would have signed it.

13      Q    You keep using the term "we would" and I --

14      A    If I were sitting down with someone, I

15  probably didn't -- he didn't, probably, say read the

16  document; just sign, sign, sign.

17      Q    Okay.  And you just went ahead and signed it?

18      A    Absolutely.

19      Q    And why did you do that?

20      A    Because I wanted to go to work.

21      Q    Okay.  You had the option to read it, though,

22  did you not?

23      A    I don't know.  I can't recall.

24      Q    You can't recall if you had the option?

25      A    Now, I didn't have the option.  If I wanted to
```

54

ARRE0512

1  work for the company, I had to join World Leadership

2  Group.  That wasn't an option.  So we weren't given

3  options.  You know, do you want to look at it?  Do you

4  agree with it?  Do you have a question about it?  Do you

5  have a problem with it?  I don't think that was ever

6  given to us.

7      Q    Did you take the time at all to look at any of

8  the paragraphs in Exhibit 2?

9      A    I think the way everyone said was, "There's

10  nothing in this contract that's any different than any

11  other contract you ever signed."

12     Q    Do you recall that being said to you?

13     A    No, but it was said quite a bit out there.

14     Q    Okay.  Well, what I want to know is, with

15  respect to Exhibit 2, were you told not to read it?

16     A    Only if he was rushing me through the process,

17  and that happened also.

18     Q    Do you recall that he rushed you through the

19  process?

20     A    I don't recall how we signed it.

21     Q    So you can tell me right now you don't recall

22  the circumstances of you signing --

23     A    That is true.

24     Q    -- Exhibit 2?

25     A    That is true.

⬜

55

1      Q    You just recall signing it?

2      A    I recall filling it out and signing it, but I

3  don't recall the conditions.

Page 49