ARRE0512

4 Q Okay.  When you say "the conditions," the

5 conditions of your signing it, correct?

6 A Yes.

7 Q But in any event, you'll agree with me that

8 Exhibit 2 was not provided to you vis-a-vis the

9 computer, it was handed to you, more than likely, by

10 Mr. Enloe?

11 A Because it's handwritten, I'm assuming it was

12 handed to me.  It's a handwritten thing.

13 Q Okay.  Now, one second, Ms. Arreguin.  Maybe I

14 asked this question before.  But when you worked for --

15 when you were working for World Financial Group selling

16 securities and insurance, did you sign a similar

17 contract to Exhibit 2?

18 A I cannot say I did or I didn't because it's

19 too many years ago.

20 Q Okay.

21 A I have no idea.

22 Q It's a fair statement.

23 A Yeah.

24 Q Given the fact we're talking six to seven

25 years ago, you don't have a firm recollection?

56

1 A I sure don't.

2 Q Okay.  But in any event, you were approved for

3 World Lending Group, Inc., on or around July 29th, 2002?

4 A Yes.

5 Q And thereafter you commenced doing work for

6 World Lending Group, Inc.?

ARRE0512

```
 7    A    Yes.

 8    Q    Okay.  And how long did you work for World

 9  Lending Group, Inc.?

10    A    Well, I have a couple pay stubs up to

11  2003 --

12    Q    Okay.

13    A    -- that says "World Lending Group."

14    Q    All right.  Do you have a recollection as to

15  how long you worked for World Lending Group, Inc.?

16    A    You know, I'm going to guess that --

17    Q    We don't want you to guess.

18    A    Exactly.  Well, then I can't tell.

19    Q    You can just say "I don't know."

20    A    I don't know.

21    Q    But at some point -- and you ultimately --

22  what did you do for World Lending Group, Inc.?

23    A    I was a senior -- World Lending Group?

24    Q    Yes, World Lending Group, Inc.

25    A    I came in as a senior associate.  And around
```

⌐

57

```
 1  September, October, November of 2002, I became a

 2  director, because I was hiring a lot of people -- or

 3  walked them through.

 4    Q    You came in as a senior associate?

 5    A    Right, and went to a regional marketing

 6  director.

 7    Q    And then regional marketing director?

 8    A    Right.

 9    Q    And working for World Lending Group, Inc., you
```

Page 51

ARRE0512

10   were originating loans, right --

11   A   Right.

12   Q   -- loan applications?

13   A   That's all we did.

14   Q   That was your job?

15   A   Uh-huh.

16   Q   And you got paid for it, right?

17   A   Yes.

18   Q   At least in terms of when you closed the loan?

19   A   Right.

20   Q   Okay.  And you did that until -- at least

21   your understanding is until about 2003 for World Lending

22   Group, Inc.?

23   A   Yes.

24   Q   All right.  And then at some point, though,

25   you did start doing work for Global Equity Lending?

58

1   A   When they changed the name.

2   Q   All right.

3   A   There was a big battle between World Savings

4   and World Leadership Group over the name -- World

5   Lending Group.  It was a big, big deal, lawsuit.  And I

6   don't know what happened.  My understanding -- this is

7   the story they told us, that World Savings actually lost

8   that, but we're going to change our name anyway.

9   Q   But in any event -- I'm just trying to

10   understand, ma'am -- World Lending Group, Inc., then

11   became Global Equity Lending, Inc.?

12   A   Yes.

Page 52

ARRE0512

13    Q    Same company, though, right?

14    A    Yes.

15    Q    It basically changed the name, at least in

16    your mind, right?

17    A    In my mind.

18    Q    All right.  So when you went to work for World

19    Lending Group, Inc., you worked for them until about

20    2003, correct?

21    A    Yes.

22    Q    And then you ended up working for Global

23    Equity Lending, Inc.?

24    A    The name changed.

25    Q    The name changed.  So basically the same

⧠

59

1    companies?

2    A    Yes.

3    Q    Okay.  Did you sign any agreement at all for

4    Global Equity Lending, Inc., when the name changed?

5    A    I couldn't tell you when or where or how, but

6    I can only say that, throughout the whole entire

7    process, they would shoot something on your Web site and

8    it would say "the new agreement," "the new terms and

9    condition," "the new policy."  Whatever it was that came

10    on your computer as you logged in, if you didn't sign

11    "yes," you would not get in.  So at what time they

12    changed the contract or agreement or a policy or term

13    and condition?  I mean, at the end, they were sending me

14    all kinds of stuff that I just didn't even agree with.

15    I couldn't even sign them anymore.

Page 53

ARRE0512

16     Q    This is 2003, right?

17     A    During the whole process.

18     Q    All right.  I just want to back up.  After

19   2003, you started working for Global Equity Lending?

20     A    The name changed.

21     Q    Okay.  The name changed.  And you don't have a

22   recollection of your signing an agreement with Global

23   Equity -- let me finish now.  You're anticipating.

24   That's okay.  We all do that.  But you don't have a

25   recollection around 2003 of signing an agreement with

60

1    Global Equity Lending, Inc.?

2      A    I do not.

3      Q    But you said that occasionally you would see

4    things pop up on your computer, correct?

5      A    Exactly.

6      Q    Were you given -- let me ask you something.

7           Were you given any kind of password or

8    anything in order to get into the Global Equity -- or

9    World Lending Group, Inc., or Global Equity Lending,

10   Inc., sites?

11     A    We were all given a code number.

12     Q    A code number.  What did the code number do?

13     A    It identified you as that person with a

14   password.

15     Q    So it allowed you to get into the site.  Do

16   you remember what your code number is?

17     A    AF0099, because I -- yes, Air Force 0099.

18   Great number.  I was retired from the air force.

ARRE0512

19      Q    AF0099.  Let me make sure I got that right

20  here.  What is it?  AF --

21      A    Air Force 0099.

22      Q    So that way, you would never forget?

23      A    Yeah.  That was a good one for me.

24      Q    And you were assigned that --

25      A    Code number.

61

1      Q    -- code number when you commenced work for

2  WLG --

3      A    Uh-huh.

4      Q    -- correct?

5           You've got to say yes or no.

6      A    Yes.

7      Q    And that code number, AF0099, stayed with you

8  through Global Equity Lending, Inc., right?

9      A    Yes.

10      Q    You always had the same code number?

11      A    Yes.

12      Q    And any time you wanted to get into the Web

13  site to, I guess, upload or download information, you

14  had to use that code?

15      A    Yes.

16      Q    All right.  When you -- I want to go back to

17  something else, Ms. Arreguin.  You said you had to pay

18  money --

19      A    Yes.

20      Q    -- do you remember that?

21           So I take it that when you signed up with

Page 55

ARRE0512

22    World Lending Group in or around July 2002, you had to

23    pay some money in order to become a member?

24        A    Yes.

25        Q    How much money did you pay?

                                                              62

1        A    It was -- this is what I recollect now.  It

2    could have been less at that time.  But I believe it was

3    125 for World Leadership Group, and 125 for World

4    Lending Group.  And the reason I said "if I can

5    recollect the exact figure" is because they changed that

6    figure and highered it later on, so I don't know if I

7    got caught up in that highering or, you know, the amount

8    or whatever, but I believe it was 250.  It could be

9    less, but I believe --

10        Q    It's kind of like an initiation fee or a

11    membership fee?

12        A    Oh, absolutely.  This is like -- the big

13    question was why do we have to pay 125 to World

14    Leadership Group?  Nobody ever, ever really knew why.

15    Why?

16        Q    But you paid it with a check?

17        A    We paid it with a money order.  Usually they

18    wanted money orders.

19        Q    Okay.  You did the same thing with respect to

20    World Lending Group, right?

21        A    Right.

22        Q    So in order for you to go to work for World

23    Lending Group, you needed to pay that money?

24        A    Right.

                        Page 56

ARRE0512

25        Q     Was that something periodically that had to be

63

1    paid?

2        A     Then they started charging you -- I think it

3    was $75 a year to keep your membership --

4        Q     Okay.

5        A     -- even though you were supposed to be an

6    employee.

7        Q     Okay.

8        A     That's when a lot of people started dropping

9    out.  Forget it.

10        Q     I'm trying to understand now.  At least from

11    your testimony, your association begins with World

12    Lending Group in 2002, July, and it continues to when

13    you -- through the name change to Global Equity Lending,

14    correct?

15        A     Right.

16        Q     And then ends -- I believe it's in around

17    2007, when you leave that business; is that right?

18        A     I believe I resigned, July.

19        Q     You resigned.

20        A     Something like that.

21        Q     And periodically would you have to re-sign

22    documents?

23        A     For what?

24        Q     To maintain your relationship with Global

25    Equity Lending.

ARRE0512

64

```
 1      A    They would flip this stuff on the Web site,
 2  again, and it would be mixed in with marketing material,
 3  it would be mixed in with agreements, terms and
 4  conditions, policies.  You know, whatever you signed,
 5  you signed, because that's the only way you could get in
 6  your computer.  That's the truth.  I mean, if they gave
 7  you a little thing and it changed your whole -- you'd
 8  never know it.
 9      Q    My question, though, is, you would get
10  periodic updates to the contract or supplements to the
11  contract; is that right?
12      A    I'm going to guess.  I don't know about --
13      Q    I don't want you to guess.
14      A    Okay.  I don't know if that's what they
15  flashed up on the Web site.  I don't know.  I
16  couldn't -- there wouldn't be a specific thing that
17  would make you say "ah-hah, this is a new change."
18      Q    Did you -- well, let me ask you something.
19  I'm not trying to be argumentative.
20      A    Yeah.
21      Q    Do you recall -- after 2002, July 2002, after
22  you signed the World Lending Group document that we have
23  here, Exhibit 2, do you recall ever reviewing updates to
24  the contract through the computer?
25      A    And I believe there were updates to the
```

65

```
 1  contract.
```

ARRE0512

2      Q     All right.  And how were you asked to agree to

3   those terms of the contract?

4      A     They would post -- if there were anything

5   posted, they would run it all on the thing, and then

6   you'd -- I'd accept, I believe, or maybe -- I don't

7   know.

8      Q     You'd have to type something into the

9   computer --

10     A     Right.

11     Q     -- to say you accept?

12     A     Either you accept, or your name, or something.

13     Q     And how would you do that?  You would type in

14  your name?

15     A     If it was your name, you'd type in your name.

16     Q     Okay.  In your case, it would be Dolores

17  Arreguin?

18     A     Right.  And then that would be it.

19     Q     And then you -- I'm sorry.

20     A     Or they would have something that would say "I

21  accept," and you click on "I accept," or "don't accept,"

22  you know.

23     Q     So you were given an option, right?

24     A     But I think those were, like, on tests you had

25  to take or something.  Sexual harassment, I think they

                                                        66

1   had one of those.  You take it, you accept it now, or

2   you want to do it later.  You know what I'm saying?

3   Things like that.

4      Q     What I want to focus on is just the

ARRE0512

5    supplements to the contract.  You recall getting

6    supplements to the contract or periodic reviews to the

7    contract, do you not?

8        A    I do not recall.

9        Q    Okay.  That's all I needed to know.

10       A    I recall a lot of documents coming up on the

11   Web site and they could have been some supplements.  I

12   just recall a lot of documents coming up all the time.

13       Q    Okay.  And you recall looking at those

14   documents.  And do you have a firm -- do you have a

15   recollection of ever typing your name, Dolores Arreguin,

16   on any of those documents?

17       A    I'm sure everyone did, because you couldn't

18   get in your Web site unless you did that.

19       Q    Okay.

20       A    You couldn't get in.

21       Q    Do you have any recollection, after July 2002,

22   of ever typing your name onto the Web site in order to

23   either accept or reject a contract?

24       A    I'm sure I did, yes.

25       Q    Okay.  Because that would have happened,

67

1    right?

2        A    It would have happened.

3        Q    And that was part of the routine that you --

4        A    Part of the routine, if you agreed with it or

5    you didn't.  You'd just either agree or you're not going

6    to get no more.

7        Q    Okay.  Now, going back to our Exhibit 2, this

Page 60

ARRE0512

8    is the document that you believe Mr. Enloe -- is it

9    E-n-l-o-w?

10        A    L-o-e.

11        Q    L-o-e.  All right.

12            -- provided to you?

13            We were looking at that earlier.  Did you

14    maintain a copy of this document, Exhibit 2?

15        A    I don't recall having a copy of this.

16        Q    So even though you signed the document, you

17    didn't maintain a copy for yourself?

18        A    Yeah, I don't recall.

19        Q    All right.

20        A    I don't have a file of this document.

21        Q    Okay.  When you were provided a copy of

22    Exhibit 2 -- and I think you said you didn't review it;

23    is that right?

24        A    I don't recall how I --

25        Q    You don't recall reviewing it?

68

1        A    -- how I did this whole package.

2        Q    Okay.  So you could have reviewed it, but you

3    just don't have a recollection?

4        A    I don't have a recollection.

5        Q    Do you know what an arbitration clause is?

6        A    Well, if you have some differences, you

7    arbitrate.

8        Q    Okay.  Did you -- was that your understanding

9    of what an arbitration clause was in July 2002?

10        A    No, I --

Page 61

ARRE0512

11      Q      You had a different understanding?

12      A      I had no understanding of arbitration.

13      Q      Okay.

14      A      I've never had an arbitration problem, I don't

15   think, that we had to arbitrate.

16      Q      You never went to arbitration?

17      A      Right.

18      Q      All right.  You ever own a home?

19      A      Yes.

20      Q      Did you go through the process of buying a

21   home --

22      A      Yes.

23      Q      -- through a real estate agent?

24      A      Yes.

25      Q      Were you ever given an option to check an

                                                          69

1   arbitration -- mandatory arbitration clause in a real

2   estate contract?

3      A      I think we sat down, went over the paperwork,

4   but I don't recall that.  No, I don't recall that even

5   being a discussion.

6      Q      Okay.  You'll agree with me, though, when you

7   went out and -- you have owned homes, right?

8      A      Yes.

9      Q      Before July 2002, right?

10      A      Right.

11      Q      And as part and parcel of buying a home, you

12   would end up looking at a contract, right?

13      A      Right.

ARRE0512

14       Q     Real estate agents give it to you, right?

15       A     Right.

16       Q     And had your real estate agent ever explained

17  to you what an arbitration clause was?

18       A     I need to talk to him for a minute.

19       Q     Sure.

20       A     Is that okay?

21       Q     You can do whatever you want.  In fact, this

22  is a good time to take a break.

23             (Recess.)

24             THE REPORTER:  There was a question pending.

25  Would you like it read back?

70

1              MR. GENTILE:  Oh, yes.

2              (Record read as follows:

3                 "Question:  And had your real estate

4                 agent ever explained to you what an

5                 arbitration clause was?")

6              THE WITNESS:  No, I don't recall --

7  BY MR. GENTILE:

8       Q     All right.

9       A     -- that being a topic of conversation when we

10  were buying.  In fact, we actually bought the property,

11  and then -- from a realtor, and then built a house, so

12  there was no -- that I recall --

13       Q     Okay.  Understood.

14       A     -- conversation about that.

15       Q     All right.  Now, if you look at Exhibit 2,

16  Bates-stamped document GEL023, what I'm going to look at

ARRE0512

17   there is a paragraph 7.1.

18          You see that it says "Arbitration of

19   Grievances"?  Do you see that?

20      A    Uh-huh.

21      Q    Okay.  You can say yes or no.

22      A    Yes.  I'm sorry.

23      Q    All right.  From what you're telling me, is

24   you never reviewed this part of the contract before you

25   signed it?

                                                          71

1       A    Let me just read it for one second.

2       Q    Sure.

3       A    Well, I'm a little confused on this.  It says,

4    "The parties agree that, except as specifically provided

5    to the contrary in this Agreement, any controversy,

6    claim or dispute arising out of or relating to this

7    Agreement between the Loan Originator, on the one part,

8    and WLG" -- so what does that mean?  Oh, this is the

9    World Lending Group?

10      Q    Right, it's World Lending Group.  That's what

11   I'm asking you.

12      A    Okay.  Did I recall that?

13      Q    Yeah.

14      A    I don't recall specifically looking at any of

15   these paragraphs --

16      Q    Okay.

17      A    -- or concentrating on them.

18      Q    So you just didn't pay attention to it; is

19   that right?

ARRE0512

20    A    It might have been, in the moment, maybe

21  someone was talking to me while I was signing.  You

22  know, "Get this done so we can get your number right

23  away."  You know, I don't know.

24    Q    And likewise, I think if you turn the page,

25  where it says -- paragraph 11, it says "Governing Law."

⟨⟩

72

1  It says, "The enforcement of this Agreement shall be

2  governed by the laws of the State of Georgia and venue

3  shall be in Cobb County or Gwinnett County Superior

4  Court; State of Georgia."  Do you see that, ma'am?

5    A    Yeah.  I have no knowledge of that,

6  specifically anyone pointing that out to me or that that

7  might make a difference.

8    Q    Okay.  I understand that.  I think if we look

9  at what we've marked as Exhibit A --

10    MR. AIN:  1.

11  BY MR. GENTILE:

12    Q    -- or 1 -- I'm sorry -- that has, also, an

13  arbitration provision in 7.1.  Do you see that?  I think

14  that's Bates-stamped 004.

15    A    Yes.

16    Q    You see that, correct?

17    A    I see it.

18    Q    All right.  Do you see Section 11, in that

19  same document, where it says "Governing Law"?

20    A    Uh-huh, right.

21    Q    Okay.

22    A    I see it now.

ARRE0512

23    Q    All right.  I understand your testimony is you

24    never saw this on 4/2/02?

25    A    No.

73

1    Q    Okay.  But you'll note that the language

2    between the two agreements are the same?

3    A    They look the same, yes.

4    Q    And looking at Exhibit 2 -- I just want to

5    make sure for the record we have it clear -- at the last

6    page of Exhibit 2, Ms. Arreguin, Bates-stamped GEL00 --

7    I'm sorry -- 025 --

8        MR. AIN:  Bless you.

9        MR. GENTILE:  Thank you.

10    Q    -- you see where it says "You must check the

11    following acknowledgments to continue"?  Do you see

12    that?

13    A    Uh-huh.

14    Q    You checked those?

15    A    I'm sure I did.

16    Q    Those are your check marks, correct?

17    A    I'm sure I did.

18    Q    Okay.  And do you recall when you were

19    assigned the ID AF0099?

20    A    Probably 7/29.

21    Q    Okay.  And you used --

22    A    I don't know.  I don't know.

23    Q    You used that continuously, though, right?

24    A    Yes.

25    Q    When was the first time that you closed a

ARRE0512

74

1   loan, if you can recall, for --

2       A    It was with ComUnity Lending, was my first

3   loan in that interim process.  And the name was Chuck

4   Mulcahy, I believe.  I believe he was the first loan,

5   but it was in that interim process.

6       Q    Do you remember when that took place, ma'am?

7   Do you have any recollection?

8       A    Maybe February, March, April.

9       Q    Of 2003?

10      A    '2.

11      Q    2002.  And that would have been through

12  ComUnity Lending as opposed to World Lending Group?

13      A    ComUnity Lending, yeah, exactly.

14      Q    And how were you able to close a loan through

15  ComUnity Lending?  Was there --

16      A    Cali Leasing were hired to allow us to do

17  loans.  I don't know.

18      Q    You signed -- did you sign an agreement with

19  Cali Leasing?  You don't remember?

20      A    I don't recall.

21      Q    Okay.

22      A    I must have.

23      Q    In or around July 2002, did you have a lawyer

24  that you worked with?

25      A    No.

75

Page 67

ARRE0512

1    Q    You didn't?

2    A    No.  July of 2002?

3    Q    And I take it, after you signed -- or you were

4  approved for World Lending Group, Inc., you then began

5  working on loans for that company, correct?

6    A    I believe so.

7    Q    And you were able to close loans, correct?

8    A    Yes.

9    Q    And you were able to get paid, right?

10    A    Yes.

11    Q    Okay.  And the process by which you would get

12  paid would be through the -- I think you would either

13  download or upload the information through the computer

14  system?

15    A    The process to get paid or the process to do

16  the loan?

17    Q    The process to do the loans.

18    A    We would have to go through a loan processor.

19    Q    Okay.

20    A    And then the loan would close six weeks, or

21  whatever, and then they would submit paperwork and we

22  got paid.

23    Q    Would that be through the computer, though, or

24  would that be manually, Ms. Arreguin?

25    A    Handing it?

☐

76

1    Q    Yeah.

2    A    I believe it was all manual in the beginning.

3  It was always manual.  I can't remember that ever

Page 68

ARRE0512

4    being --

5        Q    How about the process of payment?  Was the

6    process of payment through the computer?

7        A    It was direct deposit.

8        Q    It was direct deposit?

9        A    And I think that was on down the road.  That

10   wasn't initially either.

11       Q    Okay.  Were you licensed -- did you have any

12   licenses during the time you were working for World

13   Lending Group?

14       A    I love that question.

15       Q    Tell me why you love it.  I'm not talking

16   about a marriage license or driver's license.  I'm

17   talking about professional license.

18       A    Under the Department of Corporations, World

19   Lending Group was registered -- I didn't realize this

20   until later -- much -- I mean, now later.  This is

21   later.  World Lending Group was registered under

22   Department of Real Estate, which required a real estate

23   license, okay?  We were not licensed.  We were under

24   Department of Corporations.  Two different entities,

25   okay?

77

1            So how did we do loans?  If we were going to

2    be under real estate, we were required to have real

3    estate licenses.  Now I understand maybe why they said,

4    "You can't do home loans for a while."  They kept

5    telling us, "You can't do loans.  You can't do loans."

6    So who did our loans for us?  Someone else might have

ARRE0512

7    signed for us, or whatever.  But under the Department of

8    Corporations -- Global Equity Lending now is under the

9    Department of Corporations.  But my understanding is

10   World Lending Group was under the Department of Real

11   Estate, and that required a real estate license.  And

12   had that caught up to us, by the Department of Real

13   Estate, we'd all been really hurt.

14        Q    But my question to you was, were you --

15        A    No.

16        Q    Let me reask the question, so we have a clean

17   record.

18             Following your signing on with World Lending

19   Group in July, did you obtain -- or did you have a

20   professional license?

21        A    No.

22        Q    Okay.  You had an insurance license, right?

23        A    I gave all that up.  Insurance and securities

24   license was -- you know, I let those go.  But we

25   didn't -- we weren't required to have a license.

⬚

                                                          78

1         Q    When did you first -- when was the first -- if

2    you can recall, first time you did a loan for Global

3    Equity Lending?

4         A    Equity Lending?

5         Q    Global Equity Lending.

6         A    I don't know when -- that transition time.  I

7    have no idea.

8         Q    I believe you said something in your

9    declaration, and maybe we can look at it.  I think it's

ARRE0512

10  Exhibit 4.  You said -- I think it's on page -- Global

11  Equity Lending didn't -- wasn't come into existence

12  until August 2003.  Does that sound right?

13      A    2002.

14      Q    2002?

15      A    Uh-huh.

16      Q    Is that correct?

17      A    I believe that's what I said.  Is that true?

18           MR. AIN:  Well --

19  BY MR. GENTILE:

20      Q    Let's make sure we're not putting words in

21  your mouth.  I want you to read it.

22           MR. AIN:  I recall that it was Sandy Croteau's

23  declaration that stated that.  I don't remember if --

24  until August of '02, in paragraph 1.

25           THE WITNESS:  "Additionally, Global Equity

79

1  Lending, Incorporated, was not a licensed residential

2  lender in California until August of 2002."

3  BY MR. GENTILE:

4      Q    2002.  How did you learn of that?

5      A    I looked it up on the computer.

6      Q    When did you do that?

7      A    Oh, in the last five months.

8      Q    Very recently?

9      A    Yeah.

10     Q    Okay.  Is it fair to say, though, that shortly

11  after it became licensed in the state of California, you

12  were able to do loans for Global Equity Lending?

Page 71

ARRE0512

13    A    We always did loans.  I don't recall a cutoff.

14    Q    You don't recall the first time you did one

15    then, right?

16    A    No.

17    Q    And you mentioned something about Ms. Croteau.

18    What is your understanding of who Ms. Croteau is?

19    A    She was not in HR -- or she was in the

20    background.  She wasn't who she is today.  She's in a

21    new situation.  I believe there was a McGrath in charge

22    of HR, M-c-G-r-a-t-h.

23    Q    She was in charge of what, Ms. Arreguin?

24    A    HR.  At that time, I believe she was signing

25    appointment letters, sample appointment letters,

☐

80

1    director of HR.

2    Q    Who executed your appointment letter that's

3    attached to Exhibit 4?

4    A    Do I have one there?  I do.  Andy Woodman.  He

5    was the president.

6    Q    Okay.

7    A    I knew him real well.  President of World

8    Lending Group.

9    Q    If we look at -- I want to pull out some --

10    there is a document here.  I'm not going to pull it out,

11    but let's just take a look.  In our packet of documents

12    that's marked as Exhibit 3, there is a document that

13    begins with Bates stamp GEL012.  I want you to take a

14    look at that, please.

15    A    Okay.

ARRE0512

16    Q    Just let me know when you're done looking at

17    it.  I want to make sure you're familiar with the

18    document.

19    A    Okay.

20    Q    And that document is called "World Leadership

21    Group, Inc., Associate Membership Agreement."  Do you

22    see that?

23    A    Yes, I do.

24    Q    Okay.  And how did you come to get the World

25    Leadership Group, Inc., Associate Membership Agreement?

81

1    A    I have no idea.  You know, again, maybe it was

2    given to me, because it's signed the same date as the

3    World Lending Group.  So my start date on this would

4    have also been 7/19/02.  I didn't recognize that.

5    Because they always had me in the computer as starting

6    World Leadership Group in April.  But this doesn't say

7    that, does it?

8    Q    Now, if you look at what has been

9    Bates-stamped as GEL016 -- and counsel will help you

10    locate that --

11    A    Okay.

12    Q    -- that's page 5 of the World Leadership

13    Group, Inc., Associate Membership Agreement, correct?

14    A    Right.

15    Q    I assume that's your name, Dolores Arreguin --

16    A    Uh-huh.

17    Q    -- that's printed there, correct?

18    A    Yes.

ARRE0512

19    Q    Did you print that?

20    A    It seems so, yes.

21    Q    Is that your signature?

22    A    It seems so, yes.

23    Q    And it's dated July 19th, 2002?

24    A    Right.

25    Q    And you don't recall how you came to get this

82

1    particular agreement?

2    A    I don't.

3    Q    Do you think Mr. Enloe provided it to you?

4    A    Possibly a whole package.

5    Q    Okay.  And this would have been around the

6    same time that you had -- you signed and you reviewed

7    the World Lending Group, Inc., agreement, correct?

8    A    Yes.

9    Q    All right.

10    A    You know what's really confusing to me on

11    these, though?  It's something like this, on the first

12    paragraph, World Leadership Group, it says, hereafter

13    referred to as WLG, World Leadership Group, in that

14    first paragraph, GEL012.

15    Q    I see it.

16    A    Do you see that?

17    Q    Yes.

18    A    And if you move to the World Lending one, 021,

19    it says the same thing.  Now hereafter we refer to this

20    as WLG.  So what company were we referring to?  It was

21    really confusing.

Page 74

ARRE0512

22    Q    Okay.  Did you ever bring that issue up to

23    anybody?

24    A    No.

25    Q    Okay.

83

1    A    But we lived with that mess for a long time

2    because we didn't know.  I mean, both contracts say the

3    same thing.

4    Q    If you look at -- in the packet of

5    information, packet of documents that we've marked as

6    Exhibit 4 (sic), if you could go to GEL027.

7    A    Got it.

8    Q    That document is titled "Employee

9    Acknowledgement Regarding World Lending Group Employee

10    Policy Manual."  Do you see that?

11    A    Uh-huh.

12    Q    Yes?

13    A    I do.  Yes, I see it.

14    Q    Is that your signature at the bottom?

15    A    It is.

16    Q    And this was one of the documents that was

17    provided to you by Mr. Enloe?

18    A    Yes.

19    Q    And you dated it 7/19/02?

20    A    Yes.

21    Q    All right.

22    A    There was no policy manual on hand, just to

23    let you know.  In fact, I don't think it was ever on

24    hand.  And so you notice that nothing -- none of the

Page 75

ARRE0512

25    blocks are marked because it wasn't available.

84

1         MR. GENTILE:  I'll move to strike as
2    nonresponsive to the question that I asked.
3         Q    And I take it -- if you look at what's been
4    Bates-stamped as GEL029, it's World Lending Group, Inc.,
5    Background Investigation Consent.  Do you see that?
6         A    I do.
7         Q    What was your understanding of what this
8    document was, ma'am, at the time you reviewed it?
9         A    They were -- my understanding is they were
10   just going to run a credit check on everyone.
11        Q    Okay.  And this was a document that provided
12   them the right to do that, correct?
13        A    I believe so.
14        Q    By the word "consent," correct?
15        A    Yes.
16        Q    And that's your signature at the bottom there?
17        A    Yes.
18        Q    It says "Dolores Arreguin," correct?
19        A    Yes.
20        Q    All right.  I'm going to show you some
21   documents.  I don't know if I'm going to mark all of
22   them, but I think this is related to the issue at hand
23   here.  And this comes from your counsel's disclosure of
24   documents pursuant to the federal court rules.  I just
25   have some questions here, just so I understand it.  I'm

ARRE0512

85

1  going to hand it to you.

2      A    Okay.

3      Q    It's the full set of documents Bates-stamped 1

4  through 91.  And I just want you to take a look at that.

5          Looking at the very first document,

6  Ms. Arreguin, the very first document says on-line

7  sign-up.  Do you see that?

8      A    Yes.

9      Q    Is that your -- did you make that document or

10  create that document?

11      A    No.

12      Q    Do you know who created it?

13      A    I have no idea.  Oh, it says "Mike Arreguin."

14      Q    Yes.  It seems like it came directly from a

15  fax -- a 916 fax from Mike Arreguin.  I think that's

16  your son, correct?

17      A    Yeah, but where would he send this to?

18      Q    I have no idea.  I wanted to know if that was

19  a document you created specifically to provide to your

20  lawyer or if it was just a document that was a document

21  that was given to you by Global Equity or World Lending

22  Group; do you know?

23      A    I don't know.

24      Q    Okay.

25      A    I'm sorry.

86

1      Q    No, that's okay.  If you don't know, you don't

ARRE0512

 2  know.  I just want to know.  The next document there

 3  is -- it's WLG on-line sign-up.  Do you see that?

 4      A    Okay.

 5      Q    And that is something you produced to your

 6  attorney, I assume?

 7      A    Yes.

 8      Q    Okay.  And did you have an understanding as to

 9  what an on-line sign-up was?

10      A    Well, by this time, 2006, yes.

11      Q    Okay.

12      A    They were set up to go on-line --

13      Q    All right.

14      A    -- by 2006.

15      Q    All right.  When do you know -- when, to your

16  recollection, was they, being World Lending

17  Group/Global Equity Lending, set up to go on-line, sign

18  up on-line?

19      A    Possibly -- I'm just -- I'm sorry.  I don't

20  want to guess, but maybe --

21      Q    I don't want you to guess.

22      A    Yeah.  I'm sorry.  I'm not going to be able to

23  put a specific time frame.  I'm going to say six months

24  after July, maybe, they started going on-line a little

25  more.

                                                    87

 1      Q    Six months after July 2002?

 2      A    Yeah.

 3      Q    Okay.  But did you have an understanding of

 4  what an on-line sign-up was six months after July 2002?

                    Page 78

ARRE0512

5      A    Yes, because you could start downloading some

6   paperwork.

7      Q    Okay.

8      A    You had access to some things you needed.

9      Q    In order to obtain that access, you had to

10  type in your name, right?

11     A    If you were joining up, now you could go in --

12  you could go in and sign up, pay your money first, and

13  then have access to the documents.

14     Q    Okay.  But how would you -- what were the

15  mechanics, as far as you recall, for the on-line

16  sign-up?

17     A    At what time frame?

18     Q    Say six months after July 2002.

19     A    Well, it's hard to tell you exactly what, but

20  I believe -- I can't say exactly six months after.  I

21  know 2006, you go in and you put your name and your

22  address and all your information, pay your money, and

23  then you would have access to keep going.  And that's

24  this entire --

25     Q    Got you.

                                                           88

1      A    -- sign-up process.  I'm sure this is the

2   entire one.

3      Q    Okay.

4      A    But six months afterwards, I'm not sure what

5   was available.

6      Q    Because that's too far back --

7      A    Yeah.

                         Page 79

ARRE0512

8    Q    -- for you to remember, correct?

9    A    Yes.  I'm sorry.

10   Q    That's okay.  Then when you did that on-line

11   sign-up, you'd have to put in your user password?

12   A    Yes.

13   Q    Air Force 0099?

14   A    No, not if you were a new person.  You could

15   start, you know, the whole process without having to go

16   into the web site.

17   Q    Okay.

18   A    I'm not sure, in 2002, what that process was

19   exactly.

20   Q    Okay.  Looking at that document that you were

21   looking at --

22        Thank you, Mr. Ain.

23        -- do you recall ever seeing a document

24   similar to this document in or around the July 2002 time

25   frame?

89

1    A    Oh, no.  They didn't have this process then.

2    In fact, this document says "GEL" and "GRM."  GRM didn't

3    come in until a year and a half after, so that tells you

4    that's way later.

5    Q    How did you come to obtain these documents

6    that we're looking at now?  Did you print them off?

7    A    My girlfriend -- yeah -- no, no.  I did print

8    them off, but I was signing up my girlfriend.  She

9    wanted to go in and sign up, but she decided against the

10   process.

Page 80

ARRE0512

11      Q      Okay.  Do you know why she did?

12      A      Yeah, she's ill.  She's very ill.

13      Q      Okay.

14      A      Yeah, she was very ill.

15      Q      Just bear with me, please.

16      A      She spoke Spanish.  She probably couldn't

17  understand this anyway.

18      Q      If you look at the document that's

19  Bates-stamped in that batch of documents, which is

20  number 41 --

21      A      Okay.

22      Q      -- I believe that was produced by your

23  counsel.  Tell me, have you ever seen that document

24  before?

25      A      This looks like the loan numbers and a list of

90

1   loans that I participated in.  So that is probably added

2   on-line.

3       Q      Okay.  I understand that.  It looks like the

4   very first loan is a loan, 1934.  They have

5   conscientiously redacted the borrowers and the address,

6   but then we go to -- it says date of application,

7   1/8/03.  Do you see that, Ms. Arreguin?

8       A      Okay.

9       Q      Okay.  And I think you had said earlier this

10  wasn't the first loan that you closed, there were other

11  loans that closed prior to this one, right?

12      A      I believe so.

13      Q      That was under a different name, right?

ARRE0512

14          MR. AIN:  The Cali --

15          THE WITNESS:  ComUnity Lending.  And, you

16   know, I got a W-2 from World Lending Group for 2002.

17   BY MR. GENTILE:

18      Q    Okay.

19      A    So I obviously did some loans.

20      Q    All right.  I understand that.  But the

21   1/8/03, date of application there, do you remember who

22   you closed the loan for?

23      A    I don't.

24      Q    Okay.  I take it -- I'm not trying to put

25   words in your mouth now -- that the stack of documents,

91

1   most of them at least, which have information -- there's

2   some unsigned contracts and stuff.  Those documents

3   were, I assume, printed or downloaded to facilitate a

4   girlfriend of yours who wanted to --

5      A    Right.

6      Q    -- purchase -- or wanted to potentially become

7   a member, right?

8      A    Right.  That's right.

9      Q    Okay.  And you'll agree with me that none of

10   the documents that are contained in this packet of

11   documents, right, have your signature on it, correct?

12      A    I don't think so.

13      Q    Why don't you just take a look.

14      A    Are you saying any of this has my signature?

15      Q    Yes.

16      A    That's my first loan, right there, ComUnity

Page 82

ARRE0512

17    Lending.  Right there.

18        Q    Okay.

19        A    4/16.  There it is right there.

20        Q    What's the Bates-stamp number on that?

21            MR. AIN:  72.

22    BY MR. GENTILE:

23        Q    72.

24        A    That's my first loan.

25        Q    So Document 72 would be your first loan?

92

1         A    Right.  And I'm not sure who was after that.

2    I'm thinking my cousin, though, but I don't know.

3         Q    That's 4/13/02?

4         A    Yeah.

5         Q    Okay.

6         A    That's with ComUnity Lending.

7         Q    Okay.  So this April 13th, 2002 -- well, let's

8    strike that.

9             The document Bates-stamped as 000072, which is

10    contained in your disclosure documents, is a federal

11    truth-in-lending disclosure statement, correct?

12        A    Right.

13        Q    All right.  And it has a signature on the

14    bottom there.  But that's not -- is your signature

15    there?  Am I missing something?

16        A    Let's see.  I think it's the client's.

17        Q    Okay.

18        A    The client's signature.

19        Q    And that's dated April 13th, 2002, correct?

ARRE0512

20     A     Uh-huh.

21     Q     And that would represent the very first home

22 loan that you closed?

23     A     My signature is on that one, actually.

24     Q     Okay.  And which is that document there?

25           MR. AIN:  74.

93

1           THE WITNESS:  74.

2           MR. GENTILE:  So let's pull those two

3 documents out for me, please, and we'll mark those as

4 Exhibit 5.

5           MR. AIN:  Which two?  74 and 72?

6           MR. GENTILE:  Yeah, 72 and 74.  I want to make

7 sure I understand this now.

8           MR. AIN:  Okay.

9           (Deposition Exhibit 5 marked.)

10 BY MR. GENTILE:

11     Q     What was the name of that person?

12     A     Chuck Mulcahy.

13     Q     And he's the first fellow that you did -- or

14 you closed a loan for?

15     A     Yes.

16     Q     When you started working for home loans --

17     A     For ComUnity Lending.

18     Q     -- for ComUnity Lending?

19     A     That interim period.

20     Q     All right.

21     A     This one, I don't recognize.

22           MR. AIN:  Okay.  Let's leave that one alone.

ARRE0512

23          THE WITNESS:  Okay.

24          MR. AIN:  Do you want me to put these back

25   together?

94

1          MR. GENTILE:  That's fine.

2      Q    Just so I understand, ComUnity Lending was

3   like the interim company that you were working with or

4   working for?

5      A    Cali -- because they couldn't -- they weren't

6   set up yet to do any loans, so they hooked us up in the

7   interim and you had to work for Cali Leasing.  We had to

8   go to Lodi for meetings.  And that's who I did my first

9   loan through.  I'm trying to remember back then, but

10   that was the first person.

11      Q    Who paid you for that loan?  Do you remember?

12      A    Cali Leasing or -- yeah, I think that's who I

13   got the W-2 from.

14      Q    Who directed you to do the work for Cali

15   Leasing -- or do the loan for Cali Leasing?  Do you

16   remember?

17      A    I remember we signed papers in Carlton Enloe's

18   office.  I do remember that.  So he might have helped do

19   that process.

20      Q    But you don't have any of those documents

21   right now?

22      A    What documents?  These are it.

23      Q    The documents that ultimately facilitated you

24   to do -- or close loans for --

25      A    No.

Page 85

ARRE0512

95

1      Q     -- for Cali Leasing.

2      A     I just have a W-2.

3      Q     You just have a W-2.  And we've marked that as

4   Exhibit 5, correct?

5            MR. AIN:  Do you want me to staple those

6   together?

7            MR. GENTILE:  That's probably a better thing

8   to do.

9            Do you mind if I staple it?

10           THE REPORTER:  Oh, no.  Thank you.

11  BY MR. GENTILE:

12     Q     In any event, Number 5, so the record is

13  clear, 000074, has your signature on it, correct?

14     A     It does.

15     Q     You were the loan originator for that

16  gentleman, correct?

17     A     Yes, I was.

18     Q     All right.

19     A     I'm signed on the California disclosure.

20     Q     And then if you look at what document is

21  Bates-stamped number 80 in that --

22     A     Okay.  I love this one.  I love this one.

23     Q     All right.  That is a -- those are W-2s; is

24  that right?

25     A     It is.

96

ARRE0512

1      Q    Okay.  That's 2003, and it's for World

2   Leadership Group?

3      A    There you go.

4      Q    Okay.  And do you have any W-2s from Global

5   Equity Lending?

6      A    In 2003?

7      Q    Or at any time.

8      A    Yes.

9      Q    Okay.

10      A    I do.

11      Q    Okay.  You do.  When was the first time you

12   received a W-2 or a W -- from Global Equity Lending?

13      A    2003.

14      Q    So you would have that for 2003?

15      A    I believe I do.

16      Q    Okay.  And how about for World Lending Group?

17      A    2002.

18      Q    And you have those at home?

19      A    I do.  They are not here.

20      Q    I didn't see it.  Okay.  So just so I

21   understand, you earned income in 2002 through World

22   Lending Group, correct?

23      A    Yes.

24      Q    All right.  But your W-2 -- but your W-2 for

25   the first loan you did for Mr. Mulcahy, or whatever his

97

1   name is, that came from a separate entity?

2      A    Yes.

3      Q    And then in 2003, you earned income from

Page 87

ARRE0512

4    Global Equity Lending?

5        A    I believe I have a W-2 saying "Global Equity

6    Lending" from 2003.

7        Q    Okay.

8        A    I believe so.

9        Q    All right.

10       A    This World Leadership Group was the only one I

11   ever got.

12       Q    We're just about done here.

13            MR. AIN:  Do you want Bates-stamped 80 -- I

14   mean, marked as an exhibit?

15            MR. GENTILE:  No, I'm not going to mark it as

16   an exhibit.  It's okay.  Thank you anyway.

17       Q    And I apologize if I've asked this question.

18            Do you recall when Global Equity Lending,

19   Inc., changed its -- well, strike that.

20            Do you recall when World Lending Group changed

21   its name to Global Equity Lending, Inc.?

22       A    I don't recall the time frame.  It seems like

23   a year and a half later.

24       Q    Okay.  You said in your declaration, "It is my

25   understanding that World" Lending "Group, Inc., is the

98

1    parent company of Global Equity Lending, Inc.," correct?

2        A    Say that again.  I'm sorry.

3        Q    You stated in your declaration -- let's pull

4    that out.

5        A    World Leadership Group is the parent company.

6            MR. AIN:  What paragraph, Counsel?

Page 88

ARRE0512

7        MR. GENTILE:  Paragraph 1.

8        MR. AIN:  Okay.

9   BY MR. GENTILE:

10       Q    Do you see where it says, "It is my

11  understanding that World Leadership Group, Inc., is the

12  parent company of Global Equity Lending, Inc.," correct?

13       A    Yes.

14       MR. GENTILE:  Can we go off the record for a

15  minute.  Let me check my notes.

16       (Recess.)

17  BY MR. GENTILE:

18       Q    I just want to follow up on a couple of

19  things, Ms. Arreguin.

20       A    Okay.

21       Q    Have you ever been a plaintiff or a defendant

22  in any other lawsuit other than this lawsuit?

23       A    Yes.

24       Q    Okay.  How many times?

25       A    Oh, one or two.

                                                      99

1        Q    One or two?

2        A    Yeah, one or two.  Maybe two or more.

3        Q    What were the nature of the complaints?

4        A    One was a mold issue.  I got very sick out of

5   that.

6        Q    Okay.  Was that attendant to a real estate

7   contract or something like that?

8        A    No, it was an apartment mold.

9        Q    All right.  Have you ever been involved in a

ARRE0512

10   lawsuit regarding a contract or agreement which was in

11   dispute?

12        A    I don't recall that, no.

13        Q    what other --

14        A    Maybe an accident, you know, neck.

15        Q    Personal-injury type thing?

16        A    Yeah, personal-injury thing, right.

17        Q    You were in the air force?

18        A    I was in the civilian air force.

19        Q    You were in the civilian.  How long were you

20   in the civilian air force?

21        A    25 years.

22        Q    What did you do in the air force?

23        A    I love that question.  No, I actually worked

24   for the Stealth F117 and F22 Raptor, and I was a

25   security manager.

                                                    100

1         Q    You were a security manager.  What does a

2    security manager do?

3         A    We make sure our classified is protected, from

4    development to the end.

5         Q    Did that involve --

6         A    It's above top secret.

7         Q    Okay.  I don't want to get into top secret

8    stuff.

9              MR. AIN:  Me neither.

10             THE WITNESS:  It's above.

11   BY MR. GENTILE:

12        Q    You didn't --

                    Page 90

ARRE0512

| 13 | A | I'll have to kill you. That's all. |

14    Q    During the course of your work in the air
15 force, did you have any experience reviewing contract
16 documents or anything like that?

17    A    I did not.

18    Q    Okay. What is your educational background?

19    A    A little bit of college.

20    Q    Okay.

21    A    A lot of government education.

22    Q    Okay. Tell me about -- what college did you
23 go to?

24    A    Sierra.

25    Q    Sierra College?

⬜

101

1    A    Yeah, very little.

2    Q    What did you study?

3    A    Interior decorating.

4    Q    Okay.

5    A    Accounting. I thought I wanted to do that,
6 which was never.

7    Q    Okay.

8    A    And that's about it.

9    Q    Did you take any law courses at all?

10    A    No.

11    Q    No legal courses?

12    A    No.

13    Q    You said you took classes or you were educated
14 with the air force?

15    A    A lot of security training.

ARRE0512

16     Q     Okay.  What did that --

17     A     Security development of -- you know, where our

18     important stuff goes from one end to the other.

19     Q     None of that --

20     A     Development.

21     Q     Did any of that training involve the reading

22     or interpretation of contracts?

23     A     No.  Mine was more of a physical, out there,

24     checking the drawers and the programs.

25     Q     Okay.  And when was the last -- have you ever

⬚

102

1     spoken to Sandy Croteau?

2     A     Yes.

3     Q     When was the last time you spoke with her?

4     A     Maybe prior -- two years before I resigned.

5     Q     Okay.  And what was that conversation?  What

6     did that conversation relate to?

7     A     I had some trouble with team members.

8     Q     You were the team members' supervisor?

9     A     I was a director.

10    Q     Okay.

11    A     And they were in my line.

12    Q     Okay.  They were down line to you?

13    A     Down line to me.

14    Q     You had some problems with them?

15    A     Yes.

16    Q     And you went to Sandy for help?

17    A     Sandy was in charge.

18    Q     Did you ever talk to Sandy at all about any of

Page 92

ARRE0512

19   the contract documents --

20      A     No.

21      Q     -- like we looked at some contracts --

22      A     No.

23      Q     -- Exhibits 2, 3, 4?

24      A     No.

25      Q     All right.  There's a couple more questions.

                                                                        103

1               Do you recall, while you were working for

2    either World Lending Group or Global Equity Lending,

3    that you had to undergo any kind of compliance review?

4       A     I'm going to say no.

5       Q     You don't recall?

6       A     I don't recall.

7       Q     You don't recall.  And if you don't recall

8    that, you don't recall any of the mechanics, correct --

9       A     No.

10      Q     -- that would be involved with that?

11      A     Yeah.  I think they had some auditing, but it

12   didn't -- wasn't with our office.  It wasn't with us.

13      Q     Okay.  And I apologize if I've asked this

14   question to you before.  I just want to be complete.

15   You did not keep any of the documents you signed with

16   either World Lending Group or Global Equity Lending,

17   Inc.; is that correct?

18      A     I believe that's correct.

19      Q     Okay.

20      A     I think I sent you all this.  This is what I

21   had, right here, right?

                          Page 93

ARRE0512

22    Q    Yeah, absent what we've taken out as a --

23    A    I don't think I have anything.

24    Q    I take it, though, you did go through some

25    kind of training with World Lending Group?

104

1    A    What kind of training?

2    Q    To learn how to -- what you needed to do to

3    present mortgage loans.

4    A    In the beginning, really, they didn't know a

5    lot about it.  Walking through the loan was a

6    learning -- I studied with a little processor one hour

7    on Fridays.  She was the best processor there ever was,

8    and taught me how to do loans.  That's the truth.

9         Later on, maybe they had a lot of classes and

10   all this stuff, but not -- that's how I learned how to

11   do loans.

12        MR. GENTILE:  Okay.  I don't have anything

13   further.  Thank you very much.

14        Do you have any questions?

15        MR. AIN:  I have no questions.

16        MR. GENTILE:  We're done.

17        (Discussion off the record.)

18        MR. GENTILE:  We've concluded with

19   Ms. Arreguin's limited deposition here.

20        We have come to a stipulation.  The court

21   reporter will ensure that we will obtain -- or I will

22   obtain a copy of the transcript no later than May 28th.

23   It will be sent to me by e-mail.  On or about that same

24   date, I will send it directly to Mr. Ain by e-mail, who

ARRE0512

25    will then ensure that Ms. Arreguin obtains it,

⬜

105

1    hopefully, within the same day.  Ms. Arreguin will have

2    three days, following that time period, to make any

3    changes or corrections to her deposition.  And any

4    changes that are made, I will be advised of the same no

5    later than close of business on Wednesday, June 4th.

6              Is that okay, Mr. Ain?

7              MR. AIN:  So stipulated, Counsel.

8              MR. GENTILE:  Okay.  We're all set.

9    //

10   //

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

⬜

ARRE0512

106

```
 1              PENALTY OF PERJURY
 2
 3
 4
 5
 6
 7
 8
 9
10          I, DOLORES A. ARREGUIN, do hereby declare
11  under penalty of perjury that I have read the foregoing
12  transcript; that I have made any corrections as appear
13  noted, in ink, initialed by me, or attached hereto; that
14  my testimony as contained herein, as corrected, is true
15  and correct.
16          EXECUTED this _____ day of _____,
17  20 _____, at _____, _____.
                         (City)              (State)
18
19
20
21          _____
22          DOLORES A. ARREGUIN
23
24
25
```

107

```
 1          I, the undersigned, a Certified Shorthand
```

Page 96

ARRE0512

2  Reporter of the State of California, do hereby certify:

3       That the foregoing proceedings were taken

4  before me at the time and place herein set forth; that

5  any witnesses in the foregoing proceedings, prior to

6  testifying, were duly sworn; that a record of the

7  proceedings was made by me using machine shorthand which

8  was thereafter transcribed under my direction; that the

9  foregoing is a true record of the testimony given.

10       Further, that if the foregoing pertains to the

11  original transcript of a deposition in a Federal Case,

12  before completion of the proceedings, review of the

13  transcript [  ] was [  ] was not requested.

14       I further certify I am neither financially

15  interested in the action nor a relative or employee of

16  any attorney or party to this action.

17       IN WITNESS WHEREOF, I have this date

18  subscribed my name.

19

20  Dated: _____

21

22

23                    _____
                      KATHY NELSON
24                    CSR No. 9796

25

Page 97

*Law Offices of*

# HERBERT HAFIF
A PROFESSIONAL CORPORATION
CLAREMONT PROFESSIONAL BUILDING
269 WEST BONITA AVENUE
CLAREMONT, CALIFORNIA 91711-4784
TELEPHONE: 909/624-1671
FACSIMILE: 909/625-7772

HERBERT HAFIF
GREG HAFIF
MICHAEL G. DAWSON
MIGUEL G. CABALLERO
FARRIS E. AIN
CHARLES E. HILL
KENNETH L. MARIBOHO
JAMES F. JORDAN
EUGENE D. SENF

June 2, 5008

**Via Facsimile (408) 918-4501) and U.S. Mail**

Gregory M. Gentile, Esq.
ROPERS MAJESKI KOHN BENTLEY
50 West San Fernando Street, Suite 1400
San Jose, CA   95113

Re:     *Dolores Arreguin v. Global Equity Lending*

Dear Mr. Gentile:

Plaintiff, Dolores Arreguin, has reviewed her deposition transcript and made the following changes:

**Page:line**

16:7, change to "I do not recall."

16:9, change to "I do not recall.  My application date shows signed July 19, 2002."

21:1, change to "6 & 63."

75:8, change to "I do not recall the exact time frame when I was able to sign my own loans."

76:7, change to "paid by check first, then direct deposit later when became automated."

79:13, change to "We always did loans, but I do not recall when we started. I don't recall a cutoff."

82:24, change to "No.  I did not notice it before."

91:5, change to "right, sign up."

94:17, change to "I do not recall."

Gregory M. Gentile, Esq.
June 2, 2008
Page 2

97:10-11, change to " this World Leadership Group 1099 was the only one I ever got for a ring they awarded me."

100:13, add: "that's a joke!"

If you have any questions, please do not hesitate to contact me.

Very truly yours,

LAW OFFICES OF HERBERT HAFIF

Farris E. Ain

FEA:gs

## ** Transmit Conf.Report **

P.1
LOHH            Fax 9096257772            Jun  2 2008 01:37pm

| Fax/Phone Number | Mode | Start | Time | Page | Result | Note |
|------------------|------|-------|------|------|--------|------|
| 14089184501 | Normal | 02:01:36pm | 0'35" | 3 | # O K | |

**Fax Cover Sheet[1]**

**Law Offices of Herbert Hafif**
269 West Bonita Avenue
Claremont, California 91711
909/624-1671
Fax 909/625-7772

To:         Gregory M. Gentile, Esq.
With:       ROPERS, MAJESKI, KOHN & BENTLEY
Fax No:     (408) 918-4501
From:       Gwen/Farris E. Ain, Esq.
Reference:  Arreguin v. Global Equity Lending, Inc.
Date:       June 2, 2008

| No. | Document | No. of Pages[2] |
|-----|----------|-----------------|
| 1. | Letter dated June 2, 2008 | 2 |
| 2. | | |
| 3. | | |
| 4. | | |

**Comments:**
_X_   Original **will** follow.
___   Other message:

---

[1] **The information contained in this facsimile message is information protected by attorney-client and/or the attorney work-product privilege.** It is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law.  If the read of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original to us at the above address via the United States Postal Service. Thank you.

[2] **If you do not receive ALL pages, please phone us immediately.** Page count **excludes** cover sheet.