EXHIBIT 2

27533CroteauSandra051308

1

```
 1          UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF CALIFORNIA
 2
    DELORES A. ARREGUIN, for
 3  herself and other members
    of the general public
 4  similarly situated,
                                  Case No. C 07 6026
 5            Plaintiff,

 6  vs.

 7  GLOBAL EQUITY LENDING,
    INC., a Georgia
 8  Corporation, and DOES 1
    through 10, Inclusive,
 9
              Defendants.
10  ~~~~~~~~~~~~~~~~~~~~~~~~~

11            DEPOSITION OF
              SANDRA CROTEAU
12
              May 13, 2008
13            1:55 p.m.

14            Suite 200
        2475 Northwinds Parkway
15        Alpharetta, Georgia

16    Valerie N. Almand, RPR, CRR, CCR-B-531

17

18

19

20

21

22

23

24

25
```

27533CroteauSandra051308

2

```
1              APPEARANCES OF COUNSEL

2    On behalf of the Plaintiff (via
     videoconference):
3
         LAW OFFICES OF HERBERT HAFIF, APC
4        FARRIS E. AIN, Esquire
         269 West Bonita Avenue
5        Claremont, California 91711
         909.624.1671
6        farris.ain@hafif.com

7    On behalf of the Defendants (via
     videoconference):
8
         ROPERS, MAJESKI, KOHN & BENTLEY, PC
9        GREGORY M. GENTILE, Esquire
         80 North 1st Street
10       San Jose, California  95113
         408.287.6262
11       ggentile@ropers.com

12       MERRITT & TENNEY, LLP
         WILLIAM H. McCLEAN, Esquire
13       Suite 500
         200 Galleria Parkway
14       Atlanta, Georgia  30339
         770.952.6650
15       770.952.0028 (facsimile)
         wmclean@merritt-tenney.com
16

17

18

19

20

21

22

23

24

25
```

27533CroteauSandra051308

3

```
1              Deposition of Sandra Croteau
2                    May 13, 2008
3         SANDRA CROTEAU,
4         having been duly sworn, testified as
5    follows:
6         EXAMINATION
7         BY-MR.AIN:
8         Q.  Hello.  Can you state your name for
9    the record, please?
10        A.  Sandra Croteau.
11        Q.  How are you doing, Sandra?
12        A.  Fine.
13        Q.  My name is Farris Ain.  I am the
14   attorney for the plaintiff, Dolores Arreguin,
15   in this lawsuit against what we will refer to
16   as GEL, Global Equity Lending.
17             Can you please tell me your current
18   employment?
19        A.  By employment you mean title with
20   the company?
21        Q.  Starting with whether you work for
22   the company, yes.
23        A.  Yes.  I'm the vice-president of
24   administration for Global Equity Lending.
25        Q.  And how long have you been in this
```

4

27533CroteauSandra051308

1   position?

2        A.  Five years.

3        Q.  And what was your position before?

4   I assume you were still with the company.

5        A.  I actually worked for the former

6   company prior to the five years.

7        Q.  And what company was that?

8        A.  World Marketing Alliance.

9        Q.  Are you familiar with a company by

10  the name of World Lending Group?

11       A.  Yes.

12       Q.  Is that different from World

13  Marketing Alliance?

14       A.  Yes, it is.  World Lending Group is

15  the former name of Global Equity Lending.

16       Q.  Okay.  What was the relationship

17  with World Marketing Alliance and World

18  Lending Group?

19       A.  There's no relationship.

20           MR. GENTILE:  Objection.

21       Q.  There's no relation, okay.  Did you

22  ever work for World Lending Group?

23       A.  Yes.

24       Q.  When was that?

25       A.  That was formerly Global Equity

5

27533CroteauSandra051308

1  Lending.  I started with them January 2003.

2      Q.  Just to make sure that I heard you

3  correctly, before World Marketing Alliance

4  you worked for World Lending Group; correct?

5      A.  No, that's not correct.  I think I

6  confused the issue, I apologize.

7          World Marketing Alliance was a

8  former company that I worked for.  I was able

9  to retain my hire date and everything when I

10  moved over to World Lending Group, which is

11  now Global Equity Lending.

12      Q.  Okay.  I got you.  So you started

13  with World Lending Group in January of 2003.

14      A.  That's correct.

15      Q.  Okay.  Do you know when World

16  Lending Group changed to Global Equity

17  Lending?

18      A.  I believe it was sometime in 2003, I

19  don't know the exact date.

20      Q.  Okay.  Would November of 2003 be

21  fairly accurate, right around that time?

22      A.  Yes, I believe it was, yes.

23      Q.  Okay.  Sandra, the purpose of this

24  deposition, I'm going to give you a little

25  bit of background about what we're doing here

6

27533CroteauSandra051308

1  today.  Have you had your deposition taken

2  before?

3        A.  No.

4        Q.  This is your first time, okay.  A

5  deposition is, as you see here, is a question

6  and answer session that is under oath, as if

7  we would be in court, where you're to give us

8  your best answers to the best of your

9  ability, you know, as truthful as you can

10  recall.

11        At the end of this deposition there

12  will be a transcript that the court reporter

13  in front of you is taking down everything

14  that's being said by myself, the other two

15  attorneys and you, and you'll have an

16  opportunity to review it and make any

17  corrections or if you recall a different, you

18  know, answer later on, you'll have an

19  opportunity at the end to review this and

20  sign it under oath, and you'll provide it to

21  us, to the attorneys.

22        Although you'll be able to make

23  changes, if the changes are substantive and,

24  you know, they change what you've said

25  significantly, we could make comments about

7

1  that in court and raise the issue of

27533CroteauSandra051308

2  credibility or the accuracy of your

3  testimony.

4         The way things are going to go

5  today, I'm going to ask questions, I'm going

6  to wait for you to respond, because the court

7  reporter could only take down one person's

8  comments and, you know, talking at a time.

9         And, of course, give the attorneys

10  an opportunity to object, maybe wait a second

11  in case they want to insert an objection.  We

12  have to do that for the record to preserve

13  our objections and, you know, that's

14  understood.

15         But unless your attorneys instruct

16  you not to answer a question, for example if

17  I ask you what did you talk about with your

18  attorney, that's none of my business.  That's

19  protected under your attorney/client

20  privilege, and they will instruct you not to

21  answer.

22         And I may veer off into other issues

23  that they don't feel comfortable with me

24  asking and, you know, they'll insert their

25  objection at that time.

8

1         The purpose of this depo today, this

27533CroteauSandra051308

2  deposition, is limited to a specific issue

3  that we're in front of the court on right

4  now, and that is the arbitration clause in

5  the contracts that we'll go over and whether

6  this lawsuit belongs here in California or

7  whether it should be moved to Georgia, and

8  that's the venue clause in these contracts.

9         And specifically what I'm here to

10  ask of you is to ask you some questions about

11  what you recall about how the procedures went

12  about with Global Equity Lending and with

13  World Global -- hold on, it's going to be a

14  little bit, you know, with me screwing up the

15  names here, but I'll get them down by the end

16  of the day -- World Leadership Group and all

17  of the other entities, just so that we

18  understand how these things -- these

19  documents come about and how somebody like

20  Delores would have reviewed them, signed them

21  and whether, you know, they understood them

22  or not.

23         And, of course, there's going to be

24  some questions I'm going to ask you that

25  you're not going to know the answer to, and

9

1  it's completely fine for you to respond --

2  it's completely fine for you to respond that

27533CroteauSandra051308

3   you don't know the answer or you don't
4   recall.
5           I don't expect you to have the
6   answers to everything.  It's been well over
7   five years since most of this occurred.
8   However, when I ask a question that you may
9   have some knowledge or some facts about I'm
10  entitled to your best answer, and you can
11  give me an estimate but you can't guess.  I
12  don't want you to guess or speculate about
13  anything.
14          For example, if I want to ask you
15  how long that table is in front of you, you
16  may not have a ruler but you can estimate and
17  based on your knowledge say hey, this thing
18  looks about eight feet wide to four feet
19  wide.  But if I was to ask you how long is
20  this table in here which you can't see, I'd
21  want you to speculate that most law firms
22  have a standard sized table and it must be
23  ten feet.  Don't speculate; okay?
24      A.  Okay.
25      Q.  Let's see what else do we need to go

10

1   over?  I think that ought to be it for now.
2           Are you under any medication or did

Page 9

27533CroteauSandra051308

3   you drink any alcohol or any substance that
4   would effect your ability to testify
5   truthfully today?
6       A.  No.
7       Q.  Okay.  And then other than that, I
8   just need to ask this one nosy question.
9   Have you been convicted of any felonies?
10      A.  No.
11      Q.  Okay.
12          MR. AIN:  I'm going to wait until
13      you guys get the documents.  When they
14      get here let me know that and I'll
15      switch to that.
16          MR. MCLEAN:  They're here.
17          MR. AIN:  They're there?  Okay.  Let
18      me go ahead and start, then.
19      Q.  (By Mr. Ain)  Sandra, when you
20  worked for World Lending Group what was your
21  position?
22      A.  Vice-president of administration.
23      Q.  So you've been in the same position,
24  it's just that the company name has changed;
25  is that correct?

11

1       A.  Yes, that's correct.
2       Q.  Okay.  Before January of 2003 when
3   you worked for World Lending Group who did

27533CroteauSandra051308

4    you work for before that?

5        A.  World Marketing Alliance.  Well,

6    sorry.  Right before that I worked for World

7    Financial Group.

8        Q.  Okay.  And that was the company that

9    the plaintiff was working for as well;

10   correct?  You worked there with Ms. Arreguin?

11       A.  World Marketing Alliance was the

12   former company, yes.  World Financial Group

13   was the new -- was a different company

14   altogether.

15       Q.  Okay.  So you worked there with

16   Dolores at that company?

17       A.  Yes.

18       Q.  Okay.  When you switched over to

19   World Lending -- well, hold on one minute.

20           When you switched over to World

21   Lending Group in January 2003 did you have to

22   go through any application and job interview

23   process?

24       A.  Yes, I did.  I filled out the --

25       Q.  Can you describe -- go ahead.

12

1        A.  I filled out the employment

2    paperwork that we had at the time.

3        Q.  And would that be something you got

27533CroteauSandra051308

4   off the Internet or was it a stack of

5   documents that was produced to you by mail?

6       A.  No.  As a home office employee it

7   would be just regular paper documents that I

8   actually came in my first day of hire and

9   completed.

10      Q.  And that was in January.  Do you

11  remember the exact date?

12      A.  I don't.  It was towards the end of

13  January, but I don't remember exactly what

14  day it was.

15      Q.  Okay.  And in your position as

16  vice-president of administration what were

17  your job duties?

18      A.  I would oversee the home office HR

19  department.  I'm also the liaison between our

20  technical support people in different

21  departments.

22      Q.  In your position with HR were you

23  involved in the production of job

24  applications and loan originator contracts?

25          MR. GENTILE:  I'll object as vague

13

1       and ambiguous, the term "production."

2           MR. MCLEAN:  I would join in that

3       objection.

4       Q.  You can still answer.  Go ahead, if

27533CroteauSandra051308

```
 5   you understood my question.
 6        MR. MCLEAN:  Do you understand his
 7     question?
 8        THE WITNESS:  I'm not quite sure I
 9     do understand the question.
10        MR. MCLEAN:  Then say you don't
11     understand.
12        THE WITNESS:  I don't understand the
13     question.
14     Q.  (By Mr. Ain)  That's perfectly fine.
15   Let me ask you -- I'll strike that question,
16   let me ask you a different one.
17        In HR what were your job duties in
18   human resources exactly?  What did you do on
19   like a day-to-day basis?
20        MR. MCLEAN:  Just one clarification,
21     with which company?  Are you referring
22     to World Lending Group?
23        MR. AIN:  I believe right now, World
24     Lending Group, January 2003.
25        MR. MCLEAN:  Okay.
```

                                                    14

```
 1        A.  Well, we had home office -- there's
 2   a dual role here.  We had home office
 3   employees and what we call our field W-2
 4   employees.  I handled all the HR stuff for
```

27533CroteauSandra051308

5  our home office from hiring to firing,

6  benefits.

7          For the field employees I was

8  strictly just as a consultant, is this the

9  right HR form I should use, as far as

10 department of labor forms and things.

11     Q.  Okay.  When you refer to home office

12 employees can you give me an example of what

13 a position would be for home office

14 employees?

15     A.  Like a general ledger accountant,

16 you know, our accounting department.

17     Q.  Okay.

18     A.  Not loan originators.

19     Q.  So it's different -- okay.

20          Now, the field employees that you

21 referred to them as the W-2 employees, they

22 would call you or contact you to consult

23 about certain forms they need to fill out, or

24 what exactly they need to consult with you

25 about?

15

1      A.  No.  It was not the loan originators

2  that consulted with us, it was our operations

3  department who handled collecting of their

4  paperwork.  They would ask me questions.

5      Q.  Okay.  At what point did World

27533CroteauSandra051308

6      Leadership Group get involved with the

7      company?

8            MR. GENTILE:  Object, vague and

9         ambiguous.

10            MR. MCLEAN:  Do you understand the

11         question?

12            THE WITNESS:  I'm not really sure.

13         I don't really --

14         Q.  Okay.  That's okay.  Do you know who

15      World Leadership Group is?

16         A.  Yes, yes.

17         Q.  Who are they?

18         A.  It's an entity, it's a marketing

19      company.

20         Q.  Okay.  And what is their

21      relationship to your employer at the time,

22      World Lending Group, if you know?

23         A.  I believe it's common ownership.

24         Q.  Okay.  What is the purpose of World

25      Leadership Group?  What were they set up to

16

1      do, exactly?

2         A.  They're a marketing company.

3         Q.  If you know.

4         A.  They're a marketing company.  They

5      would market materials out to our field

27533CroteauSandra051308

6    force.

7         Q.   What kind of material would that be?

8    Can you give me some examples?

9         A.   I'm trying to think.  Recruiting

10   materials in order to recruit agents to our

11   company.

12        Q.   So they would provide documents to

13   help loan originators find other loan

14   originators, basically?

15        A.   Yeah.  I mean, there was more than

16   that, I'm sure.  But yeah, that was part of

17   it.  You know, they helped them recruit

18   agents.

19        Q.   What else did they do?

20        A.   They handled all the conventions

21   that, you know, we put on for our agents.

22   They organize it.  They do all the graphics

23   for the materials, our websites.

24        Q.   Do you know who the president is of

25   World Leadership Group?

                                      17

1         A.   I'd have to say I'm not sure, to be

2    honest.

3         Q.   Okay.  Do you know any of its

4    officers such as the CEO or the CFO?

5         A.   The CFO I believe is Robert Dollar.

6         Q.   Now, is World Leadership Group a

27533CroteauSandra051308

 7   subsidiary of World Lending Group?

 8          MR. GENTILE:  I'm going to object.

 9      This calls for a legal conclusion.

10      She's a layperson.

11      Q.  Sandra, do you know if World

12   Leadership Group is owned by World Lending

13   Group, or any percentage thereof?

14      A.  I don't know the answer to that.

15      Q.  Okay.  Do you recall when Dolores

16   Arreguin, the plaintiff in this lawsuit,

17   applied for a job with World Lending Group?

18      A.  I was not there at the time, no.

19      Q.  Where were you -- were you still

20   with the previous company that you were

21   working for?

22      A.  That is correct, yes.

23      Q.  And that would be World Financial

24   Group?

25      A.  Yes.

                                          18

 1      Q.  Or the World Marketing?  Which one?

 2      A.  World Financial Group.

 3      Q.  Okay.  When did you switch over from

 4   World Financial Group?  And I may have asked

 5   you that.  Would that have been January 2003?

 6      A.  Yes.

                    Page 17

27533CroteauSandra051308

7     Q.  And that's when you went over to

8  World Lending Group.

9     A.  Yes.

10     Q.  So when was it you worked for World

11  Marketing Alliance?

12     A.  Back -- I started with them in '98

13  and worked through till 2001 with them.

14     Q.  Okay.  And from there you went to

15  World Financial Group; correct?

16     A.  That is correct, yes.

17     Q.  Okay.  Are you familiar with the

18  website that World Leadership Group has set

19  up for the purpose of recruiting loan

20  originators?

21        MR. GENTILE:  I'm going to object,

22        assumes facts not in evidence.  It's

23        also vague and ambiguous.

24     Q.  You can answer, if you can, Sandra.

25        MR. MCLEAN:  Do you understand his

                                19

1        question?

2        MR. GENTILE:  And I'll just caution

3        the witness to make sure that she

4        understands the question.

5     A.  I think there's some twisting of

6  terms, so I'm not sure that I can answer that

7  question correctly.

                        Page 18

27533CroteauSandra051308

8      Q.  Okay, that's fine.  I'll strike the

9  question, let me ask a different one here.

10          When you went through the

11  application process to work for World Lending

12  Group in January 2003 was your job

13  application process different than a loan

14  originator?

15      A.  Yes, it was.  It was --

16      Q.  Okay.

17      A.  I'll explain that to you.  The home

18  office was strictly paper.  We don't sign an

19  agreement because we're not loan originators.

20      Q.  Okay.  What was your job application

21  process like?

22      A.  Honestly, I don't remember all the

23  documents.  I can tell you there was an I-9 I

24  had to fill out, a W-4, an application, a

25  standard type application.  I'm sure there

20

1  was some type of communication things that I

2  had to, you know, acknowledge, but I don't

3  really know all the names of the forms and

4  stuff.

5      Q.  Okay.  Are you familiar with the

6  mortgage loan originator employment agreement

7  that was signed by Ms. Arreguin?  Have you

Page 19

27533CroteauSandra051308
8    seen that before?

9        A.  Yes, I have.

10            MR. GENTILE:  I'm going -- excuse

11        me.  I want to object here, in that it

12        is vague and ambiguous.  There are

13        several agreements that have been signed

14        by Ms. Arreguin, and maybe we could be a

15        little bit more specific.

16            MR. AIN:  You're right, Counsel, I

17        apologize.

18        Q.  Sandra, let me have you take a look

19    at what is Bates stamped as GL 021 through

20    025.

21        A.  I have it in front of me.

22        Q.  Okay.  Take a minute to --

23            MR. GENTILE:  Okay.  Just for the

24        record, let's just make sure we have the

25        document, the proper document.  This is

                                              21

1        the World Lending Group, Inc. Mortgage

2        Loan Originator Employment Agreement;

3        correct?

4            THE WITNESS:  Yes, that's correct.

5            MR. GENTILE:  Okay.

6        Q.  (By Mr. Ain) Now, Sandra, you've

7    seen this document before; correct?

8        A.  Yes, I have.
                        Page 20

27533CroteauSandra051308

9     Q.   Okay.  How would a loan original --

10    a loan originator potential employee receive

11    this document?

12         MR. GENTILE:  I'm going to object as

13         vague and ambiguous, and also calls for

14         speculation.  Are we talking generally

15         speaking?

16         MR. AIN:  I'll be more specific.

17         MR. MCLEAN:  Go ahead, I'm sorry.

18         MR. AIN:  I'll be more specific.

19    Q.  (By Mr. Ain)   In the application

20    process when a loan originator has to apply

21    for a job, what procedures do they have to go

22    through with World Lending Group?

23         MR. GENTILE:  And I'll also object

24         as vague and ambiguous as to time.  What

25         time period are we talking about,

22

1         Mr. Ain?  I think those are valid issues

2         there.

3         MR. AIN:  I understand.

4    Q.  Let's talk about on or about April

5    of 2002 until August of 2002 when the

6    plaintiff applied for a job.

7    A.  I really can't answer that exactly

8    because I was not here during that time.

Page 21

27533CroteauSandra051308

9     Q.  Okay.  What about in January of '03

10  and on?  Was this something -- are you

11  familiar with the application process during

12  that time period?

13     A.  Yes, I am.

14     Q.  Can you describe it for me, please?

15     A.  We have an on-line system to sign up

16  for World Lending Group, there's an

17  application, I don't remember, there's a list

18  of questions that they have to ask.  Once

19  they pass that they go into signing off on

20  the agreement.

21          Now, we have -- in 2003 I don't

22  remember all the documents that were in

23  there.  We have improved, which means we

24  added more documents as of today to our

25  sign-up, so I don't remember exactly what

23

1  documents were there in 2003 as opposed to

2  what's there today.

3          But what they didn't sign up on line

4  they would send in and have a wet signature,

5  like the W-4 and the I-9 are documents that

6  they would have to send in to us.  And they

7  would sign a background consent form, sorry.

8     Q.  Okay.  So let's call this the

9  application packet, whatever documents were

27533CroteauSandra051308

10   included in it at the time, we'll go ahead

11   and, you know, set that aside for now.  But

12   for the most part all these documents they

13   would receive from the website that they sign

14   up on?

15        A.  Yes.

16        Q.  Now, who set up this website?  Is it

17   World Leadership Group or World Lending

18   Group?

19        A.  I don't really know, to be honest

20   with you, since it was in place at the time.

21   I don't know where it originated.

22        Q.  Okay.  So this document that's Bate

23   stamped GEL 021 through GEL 025, to the best

24   of your knowledge was that something that

25   would have been produced via the website?

24

1        MR. GENTILE:  I'll object as vague

2        and ambiguous using the term produced.

3        Q.  If you understand my question go

4   ahead and answer.  If not, I could clarify.

5        MR. McLEAN:  And, Sandy, if you

6        don't understand a question you need to

7        speak up and say you don't understand.

8        A.  Right.  And I was going to say I

9   don't know what you mean by produced.

27533CroteauSandra051308

10      Q.   How would a loan originator get this

11  document?   Is it one of the documents that's

12  produced in the packet over the Internet or

13  is this something that's mailed to them?

14          MR. McLEAN:   Let me object at this

15          point.   The document that's been

16          referred to is one that preceded -- I

17          believe it was generated at the time

18          before Sandy Croteau has testified she

19          came on with the company and precedes

20          her knowledge.

21          MR. AIN:   Okay, that's fair.   I

22          understand that.

23      Q.   (By Mr. Ain)   Sandy, is there a

24  document similar or another loan originator

25  employment agreement that existed in January

                                                25

1   of 2003 on?

2           MR. GENTILE:   Again, I'll object as

3           vague and ambiguous.

4       Q.   You can answer if you can.

5       A.   No, I'm not quite sure -- how you're

6   asking that is confusing to me.

7       Q.   Okay.   In January of '03 on, would

8   there have been an employment agreement from

9   World Lending Group that's referred -- you

10  know, that would be called a mortgage loan

                    Page 24

27533CroteauSandra051308

11    originator employment agreement?

12        A.  Yes, but I think I need to clarify a

13    little bit.  It's the same agreement.  It

14    might have had a little bit of updates done

15    to it.  But it would be like the same type of

16    agreement -- the same agreement that we have

17    here with updates, and that would have been

18    fully electronic in 2003.  We did not mail

19    those out.

20        Now, the agent did have the ability

21    to print it off and keep a copy of it.  We

22    just didn't, you know, send it out to them

23    where they signed it and send it back.

24        Q.  Okay.  Now, in this process when

25    this document is sent electronically do you

26

1    know whether the potential employee has an

2    opportunity to decline to accept this

3    agreement?

4        A.  Well, it's not sent anyplace.  They

5    actually go on to our website and they can

6    exit.  They do not have to sign this

7    agreement.  It is part of the hiring packet,

8    which means they could not go any further.

9        Q.  Okay.  It is my understanding that

10    from January 2003 on when somebody wants to

Page 25

27533CroteauSandra051308
11  log into the system they have to insert a

12  password; correct?

13          MR. GENTILE:  I'll object.  Assumes

14      facts not in evidence.

15          I'm not trying to be difficult,

16      Farris, I just want to put that

17      objection on the record.

18          MR. AIN:  Okay.

19      Q.  (By Mr. Ain) Sandra, again, unless

20  you're instructed not to answer, go ahead and

21  answer after the objection.  If you don't

22  understand the question please tell me.

23      A.  I think the question is wrong.  I

24  mean, you said since 2003, and I have to say

25  that that's not correct, to my knowledge.  We

                                            27

1   do have a user ID and password, but they

2   would have had it, I believe, back when they

3   originally started as well.  I can't, you

4   know, confirm that, but I'm sure that they

5   did.  I wouldn't say it just started when I

6   went there.

7       Q.  Fair enough.  I just -- that's why I

8   limited it to January of '03, because I know

9   that was before your time and --

10      A.  Got you.

11      Q.  -- I don't want to -- okay.  But
                    Page 26

27533CroteauSandra051308

12    when you log into the system from January '03
13    and on or to the extent that you know prior
14    to January of '03, when you enter into the
15    system you have to log in on the website;
16    correct?
17        A.  Yes, that is correct.
18        Q.  Okay.  From time to time is it
19    accurate that certain documents are provided
20    on the website to the loan originators to
21    review?
22        A.  I think I'd have to ask you to be
23    more specific.  I mean, we have lots of
24    documents, and so I'm not sure what documents
25    you would be referring to.

                                            28

1        Q.  Well, what do you mean by lots of
2    documents?  Can you give me some examples and
3    I could focus on the ones I'm concerned with?
4        A.  Well, like I told you, we have the
5    World Lending Group agreement that's on the
6    website that they can view at any time.  We
7    have our policy employee manual that's out
8    there.
9        Q.  Okay.  Is there ever any updates to
10    the loan originator agreements that's posted
11    on these websites when someone logs in?

27533CroteauSandra051308

12  A.  Yes, and I'd like to explain that a
13  little.
14       When we have significant changes to
15  the agreement we do post that particular
16  change, but we do what we call a yearly
17  signing of the agreement again, so they would
18  see any updates at that time.
19       Q.  Okay.  And how is it that they
20  are -- how is it that they review or
21  acknowledge these updates?  Are you aware of
22  the facts regarding that?
23       MR. GENTILE:  I'm going to object.
24       It calls for speculation, hopelessly
25       vague and ambiguous.

                                        29

1       When you say they, you're talking
2       very generally to any representative of
3       the company, and it's a fairly large
4       class of people.
5       MR. AIN:  That's fair.
6       Q.  (By Mr. Ain)  Sandra, have you ever
7  seen someone -- well, let's be specific.  A
8  loan originator, have you ever helped one of
9  them log into the system?
10      A.  I have not, no.
11      Q.  Okay.  Are you familiar with the
12  log-in procedure?

27533CroteauSandra051308

13        A.  Yes, I am.

14        Q.  Can you just give me a brief

15   description of that?

16        A.  You have to have -- well, first of

17   all, you're issued an agent ID, which is

18   unique to you.  You enter that in as your

19   user ID, and then you enter a password and

20   that gets you into the site.

21        Q.  And what can you do on this website

22   exactly?

23        A.  I'm thinking.

24        Q.  Take your time.

25        A.  You can enter your loans through the

                                           30

1    Global Equity Lending site.  You know, that's

2    how we submit our loans, our mortgage loans.

3         Q.  What else?

4         A.  You also would renew, for your

5    annual renewal compliance, you would go

6    through a questionnaire.  You would

7    acknowledge the questions, yes or no.

8             Any important notice that we would

9    have we would put out there on the website

10   for you to acknowledge, and again it is

11   electronic so we would capture the signature

12   and the date of that acknowledgment.

27533CroteauSandra051308

13      Q.   Okay.  What are some of these

14   important notices that would be provided?

15      A.   For instance, we have a fraud policy

16   that we want to make everyone aware of, and

17   they do have to acknowledge the fraud policy.

18      Q.   How would they acknowledge it?

19      A.   Electronically, they would read the

20   information, check off a box that says I

21   accept it, and type in their name and submit

22   it, and we capture that in the back end.

23      Q.   Now, at what point -- is there like

24   an area in the website where you have these

25   notices or do they automatically pop up when

31

1   you log in?

2      A.   They automatically pop up when you

3   log in.

4      Q.   Okay.

5      A.   If you have not signed in.

6      Q.   I assume -- if I'm wrong correct

7   me -- but I assume, say I log in.  At that

8   point a window pops up and says please review

9   and accept, for example, our fraud policy.

10   Is that accurate?

11      A.   Yes.

12      Q.   Okay.  And then would you be able to

13   ignore an important notice like a fraud

Page 30

27533CroteauSandra051308

14    policy and continue about your business,

15    whether it's to upload or download mortgage

16    documents?

17        A.  It would depend on --

18            MR. GENTILE:  I'm going to object.

19            Excuse me a minute, Ms. Croteau.

20        I'm going to object as vague and

21        ambiguous.

22            Farris, you're using the term "you."

23        Are you talking about her personally or

24        are you talking about an applicant or

25        someone who is signing on?

32

1            MR. AIN:  You're correct, my

2        apology.

3        Q.  (By Mr. Ain)  Let's talk about a

4    loan originator.

5        A.  It would depend on --

6        Q.  Would they be --

7        A.  It would depend on the document.

8    Sometimes we do allow them to move forward

9    for a certain period of time, but eventually

10    they would have to acknowledge it.

11        Q.  Okay.  What's an example of a

12    document that they may not have to accept

13    right then and there and they could move

27533CroteauSandra051308

14    forward for some time?

15         A.  The sexual harassment training that

16    we have out on our website.

17         Q.  Is that the only example?

18         A.  I think we allow them to bypass one

19    time for our advertising policy, and again it

20    depends at the time what we have out there

21    for them.

22         Q.  Okay.  What about updates to the

23    mortgage loan originator employment agreement

24    with World Lending Group?  When that's

25    updated are they allowed to bypass that, if

                                              33

1    you know?

2         A.  It's hooked to our annual renewal

3    compliance, and they have a small window of

4    time.  They have like ten days to read it

5    over and acknowledge it.  They may have like

6    ten opt outs.  I'm not quite sure what it's

7    set on now, but that's kind of what we call

8    it, where they can opt out a few times.

9         Q.  By opt out you mean just delay the

10    acknowledgment for a later time?

11         A.  That is correct, yes.

12         Q.  You do not mean opt out as in not

13    agree to the document and continue to work

14    and be employed.

27533CroteauSandra051308

15    A.  No, thank you for clarifying it.

16  They would just opt out at that particular

17  moment.  They would still, the next time they

18  sign on, the agreement would be back on there

19  again for them to acknowledge.

20    Q.  Okay.  Sandra, do you remember

21  signing a declaration in support of

22  defendant's motion on or about January 16th,

23  that would be your first declaration?  Do you

24  remember that?

25    A.  Yes, I do.

34

1    Q.  Okay.  Do you happen to have a copy

2  of it with you?

3    A.  Yes, I do.

4    Q.  Okay.  The attachment to your

5  declaration there is Exhibit A.  Do you have

6  that in front of you?

7    A.  No, I don't.

8    Q.  Take a look at Page 4, what's

9  labeled as Paragraph 15.  You testified under

10  oath in this document that the agreement

11  that's attached as Exhibit A, which I

12  understand you don't have with you at this

13  time, is a copy of the agreement stored

14  electronically by GEL under the name of

27533CroteauSandra051308

15  Dolores Arreguin and executed on April 2nd,

16  2002.  Do you remember signing this under

17  oath?

18      A.  Yes, I do.

19      Q.  Did you get a chance to review that

20  agreement?  I know you don't have it with you

21  now, but at the time that you prepared this

22  declaration did you get a chance to review

23  it?

24      A.  I'd have to say not fully, no.

25      Q.  Okay.  Do you know when Dolores

35

1  started working for World Lending Group?

2      A.  I believe according to our records

3  her official hire date was July of 2002.  I

4  think it was the 19th, but I don't know for

5  sure.

6      Q.  Okay.  Because we've been trying to

7  reconcile the dates here and I'm hoping you

8  could help us a little bit.

9          I think what may have happened in

10  April of '02 is that Dolores may have started

11  the application process.  Is that possible,

12  and maybe that's why this was signed then?

13          MR. GENTILE:  Well, I'm going to

14      object as vague, ambiguous, also calls

15      for speculation, and I ask you to

27533CroteauSandra051308

16    rephrase the question.

17         MR. AIN:  Fair enough.  I

18    understand, Counsel.  Hold on one

19    second.  I want to find the name of

20    this.

21         Q.  (By Mr. Ain)  Sandra, did you work

22    at World Financial Group with Dolores in 2001

23    on?

24         A.  I believe Dolores was with WMA

25    Mortgage Services, and that was not under

                                        36

1    World Financial Group.

2         Q.  Okay.  Did you work with her at any

3    point prior to -- go ahead.

4         A.  When I worked for World Marketing

5    Alliance I did not have any field

6    interactions, so I cannot say that I did or

7    did not.

8         MR. MCLEAN:  Let him finish his

9    question.

10        Q.  When was the first time you met

11   Dolores?

12        MR. GENTILE:  When you say met, you

13   mean personally met or talked on the

14   phone or communicated?

15        Q.  Generally, communicated with her on

27533CroteauSandra051308

16  the phone or met her in person or became

17  aware of her.

18      A.  I met her at one of our conventions.

19  I really don't remember what year that was.

20      Q.  At one of the conventions?  Okay.

21  Do you know if Dolores applied for a job with

22  World Lending Group in April of 2002?

23      A.  I wasn't here then.

24      MR. GENTILE:  I'll object to the

25      extent it calls for speculation.

37

1      Q.  Go ahead.  You were going to say you

2  weren't with the company?

3      A.  I wasn't with the company then.

4      Q.  Okay.  I'm looking at your

5  declaration right now.  If you could please

6  take a look at Paragraph 18 on Page 4.  Go

7  ahead and read that to yourself and then when

8  you're ready let me know.

9      A.  Okay.

10      Q.  Can you explain to me exactly when

11  this would have happened?

12      A.  I'm not sure I understand the

13  question.

14      Q.  Well, you started with the company

15  in January of '03 and I'm just trying to get

16  a time frame of what it is you knew prior to

Page 36

27533CroteauSandra051308

17    January of '03.

18        If Dolores applied for the job

19    somewhere in July of '02 or even maybe April,

20    for all we know, what knowledge do you have

21    about this process that's referenced here in

22    Paragraph 18 presumably prior to January

23    of -- prior to when you started with the

24    company in January of '03?

25        MR. GENTILE:  Okay, again I'm not

38

 1        trying to be difficult here, but I'm

 2        going to object as vague and ambiguous

 3        in the extreme.

 4            The process set forth in Paragraph

 5        18 has a number of components to it, and

 6        I would ask you, Mr. Ain, to break it

 7        down for the witness.

 8            MR. MCLEAN:  Let me just throw one

 9        other thing in there, Mr. Ain, is

10        that --

11            MR. AIN:  Yes.

12            MR. MCLEAN:  -- Ms. Croteau's

13        testimony, if you'll recall, with regard

14        to the website refers to the uploading

15        in the normal course of business of

16        mortgage loan applications, which is one

17    of the references in Number 18.

18        So it's not just something that

19    would have preceded January or gone back

20    to April of '02 but something, if I

21    understand her testimony, would be

22    ongoing during the course of her

23    employment with Global Equity Lending.

24        MR. AIN:  Fair enough.

25    Q.  (By Mr. Ain)  And that's kind of the

39

1    clarification I'm trying to reach that the

2    process before January of '03, Sandra, to the

3    best of your knowledge, it would have been

4    the same process when you started in January

5    of '03; is that correct?

6    A.  I believe it to be, yes.

7    Q.  Okay.

8        MR. AIN:  Is there a way we can get

9    a copy of the Exhibit A that's attached

10    to the declaration?

11        MR. GENTILE:  My understanding is,

12    I'm 99 percent positive that it's the

13    same document that's been Bates stamped

14    as GEL 001 through GEL 006.

15        MR. MCLEAN:  I have that document in

16    front of me if you're willing to go on

17    that representation.

Page 38

27533CroteauSandra051308

18          MR. GENTILE:  I'm sorry?

19          MR. MCLEAN:  I have that document in

20      front of me if Mr. Ain is willing to go

21      on that representation.

22          MR. AIN:  I will accept that

23      representation.  The documents are

24      practically identical with the exception

25      of the Exhibit A stamp on the bottom,

40

1       and they're both dated April of '02 as

2       the print name date of when Dolores

3       Arreguin would have purportedly have

4       reviewed this document and submitted it

5       on the Internet.

6          Q.  (By Mr. Ain)  Now, Sandra, can you

7    explain to me on Page 6 of this document, how

8    is it that this document would have been

9    reviewed and dated April of 2002?

10          MR. GENTILE:  Again, not to be

11      difficult, but object as vague and

12      ambiguous.

13          MR. MCLEAN:  And if you know.

14          MR. AIN:  Okay.

15       A.  I can only tell you of how it would

16    have been starting in 2003, to let you know

17    how.

27533CroteauSandra051308

18      She could have started the agreement

19   and signed it electronically on line and then

20   the paperwork would have been mailed in

21   later, the paperwork being the I-9 and the

22   W-4, and until we received that she would not

23   have been an official employee but she would

24   be a pending employee waiting for a

25   background confirmation.

41

1      Q.   Okay.  Do you have any knowledge as

2   to when Dolores began the application

3   process?

4      A.   Actually, the only record I have is

5   a report that's done through our system that

6   tells us that she electronically signed this

7   document on 4/2, and that's how that date

8   came about.

9      Q.   Okay.  Now, this document, if we go

10   back to Page 1, it's labeled Global Equity

11   Lending, Inc. Mortgage Loan Originator

12   Employment Agreement.

13      Was Global Equity Lending in

14   existence in April of 2002?

15      MR. GENTILE:  And, again, I just

16      want to object on the basis of

17      vagueness, ambiguity and also calls for

18      a legal conclusion.

Page 40

27533CroteauSandra051308

19          You say in existence, you're talking
20     about legally in existence?  De facto in
21     existence?  I mean, I just want to make
22     sure the witness understands the
23     question, and it may be very well
24     calling for a legal conclusion.
25          MR. AIN:  Okay, that's fair enough.

                                              42

1     Q.  (By Mr. Ain)  Sandra, at the time in
2  April of 2002 who was the employer?  Would it
3  have been World Equity Lending or would it
4  have been World Lending Group?
5     A.  World Lending Group was the name of
6  the company, when I came in in 2003.  And,
7  again, we changed our name to Global Equity
8  Lending.
9     Q.  Okay.  Now, looking at this document
10 do you know why Global Equity Lending is
11 written there at the top of that page if the
12 company name didn't change until after 2003?
13     A.  How we keep our electronic
14 signatures, this was -- obviously it was an
15 error.  The Global Equity Lending agreement
16 should have been World Lending Group
17 agreement.  This was clearly an error.
18          I thought this was the earliest

27533CroteauSandra051308

19    version of the document, since I came in at

20    2003, and that's the document that we had

21    sent over.

22        Q.  Okay.  Okay.  Now, this document, is

23    this how it would have been retrieved with

24    Dolores Arreguin's printed name on it and

25    dated 2002?

43

1        A.  It comes off our system and you

2    merge the two together is how it comes off.

3        Q.  Okay.  So basically you have a list

4    of agreements that existed from time to time

5    and a list of I guess I accept via the

6    Internet, and based on the date you would

7    compare it to the document that existed at

8    the time and that's how you could tell what

9    they accepted or did not accept, potentially?

10        A.  Yes, I think that's a fairly

11    accurate statement.

12        Q.  Okay.  Sandra, we've been going for

13    about an hour.  Did you want to take a break

14    for five minutes or do you want to keep

15    pushing through?

16        A.  Is it going to be long?

17        Q.  It's up to you.  It's just I'm

18    watching the clock and it's not a marathon, I

19    don't want to tire you out.

27533CroteauSandra051308

20      A.  No, I'm fine.

21          MR. GENTILE:  I'm sorry, how much

22      time do you have?  What's your

23      anticipated length of the depo, Mr. Ain?

24          MR. AIN:  I wouldn't be surprised if

25      we're done in another hour.  That's why

                                        44

1       I want to see if she wants to take a

2       quick break now.

3           THE WITNESS:  Oh, yeah, if it's

4       going to be another hour then a quick

5       break would be nice.

6           MR. AIN:  Okay, go ahead.  Let's

7       take a break for about five minutes.

8           How about when we're all in the

9       picture -- it's 11:05 right now.  Once

10      everybody's seated we'll reconvene at

11      11:10 my time.

12          MR. GENTILE:  Good enough.  Thank

13      you so much.

14          MR. AIN:  Okay.

15          (Recess.)

16      Q.  (By Mr. Ain)  Sandra, I have a few

17      questions for you, and I think I'm going to

18      wrap it up because most of what we're trying

19      to address here occurred prior to when you

                    Page 43

27533CroteauSandra051308

20  started working in January of '03, but let me

21  just ask you a few questions real quick.

22          Looking at the documents that is

23  Bate stamped GEL 021 to 025, have you seen

24  this document before?

25          A.  Yes, I have.

45

1       Q.  Okay.  Turn to Page 25, please, of

2  that document, or what's labeled GEL 025.

3          This document seems to have an

4  actual signature on it as opposed to what we

5  were discussing earlier as, you know, the

6  application process where you click a button

7  and accept on the Internet.

8          Do you know how this document would

9  have been signed or how it was produced to

10  Dolores Arreguin?

11          A.  I don't have knowledge of that, no.

12          Q.  To the best of your knowledge was

13  there ever a point where the application

14  process was done face-to-face as opposed to

15  via the Internet?

16          A.  I'm sorry, I don't know that.

17          Q.  Okay.  Today are all -- well, from

18  2003 on are all application processes for

19  loan originators completed via the Internet?

20          A.  Yes, they are.

                    Page 44

27533CroteauSandra051308

21      Q.  Does any of these loan -- do any of

22  these loan originators have an opportunity to

23  discuss with anyone with the company the

24  terms of these agreements?

25          MR. GENTILE:  Well, I'm going to

                                                46

1       object.  Calls for speculation.

2           It also seems to be irrelevant,

3       because from what I understand we agreed

4       that this deposition would be limited to

5       Dolores Arreguin and her consent to the

6       contract or contracts.  I think we're

7       going a little far afield here, Mr. Ain.

8           MR. AIN:  Well, to the extent that

9       we're trying to understand the process

10      and the policies and procedures that

11      surround the -- you know, the

12      application process here, I'd like to

13      just get an understanding of whether,

14      you know, a loan originator -- and I

15      understand that, you know, Sandra wasn't

16      there prior to '03, but I'm just trying

17      to solicit some testimony regarding the

18      process as she knows it from January '03

19      on, because, you know, if it's changed

20      then, you know, it's relevant to how

Page 45

27533CroteauSandra051308

21      Dolores would have -- you know, the

22      plaintiff would have signed and reviewed

23      these documents.

24          Can you kind of allow me some

25      testimony regarding whether a loan

47

1       originator employee would have had an

2       opportunity to call Sandra, for example,

3       and ask for some explanation or some

4       help in the application process?

5           MR. GENTILE:  I have difficulty with

6       that, because does the witness know how

7       that is accomplished?  I think that's

8       one question.  Why don't you ask her?

9           MR. AIN:  Let's start with that,

10      that's all right.  I'll back up a little

11      bit.

12      Q.  (By Mr. Ain)  Sandra, have you had

13  anybody ever call you, any loan originator

14  ever call you with questions regarding the

15  application process?

16      A.  No, I have not.

17      Q.  If a loan originator potential

18  applicant or a potential employee has some

19  questions regarding the application process

20  and the signing of these documents, who would

21  they contact?

27533CroteauSandra051308

22        A.   We have a customer support section

23    that answers all questions, and they would

24    contact customer support.   That's all out

25    there on our website for them to know what

48

1    e-mail to contact and what number to call if

2    they have questions.

3        Q.   Did you have to sign a similar

4    agreement that contains an arbitration clause

5    before you became employed in January of '03?

6             MR. GENTILE:   I'm going to object.

7        I think it's vague and ambiguous.   It's

8        irrelevant.

9             It also invades her right to

10       privacy.   I don't see how that has

11       anything to do with the issues here.

12            I mean, the issue here is Dolores

13       Arreguin's intent and the issue of the

14       contract itself.   I mean, what this

15       witness did when she signed on with

16       Global Equity Lending has nothing to do

17       with Dolores Arreguin, plus she's not

18       even in the same capacity as Dolores

19       Arreguin.

20            So, frankly I'm going to instruct

21       the witness not to answer the question.

27533CroteauSandra051308

22        MR. AIN:  Okay, that's fine, I

23    understand.

24        Q.  (By Mr. Ain)  Sandra, do you know

25    who Community Lending is?

49

1        A.  I've heard of them.  I'm not sure

2    who they are.

3        Q.  What have you heard about them?

4        A.  That they're a mortgage lending

5    company.

6        Q.  Do you know if they were ever used

7    in conjunction with preparing loan

8    applications for World Lending Group?

9        A.  I wouldn't know that, no.

10        Q.  What about Callie Leasing?  Are you

11    familiar with that name?

12        A.  No, I'm not.

13        Q.  Let me turn your attention to Page

14    Number GEL 027.

15        MR. GENTILE:  Just so we know we're

16        all on the same page here, no pun

17        intended, this is the employee

18        acknowledgment regarding the World

19        Lending Group Policy Manual.  Am I

20        correct, Farris?

21        MR. AIN:  Yes, that's correct.

22        MR. GENTILE:  Okay.

Page 48

27533CroteauSandra051308

23      Q.   (By Mr. Ain)  Sandra, have you seen

24   this document before?

25      A.   Yes, I have.

50

1      Q.   And when you say yes, are we talking

2   about this specific document that was signed

3   by Dolores or you've seen this document

4   generally?

5      A.   Both.

6      Q.   Okay.  To the best of your knowledge

7   if you look in the middle of this page under

8   the paragraph that starts, "I specifically

9   reviewed the following policies, including

10  any reporting requirements," and then you

11  have nine categories there.

12         Are those boxes supposed to be

13  checked by the potential employee?

14      A.   Honestly, I'm not sure.  I don't

15  believe so, but I can't say for sure.

16      Q.   Okay.  Do you know at the time that

17  Ms. Arreguin signed this in 2002, in July of

18  2002, whether there was actually an employee

19  policy manual?

20      A.   I wasn't here then so I don't want

21  to speculate.

22         MR. GENTILE:  We ask that you do not

27533CroteauSandra051308
23    speculate, Ms. Croteau.

24         MR. AIN:  Fair enough.

25    Q.  Is there an employee policy manual


51

1    today?

2         A.  Yes, there is.

3              MR. GENTILE:  Again, I'm going to

4         object.  I think that's based on

5         relevancy to specific issues.

6              If you can explain to me how this is

7         relevant to Dolores Arreguin's consent

8         of the contract I'd certainly like to

9         know.  Otherwise I'm going to instruct

10        her not to answer the question.  This

11        seems to be going into areas that may be

12        relevant if the case proceeds on its

13        merits.

14             MR. AIN:  It's relevant to the

15        extent of whether this signature, like

16        other documents the plaintiff has

17        signed, truly acknowledge what the

18        document she signed purports, such as

19        the fact that, as we heard yesterday the

20        plaintiff testify, there was no employee

21        policy manual at the time that she

22        signed this document, and I'm trying to

23        get an understanding of whether today
                        Page 50

27533CroteauSandra051308

24        there is one, if somebody's required to
25        check these boxes and whether they've

                                                   52

1         read these actual documents or not.
2              MR. GENTILE:  Well, what went on
3         today or what goes on today has no
4         relevance as to what went on in April or
5         July of 2002, so I think we're going far
6         afield, Mr. Ain.  I just can't see how
7         this is relevant to the issues.
8              And, as you know, the judge did call
9         for -- the judge's clerk did advise us
10        that there's a specific narrow issue
11        that you're supposed to make inquiry to
12        in these depositions.
13             MR. AIN:  Okay.
14             Can we go off the record for a quick
15        question?
16             MR. GENTILE:  Certainly.
17             (A discussion ensued off the
18        record.)
19        Q.  (By Mr. Ain)  Sandra, let me turn
20   you to your supplemental declaration that you
21   submitted.  Do you have a copy of that with
22   you?
23             MR. MCLEAN:  Give me a moment.
                        Page 51

27533CroteauSandra051308

24        MR. AIN:  Sure.

25        A.  Got it.

53

1            MR. AIN:  I don't have it anymore.

2            MR. GENTILE:  And for the record,

3        that's the one dated February 29th, '08;

4        right?

5            MR. AIN:  Give me one minute.

6            MR. GENTILE:  Sure.

7            MR. AIN:  Give me one second.  I

8        seem to have misplaced it myself.

9            MR. GENTILE:  Sure.

10        Q.  Sandra, take a look at your

11    declaration starting with Paragraph 5 on

12    until Paragraph 9.  Can you please review

13    those briefly and let me know when you're

14    ready?

15        A.  Okay.

16        Q.  Okay.  Sandra, starting with

17    Paragraph 6 on Page 2, what knowledge do you

18    have regarding the application process that

19    Dolores went through that you describe here?

20        A.  I was using my knowledge of when I

21    came in in 2003 and was going by it wasn't

22    that much different in 2002.

23        Q.  Okay.  But you don't know

24    specifically whether Dolores went through the

27533CroteauSandra051308

25    process, clicked on the submit button and

54

1    went on to Page 2 as described in this

2    particular paragraph; do you?

3        A.  I believe this is the application

4    question page, and that may be in question at

5    that time in 2002.  We may not have had that

6    up there.

7        Q.  Do you have any specific knowledge

8    of whether Dolores went through this

9    application process that you described in

10    these paragraphs that I had you read, or was

11    that just simply based on what the process

12    was in January of '03?

13        A.  Well, what I have is the report

14    showing me that she electronically signed the

15    agreement, which means she would have gone

16    through and clicked off A through D on Page

17    10 of her agreement by the report that I got

18    that she started the sign-up in April of

19    2002.

20        Q.  And when you say the agreement,

21    which agreement are you referring to?  Is

22    that the one that we were -- that was

23    attached to your Exhibit A of your

24    declaration as what we have now described as

27533CroteauSandra051308
25    GEL 1 through 6?

55

1            MR. GENTILE:  Or otherwise known as
2         Global Equity Lending, Inc. Mortgage
3         Loan Originator Employment Agreement,
4         correct?
5         A.   Could you ask that question again
6    now that I have it in front of me, please?
7            (Whereupon, the record was read by
8         the reporter as requested.)
9         A.   As we talked about, that was not the
10   correct agreement.  I thought at the time it
11   was, but it was not.
12        Q.   Okay.  Can I draw your attention to
13   document GEL 21 through 25 again?
14           Sandra, this is the correct
15   agreement for that time frame of when Dolores
16   was applying for a job; do you agree with
17   that?
18        A.   Yes.
19           MR. GENTILE:  I'm going to just make
20        sure we have -- let's make sure we have
21        a clear record here.
22           When you're talking about the
23        agreement you're talking about the World
24        Lending Group, Inc. Mortgage Loan
25        Originator Employment Agreement Bates
                         Page 54

27533CroteauSandra051308

56

1       stamped GEL 021 through 025, is that
2       correct, Mr. Ain?
3           MR. AIN:  Correct.
4           MR. GENTILE:  Okay.  I just want to
5       make sure we're all on the same page
6       here.
7       Q.  (By Mr. Ain)  Sandra, this document
8   was physically signed July 19th, 2002.  And I
9   want to ask you now, are you sure that
10  Dolores would have went through the
11  application process on the Internet as you
12  described in your declaration or is it
13  possible that this document was physically
14  provided to her, signed and sent back, as
15  opposed to clicking a submit on the website
16  the way things are today?
17          MR. GENTILE:  I'm going to object as
18      vague and ambiguous and ask you to break
19      it down.  That's compound.  Please.
20          MR. AIN:  Okay, fair enough.
21      Q.  Sandra, is it possible that Dolores
22  did not check the "I agree" on the website
23  when she was applying for a job and actually
24  was provided with this document to physically
25  sign?  If you could answer.

Page 55

27533CroteauSandra051308

57

1        A.  I don't believe it could be possible

2   because we wouldn't have been able to

3   register her date and signature if she did

4   not click that "I accept" on line.

5            But obviously I was not there

6   physically to see her do it, so I'm not sure

7   what you're asking me.

8        Q.  Do you know whether Dolores was

9   provided with an application packet by an

10  individual of the name of Carl Inlow?

11       A.  I have no knowledge of that.  I

12  don't know.

13       Q.  Okay.  Let me take a quick

14  two-minute break and I think I'm done.

15           (Recess.)

16       Q.  Sandra, is there anything else that

17  you left out that you know about Delores's

18  application process that she went through

19  back in July of 2002?

20       A.  I can't think of anything.

21           MR. GENTILE:  Object, vague and

22       ambiguous.

23       Q.  Go ahead and answer.

24       A.  I can't think of anything.

25       Q.  Other than what you've provided in

27533CroteauSandra051308

58

1   your two declarations, do you have knowledge
2   of any other circumstances regarding how she
3   would have went through the application
4   process?
5       A.  No.
6           MR. AIN:  All right.  I have no
7       further questions.
8           If we could enter into a stipulation
9       upon my relief of the court reporter of
10      her duties, if we could have the
11      transcript provided to the witness to
12      review.
13          I'll give the witness seven days to
14      review the transcript from when it's
15      received.  After that she will advise
16      her attorneys of any changes and I will
17      be advised of those changes by counsel
18      for defendant, Greg Gentile, preferably
19      before June 3rd.
20          Is that okay, Greg?  I think we did
21      it with the same date for Dolores.
22          MR. GENTILE:  Yeah.  That was my
23      understanding.  Why don't we just have
24      the same stipulation we entered into
25      yesterday, assuming we can have the

27533CroteauSandra051308

59

```
 1     transcript ready and provided to us by
 2     May 28th, if it could be e-mailed
 3     directly to me and to Mr. McLean, I'm
 4     assuming Mr. McLean can send it directly
 5     to Ms. Croteau for review and I would
 6     assume that Ms. Croteau, it would be --
 7     you'd have three days would be
 8     sufficient for you to review the
 9     transcript and make any changes?
10          THE WITNESS:  Yeah, as long -- I'll
11     be back by then, so that will be fine.
12          MR. GENTILE:  So that would be what,
13     that would be May 31st?  And then if
14     there's any changes you can advise
15     myself and Mr. McLean and you can get
16     that information directly to Mr. Ain.
17          Our supplemental papers need to be
18     filed June 9th, so it should be the same
19     stipulation as we entered into yesterday
20     with respect to Ms. Arreguin's review of
21     the transcript, okay?
22          MR. AIN:  Let's do this, go ahead.
23     We'll do the same stipulation as we did
24     yesterday.  I only have one question
25     with regard to the original transcript.
```

27533CroteauSandra051308

60

1      I'm not sure how Georgia's laws may
2      differ with regards to the release of
3      that transcript and who it goes to,
4      preferably I'd like to get it.
5          THE COURT REPORTER:  Normally the
6      taking attorney will receive the signed
7      -- or not the signed, but the sealed
8      original, and then it's up to you and
9      whatever state rules you have whether
10     it's submitted to the Court or not, but
11     you would receive that as a matter of
12     course.
13         MR. AIN:  Okay, excellent.  Then
14     I'll receive the original, and other
15     than that we will enter into the same
16     stipulation entered into yesterday in
17     the plaintiff's deposition.
18         MR. GENTILE:  That's fine.  Close of
19     business of Wednesday, June 4th we'll be
20     advised of any changes made by
21     Ms. Croteau.  Okay?
22         MR. AIN:  Thank you, Sandra, for
23     your time.
24         (Whereupon, the deposition was
25     concluded at 2:50 p.m.)

27533CroteauSandra051308

61

```
 1                INDEX OF EXAMINATION

 2

 3   WITNESS:  Sandra Croteau

 4

 5   EXAMINATION                    PAGE

 6

 7   By Mr. Ain                      3

 8                      - - -

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```