EXHIBIT 3

27533PenningtonEricDavid051308

1

```
 1            UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA
 2
     DELORES A. ARREGUIN, for
 3   herself and other members
     of the general public
 4   similarly situated,
                                  Case No. C 07 6026
 5          Plaintiff,

 6   vs.

 7   GLOBAL EQUITY LENDING,
     INC., a Georgia
 8   Corporation, and DOES 1
     through 10, Inclusive,
 9
            Defendants.
10   ~~~~~~~~~~~~~~~~~~~~~~~~~

11            DEPOSITION OF
            ERIC DAVID PENNINGTON
12
            May 13, 2008
13            2:54 p.m.

14            Suite 200
          2475 Northwinds Parkway
15         Alpharetta, Georgia

16   Valerie N. Almand, RPR, CRR, CCR-B-531

17

18

19

20

21

22

23

24

25
```

27533PenningtonEricDavid051308

2

```
 1              APPEARANCES OF COUNSEL

 2   On behalf of the Plaintiff (via
     videoconference):
 3
          LAW OFFICES OF HERBERT HAFIF, APC
 4        FARRIS E. AIN, Esquire
          269 West Bonita Avenue
 5        Claremont, California 91711
          909.624.1671
 6        farris.ain@hafif.com

 7   On behalf of the Defendants (via
     videoconference):
 8
          ROPERS, MAJESKI, KOHN & BENTLEY, PC
 9        GREGORY M. GENTILE, Esquire
          80 North 1st Street
10        San Jose, California  95113
          408.287.6262
11        ggentile@ropers.com

12        MERRITT & TENNEY, LLP
          WILLIAM H. McCLEAN, Esquire
13        Suite 500
          200 Galleria Parkway
14        Atlanta, Georgia  30339
          770.952.6650
15        770.952.0028 (facsimile)
          wmclean@merritt-tenney.com
16

17

18

19

20

21

22

23

24

25
```

27533PenningtonEricDavid051308
3

```
1              Deposition of
            Eric David Pennington
2              May 13, 2008

3    ERIC DAVID PENNINGTON,

4       having been duly sworn, testified as

5    follows:

6       EXAMINATION

7       BY-MR.AIN:

8       Q.  Good morning.  Can you please state

9    your name and spelling for the record?

10      A.  My name is Eric David Pennington,

11   and it's E-R-I-C, David, D-A-V-I-D, and the

12   last name is P-E-N-N-I-N-G-T-O-N.

13      Q.  Good afternoon, Eric.  My name is

14   Farris Ain.  I am the attorney for Dolores

15   Arreguin in the lawsuit of Dolores Arreguin

16   and the class against Global Equity Lending.

17          We're here to take your deposition

18   today, and I have a couple of questions I

19   want to start out with.

20          Have you ever had your deposition

21   taken before?

22      A.  Yes.

23      Q.  How many times?

24      A.  I'd say less than ten.

25      Q.  Eric, the purpose of this deposition
```

4

27533PenningtonEricDavid051308

1  is regarding a limited issue dealing with the

2  application process that a loan originator

3  goes through, and specifically we're dealing

4  with the plaintiff's application process and

5  the loan originator employment agreement that

6  she would have purportedly signed.

7          I'm going to ask you some questions

8  about the circumstances surrounding the

9  application process and specifically the

10  application and employment of Dolores

11  Arreguin, but before I get to the substantive

12  issues here I'm going to go over some ground

13  rules.

14          I know you've had your deposition

15  taken almost ten times, but I'll lay down

16  some rules just so you understand what's

17  going on here today.

18          In front of you is the court

19  reporter.  She's taking down everything

20  that's being said by myself, the other two

21  attorneys and, of course, you.

22          This, although we're in an informal

23  setting, everything here is being asked of

24  you and your answers are requested under

25  oath, under penalty of perjury.  And to

5

27533PenningtonEricDavid051308

1  facilitate the process I'm going to ask some

2  questions, I'm going to give you time to

3  respond.

4        We have a little bit of a delay in

5  the televideoconference system, so I will

6  allow an extra minute or two there for

7  counsel to insert their objection, so give

8  them a little bit of time before you answer.

9        And I'm entitled to your best answer

10  today.  Give me responses that you have

11  knowledge about as opposed to speculations.

12  I don't want you to give me any guesses or

13  speculations.

14        I'll give you the canned book

15  example of giving me an estimate of what that

16  table in front of you, what the dimensions of

17  it are.  You could look at it, although you

18  don't have a ruler, you could tell me it's

19  ten feet by four feet, as opposed to the

20  table here in front of me which you cannot

21  see.  I don't want you to speculate that it

22  must be the same size as the table you have

23  over there.

24        So unless you have knowledge about

25  your responses to my questions, just let me

6

27533PenningtonEricDavid051308

1   know.

2          You're entitled to answer that you

3   don't recall.  The events that occurred here

4   are back from 2002, 2003 time period, so if

5   you don't recall that's a perfectly fine

6   answer, just tell me.

7          If my questions are not clear I want

8   you to tell me that you don't understand the

9   question and I will ask it again or clarify

10  what I mean.

11         I don't want you to guess at what I

12  meant by my question because I will assume

13  that you understood my question.  Let me know

14  that you don't understand it because I will

15  assume you understood it when you answer.

16         At the end of this deposition the

17  court reporter will prepare a transcript.

18  You'll have an opportunity to review it, make

19  any changes, if there's a name misspelled, of

20  course, that's understood or if there's

21  something wrong, you want to correct, you're

22  entitled to do that prior to signing your

23  deposition transcript under oath.

24         However, if you make any substantive

25  answers, changes, for example from a yes to a

7

1   no, I will be allowed to comment on the

27533PenningtonEricDavid051308

2   credibility of your testimony with regard to

3   that question or anything else that may be in

4   the deposition transcript.

5           With that being said, I think we've

6   covered the basics for a deposition.  Do you

7   have any questions at this time?

8       A.  No, I do not.

9       Q.  Okay.  Is it okay if I call you Eric

10  throughout the deposition?

11      A.  That is okay.

12      Q.  Or do you -- okay.

13          Eric, did you take any drugs prior

14  or any alcohol prior to this deposition that

15  may affect your ability to answer truthfully

16  today?

17      A.  No.

18      Q.  Okay.  And have you ever been

19  convicted of a felony?

20      A.  No.

21      Q.  Okay.  Eric, what is your current

22  position with Global Equity Lending?

23      A.  I do not have a position currently

24  with Global Equity Lending.

25      Q.  When were you last employed by

8

1   Global Equity Lending?

27533PenningtonEricDavid051308

2  A. I was employed with the corporate

3 office of Global Equity Lending for a brief

4 period of time in 2002, I believe it was from

5 February 2002 to July of 2002.

6  Q. Would that be Global Equity Lending

7 or World Lending Group?  Do you know?

8  A. At the time I believe the name was

9 World Lending Group.

10  Q. Okay.  Do you know when that name

11 change occurred?

12  A. I don't recall.

13  Q. Okay.  What did you do for World

14 Lending Group in February of '02 until the

15 end of your employment in July of '02?

16  A. My principal duties were to help set

17 up the company.  I hired new employees.  I

18 worked with attorneys and HR firms basically

19 to prepare the company to originate loans.

20  Q. Can you describe to me specifically

21 your hiring of new employees process and what

22 you set up?

23  MR. MCLEAN:  Let me object.  There's

24  been previous testimony, the distinction

25  between corporate employees and loan

9

1  originator employees.  Could you

2  distinguish or clarify what you're

Page 8

27533PenningtonEricDavid051308

3    referring to?

4        MR. AIN:  I'll refer to both at this

5    time because he said -- his testimony

6    was the hire of any employees, so I'll

7    start specific and I'll narrow my

8    questions to the loan originators.

9        MR. MCLEAN:  Fair enough.

10        MR. AIN:  I just want to understand

11    the overall process.

12        THE WITNESS:  Could you repeat your

13    question, please?

14        (Whereupon, the record was read by

15    the reporter as requested.)

16    A.  I was referring to corporate

17    employees.  I was not retained to hire

18    salespeople employees.

19        I would interview various

20    individuals for open positions and make a

21    determination on whether they could be hired

22    or not.

23    Q.  Okay.  Did you ever or were you ever

24    involved in the hiring process for loan

25    originators?

10

1        A.  For a period of time I was a loan

2    originator myself and, as such, I had several

27533PenningtonEricDavid051308

3   people in my organization, and if that

4   constitutes hiring then I was involved in

5   that process.

6        Q.  Did you go through the application

7   process for a loan originator when you became

8   a loan originator employee for the company?

9        A.  I did.

10       Q.  Can you describe that process for

11  me?

12       A.  I honestly don't recall, as it was

13  several years ago, every step, but I am

14  familiar with the procedure at that time.

15  Would you like to hear that?

16       Q.  Please, to the best of your

17  recollection.

18       A.  To the best of my recollection the

19  process involves an on-line application where

20  questions are asked and information is keyed

21  into the computer.

22           It also involves the completion of

23  some documents in a paper format, as opposed

24  to an electronic format.

25           It's my recollection that a loan

11

1   originator receives a conditional offer

2   letter -- I don't know if that's the exact

3   terminology -- to work for the company.

27533PenningtonEricDavid051308

4       Q.  Okay.

5       A.  And conditioned upon a successful

6   background check and a compliance review and

7   whatever other procedures may have existed at

8   that time, you can become an employee of the

9   company.

10       Q.  Okay.  Now, this recollection is

11   based on the process you went through as a

12   loan originator, or your subsequent

13   experience with the company preceding

14   application?

15       A.  Both.

16       Q.  Both?  Do you recall specifically

17   what documents you filled out?

18       A.  I do not specifically recall which

19   documents I filled out.

20       Q.  Do you recall signing a mortgage

21   loan originator employment agreement?

22       A.  I don't actually remember signing my

23   agreement, but I am familiar with the process

24   and know that there was one, and I could not

25   have become associated with the organization

12

1   without doing so.

2       Q.  Can you describe for me that

3   process?

Page 11

27533PenningtonEricDavid051308

4      A.  I don't understand your question.

5      Q.  You said that prior to becoming an

6   employee there's a process in which you would

7   have had -- a potential employee, a potential

8   loan originator would have had to sign this

9   document.

10          To the best of your recollection

11  what was that process?

12      A.  I believe I answered that question

13  in stating that there was an on-line

14  application --

15      Q.  Okay.

16      A.  -- that was completed.  I know from

17  experience that every answer must be -- or

18  every question must be answered.

19          I know that that agreement included

20  an application that could be signed both on

21  line and for a period of time I believe there

22  was an opportunity to sign it with a wet

23  signature.

24          Those documents, either

25  electronically or paper, were submitted to

13

1   the corporate office for their review and

2   determination if an individual, myself in

3   this case, could become an employee of the

4   company.

27533PenningtonEricDavid051308

5      Q.  Do you recall if you signed a

6  physical, what you refer to as a wet

7  employment agreement, or did you go through

8  the Internet website process in accepting

9  that agreement?

10      A.  I honestly do not recall.

11      Q.  Okay.  Do you know the plaintiff,

12  Dolores Arreguin?

13      A.  I do not.  It is possible I may have

14  met her, but I don't believe I know her.

15      Q.  Okay.  With that being said, I

16  presume that you were not involved in her

17  application process.

18      A.  I do not recall being specifically

19  involved in her application process, as there

20  were many applications.

21      Q.  Okay.  Where did you work out of

22  when you worked for the company in 2002?

23      A.  I don't -- I don't know their

24  address.  It was in the Johns Creek area, but

25  I do not recall the street address.

14

1      Q.  Johns Creek, what state is that in?

2  Pardon my ignorance there.

3      A.  Georgia.

4      Q.  Georgia.  Okay.  Let me turn your

27533PenningtonEricDavid051308

5  attention to a document that has been Bate

6  stamped GEL 021 through GEL 025.

7          MR. GENTILE:  And, again, just for

8          the record, this is the World Lending

9          Group, Inc. Mortgage Loan Originator

10         Employment Agreement that bears the

11         signature of Dolores Arreguin dated

12         7/19/02 on the last page; correct?

13         MR. AIN:  Correct.

14         MR. MCLEAN:  Also for the record,

15         the Bate stamp numbering is GEL 001

16         through 006.

17         MR. GENTILE:  Well, actually I think

18         he was referring to, Bill, the agreement

19         with World Lending Group, 021.

20         MR. MCLEAN:  Okay.  I misheard.  My

21         apologies.

22         MR. GENTILE:  Okay.

23     Q.  (By Mr. Ain)  Eric, do you remember

24  seeing this document prior to today, not

25  necessarily the one Dolores signed, but the

                                        15

1  document in its normal existence?

2      A.  This does appear to be the document

3  that existed at this period of time.

4      Q.  And we're talking on or about April

5  of 2002.

                    Page 14

27533PenningtonEricDavid051308

6      A.   That is correct.

7      Q.   Okay.  When did you apply for the

8  loan originator position?

9      A.   I believe the year was 2002, but I

10  would be speculating for the exact date.

11      Q.   Do you recall the month, by any

12  chance?

13      A.   I do not.  But that could be

14  ascertained.

15      Q.   Okay.  Does this document in front

16  of you look like the employment agreement

17  that you were required to sign?

18      A.   As I stated earlier, I do not

19  specifically remember my agreement, but I am

20  familiar with their systems and procedures,

21  and this does appear to be the document that

22  existed at that period of time.

23          MR. GENTILE:  One admonition here.

24      I think we have an agreement that we're

25      not going to go into third-party

16

1      employment practices, et cetera.

2          I mean, he's here basically to talk

3      about the process that was used during

4      the relevant time frame.  I don't want

5      to start getting into Mr. Pennington's

27533PenningtonEricDavid051308

6    personal employment process with any of

7    the entities here.

8        I think we're going to have to start

9    objecting on the basis of his privacy

10    rights.  He's here as a person most

11    knowledgeable as to certain designated

12    categories propounded by the plaintiff,

13    and to the extent that they start going

14    beyond the area of Dolores Arreguin and

15    the actual process that was used during

16    this period, I think we're going far

17    afield in irrelevancy.

18        MR. AIN:  Well, Counsel, my only

19    concern here is it seems like what he

20    recalls as a PMK may have originated

21    from his own application process as

22    opposed to the process that Dolores

23    Arreguin went through, because it

24    appears that his employment ended right

25    about the time she was applying for the

17

1    job, which I will get to next.

2        But it's going to be very hard to

3    limit my questions because I need to

4    understand the application process that,

5    A, your first witness couldn't give me

6    answers to because she wasn't there, and

Page 16

27533PenningtonEricDavid051308

7    I'm not sure what he knows at this

8    point, if he only recalls his own

9    application process.

10        MR. GENTILE:  I want to give you

11    some latitude there, Mr. Ain, and

12    certainly understand that you need to

13    explore that.  I just want to make sure

14    we understand what the parameters

15    here -- what the parameters are here,

16    and he's here to talk about the

17    application process.

18        To the extent he can separate them

19    out I would rather have him do that,

20    than getting into his own specifics.

21        MR. AIN:  Fair enough.

22        MR. McLEAN:  I can short-circuit --

23        MR. GENTILE:  Why don't you go ahead

24    and proceed and we'll take it question

25    by question.

18

1        MR. McLEAN:  I can cut short a lot

2    of that if you will allow Mr. Pennington

3    to describe for you the foundation for

4    his knowledge upon which he is

5    testifying as a PMK.

6        MR. AIN:  I'm sorry, I got a lot of

27533PenningtonEricDavid051308

7     feedback on that.  Can you repeat what

8     you said?  I'm sorry.

9          MR. MCLEAN:  Sure.  We can cut short

10          a lot of this question and answer if you

11          will allow Mr. Pennington to describe

12          for you the foundation of his knowledge

13          for which he is a designated PMK on

14          specific issues that you've designated.

15          MR. AIN:  Okay, that's fair.

16     Q.  (By Mr. Ain)  Eric, can you please

17     describe to me what you know about the

18     application process on or about April to

19     August of '02 when plaintiff would have

20     applied for a job?

21          MR. MCLEAN:  Let me object at this

22          point.  That is a substantive question.

23          I was trying to cut short the issues

24          of whether or not Mr. Pennington's

25          knowledge was limited to the time period

19

1          of his employment and cut short a lot of

2          substantive questions about that.

3          I thought you were concerned

4          initially about the foundation of his

5          knowledge.  If you want to ask about

6          that, he's prepared to answer.  If you

7          want to ignore that, it is your

27533PenningtonEricDavid051308

 8    deposition.

 9        MR. AIN:  All right.  Let's go ahead

10        and ask that first, then.

11        Q.  (By Mr. Ain)  Eric, tell me about

12    the foundation of your knowledge with regards

13    to the subject matter of the application

14    process here today.

15        A.  Well, the foundation of my knowledge

16    probably stems primarily from my occupation.

17    Primarily what I do is I'm a partner in a

18    software development firm, and our firm was

19    retained by both WLG and what is now GEL,

20    what used to be World --

21        MR. MCLEAN:  Lending Group.

22        A.  -- Lending Group, to design and

23    build and host their software applications.

24        Q.  Their software applications?

25        A.  Yes.

                                              20

 1        Q.  What is a software application?

 2        A.  An on-line sign-up, a web-based

 3    sign-up for either company would be an

 4    example of a software application.

 5        Q.  And did this sign-up process also

 6    include the process by which a loan

 7    originator potential employee would have

27533PenningtonEricDavid051308

8   applied for the position or a job with World

9   Lending Group at the time?

10     A.  Yes.

11     Q.  Can you describe for me that

12   process?

13     A.  Can you become more specific?

14     Q.  How is it that a loan -- a potential

15   employee that would like to become a loan

16   originator, how is it that they go through

17   the website that you designed to apply for a

18   job?

19     A.  They would first make an application

20   with World Leadership Group.  There is also

21   an on-line application where contact

22   information and a contract takes place on

23   line.

24     Once they've completed that

25   application they are able to sign up with

21

1   what is now Global Equity Lending and what

2   was then World Lending Group.

3     Q.  Is World Leadership Group set up

4   specifically to accept on-line applications

5   for World Global Lending and GEL, who I'll

6   refer to from now on as the defendant, you

7   know, absent the name change, or did they

8   also do so for other loan companies?

27533PenningtonEricDavid051308

 9    A.  World Leadership Group to my

10   knowledge, and this may not be extensive in

11   this area, primarily did business with the

12   defendant.

13        Q.  Okay.  What is it that World

14   Leadership Group does?

15        A.  Could you be more specific?

16        Q.  What is the -- other than sign up on

17   their website, do they conduct any business?

18        A.  I know that they do a training,

19   leadership training, motivational training.

20   They are the multilevel arm of the

21   organization.

22        Q.  Do you know if they're a subsidiary

23   of World Lending Group?

24        A.  I do not.

25            MR. GENTILE:  I'll object to the

                                              22

 1            extent it calls -- I'll object to the

 2            extent it calls for a legal conclusion.

 3                MR. MCLEAN:  We're also getting a

 4            little far afield from the authorized

 5            scope of inquiry.

 6        Q.  (By Mr. Ain)  Did you set up World

 7   Lending Group's website?

 8        A.  Not personally, but my company did.

27533PenningtonEricDavid051308

9      Q.   Okay.   What about the World

10  Leadership Group?  Do they have a website as

11  well?

12      A.   They do.

13      Q.   And is that one and the same for the

14  purposes of the application process of the

15  defendant?

16      A.   In my opinion --

17          MR. GENTILE:   I'll object, vague.

18          MR. MCLEAN:   Go ahead and answer if

19      you can.

20      A.   In my opinion it is not.

21      Q.   Okay.   So if I was to apply for a

22  job at the time period of April or January of

23  '02 until -- or whenever this website was set

24  up until August of '02, how would I go about

25  applying for a job as a loan originator?

23

1      A.   You would be required to complete an

2  application with both World Leadership Group

3  and the defendant.

4      Q.   Okay.   Now, would I -- of course,

5  we're speaking hypothetical.  Do I or any of

6  these loan originators ever become an

7  employee of World Leadership Group?

8          MR. GENTILE:   I'm going to object.

9      It calls for a legal conclusion.   I

27533PenningtonEricDavid051308

10          think it's clearly irrelevant to the
11          issue framed by the Court.
12              MR. AIN:  Well, Counsel, you've
13          produced some contracts with World
14          Leadership Group that my client has
15          signed, and I'd like to just understand
16          what significance these documents have
17          in relationship to the defendant, and,
18          you know, if this was submitted at some
19          point as the contract in which she
20          signed an arbitration agreement, I'd
21          like to know what relevance this has to
22          the defendant and the plaintiff, so I'd
23          like to just explore that to the extent
24          that we could figure out if she's an
25          employee of World Leadership Group and

24

1          who World Leadership Group is as she
2          signed some documents with them on the
3          date that she was going through the
4          application process.
5              MR. GENTILE:  Again, I don't think
6          this has anything to do with what his
7          designation is here as a PMK.  He's
8          designated here to talk about a process,
9          not to talk about the specific company.

Page 23

27533PenningtonEricDavid051308

10          why don't we take it question by

11      question and see if you're veering

12      further off base?

13          MR. AIN:  Okay, that's -- I'll try

14      again here.

15      Q.  (By Mr. Ain)  Eric, why would I need

16  to apply to World Leadership Group?  For what

17  purposes am I submitting an application with

18  them?

19      A.  That's not within my knowledge.

20      Q.  Okay.  Let me draw your attention to

21  a document that is Bate stamped GEL 012

22  through GEL 016.

23          MR. GENTILE:  For the record, folks,

24      this is the World Leadership Group, Inc.

25      Associate Membership Agreement; correct?

25

1          MR. AIN:  Correct.

2          MR. GENTILE:  Okay.

3      Q.  Eric, have you seen -- I'll give you

4  a minute to review it.  Have you seen this

5  document before?

6      A.  Prior to today I have not seen this

7  specific document, no.

8      Q.  What about an unsigned copy of the

9  same?

10      A.  Yes, I believe I have.

Page 24

27533PenningtonEricDavid051308

11    Q.  Where would that be?

12    A.  It was part of our duties as the

13  firm that designed and hosted the web-based

14  sign-up that this contract would have been

15  part of that web-based sign-up.

16    Q.  Do you know why?

17    A.  Not other than that we were asked to

18  make it part of the sign-up.

19    Q.  Okay.  Let's continue with the

20  application process.  Let's put aside World

21  Leadership Group right now and describe to me

22  the sign-up on the website that a potential

23  loan originator employee would go through.

24    MR. GENTILE:  And, Counsel, just for

25    clarification, I'm assuming you're

                                        26

1     talking about the relevant period in

2     which Ms. Arreguin signed up.  Is that

3     what we're talking about?

4     MR. AIN:  Yes.

5     MR. GENTILE:  Okay.  We're talking

6     April 2002 time frame, then.  Is that --

7     MR. AIN:  To about August of '02,

8  yes.

9     MR. GENTILE:  Okay.

10    A.  And could you repeat the question

27533PenningtonEricDavid051308

11    again quickly?

12        Q.  Just describe for me the application

13    process that a potential employee seeking a

14    job of loan originator would go through on

15    the website that you helped or your company

16    helped design.

17        A.  I'll begin with a disclaimer that

18    the process was fairly dynamic, meaning --

19        Q.  Okay.

20        A.  -- that as time has gone on, more

21    and more of the process has become electronic

22    or paperless, whereas earlier in the

23    company's history there was a combination of

24    electronic and paper in the application

25    process.

27

1        Q.  Do you recall what was in the paper

2    process?

3        A.  I don't recall where I could narrow

4    it down to a period of a few months in 2002.

5        Q.  Please do.

6        A.  My answer was that I do not recall

7    sufficiently so that I could narrow it down

8    to this time period in 2002.

9        Q.  Okay.  What about as far as the

10    World Lending Group Mortgage Loan Originator

11    Employment Agreement, which you should have

27533PenningtonEricDavid051308

12    in front of you as GEL 021 through 025.  Was

13    this something that was provided on line or

14    in paper format to the potential employee?

15        A.  It was on line, and there was a

16    period of time where the process may have

17    been duplicated, where there was both an

18    on-line form and, if the applicant requested,

19    a paper version of the form.

20        Q.  What do you mean by requested?

21        A.  It's my recollection that the

22    applicant had an opportunity early in the

23    history of the company to do part of this

24    process manually.

25            And I don't recall if that meshes

                                                28

1    with exact dates in question, but I do know

2    it was approximately this time period.

3        Q.  Okay.  Let me draw your attention to

4    the last page, Page 25.  On there there is a

5    physical signature of the plaintiff, Dolores

6    Arreguin.

7            Does that help you recall whether

8    this document, during that time period of

9    April to here it would be July of '02,

10    whether this was provided on line,

11    physically, or both?

                        Page 27

27533PenningtonEricDavid051308

12      A.  Well, this is an obvious example of
13 someone who signed the document with what I
14 call a wet signature.  It was actually signed
15 by the client, as opposed to an electronic
16 signature.
17          This does not mean that she did not
18 also sign electronically.
19      Q.  Okay.  Were you involved in the
20 application process on or about the time that
21 Ms. Arreguin was applying for the job?
22      A.  Yes.
23      Q.  So you were still involved in July
24 of -- July 19th, 2002.
25      A.  Yes.

                                                29

1      Q.  Okay.  Can you describe to for me
2 the process by which the plaintiff, Dolores
3 Arreguin, would have received this document?
4          MR. MCLEAN:  Objection, calls for
5          speculation.
6          MR. GENTILE:  Yeah, I'll join in
7          that as well.  When you say "this
8          document," are you talking about it
9          generally or are you talking about it
10         specifically?  Because I believe we had
11         testimony from Ms. Arreguin yesterday
12         that it was provided to her by a

27533PenningtonEricDavid051308

13      Mr. Carlton Inlow.

14          MR. McLEAN:  Seconding that -- I'm

15      sorry, seconding that, the other part is

16      that Mr. Pennington is in no position to

17      know how Ms. Arreguin received the

18      document.

19          MR. AIN:  Okay.  Let's disregard

20      Ms. Arreguin and let's go general here.

21      Q.  (By Mr. Ain)  Eric, how would an

22  employee receive a document, this particular

23  document, and provide a wet signature in the

24  application process?

25      A.  I believe that the document -- and I

30

1  know this was true at a period of time.

2  Again, I don't recall what exactly was

3  available during a specific four-month period

4  in 2002.  But I do know that on or about this

5  date this document was available to an

6  applicant to download.  In other words, from

7  the website they could download the document.

8          There was also a period of time

9  where the manual -- or, excuse me, the paper

10  documents required in an application were

11  sent to the applicants.

12          I don't have knowledge at this

Page 29

27533PenningtonEricDavid051308

13  specific time frame if the contract was part

14  of the document that would have been sent on

15  a regular basis to an applicant who needed to

16  complete the other forms that could only be

17  done in a paper format.

18      Q.  Okay.  Let's turn to the website

19  application process.  At what point in the

20  application process would this document, the

21  World Lending Group Originator Employment

22  Agreement, be provided to a potential

23  employee?

24      A.  Is your question a chronological

25  question?

31

1       Q.  Yes.  Or let me have you start by

2   describe -- actually, here, let me make this

3   easier on you.

4           If you turn, if you could please

5   show him the supplemental declaration of

6   Sandra Croteau and the exhibits attached,

7   maybe that will help with your recollection

8   as to what I'm going to ask you about, and

9   that's the application process on the

10  Internet that an employee or a potential

11  employee would go through.  That's starting

12  with Exhibit A, Page 1 through --

13          MR. MCLEAN:  The supplemental

27533PenningtonEricDavid051308

14          declaration that we have does not have,

15          for some reason, the exhibits.

16              I'll tell you what I do have.  It's

17          a WLG loan originator agreement that was

18          taken obviously as a screen shot, if

19          that is what you're referring to.  I'll

20          present it to Mr. Pennington.

21              MR. AIN:  There's actually some

22          other documents that are the printouts

23          of the website, World Leadership Group's

24          website employment application, and I

25          kind of wanted to use it to the extent

32

1          that could help him recall the process.

2              Q.  (By Mr. Ain)  But if we don't have

3          it then, Eric, I'll ask you just to describe

4          for me the chronological order of what comes

5          up on the website during an application

6          process and where this employment agreement

7          falls in that process.

8              A.  I'll need to just repeat my

9          disclaimer that early in the company's

10          history this process was very dynamic, and

11          exactly what existed on line during a

12          four-month period in 2002, I don't have a

13          good recollection.

27533PenningtonEricDavid051308

14          I can tell you that the contract was
15    always part of the on-line agreement.
16          Q.  Or the on-line application
17    process --
18          A.  Yes, sir.
19          Q.  -- you mean.  Okay.  Did the
20    application process allow for a potential
21    employee to negotiate any of the terms of the
22    agreement?
23          MR. GENTILE:  I'm going to object as
24          vague and ambiguous.  Let me object here
25          as vague and ambiguous.


                                              33

1          When you say application process,
2          are you talking about the on-line
3          application process?  Is that correct?
4          MR. AIN:  Yes.  Yes.
5          MR. GENTILE:  And how is that
6          relevant to the issue of Dolores
7          Arreguin, since we already know that she
8          signed, she has a wet signature here on
9          the World Lending Group Loan Originator
10          Agreement?
11          MR. AIN:  Well, there's a
12          possibility that she also, as defendant
13          has provided, she may have also reviewed
14          this document on line and potentially

27533PenningtonEricDavid051308

15    clicked, "I accept," and to the extent
16    that there may be two agreements I'd
17    like to cover the process in which that
18    agreement would have been reviewed and
19    acknowledged, if at all, during the
20    website application process, because
21    Eric just testified that has always been
22    a part of the process.
23        MR. GENTILE:  Okay, that's fine.
24    But why don't you focus the question on
25    that specific issue?  Maybe you could

34

1    reask the question.
2        MR. AIN:  If I could have my first
3    question reread, I'm not sure what was
4    wrong with it.
5        (Whereupon, the record was read by
6        the reporter as requested.)
7    A.   There was no technical editing type
8    of tool where an applicant could strike or
9    make additions to a contract on line.
10    Q.   And how is it that this document is
11    accepted on line?
12    A.   It is a three-part process to accept
13    a document with an electronic signature.  The
14    process involves, one, checking a box that

27533PenningtonEricDavid051308

15    says something to the effect that, "I agree

16    to the above terms and conditions," and I'm

17    very loosely quoting that.  But it's an

18    acknowledgment where you check that you've

19    read or accept.

20        The second part is that the

21    applicant would type his or her name in a

22    signature field.

23        And the third part is the applicant

24    would click a button that said something to

25    the effect that, "I accept," or, "I agree."

35

1    Q.  In this process is there a way to

2    determine whether the applicant scrolled

3    through the agreement as opposed to just

4    clicking, "I accept"?

5    A.  The only way to get to the

6    three-part process that I just described was

7    to scroll to the end of the agreement and

8    complete those three steps.

9    Q.  Okay.  Let me ask my question a

10    different way.  Nowadays it seems to be that

11    there are some agreements on line that

12    instead of allowing you just to click, "I

13    accept" at the bottom and submit and move on

14    to the next website that you're trying to

15    view, it seems like some websites will

27533PenningtonEricDavid051308

16  require you to actually scroll down as if

17  you're actually reading the application, or

18  the, sorry, the agreement.

19       Was your website set up one way or

20  the other?

21     A.  Yes.  While we cannot guarantee an

22  applicant read the agreement, it does require

23  that they scroll to the bottom of the

24  agreement to complete the on-line signature.

25     Q.  Okay.  And if they choose not to

                                                    36

1  agree to the agreement or any of its terms,

2  what happens?

3     A.  The process terminates.  They cannot

4  continue.

5     Q.  Do you have any knowledge with

6  regard to the process by which a wet

7  signature is obtained on the loan originator

8  employment agreement?

9       MR. GENTILE:  Object, asked and

10      answered.

11    A.  I do believe I answered this

12  question by stating that on or about this

13  period of time it's my recollection that an

14  applicant could download from the website a

15  contract document, and I believe I also

27533PenningtonEricDavid051308

16    previously stated that an applicant could

17    request a printed copy of the form that could

18    be mailed to them.

19         Q.  Okay.  Now, was it a requirement

20    that a loan originator employment agreement

21    be printed out, physically signed and

22    provided to the company?

23         A.  There may have been a period of time

24    where that was required, but that is not an

25    area of my knowledge.

37

 1         Q.  Okay.  Let me just ask one last

 2    question in this area.  Eric, if you look at

 3    that one document, GEL 21 through 25 and GEL

 4    26 through 34?

 5         A.  I have in my hand Bate stamped GEL

 6    21 through 25 and Counsel is looking for the

 7    other one.

 8         Q.  Okay.  While you're looking at the

 9    one you have in front of you, on Page 25

10    there's a wet signature.

11             Do you know whether the plaintiff

12    would have printed this out from the on-line

13    website and provided it, or could this have

14    been provided to her physically to fill out?

15         A.  I don't believe I can tell by

16    looking at this.

Page 36

27533PenningtonEricDavid051308

17    Q.  Do you have the other documents yet?

18    A.  Yes, I do.

19    Q.  It appears, and, you know, I could

20  be wrong, but to the best of plaintiff's

21  recollection what looks like here is that she

22  filled out some forms on July 19th of 2002,

23  she physically filled these out, and it

24  doesn't appear that they were obviously

25  completed in typed format on the Internet.

38

1        Do you have any knowledge of how the

2  application process with regards to these

3  documents existed at the time?

4    A.  I missed part of your question.

5  There was a little static.  Could you repeat

6  it?

7        (Whereupon, the record was read by

8        the reporter as requested.)

9    A.  Not anything more than I've already

10  responded, that the applicant may have

11  downloaded these documents, completed them

12  and sent them in.

13    Q.  When you say "sent them in," where

14  would she have sent them in to?

15    A.  To the home -- corporate

16  headquarters, the home office.

27533PenningtonEricDavid051308

17    Q.  Were there any recruiters employed

18  at the time that Ms. Arreguin was applying

19  for a job?

20    A.  I'm not sure -- what's a recruiter?

21    Q.  There's a possibility that a

22  recruiter by the name of Carl Inlow may have

23  physically provided the plaintiff with these

24  documents to fill out.  Are you aware of such

25  a process during the application for a job

39

1  during this time period?

2    A.  I am not.  That was not my area of

3  expertise.

4    Q.  Okay.  These other documents, Page

5  26, GEL 26 through, are these documents

6  available on line at the time period of 2002,

7  April to July 2002?

8    A.  Again, I don't have a recollection

9  during this four-month period which documents

10  were available on line to download.

11    Q.  Is there any way you could ascertain

12  that answer from looking at any of them?

13    A.  No, I don't believe there's any way

14  to tell if a document like this was a PDF

15  document that was downloaded off the Internet

16  or not.

17    Q.  Okay.  Let us turn back to the
                    Page 38

27533PenningtonEricDavid051308

18    employment agreement for a minute, which was

19    the GEL 21.

20         If this document was to be provided

21    on the Internet, I presume it would pop up

22    for an applicant to review?

23    A.  This document would be on the screen

24    in a web-based format for the applicant to

25    view, yes.

40

1    Q.  What if an applicant does not agree

2    with the terms?  Does the application process

3    provide for the applicant a process by which

4    they could contact the potential employer and

5    discuss or negotiate the terms of this

6    agreement?

7    A.  The actual on-line application was

8    just you signed it or you didn't, and if you

9    did not, the process ended.

10         I could not give you testimony

11    whether she could call and negotiate the

12    contract.

13    Q.  The deponent, the witness just

14    before you testified that there was a help

15    desk number that could be called to seek

16    assistance in the application process.  Is

17    that accurate?

27533PenningtonEricDavid051308

18    A.  Again, in the time period in

19  question I couldn't tell you if there was a

20  phone number posted on the website, but it is

21  entirely possible.

22    Q.  Does that process -- actually, she

23  referred to it as customer support -- does

24  that option exist today?

25    A.  I can only tell you that there is a

41

1  customer support department and I believe

2  there are access numbers on the website which

3  provide directions on how to contact

4  individuals.

5    Q.  What would be the purpose of

6  contacting some of these individuals as it

7  relates to the application process?

8    MR. GENTILE:  Objection, vague,

9    overbroad, calls for speculation.

10    Q.  Go ahead and answer if you can.

11    A.  What is the time period you're

12  asking about?

13    Q.  Just generally, the entire

14  application process to the extent that it

15  remained the same.  So let's say the

16  support -- let's say the support system

17  existed, what would I call to ask about?

18    A.  That's not my area of expertise.  I

27533PenningtonEricDavid051308

19    don't know.

20        Q.  Could someone call in to customer

21    support during the 2002 period and ask

22    questions about the application process?

23        A.  Was your question could someone?

24        Q.  Yes.

25        A.  I don't recall.

42

1        Q.  What about at any time during your

2    involvement with the defendant?

3        A.  I really can't give you a good

4    answer on why people call the customer

5    service department.

6        Q.  Could they call in to talk to a

7    recruiter or a representative of the

8    defendant to discuss the terms of their

9    employment agreement?

10        A.  I don't know.

11        Q.  Do you know when World Lending Group

12    changed its name -- and I may have asked you

13    this already -- to Global Equity Lending?

14        A.  You did ask, and my response was

15    that I did not know.

16        Q.  Okay.  After July of 2002 when your

17    employment ended with defendant, where did

18    you continue to work thereafter?

27533PenningtonEricDavid051308

19    A.  I returned to my firm.

20    Q.  What firm is that?

21    A.  Turnkey Technology.

22    Q.  So you were specifically hired or

23  contacted by defendant to set up this process

24  from February of '02 to July of '02?

25    A.  Yes.

43

1     Q.  Did this website require any

2  maintenance or changes after July of '02?

3     A.  Yes.

4     Q.  Do you know who conducted that

5  maintenance or changes to the website?

6     A.  The websites can change on almost a,

7  well, multiple times a day, so you'd probably

8  need to be more specific.

9     Q.  If there's an update, I believe

10  there's an annual update process which will

11  include a new or modified employment

12  agreement.  who would make those changes to

13  the website to provide an updated agreement,

14  or any other changes, for that fact?

15    A.  Any change would be requested by our

16  client and a member of my staff would make

17  the appropriate changes.

18    Q.  When you say staff, would that be

19  other employees at Turnkey Technology?

27533PenningtonEricDavid051308

20      A.  That is correct.

21      Q.  So after July of '02 your firm was

22  still retained to provide other services in

23  relation to defendant and their website

24  application process.

25      A.  That is correct.


                                            44

1       Q.  And is that relationship still in

2   existence today?

3       A.  It is.

4           MR. AIN:  Let me take a three-minute

5           break and then I'll come back with some

6           more questions.

7           Can we go off the record?

8           MR. GENTILE:  Sure.

9           (Recess.)

10      Q.  (By Mr. Ain)  I have some more

11  questions for you here, Eric.

12          Along with the application process

13  on line is an applicant required to submit a

14  payment of any sort?

15      A.  Generally an applicant is required

16  to submit a payment.

17      Q.  In what amount?

18      A.  The amount has changed over the

19  years.  At the time period in question it's

27533PenningtonEricDavid051308

20  my recollection it was between 100 and $150.

21      Q.  Do you know what that's supposed to

22  cover?

23      A.  I do not.

24      Q.  Or what's the purpose?

25      A.  I do not.

45

1       Q.  Was there another -- go ahead,

2  sorry.

3       A.  I just answered I do not.

4       Q.  Okay.  Was there another payment

5  that went to World Leadership Group?

6       A.  There was.

7       Q.  And what about that payment?  Do you

8  know the purpose of that amount paid to World

9  Leadership Group?

10      A.  I do not.

11      Q.  Have you had a chance to review the

12  declaration of Sandra Croteau dated I believe

13  it's March -- January 16th, sorry?

14      A.  I believe I saw this briefly upon

15  arriving at the offices here today.

16      Q.  Okay.

17      A.  Would you like me to read it?

18      Q.  Please do, yes.

19      A.  All right.

20      Q.  Attached to that declaration is

27533PenningtonEricDavid051308

21    Exhibit A, which is not in front of you, but

22    we are all in agreement that it is a document

23    Bate stamped GEL 001 through 006.  Can you

24    take a look at that for me?

25         A.  All right, I've looked at it but not

46

1    read it.

2         Q.  That's fine.  The declaration of

3    Ms. Croteau describes the process by which

4    Dolores would have reviewed and accepted,

5    purportedly, this agreement.  However, this

6    agreement is with Global Equity Lending,

7    which did not exist in April of '02.

8             How would you determine what

9    employment agreement existed at the time in

10   the on-line application process?

11        A.  The date of the signature would need

12   to be determined and then the company, our

13   client, would provide a sample of the

14   agreement that existed at that period of

15   time.

16        Q.  Do you know what agreement existed

17   at that time?

18        A.  I do not know which version of the

19   agreement existed at that time.

20        Q.  Clearly it isn't GEL 001 labeled

27533PenningtonEricDavid051308

21  Global Equity Lending; is that correct?

22      MR. GENTILE:  Objection,

23    argumentative.

24  A.  I --

25  Q.  To the extent that you know.


                                                47


 1      A.  My earlier testimony was I did not

 2  know when the name changed, so I cannot

 3  answer your question.

 4      Q.  In April of '02 when you were

 5  employed at the company what was the name of

 6  the company?

 7      A.  I don't recall if the name had

 8  changed at that point.

 9      Q.  Okay.  I'll represent to you that in

10  her supplemental declaration Ms. Croteau

11  testified that the name change was November

12  of 2003, which we believe is accurate, or

13  about 2003 is the time period.

14          So why would this document be

15  labeled Global Equity Lending and believed to

16  be the document that plaintiff signed in

17  April of '02?

18      MR. GENTILE:  I object as compound,

19    argumentative, vague and ambiguous and

20    assumes facts not in evidence.

21  Q.  (By Mr. Ain)  To the extent that you

27533PenningtonEricDavid051308

22    can answer, Eric, can you help us understand

23    how this mistake could have been made?

24        A.  I cannot.

25        Q.  Okay.  Let us turn back to the

48

1    document GEL 21 through 25.

2        A.  I have it.

3        Q.  During the application process back

4    in February of 2002 till about July of 2002

5    when you were with the company and when

6    Dolores applied for a job, was there any

7    system or protocol set up to allow for an

8    applicant to call anyone at the company and

9    discuss the terms of this agreement?

10            MR. GENTILE:  I'm going to object.

11        It's asked and answered now, I think

12        it's twice.

13            MR. MCLEAN:  I second that

14        objection.

15        A.  I don't recall at the time period in

16    question what, if any, customer service

17    department existed, nor do I know if they

18    would have handled calls dealing with terms

19    of a contract.

20        Q.  At any time period was there a

21    customer service representative available?

27533PenningtonEricDavid051308

22    A.  I know that GEL, or that the company

23  has a customer service department.  I'm not

24  familiar with what they do.

25    Q.  Okay.  Could I have you take a look

49

1  at the supplemental declaration of Sandra

2  Croteau?

3    A.  I have it.

4    Q.  Please review, just I'll make it

5  easy on you here, Paragraph 5 through 9, and

6  let me know when you're done.

7      MR. GENTILE:  And just for the

8      record my understanding is the witness

9      does not have, and correct me if I'm

10     wrong, the Exhibit A that's to

11     Ms. Croteau's supplemental declaration.

12     MR. MCLEAN:  That's correct.

13     MR. AIN:  That's correct.  I wanted

14     to ask him some questions with regard to

15     these website pages and we don't have

16     them, apparently.

17    A.  Did you say through Paragraph 7?

18    Q.  Nine, please.

19    A.  I'm done.

20    Q.  Do these paragraphs accurately

21  describe the application process as you know

22  it back in April of '02 through July of '02?

27533PenningtonEricDavid051308

23      A.  I'll have to stick with my testimony

24  that during the four months or so in 2002 I

25  don't have personal recollection of exactly

                                            50

1  what the process was at that period of time.

2      Q.  Okay.  Could Ms. Arreguin have just

3  submitted the wet signature contract but not

4  have reviewed and accepted whichever

5  employment agreement existed at the time on

6  the Internet during her application process

7  in the year 2002?

8          MR. GENTILE:  Objection, calls for

9          speculation, vague and ambiguous.

10      A.  My recollection of the technology

11  was that you could not complete an

12  application on line without accepting the

13  agreement.

14      Q.  And do you have -- we've seen a

15  couple of documents here, the one that starts

16  with GEL 001 and the one that starts with GEL

17  021.  Can you ascertain which document would

18  have been posted on the Internet at that

19  time, if either?

20      A.  Looking at the documents, I cannot.

21          MR. AIN:  All right.  Let me take --

22          I am missing one document in front of

27533PenningtonEricDavid051308

23    me.  Let me take a two-minute break and

24    I'll be right back.

25          MR. GENTILE:  Okay.

51

1          (Recess.)

2      Q.  (By Mr. Ain)  Eric, do you have any

3    knowledge with regard to Ms. Arreguin's

4    review and signing of the employment

5    agreement that we've been referring to as the

6    wet signature?

7      A.  I do not have any personal knowledge

8    of Ms. Arreguin's signing of the document.

9      Q.  And just a follow-up question just

10    to be clear:  You don't have any knowledge of

11    any facts surrounding the circumstance under

12    which she signed this agreement where she was

13    and who she was with.

14      A.  I do not.

15      Q.  Okay.  And as far as the electronic

16    signature, you do not know which document she

17    would have reviewed and accepted during her

18    application process in April of 2002 to July

19    of 2002, if any.

20      A.  The process described by Ms. Croteau

21    is an accurate process.  What I can't do is

22    just say that that was the exact process on

23    April 8th of 2002, for example.  But she

Page 50

27533PenningtonEricDavid051308

24    describes a process accurately, and it was on

25    or about the time period in question.

52

1        Q.   Do you have any specific knowledge

2    with regard to the application process that

3    Ms. Arreguin went through?

4        A.   I do know that --

5        Q.   Specifically whether -- go ahead.

6        A.   I do know that Ms. Arreguin

7    electronically signed a contract.

8        Q.   Do you know what contract that is?

9        A.   No.  On the technical side what we

10    have is a date down to the millisecond that

11    the contract was accepted.  It would then be

12    the responsibility of our client to say,

13    "Here's the contract that existed on that

14    date."

15        Q.   Okay.  Now, do you also understand

16    that what was produced without an electronic

17    signature on it is not the correct contract,

18    GEL -- we're referring to GEL 001 through

19    006?

20        A.   I don't have any personal knowledge

21    on how this was produced, who produced it and

22    the accuracy of this document.

23        Q.   But it is your belief that such an

Page 51

27533PenningtonEricDavid051308
24   employment agreement would have existed in

25   2002.

53

1        A.  Yes, it is my belief.

2        Q.  And I'll be more specific.  On the

3   website there had to have been an employment

4   agreement that an applicant is required to

5   accept.

6        A.  That is correct.

7        Q.  During your application process do

8   you recall seeing such an employment

9   agreement?

10        A.  No.  I believe as I stated

11   previously I really don't remember my

12   specific experience.

13        MR. AIN:  Okay, all right.  I am

14        done questioning this witness.  I'll

15        reserve my right to seek further

16        testimony in the future if deemed

17        necessary with regard to the issues

18        we're dealing with here, specifically

19        Plaintiff's's application process and

20        the documents she would have signed

21        which he has no knowledge about, we're

22        talking about, specifically, the wet

23        documents.

24            And, further, if another employment

Page 52

27533PenningtonEricDavid051308

25      agreement is later produced that would

54

1       have existed on this website on or about

2       April of '02 through July of '02 then I

3       would like to seek a further deposition

4       with regard to the testimony of a person

5       most knowledgeable on that area, because

6       it seems like the witness's recollection

7       and his knowledge is somewhat limited,

8       as he's not familiar with the issues the

9       Court wanted us to address, specifically

10      whether the plaintiff accepted the terms

11      of this agreement, other than the fact

12      that she would have gone through this

13      application process on the Internet, for

14      which we don't have an existing

15      agreement from that time, and the only

16      agreement we have is one that she

17      physically signed to which he has no

18      knowledge about.

19          With that being said, I'll conclude

20      the deposition.

21          MR. GENTILE:  I'm sorry, Bill?

22          MR. McLEAN:  Go ahead, Greg.

23          MR. GENTILE:  No, that's your

24      prerogative.  I'm not going to agree

27533PenningtonEricDavid051308
25      with your position but you can do

55

1      whatever you feel you need to do.

2          As far as I'm concerned we produced

3      the person most knowledgeable.  If you

4      feel he doesn't measure up to what we

5      expected then that's an argument you're

6      going to have to make to the Court.

7          I think we've provided you with the

8      proper folks, and we'll take it up after

9      the deposition, if there's an issue

10      there.

11          I assume we have the same

12      stipulation in effect with respect to

13      the review and signature of the -- for

14      the changes of the deposition?

15          MR. AIN:  Yes, the same as we just

16      did for Ms. Croteau.

17          MR. GENTILE:  Okay, very well.

18          MR. AIN:  Thank you, gentlemen.

19      We're off the record.

20          (Whereupon, the deposition was

21      concluded at 4:34 p.m.)

22

23

24

25

27533PenningtonEricDavid051308

56

```
 1              INDEX OF EXAMINATION

 2

 3   WITNESS:  Eric David Pennington

 4

 5   EXAMINATION                    PAGE

 6

 7   By Mr. Ain                      3

 8

 9                       - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```