EXHIBIT 4

RICHARD M .WILLIAMS (SBN 68032)
GREGORY M. GENTILE (SBN 142424)
J. MARK THACKER (SBN 157182)
ROPERS, MAJESKI, KOHN & BENTLEY
80 North First Street
San Jose, CA  95113
Telephone:    (408) 287-6262
Facsimile:     (408) 918-4501

Attorneys for Defendant
GLOBAL EQUITY LENDING, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DOLORES A. ARREGUIN, for herself and other members of the general public similarly situated,

Plaintiff,

v.

GLOBAL EQUITY LENDING, INC., a Georgia Corporation; and DOES 1 through 10, Inclusive,

Defendant.

CASE NO.  C 07 6026 MHP

**SUPPLEMENTAL DISCLOSURES OF DEFENDANT GLOBAL EQUITY LENDING, INC.**

**[FRCP Rule 26(e)]**

Complaint filed:   November 29, 2007

Comes now Defendant GLOBAL EQUITY LENDING, INC., a Georgia corporation and provide its Initial Disclosures pursuant to FRCP Rule 26 as follows:

(A)    Witnesses:

DOLORES ARREGUN, Sandy Croteau, and Persons Most Knowledgeable as determined by Defendant..

(B)    Documents/Tangible Things:

1.    GEL-001-006 — Plaintiff's contract with GLOBAL EQUITY LENDING, INC.;

2.    GEL-007— DOLORES ARREGUIN Employment History;

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1     3.    GEL-008 — DOLORES ARREGUIN Contact Information;

2     4.    GEL-009 — DOLORES ARREGUIN References;

3     5.    GEL-010 — DOLORES ARREGUIN Applicant Certification Agreement

4     dated 7/19/02;

5     6.    GEL-011 — DOLORES ARREGUIN W-9 Certificate dated 7/19/02;

6     7.    GEL-012-020 — World Leadership Group, Inc. Associate Membership

7     Agreement dated 7/19/02 and Glossary and Explanation of Terms;

8     8.    GEL-021-025 — World Lending Group, Inc. Mortgage Loan Originator

9     Agreement dated 7/19/02;

10    9.    GEL-026 — World Lending Group, Inc. New Employee Information Form

11    dated 7/19/02;

12    10.   GEL-027 — DOLORES ARREGUIN Employee Acknowledgement re

13    World Lending Group Employee Policy Manual dated 7/19/02;

14    11.   GEL-028 — Employee Insurance Acknowledgment dated 7/19/02;

15    12.   GEL-029 — World Lending Group Inc. Background Insurance Consent

16    dated 7/19/02;

17    13.   GEL-030 — W-4 Employee Withholding Allowance Certificate dated

18    7/19/02;

19    14;   GEL-031-032 — EDD Employee Withholding Allowance Certificate,

20    pages 1 and 2 of 4 dated 7/19/02;

21    15.   GEL-033 — Dolore Arreguin's Authorization for Direct Deposit dated

22    7/19/02 with voided check, number 551; and

23    16.   GEL-034 — Employment Eligibility Verification dated 7/19/02.

24    (C)    Insurance:

25    Defendant GLOBAL EQUITY LENDING, INC. is insured under an insurance

26    policy issued by Westchester Fire Insurance Company (Policy No. N01913281003).  GLOBAL

27    EQUITY LENDING, INC. tendered to this insurance company which declined to accept tender.

28    GLOBAL hereby reserves its right to amend and/or supplement this Disclosure and the

1    information contained therein to the extent further information is acquired by GLOBAL during

2    the course of this litigation.

3    Dated:  April 30, 2008                                ROPERS, MAJESKI, KOHN & BENTLEY

4
                                                                  By: _____
5                                                                        GREGORY M. GENTILE
                                                                         Attorneys for Defendant
6                                                                        GLOBAL EQUITY LENDING, INC.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CASE NAME:    **ARREGUIN v. GLOBAL EQUITY LENDING**

**ACTION NO.:**    **C 07 6026**

**PROOF OF SERVICE**

**METHOD OF SERVICE**

☒  First Class Mail            ☐  Facsimile                    ☐  Messenger Service

☐  Overnight Delivery          ☐  E-Mail/Electronic Delivery

1. At the time of service I was over 18 years of age and not a party to this action and a Citizen of the United States.

2. My business address is 80 North First Street, San Jose, CA  95113.

3. On April 30, 2008 I served the following documents:

**SUPPLEMENTAL DISCLOSURES OF DEFENDANT
GLOBAL EQUITY LENDING, INC.**

4. I served the documents on the persons at the address below (along with their fax numbers and/or email addresses if service was by fax or email):

| | |
|---|---|
| James F. Jordan, Esq.<br>Law Offices of Herbert Hafif, APC<br>269 West Bonita Avenue<br>Claremont, CA  91711-4784 | (909) 624-1671<br>(909) 625-7772 (Fax)<br>**Attorneys for Plaintiff**<br>james.jordan@hafif.com |
| Steven L. Miller, Esq.<br>16133 Ventura Boulevard, Suite 1200<br>Encino, CA  91436 | (818) 986-8900<br>(818) 990-7900 (Fax)<br>**Attorneys for Plaintiff** |
| Scott A. Miller, Esq.<br>Law Offices of Scott A. Miller, APC<br>16133 Ventura Boulevard, Suite 1200<br>Encino, CA  91436 | (818) 788-8081<br>(818) 788-8080 (Fax)<br>**Attorneys for Plaintiff** |

5. I served the documents by the following means:

a.  ☒  By United States mail: I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses specified in item 4 and placed the envelope for collection and mailing, following our ordinary business practices.  I am readily familiar with this business's practice for collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

b.  ☐  By overnight delivery: I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses in item 4.  I placed the

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

c.  ☐  By messenger: I served the documents by placing them in an envelope or package addressed to the persons at the addresses listed in item 4 and providing them to a messenger for service.  (Separate declaration of personal service to be provided by the messenger.)

d.  ☒  By fax transmission: Based on an agreement between the parties and in conformance with Fed. Rules Civ. Proc. rule 5, and/or as a courtesy, I faxed the documents to the persons at the fax numbers listed in item 4.  (Separate Proof of Transmission by Fax to be provided.)

e.  ☐  By email or electronic transmission: Based on an agreement between the parties and/or as a courtesy, I sent the documents to the persons at the email addresses listed in item 4.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I am employed in the office of a member of the bar of this court at whose direction the service was made.  I certify under penalty of perjury that the foregoing is true and correct.

Date:   April 30, 2008

GINA Q. HUERTA
Type Name

Signature

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

# Global Equity Lending, Inc.
## Mortgage Loan Originator Employment Agreement

This Mortgage Loan Originator Employment Agreement ("Agreement"), made and entered into effective as of the date of execution by the parties hereto, is by and between Global Equity Lending, Inc., a Georgia corporation (hereinafter "GEL"), and the undersigned individual (hereinafter "Loan Originator");

## R E C I T A L S

WHEREAS, GEL is engaged in the activity of originating loans evidenced by notes ("Notes") and secured by mortgages ("Mortgages") on real property (hereinafter the Mortgages and Notes are collectively referred to as "Loans") for mortgage lenders and is desirous of employing Loan Originator to obtain and prepare loan applications and other materials from prospective borrowers ("Applicants");

WHEREAS, Loan Originator is desirous of becoming employed by GEL to assist GEL in obtaining and preparing loan applications and other materials from Applicants;

NOW, THEREFORE, in consideration of mutual promises of and benefits to be derived by the parties GEL, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, GEL hereby agrees to employ Loan Originator, and Loan Originator hereby agrees to be employed by GEL, subject to the following terms and conditions:

1.  **Loan Originator's Duties, Responsibilities, Limitations on Authority.**

    1.1  **Generally.** Loan Originator shall use his or her best efforts to originate real estate loans on GEL's behalf by contacting the public and members of the real estate profession. All originations shall be done in a prudent manner and shall conform to the standards required by GEL as well as all state, federal and local regulations and statutes. In particular, Loan Originator covenants that he or she shall comply with the Federal Equal Credit Opportunity Act and its Regulation B, the Fair Housing Act, the Home Mortgage Disclosure Act and its Regulation C, the Federal Truth-In-Lending Act and Regulation Z, and the Real Estate Settlement Procedures Act and its Regulation X. Loan Originator understands and agrees that Loan Originator has an obligation to all Applicants to ensure that Applicants are fully advised of the various loan options available to them prior to obtaining and submitting an application to GEL. Loan Originator shall counsel each Applicant by analyzing the Applicant's income and debt and pre-qualifying the Applicant to determine what the Applicant can afford; consulting with the Applicant about home financing, including advising Applicant about different loan products, closing costs, and monthly payments; assisting in collecting from Applicant financial information (including tax returns and bank statements) necessary for the application process; maintaining regular contact with Applicant, GEL and others between the time the application is submitted to GEL and the loan closing in order to apprise Applicant of the status of the application and to gather any additional information as needed. As to all applications which are accepted for processing, Loan Originator voluntarily agrees to complete the application (including taking information from Applicants and assisting Applicants in filling out the application), submit the application to GEL, and assist in attaining such supplementary information as may be requested of Loan Originator by the processing agent in the event the Applicant does not respond to the processing agent's information requests in a timely manner. Loan Originator will only utilize the E-MAPsm and E-1003sm loan origination tools and pipeline reporting tools (Collectively the Mortgage Closing System) to submit applications, track activities relating to applications, and communicate the status of the applications.

    1.2  **Compliance With GEL Rules and Guidelines.** The Loan Originator agrees to comply with all rules and guidelines set forth in the Mortgage Loan Originator Agreement Rules and Guidelines ("Rules and Guidelines") and other written policies, instructions and procedures, either now existing or as issued from time to time by GEL, which by this reference are made part of this Agreement. The Rules and Guidelines are those rules and guidelines published in writing from time to time by GEL to its Loan Officers containing certain additional requirements imposed on GEL Loan Officers as part of their contractual relationship with GEL and other matters affecting GEL Loan Officers. GEL also publishes policies and procedures of GEL and the operational rules and regulations required by the various regulatory agencies.

1.3    Business Cards, Advertising. Loan Originator shall have the authority to represent through business cards, announcements, or other documents, that Loan Originator is an employee of GEL performing mortgage loan origination services. GEL will provide such advertising and promotional materials as it deems appropriate. Loan Originator shall not engage in any additional advertising or use any marketing materials that are not approved in advance and shall submit such advertising or marketing materials to GEL for approval before circulating them to the public. Due to Branch Office registration requirements in several states, only cell phone numbers, ESA numbers, etc. may be used on any personalized advertising you may request.

1.4    Other Contractual Affiliations. Subject to the provisions of this Paragraph 1.4, Loan Originator may engage in other business activities to the extent such other activities do not interfere or conflict with Loan Originator's employment duties hereunder. Notwithstanding the foregoing, during the term of this Agreement, Neither Loan Originator nor any of Loan Originator's immediate family shall not, except with respect to Exempt Business Activities (as defined in Section 6.4 hereof), if any: i) be associated with, be a representative of, or enter into a contractual agreement of any kind with any other mortgage brokerage or mortgage banking firm; ii) maintain any mortgage broker license; or iii) originate any real estate loans except on behalf of GEL unless specifically approved in writing by GEL. Loan Originator or any of Loan Originator's immediate family members agrees to immediately notify GEL in writing if Loan Originator acquires or obtains any interest in or affiliation with any other mortgage brokerage or mortgage banking firm, or engages in any employment relating to the origination of real estate loans, either directly or indirectly, whether alone or with any person or entity other than GEL. Loan Originator shall immediately notify GEL if Loan Originator becomes involved in any activity that would create the possibility of a conflict of interest on the part of Loan Originator with respect to GEL or any services offered by or on behalf of GEL.

1.5    No Other Authority. Except as set forth in this Paragraph 1, Loan Originator shall not have any authority, and shall under no circumstances hold himself or herself out to any person as having any authority, to represent or obligate GEL in any manner. Loan Originator shall not contact Investors, Lenders, Mortgage Insurers, State regulators, or Federal regulators in the conduct of their GEL activities.

2.    Compensation. For all services to be rendered hereunder, Loan Originator shall be paid on a commission basis only, in the amounts and at the times set forth on GEL's published commission schedules as amended from time to time. Loan Originator's compensation shall be paid in accordance with GEL's normal commission payroll practices in effect from time to time and shall be reported on Federal form W-2 as employee compensation, subject to FICA, FUTA, and income tax withholding as required by federal, state, and local laws. Loan Originator agrees that, where required by law, he or she shall disclose to customers all the fees that Loan Originator will be paid for services rendered in connection with this Agreement in a form approved by GEL and in accordance with state and federal regulations. GEL shall, in its sole and absolute discretion, have the right to change, modify, alter, or decrease any commissions payable pursuant to this Agreement; provided, however, that any changes, modifications, alterations, or decreases shall be effective only on a prospective basis. Except as set forth above, Loan Originator shall not be entitled to receive any other compensation or benefits from GEL of any kind or nature.

3.    Term and Termination. This Agreement shall commence on the date of execution of this Agreement and shall continue until it is terminated in accordance with the provisions hereof. This written Agreement is terminable at will by either party upon advance written notice of seven (7) days. This Agreement shall also terminate by operation of law or upon the death or disability of Loan Originator. Upon termination of this Agreement, except as otherwise provided hereunder and except as to commissions earned by Loan Originator prior to the effective date of termination, which shall be paid by GEL to Loan Originator within a reasonable period of time, the parties shall have no further rights or obligations with respect to each other. GEL may terminate this Agreement immediately if Loan Originator breaches any of the requirements contained in sections 1.1, 1.2, 1.4, 5, 6.1, 6.2, 6.3, 6.4, or 13.

4.    Loan Applications, Programs. GEL, in its sole discretion, may reject any application for reasons of its own business convenience, and nothing herein shall be construed to require the processing of any loan application presented by Loan Originator. GEL shall have the sole discretion of determining what loan programs it will offer and what Loans it will make. All Loans shall be closed in the name of GEL or such other names as GEL shall determine.

5.    Representations. Loan Originator agrees that at all times during the term of this Agreement that Loan Originator shall devote such time and effort as are necessary to faithfully perform to the best of Loan Originator's ability Loan Originator's duties and responsibilities hereunder. Loan Originator specifically represents to GEL that by entering into this Agreement, Loan Originator does not and will not conflict with or violate any other agreement or understanding to which the Loan Originator is a party, or any law, regulation, or order, including but not limited to any disciplinary orders or requirements of any regulatory agency to which the Loan Originator is subject. Loan Originator agrees that Loan Originator is and will

GEL-002

continue to be in compliance with all applicable state and federal laws, rules and regulations governing the business contemplated by this Agreement. Loan Originator will comply with the state laws concerning mortgage originations in the states where Loan Originator solicits applications. Loan Originator acknowledges that GEL maintains links to law summaries and on its web site and affirmatively confirms Loan Originator's duty to know and understand these laws.

6.     Covenants.

6.1     General. Loan Originator acknowledges and agrees that GEL is the owner of the rights to all Applicants placing Loans through GEL, and that these Applicants comprise a substantial part of the goodwill of GEL. To protect the business and goodwill of GEL and all confidential information belonging to GEL, the parties have agreed to a limited period of non-competition, non-solicitation, and to a nondisclosure of confidential information following termination of this Agreement. Such limitations relate solely to the business of GEL, and to GEL's Applicants, however, and are not intended to prevent Loan Originator from rendering mortgage origination services, if Loan Originator so desires.

6.2     Non-Competition. Upon termination of this Agreement, Loan Originator agrees that for a period of one (1) year following such termination Loan Originator will not, without the written consent of GEL, directly or indirectly solicit or accept loan applications from, or perform any of the services Loan Originator performed within the scope of this Agreement for, any Applicant or GEL employee (other than Loan Originator's Exempt Persons as hereinafter defined) with whom Loan Originator had personal contact or established a business relationship during the term of this Agreement. Exempt Persons shall consist of: (i) any persons, identified by name and city and state of residence, and with respect to whom Loan Originator provides written documentation as of the date of execution of this Agreement establishing that such persons are existing customers of Loan Originator, and (ii) any persons, identified by name and city and state of residence, and with respect to whom Loan Originator provides written documentation as of the date of execution of this Agreement establishing that such persons are contractually affiliated with Loan Originator, and who thereafter become Loan Originators of GEL within thirty (30) days from the date of this Agreement.

6.3     Confidential and Proprietary Information. Loan Originator acknowledges that, in the course of Loan Originator's employment with GEL pursuant to this Agreement, Loan Originator will become acquainted with confidential information belonging to GEL. This information relates to persons, firms, and corporations that are or may become customers, financing entities, or accounts of GEL during the term of this Agreement; this provision includes the names of all customers, lenders, rates, and requirements. Loan Originator will not, without the written consent of GEL, disclose or make any use of such confidential information. All Loans placed and all GEL records of Applicants or of any company business, whether prepared by Loan Originator during the term of this Agreement or otherwise coming into Loan Originator's possession and control, shall remain and be the exclusive property of GEL and be surrendered to GEL upon termination of this Agreement. Loan applications, files, forms and other documentation procured during the term of this Agreement are the property of GEL and shall not be removed from the present premises or control of GEL without its express written consent. Any such loan application, files, or documents, shall be surrendered to GEL immediately upon the termination of this Agreement.

6.4     Organizing Competitive Business/Soliciting GEL Loan Originators or Employees. Except for an Exempt Business Activity, Loan Originator agrees that during the term of this Agreement, Loan Originator will not directly or indirectly undertake the planning or organizing of any business activity competitive with the work Loan Originator performs as an employee pursuant to the terms of this Agreement. Loan Originator agrees that Loan Originator will not, for a period of two (2) years following termination of this Agreement, directly or indirectly, solicit any of GEL's independent contractors, loan officers or employees, with whom Loan Originator during the term of this Agreement had personal contact (but excluding any of Loan Originator's Exempt Persons) to work for Loan Originator or any other competitive company. "Exempt Business Activity" shall mean any business activity with respect to which Loan Originator provides written documentation as of the date of execution of this Agreement establishing that Loan Originator is already engaged in such business activity, and that, to the reasonable satisfaction of GEL, in such business activity Loan Originator does not originate the types of Loans offered by GEL.

6.5     Indemnification. Loan Originator shall indemnify GEL for and hold it harmless from and against any and all claims, losses, liabilities, damages, taxes, penalties, fines, forfeitures, reasonable legal fees and expenses, judgments, and other costs and expenses that GEL may sustain arising and/or resulting from any claim, demand, defense or assertion based on or grounded upon, or resulting from a breach of any representation, warranty, or covenant by Loan Originator under this Agreement. This indemnity shall survive the termination of this Agreement.

7.     Arbitration of Grievances.

7.1   _General._ The Parties agree that, except as specifically provided to the contrary in this Agreement, any controversy, claim or dispute arising out of or relating to this Agreement ("Grievance"), between the Loan Originator, on the one part, and GEL and/or any of its officers and employees, or any of them, on the other part shall be resolved exclusively by arbitration in accordance with this Paragraph 7. For purposes of this Paragraph 7, the terms "Party" and "Parties" include GEL, the Loan Originator and other officers and employees of GEL. All Grievances, unresolved in the normal course of business, to the extent that any Party wishes to pursue the matter further, shall be resolved by arbitration in accordance with the Commercial Arbitration Rules ("Rules") of the American Arbitration Association then in effect, except that, or in addition to such Rules: i) in order to assure neutrality and impartiality of the arbitrator(s), and to preserve the confidentiality of proprietary information, the arbitrator(s) shall not be any present or past owner, officer, director, employee, consultant, contractor, agent, attorney or other representative of any mortgage company, mortgage broker, mortgage banker, or of any affiliate of any of them; ii) the locale where the arbitration shall be held is the principal business location of GEL in Norcross, Georgia; iii) a transcript shall be made on the proceeding; and iv) the arbitrator's(s') award shall state their findings of fact and conclusions of law. The award, including such findings and conclusions may be reviewed, vacated, modified or corrected upon application or petition of any Party brought within thirty (30) days after the date of the award, by a court of competent jurisdiction, provided that in addition to the grounds stated in the United States Arbitration Code, 9 U.S.C. § 1, and following, or in any other applicable law or statute, the court may also vacate, modify or correct the award if the conclusions of law are contrary to law, or if the findings of fact are not supported by the facts (as determined by whether there was any pertinent and material evidence to support the findings). Otherwise, or in compliance with the court's review, the decision of the arbitrator(s) shall be final and binding. Judgment upon the award rendered by the arbitrator(s), or judgment upon the award as reviewed by the court, may be entered in any court having jurisdiction thereof.

7.2   _Waiver of Litigation._ The Parties acknowledge and agree that they are engaged in, and that this Agreement evidences transactions involving, interstate commerce and that, except as specifically provided to the contrary in this Agreement, this Paragraph 7 is and shall be the Parties' exclusive remedy for any Grievance arising out of or relating to this Agreement, or the breach thereof. Except as specifically provided to the contrary in this Agreement, the Parties expressly waive the right to litigate in a judicial forum all Grievances and waive the right to trial by jury. The Parties further agree that the findings of fact issued by the arbitrator(s), as reviewed, if applicable, shall be binding on them in any subsequent arbitration, litigation or other proceeding.

7.3   _No Condition Precedent to Action and Power of Arbitrators._ Anything herein or elsewhere contained to the contrary notwithstanding, GEL shall not be required to negotiate, arbitrate or litigate as a condition precedent to taking any action under this Agreement. The Parties expressly authorize the Arbitrator(s) to fashion and award any type of remedy that could be awarded by a court, including such equitable or extraordinary remedies as temporary and permanent injunctive relief.

7.4   _Extraordinary Relief._ The Parties agree that GEL has the right to seek preliminary and temporary restraining orders, injunctions and other extraordinary relief (such orders, injunctions and other relief referred to as "Extraordinary Relief") under Paragraph 6 of this Agreement without complying with this Paragraph 7. Without limitation, the Parties agree that the requirements for good faith arbitration under this Paragraph 7 do not preclude GEL from seeking in an arbitral or in a judicial forum, or in both, Extraordinary Relief to protect its rights under Paragraph 6 of this Agreement. This Paragraph 7 shall not be deemed to preclude or narrow the judicial or arbitral powers regarding Extraordinary Relief.

8.   _Assignment._ This Agreement may be assigned by GEL in the event of a bona fide sale or transfer of ownership or control of the business to another person or entity; provided however, that the assignee shall assume all obligations of GEL herein, in which case GEL shall be released of any further liability to the Loan Originator hereunder. The personal character and skill of the Loan Originator are a material inducement to GEL to enter into this Agreement, and any attempt by Loan Originator to assign this Agreement or to assign any rights (including the right to receive commissions) which Loan Originator may have hereunder shall be null and void, and such attempt to assignment shall be considered a repudiation and termination of this Agreement by Loan Originator.

9.   _Amendment._ This is the entire Agreement of the parties and any amendment or modification thereof shall be in writing and signed by both parties. This Agreement is binding upon the parties, their heirs and assigns.

10.   _Waiver._ The waiver by GEL of any breach or default by Loan Originator shall not operate or be construed as waiver of any subsequent breach or default by Loan Originator.

GEL-004

11.    Governing Law. The enforcement of this Agreement shall be governed by the laws of the State of Georgia and venue shall be in Cobb County or Gwinnett County Superior Court, State of Georgia.

12.    Severability. The provisions of this Agreement are severable, and if one or more provisions thereof are found to be unenforceable in whole or in part, the remaining provisions and any partially enforceable provisions will nevertheless be binding and enforceable to the full extent of the law.

13.    Fiduciary Obligation / Consequences of Loan Fraud. Loan Originator acknowledges that GEL, as a licensed mortgage lender/broker, may bear the responsibility to third parties for all actions of its employees. Loan Originator hereby acknowledges and agrees that Loan Originator is responsible for the content and quality of each application taken and each Loan submitted to GEL. Loan Originator understands that the submission of a loan application containing false information is a crime and that loan fraud includes, but is not limited to submission of inaccurate information, including false statements on loan application(s) and falsification of documents purporting to substantiate credit, employment, deposit and asset information, personal information including identity, ownership/non-ownership of real property; forgery of partially or predominantly accurate information; incorrect statements regarding current occupancy or intent to maintain minimum occupancy as stated in the security instrument; lack of due diligence by Loan Originator, including failure to obtain all information required by the application and failure to request further information as dictated by borrower's response to other questions; unquestioned acceptance of information or documentation which is known, should be known, or should be suspected to be inaccurate; simultaneous or consecutive processing of multiple owner occupied loans from one applicant supplying different information on each application; allowing an applicant or interested third-party to "assist" with the processing of the loan; Loan Originator's non-disclosure of relevant information. Loan Originator acknowledges that fraudulent loans cannot be sold into the secondary market and, if sold, will require repurchase by GEL and fraudulent loans damage GEL's contractual agreements with its investors and mortgage insurance providers. If Loan Originator participates in loan fraud of any kind, the following is a list of a few of the potential consequences that may result to Loan Originator: criminal prosecution; immediate termination of this Agreement; loss of lender access due to exchange of information between lenders, mortgage insurance companies, including submission of information to investors (FHLMC/FNMA), police agencies, and the Department of Financial Institutions; civil action by GEL; civil action by applicant/borrower or other parties to the transaction.

14.    New Employee Training Certification fee. As part of the application process, I acknowledge that I will pay a $125.00 training certification fee. This fee is payable by credit card (Visa, Master Card, American Express, or Discover) to Global Equity Lending, Inc. I acknowledge and understand that this fee is non-refundable. I acknowledge and understand that I am responsible for any additional state licensing/registration fees, if any. I acknowledge and understand that I am responsible for fees pertaining to pre-licensing training, education and continuing education.

15.    Previous Agreements. This Agreement supersedes any and all previous agreements between the parties hereto.

IN WITNESS WHEREOF, the parties have executed this Agreement by affixing their signatures thereto.

**New Loan Originator's Acknowledgements**

You must check the following acknowledgments to continue:

☒    A.    My becoming an employee of Global Equity Lending will not violate the terms of or interfere with any contract, agreement or business relationship that I have or have had with any third party, including without limitation, World Financial Group, Inc...

☒    B.    Upon becoming an employee of Global Equity Lending, I will not engage in any business practice or behavior, nor will I take any action, which will result in any violation of any restrictions or covenants to which I am subject pursuant to any agreement to which I was previously a party, including, without limitation, any agreement with World Financial Group, Inc.

GEL-005

☒   C.   Global Equity Lending, its officers, directors, shareholders and employees have not induced me in any way whatsoever to terminate any contract, agreement or business relationship that I presently have or have had with any third party, including without limitation, any agreement with World Financial Group, Inc.

☒   D.   I understand that these acknowledgments constitute a part of my Global Equity Lending, Inc., Mortgage Loan Originator Employment Agreement to which I am bound and are material representations upon which Global Equity Lending shall rely in its acceptance of my Mortgage Loan Originator Employment Agreement.

**Printed Name: Dolores Arreguin**

**Date: 4/2/2002 3:07:51 PM**

By typing my full name and clicking "I Accept" below I signify my acceptance of the Global Equity Lending New Loan Originator's Acknowledgments.

GEL-006

# Employment History    AFDO 99

You must provide information for at least the last five years, whether employed or not. Gaps in your historical information are not allowed so you must account for all time. Please begin with your most recent employment information and provide any additional history in a "most recent to oldest" order.

NOTE:   * denotes required fields.

## Employer 1  (most recent)

* From (month/year): _JAN 02_     * To (month/year): _Present 19July02_
* Company Name: _Woodbridge Group / Comunity lending_
* Business Type: _Motgages_
* Phone: _(408)210 -7378_
* Address: _____
Suite/Apt: _____
* City: _____
* State: _Ca_
* Zip Code: _____
* Supervisor: _Dave Thawley_

## Employer 2

From (month/year): _Nov 2000_     * To (month/year): _Dec 2000_
Company Name: _World Financial Group_
Business Type: _Securites_
Phone: _(916) 481-0481_
Address: _3701 Marconi Ave, Ste 209_
Suite/Apt: _____
City: _Sac_
State: _Ca_
Zip Code: _95181_
Supervisor: _Doug Cain_

## Employer 3

From (month/year): _Nov 78_     * To (month/year): _Dec 99_
Company Name: _USAF Civilian_
Business Type: _Military_
Phone: _____
Address: _WPAFB_
Suite/Apt: _____
City: _____
State: _OH_
Zip Code: _____
Supervisor: _____

# Contact Information

NOTE:  * denotes required fields.

* Daytime phone: 916) 224-3227

* Home phone: 916) 224-3227

Fax:

VoiceTel:

* Email address: LALAbiz 444@Hotmail.com

* Home Address: 6526 Main st

* City: Orange vale

* State: Ca

* Postal/Zip code: 95662

* Country: USA

GEL-008

# References

Please enter three personal references. You must provide all information for all three references.

**NOTE:**  * denotes required fields.

Reference 1
    * Reference name: _Rosie Resendiz_
    * Phone Number: _707 678 3696_

Reference 2
    * Reference name: _Esther Jimenez_
    * Phone Number: _916) 645  3801_

Reference 3
    * Reference name: _Dea Hobb_
    * Phone Number: _916) 663-2051_

GEL-009

## Applicant's Certification Agreement  *(Check all that apply)*

1. I authorize the investigation of all statements contained in this application and release from all liability any persons or employers supplying such information, and I also release the Company from all liability which might result from making the investigation.

2. I certify that the facts and information set forth in this application are true and complete to the best of my knowledge. I understand that any falsification, misrepresentation or omission of facts on this application (or on any required documents) will be cause for denial of employment or immediate termination of employment, regardless of when or how discovered.

3. I agree, if I am offered and accept a position, to conform to all existing and future Company rules and regulations and I understand that the Company reserves the right to change commissions, hours and working conditions as deemed necessary. I also understand and agree that I may resign or be terminated, with or without cause, and with or without notice, at any time.

4. I understand that any employment offer is contingent upon my providing, within three (3) working days of employment, valid proof of identity and eligibility to work in order to comply with the Immigration Reform and Control Act of 1986.

5. I understand that any intentional or negligent misrepresentation(s) of the information in a mortgage application may result in civil and/or criminal penalties.

6. I have read and reviewed the information provided in this application and the above statements. By signing this application for employment and clicking the "Submit Application" button below, I certify that I understand and agree to all parts of it and have answered all questions completely and fully.

Sign : _____    Date 7-19-02

GEL-010

# W-9 Information

NOTE: * denotes required fields.

| Form **W-9** | **Request for Taxpayer** | Give form to |
|---|---|---|
| (Rev. December 1996) | **Identification Number and Certification** | the requester |
| Department of the Treasury Internal Revenue Service | | Do NOT send to the IRS. |

Please Print or Type

Name (If a joint account or you changed your name. See Specific Instructions on page 2)

**DOLORES ARREGUIN**

Business name, if different from above (See Specific Instructions on page 2)

○ ○ ○ ○

6526 MAIN St

Requester's name and address (optional)

Oakyevale, CA 95662

List Account number(s) here (optional)

**Part I**

## Taxpayer Identification Number (TIN)

**Part II**

**For Payees Exempt From Backup Withholding**
(See the instructions on page 2.)

> 547 62 0827

**Part III** Certification

Under penalties of perjury, I certify that

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because. (a) I am exempt from backup withholding. Or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding

**Certification Instructions.—** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. (See the instructions on page 2)

Sign Here   Signature ▶ _Dolores Arreguin_   Date ▶ 7-19-02

GEL-011

# WORLD LEADERSHIP GROUP, INC.
## Associate Membership Agreement

**THIS AGREEMENT** is made by and between **WORLD LEADERSHIP GROUP, INC.** (hereinafter referred to as "WLG"), and the undersigned individual (hereinafter referred to as the "Associate").

**WHEREAS,** the Associate desires to become a member of WLG's sales force (hereinafter referred to as "World Leadership Group" and further defined herein) which will be composed of a group of individuals ("members") who enter into agreements with WLG pursuant to which they become authorized to engage in the business of selling Products and Services offered by WLG; and

**WHEREAS,** WLG has established a contractual relationship with one or more companies (collectively, the "Preferred Companies", or individually, a "Preferred Company") authorizing WLG or the members of "World Leadership Group" to market and sell various Products and Services and to recommend and designate members of "World Leadership Group" for appointment with the Preferred Companies as independent sales representatives with respect to such various Products and Services; and

**WHEREAS,** WLG is continually recruiting new members to "World Leadership Group" and desires to have the Associate become a member of "World Leadership Group" by entering into a written agreement with the Associate which establishes and defines the terms and conditions of the Associate's membership in "World Leadership Group";

**NOW, THEREFORE,** in consideration of the premises, the mutual promises and covenants in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, and intending to be legally bound hereby, WLG and the Associate agree as follows:

## I. Membership in "World Leadership Group"

The Associate hereby agrees to become a member of "World Leadership Group" and to abide by the terms and conditions of membership as hereinafter set forth in this Agreement.

## II. Associate's Duties As A Member

A.  As a member of "World Leadership Group" the Associate promises that he/she will do the following:

1.  Use his/her best efforts to sell and promote the sale of the Products and Services;
2.  Preserve the good name and reputation of "World Leadership Group" and WLG and not do anything that will damage the name and reputation of "World Leadership Group" or WLG;
3.  Comply with all rules and guidelines set forth in the Associate Agreement Rules and Guidelines and other instructions and procedures, either now existing or as issued from time to time by WLG.
4.  Comply with all of the terms and conditions of any contract(s) into which Associate enters with WLG, the Preferred Companies, or any companies with which WLG is or may hereafter become affiliated, directly, indirectly, through common ownership, by contractual agreement, or otherwise ("WLG Affiliated Companies"). For purposes of this Agreement, any reference hereinafter made to WLG shall be deemed to constitute a reference to all of the WLG Affiliated Companies;
5.  Participate in the training that will be provided to "World Leadership Group";
6.  Refrain from selling or soliciting for sale any Products and Services of a Preferred Company until the Associate receives written notice from WLG or the Preferred Company that the Associate has been approved to market such Products and Services; and
7.  Execute such further agreements and obtain such licenses that WLG determines to be required for the Associate to be lawfully authorized to sell any of the Products and Services.

B.  The Associate understands and acknowledges that WLG is in the business of building "World Leadership Group" to provide Products and Services to the consuming public and "World Leadership Group" is a valuable asset of WLG. The Associate acknowledges that WLG owns all rights in and to the following: (i) "World Leadership Group", which, for purposes of this Section II.B., includes all persons (other than the Associate's Exempt Persons) who have in force independent contractor agreements with WLG and all such agreements; (ii) the identities of and and lists of the members comprising "World Leadership Group"; and (iii) the identities of and all lists of the customers (other than the Associate's Exempt Persons) produced by "World Leadership Group" ("Customers") (even though the Associate may not have recruited any of the members or produced any of the Customers) which constitute property owned solely by WLG. Except as to the Associate's Exempt Persons, Associate agrees that Associate shall have no proprietary interest in, or ownership of, any Customers, other Associates of WLG including Downline Associates, or Products and Services. WLG shall have exclusive proprietary interest in, or ownership, of all Customers, and contractual relationships with other Associates and the Preferred Companies.

C.  As a member of "World Leadership Group", the Associate is not an employee of WLG or "World Leadership Group". Instead, the Associate's relationship with WLG is that of an independent contractor. Nothing in this Agreement shall be construed to constitute the Associate as a partner, employee or agent of WLG, nor shall WLG, the Preferred Companies or the Associate have any authority, except as expressly provided herein, to bind the other; it being the intention that each shall remain an independent contractor responsible for his/her own actions. Subject to all applicable local, state and federal laws and regulations, this Agreement, Associate Agreement Guidelines, Rules, and other instructions and procedures published by WLG, and any contract(s) between the Associate and the Preferred Companies, the Associate shall conduct and control his/her business activities, work hours, selection of Customers, office location and sales methods. Even though a state license or form may designate the Associate as an "employee" of WLG or the Preferred Companies, such designation will not change the fact that by definition and by practice the Associate is an independent contractor. As an independent contractor, the Associate shall be responsible for paying any and all federal, state, city or other taxes that may become payable with respect to any compensation the Associate may receive under the terms of this Agreement.

**D.** Associate shall promptly pay all expenses relating to the performance of Associate's duties under this Agreement, including but not limited to indebtedness to WLG. Associate shall be solely responsible for all of his/her expenses, including but not limited to travel, entertainment, office, signs, telephone, education, dues, subscriptions, licenses, etc., and shall receive no remuneration or reimbursement of any nature whatsoever other than the commissions referred to herein. Company shall not provide any facilities, furniture, or equipment to Associate. Associate shall provide his/her own office, telephone, supplies, transportation, and all other facilities which Associate may deem necessary.

**E.** Associate shall supervise the WLG-related activities of Associate's Downline Associates and use Associate's best efforts and continuing diligence in directing Associate's Downline Associates to comply with their respective associate membership agreements with WLG and in training and providing assistance to Associate's Downline Associates, all in accordance with WLG policies and procedures, including those contained in the Associate Agreement Rules and Guidelines. Associate's fulfillment of such supervisory and training responsibilities is an essential requirement of Associate's compliance with this Agreement.

**F.** Associate shall, if required by state law to sell Products and Services, obtain the appropriate license in each jurisdiction in which and from which Associate solicits, offers or obtains applications and orders for purchase of Products and Services and in each jurisdiction, where required by law, in which and from which Associate receives Override Compensation. Associate will bear the cost of all initial and renewal fees for licensing and registrations. Associate will make payment as instructed by WLG.

**G.** Associate shall maintain accurate and current records of all transactions entered into pursuant to this Agreement. Such books and records shall conform to the requirements of federal and state laws, the rules and regulations of appropriate regulatory agencies and the policies and procedures of WLG. Associate shall maintain an accurate and current file of all commission statements and other records and correspondence received from WLG and notify WLG in writing within thirty (30) days after WLG making available such statements, records and correspondence, or any of them, is inconsistent with Associate's records or, in the opinion of Associate, not accurate. As to any statements, records or correspondence furnished by or on behalf of WLG to Associate, if Associate does not furnish WLG with written objections or corrections within thirty (30) days of after WLG makes available such statements, then Associate shall be deemed to have approved such statements, records and correspondence as to any matter not objected to or corrected, and to have released WLG from liability and responsibility for all matter contained therein.

**H.** Associate shall not use sales material of any kind which has not been approved in writing by WLG for such use, including but not limited to any type of form letter or correspondence. Without the prior written approval of WLG, Associate shall not use any form of media, including but not limited to the Internet, electronic mail (email), radio, newspaper, television, letters, business cards, letterhead, or photocopies, to promote sales. The Associate promises not to use the name "World Leadership Group" in conjunction with any notation indicative of a business organization, such as "Corporation", "& Company", "Ltd.", "Inc.", or "& Associates", unless the Associate is specifically granted written permission from WLG to do so. The Associate may not appropriate the name "WLG" or "World Leadership Group" for use in any corporate name, joint venture or partnership.

**I.** All activities conducted by Associate under this Agreement shall be conducted in accordance with all applicable laws. Associate also has the duty to faithfully abide by the rules and regulations set forth in the Associate Agreement Rules and Guidelines that may be issued from time to time, and other instructions, procedures, etc. published by WLG, as amended from time to time, and all applicable bulletins or memoranda issued by the Preferred Companies. Associate shall immediately advise WLG of any action or fact whatsoever which comes to Associate's knowledge which may possibly constitute a violation of any applicable laws or regulations with respect to WLG, Associate or any party who is, has been, or may be doing business with WLG . The Associate's failure to comply with, or failure to cause his/her Downline Associates to comply with, any Associate Agreement Rule constitutes a material breach of this Agreement.

**J.** In the event that WLG contracts with one or more insurance companies to provide WLG and its independent contractors with group plans for errors and omissions and fidelity insurance coverage, the Associate will be required to participate in these group plans and monthly insurance premiums will be deducted by WLG from commissions due to Associate. If Associate's commissions are insufficient to cover the monthly insurance premiums, then WLG shall have the right to direct any WLG Affiliate to offset such deficit against any earned commissions due to Associate, or, at the option of WLG, Associate may be billed for the total amount of accrued insurance premiums and such amount will be paid in full by Associate within 15 days of the billing date, otherwise this Agreement will be terminated. WLG specifically reserves the right to modify insurance premiums charged without prior notice.

**K.** Associate shall not take, undertake or engage, directly or indirectly, in any Prohibited Actions.

**L.** Associate acknowledges and agrees that all supplies, including but not limited to memoranda, visual aids, manuals, training materials, recruitment materials, vendor materials and brochures, furnished by WLG to Associate are and shall be the property of WLG and shall be returned promptly to WLG upon demand.

**M.** Associate shall comply with the terms, conditions and restrictions on use contained in any and all license or other contractual agreements between third party owners of any computer software and WLG or any WLG Affiliate, pursuant to which WLG or a WLG Affiliate has obtained the right to use such computer software. Associate further agrees to comply with the terms of any license or other contractual agreement into which Associate is required to enter with any third party computer software owner.

**N.** Associate shall not violate the Covenants.

## III.  Associate's Compensation

**A.**    The Associate acknowledges and understands that the Associate earns income only from the sale of the Products and Services and no income is earned by or paid to Associate for recruiting.  The Associate's sole compensation under and during the term of this Agreement shall be commissions paid by, or caused to be paid by, WLG pursuant to this Agreement and paid in the manner provided in, and subject to the terms and conditions contained in, those Associate Agreement Guidelines and commission schedules which are published by WLG from time to time.  The Preferred Companies are generally not obligated to pay the Associate any money.  There is no guarantee that the Associate will be financially rewarded solely by virtue of becoming a member of "World Leadership Group".

**B.**    WLG will publish Associate Agreement Guidelines and commission schedules from time to time which relate to sales position designations, performance standards, commission rates of WLG or the Preferred Companies and other matters affecting the terms of the members' compensation.  WLG may, from time to time, in the exercise of its sole discretion, and without notice, increase or decrease the rates and amounts of commissions or the sales position of Associate; provided, however, that any such changes may be prospective only, but may affect any new business and any commissions earned thereafter on existing business.

**C.**    Associate acknowledges and agrees that Associate's commissions are a share of WLG's commissions and Associate's commissions are earned by, and shall be payable to, Associate only after all of the following have occurred: i) the order or application for Products and Services submitted by Associate is accepted and approved by WLG or a Preferred Company at its principal office, or by an approved WLG designee; ii) actual payment for the same has been made by and received from the Customer; and iii) WLG has actually received payment from a Preferred Company, if applicable, of WLG's commission (subject to WLG's refund rights set forth in Section III.F. of this Agreement.

**D.**    Any money and value owed by Associate to WLG, any debt, any Debit Balance, and any money and value which has been advanced or credited by or on behalf of WLG or a WLG Affiliate to, or for the benefit of, Associate, represents a loan and may be offset and deducted by WLG from any commissions or other money or value then or thereafter owed by WLG to Associate pursuant to this Agreement or owed by any WLG Affiliate to Associate.  WLG is hereby authorized by Associate to deduct from commissions due the amount of any commissions paid to Associate in connection with any payment or amount that WLG refunds to Associate's Customer.

**E.**    All Debit Balances shall be repaid immediately by Associate upon notice thereof to Associate by WLG or a WLG Affiliate.  Any Debit Balances not paid within thirty (30) days from the effective date of such notice shall bear interest from the end of such thirty (30) days at a rate equal to the maximum legal rate of interest provided by applicable law.  From time to time in its sole discretion, WLG or a WLG Affiliate may cause a reduction in all or any portion of the Associate's Debit Balance in any of the following ways: i) by applying any commissions or other forms of compensation payable to the Associate by WLG or a WLG Affiliate to reduce the Associate's Debit Balance; or ii) by exercising any other legal rights and remedies available to WLG or a WLG Affiliate, including any rights or remedies that are included in Associate Agreement Guidelines and Rules.  The Associate is also obligated to repay WLG or WLG Affiliates for the Debit Balances of any of Associate's Downline Associates.  If a Downline Associate does not pay his Debit Balance either after ninety (90) days from the effective date of notice by WLG or a WLG Affiliate to Downline Associate, or immediately upon termination of that Downline Associate's Associate Membership Agreement with WLG or other contractual agreement with a WLG Affiliate, then that Downline Associate's Debit Balance, and the interest and other liabilities in connection therewith, shall Roll Up to Associate and become in all respects part of Associate's Debit Balance for which Associate and such Downline Associate shall be jointly and severally liable for payment to WLG or a WLG Affiliate.

**F.**    In the exercise of its sole discretion, WLG reserves the right to, and may, refund to any Customer all or any part of payments made by Customer, and Associate agrees to promptly reimburse WLG for its expenses in connection therewith.  Associate further agrees to promptly repay WLG all commissions by Associate with respect to any refunds to Customers, and WLG is hereby authorized to deduct from any other commissions due or that may become due to Associate hereunder, the amount due WLG for any such expenses or commissions to be repaid by Associate.

**G.**    Except as set forth above in Sections III.A., Associate shall receive no other compensation of any kind whatsoever under this Agreement.  Associate will not receive any fringe benefits under this Agreement whatsoever, including but not limited to insurance benefits, disability income, paid vacation, expense reimbursement or retirement benefits unless otherwise specifically provided for in this Agreement.

## IV.  Term and Termination

**A.**    This Agreement shall continue in effect until Termination.

**B.**    Upon the Termination of this Agreement, all unpaid commissions earned by Associate prior to the effective date of Termination of this Agreement shall be paid by WLG to Associate within a reasonable period of time.  No further compensation, other than the commissions earned as of the effective date of Associate's Termination, shall be payable to Associate under this Agreement after Termination.  However, WLG or any WLG Affiliate shall have the right to offset against any commissions due to Associate the amount of any Debit Balance, indebtedness owed by Associate to WLG or to any WLG Affiliate, or any charges made by WLG or a WLG Affiliate to Associate occasioned by improper activity, breach of this Agreement, or the amount of any Indemnified Loss.  Upon Termination of this Agreement, any debt or Debit Balances then or thereafter outstanding, and any debt or Debit Balances that may thereafter exist, shall without notice immediately become due and payable and shall bear interest at the highest rate permitted under applicable law until paid.  Associate shall promptly surrender to WLG all books and records relating to WLG including but not limited to all applications and payments which Associate may have in his/her possession or under his/her control at the time of Termination.

## V.  Arbitration of Grievances

The Parties agree that, except as specifically provided to the contrary in this Agreement, any Grievance shall be resolved exclusively by Good Faith Arbitration.  For purposes of this Article V, the terms "Party" and "Parties" include WLG, the Associate and the Corporate People.

## VI. Extraordinary Relief

The Associate acknowledges that WLG would suffer extremely costly and irreparable harm, loss and damage if any of the provisions of this Agreement are violated by the Associate. The Associate agrees that WLG shall be entitled to seek Extraordinary Relief to temporarily enjoin violations by the Associate of this Agreement and that WLG may seek Extraordinary Relief in the federal and state courts of the State of Georgia, in any court of competent jurisdiction outside the State of Georgia, as well as in Good Faith Arbitration and if justice requires, in more than one of them, all without having to first comply with the requirements of Article V. The specifics of this Article VI shall not be deemed to preclude or narrow the judicial or arbitral powers regarding Extraordinary Relief.

## VII. Associate's Promise to Indemnify and Assign

**A.**   The Associate agrees to indemnify and hold harmless, from and against any and all Indemnified Losses which are incurred, sustained, suffered, or assessed against the Indemnified Party, or all or any combination thereof, because of, arising out of or as a result of any acts or omissions, including but not limited to a breach of Section II. N. or any breach of Associate's contract(s) with Preferred Companies, by the Associate and also any of Associate's Downline Associates. The Indemnified Party shall be entitled to use counsel of its own choosing, shall be entitled to determine the validity of the Indemnified Loss and shall not be required to notify the Associate of the existence or progress of any claims or Indemnified Loss as a condition precedent to requiring payment by the Associate to the Indemnified Party for an Indemnified Loss.

**B.**   To secure the Associate's promise of indemnification and the Associate's obligation to repay his/her Debit Balance or his/her Downline Members' Debit Balances, the Associate hereby assigns to WLG, and grants, and agrees to, from time to time, execute any additional instruments or documents necessary to perfect, a continuing security interest to WLG in, all commissions (or advances thereon) otherwise payable to the Associate by WLG, to the extent necessary to satisfy WLG for any such Indemnified Loss or any such Debit Balance obligations. This assignment is given to WLG to secure the Associate's obligations as set forth above and elsewhere in this Agreement. WLG has the right to withhold commissions in connection with this indemnity in such amount as WLG determines in its sole discretion.

## VIII. Representations and Warranties

**A.**   The Associate expressly represents and warrants that the Associate has the authority to enter into this Agreement and that the Associate is not and will not, by virtue of entering into this Agreement and consummating the transactions contemplated hereby, or otherwise, be in breach of, violate, or interfere with, any other contract, agreement, or business relations which the Associate has or had with any third party, company, agency, association, firm, person, corporation, or other entity.

**B.**   Associate has not engaged in nor will engage in any business practice or behavior nor has taken nor will take any action which has or will result in any violation of any restrictions or covenants to which the Associate is subject pursuant to any agreement to which the Associate was heretofore a party.

## IX. Miscellaneous

**A.**   All capitalized terms used but not otherwise defined herein shall have the meaning set forth in that certain Glossary and Explanation of Terms published by WLG and in effect as of the date of this Agreement, a copy of which Associate acknowledges receipt. The Glossary and Explanation of Terms are contractual supplements to this Agreement that are binding on the Associate and by this reference are made part of this Agreement. Any changes to the Glossary and Explanation of Terms shall be effective as of the date of general publication by WLG.

**B.**   If any term of this Agreement controverts the express, or in the opinion of WLG's counsel, the intended provisions of any applicable regulatory authority or court decision, then said term shall be governed by said regulatory provision or decision and the subject term of this Agreement shall be deemed automatically amended or deleted as the case pertains. Should such amendment or deletion materially affect the substance of this Agreement, then this Agreement shall be subject to immediate termination upon written notice to the other party.

**C.**   The Associate understands that the eligibility requirements for certain sales position designations, as well as the obligations that are imposed upon the Associate in such positions, shall be as are published from time to time and that said requirements may be changed from time to time, by WLG, and that such designations are within the sole discretion of WLG.

**D.**   All notices or demands hereunder shall be sent either by certified mail, return receipt requested, postage and certified fees prepaid or by overnight courier service, addressed as follows: if to WLG, addressed to Administrator of Contracts, World Leadership Group, Inc., at its then principal home office address in Georgia; if to an officer, director or employee of WLG, then addressed to that person c/o World Leadership Group, Inc.; and if to the Associate, addressed to him/her at the address provided in WLG Application Package. For purposes of this Agreement, the Associate shall maintain only one address at a time (the "Associate's Principal Address"), and shall immediately notify WLG of any change in the Associate's Principal Address.

**E.**   The failure or delay by any party to insist upon strict performance of the terms and conditions of this Agreement shall not be deemed a waiver of any subsequent breach or default in the terms hereof. Any waiver must be in writing and signed by the party granting the waiver.

**F.**   Titles and headings of sections and subsections of this Agreement are for convenience and are not intended to encompass all of the provisions therein or to interpret such provisions.

**G.**   If any part, section, clause, paragraph, term or provision of this Agreement shall be found to be void or unenforceable by any court or arbitration of competent jurisdiction, such finding shall have no effect upon any other part, section, clause, paragraph, term or provision of this Agreement.

**H.**   The Associate may not assign any rights or delegate any duties under this Agreement except as expressly provided herein. WLG may, from time to time, desire to assign to its affiliates or others all or a part of its rights and obligations hereunder (a "future assignment"); and the Associate consents and agrees to any such future assignment and agrees that, after any such future assignment, WLG shall be released from all obligations and liabilities so assigned, so long as such obligations and liabilities are assumed by the assignee.

**I.** If any Party hereto commences an action or arbitration to enforce any of the provisions hereof, the prevailing Party in such action shall be entitled to an award of its reasonable attorneys' fees and all costs and expenses incurred in connection therewith.

**J.** This Agreement, including any Associate Agreement Rules constitutes the entire agreement and understanding between the parties hereto, unless another agreement is executed simultaneously with or subsequent to this Agreement by the parties which makes specific reference to this Agreement and expressly supplements or modifies this Agreement. No change, amendment, termination or attempted waiver of any of the provisions hereof shall be binding upon WLG unless in writing and signed by WLG.

**K.** Since the parties acknowledge that significant aspects of performance of this Agreement will occur in the State of Georgia, even though the business activities of the Associate may occur anywhere authorized, provisions of this Agreement (other than the provisions pertaining to the Covenants and Article II, Section N, as to which the parties do not specify an agreed upon choice of law) will be governed and construed under the laws of Georgia. If conflict or choice of law rules would choose a law of another jurisdiction, each party waives such rules and agrees (other than with respect to the Covenants and Article II, Section N) the substantive law of Georgia shall nonetheless govern. The parties agree that, without waiver of their rights and obligations under Section V., unless expressly provided to the contrary in this Agreement, the state and federal courts of Georgia shall have exclusive jurisdiction of any litigation between the parties and the Associate expressly submits to the jurisdiction and venue of the federal and state courts sitting in Gwinnett County, Georgia or Cobb County, Georgia with respect to any such litigation.

**L.** The Associate agrees that WLG shall have the right to run credit, employment and other financial and background investigations on the Associate at any time WLG deems useful, whether such investigation is conducted by WLG or by an outside service or third party. The Associate consents to such investigations and consents to the disclosure of any person or entity to WLG of any financial, background and employment information conducted by WLG or by an outside service or third party.

**M.** As a condition to becoming a member of "World Leadership Group", the Associate understands that the Associate is not required to purchase any of the Products and Services and is not required to pay WLG or the Preferred Companies any consideration except for the administrative fee to process his/her application for membership. Further, the Associate is not required to enter into any contract with WLG or the Preferred Companies in order to purchase any Products and Services.

**N.** The Associate irrevocably consents to and forever authorizes the use by WLG or anyone authorized by WLG, its legal representatives or assigns, the absolute and unqualified right to use all photographs in which the Associate has appeared for WLG and reproductions thereof, in which the Associate has been included in whole or part, made through any media without inspection or approval of the finished product or use to which it may be applied, in any manner WLG may desire, factually or fictionally, including the right to make adaptations of said material of every and any kind and character. For such purpose WLG may adopt, arrange, change, dramatize, make musical versions of, interpolate in, transpose, add to, and subtract from such photographs and reproductions to such extent as WLG, in its sole discretion, may desire, and in any language; and, further to obtain copyright in all countries on such use by WLG of such material in any form and upon any and all adaptations thereof to renew such copyrights. The Associate releases and discharges WLG, its assigns, agents, or licensees from any and all claims and demands that the Associate may have, which arise out of or in connection with the use of such photographs or reproductions, including but not limited to, any and all claims of libel, slander, and invasion of privacy. The Associate further releases WLG, its assigns, agents, or licensees from any liability of alterations, optical illusion or faulty mechanical reproduction. The Associate is over eighteen years of age and has read the above authorization and release prior to its execution.

**O.** The Associate acknowledges that any changes to this Agreement, the Glossary and Explanation of Terms, Agreement Rules and Agreement Guidelines, or compensation schedule may be published by WLG by posting such changes to the WLG Internet site. Any changes shall become effective as of the date of posting.

By the Associate's signature below, the Associate: (i) signifies his or her acceptance to all of the terms, and conditions and restrictions contained or referenced in this Agreement (ii) agrees that upon acceptance by WLG the Agreement shall be a valid and enforceable agreement between Associate and WLG, and (iii) consents to the record of the execution of this Agreement being maintained in electronic form.

ASSOCIATE:                                                WORLD LEADERSHIP GROUP, INC.

*Dolores Arreguin*
Print Name                                                By: _____

*(signature)*
Signature

Date: 7-19-02

# WORLD LEADERSHIP GROUP, INC.
## GLOSSARY AND EXPLANATION OF TERMS

The following sections ("Sections") define and explain additional terms which apply to and are part of the Associate's Associate Membership Agreement ("Agreement").

A. **"Advance Commissions".** Any monies that may be paid to Associate from WLG or any WLG Affiliate as an advance against Associate's commissions, or Associate's Override Compensation, either or both of which are yet to be earned, that may become due and payable by WLG or any WLG Affiliate.

B. **"Associate Agreement Guidelines" and "Associate Agreement Rules".** "Associate Agreement Guidelines" are those guidelines published in writing from time to time by WLG to WLG Associates containing sales position designations, performance standards, commission rates, and other matters affecting WLG Associates' compensation. "Associate Agreement Rules" are those rules published in writing from time to time by WLG to WLG Associates containing certain additional requirements imposed on WLG Associates as part of their contractual relationship with WLG. Associate Agreement Guidelines and Rules are contractual supplements to this Agreement that are binding on the Associate and by this reference are made part of this Agreement. Associate Agreement Guidelines and Rules are not governed by the notice requirements of this Agreement; provided, however, that any changes set forth therein shall be effective as of the date of general publication.

C. **"Corporate People".** Any and all of the officers, directors and employees of WLG or any WLG Affiliate, whether present or past and whether in their individual or their corporate capacities.

D. **"Covenants".** Those covenants set forth below in this Section D.

1. Valuable Assets of WLG. The Associate understands and acknowledges that WLG has developed, through the expenditure of considerable sums of monies, and owns, the following valuable, special and unique assets: i) a competent network of contractually affiliated sales associates, which associates are located throughout United States, but are and have been organized and trained, with the result that WLG is a highly effective marketing organization; ii) a lasting and sophisticated relationship with the Preferred Companies; and iii) the Customers particularly insofar as WLG receives its primary compensation from sales of Products and Services to such Customers. The Associate understands and acknowledges that the commissions the Associate earns from the sale of Products and Services constitute, in part, compensation for producing the property rights of WLG in its network of contractually affiliated sales associates and in the Products and Services sold by the Associate or his/her Downline Associates and for the Associate's agreement herein not to violate or interfere with such property rights and not to breach the covenants set forth below.

2. Associate Non-Recruitment. The Associate covenants that he/she will not, at any time during the term of this Agreement, and for a period of two (2) years thereafter, directly or indirectly: i) induce or attempt to induce any person (other than Associate's Exempt Persons) who is contractually affiliated with WLG as an associate or in other capacity, or any member of WLG's administrative staff, to terminate their relationship with WLG; or ii) hire, induce or attempt to hire or induce any such persons to sell or solicit products and services which are competitive with the Products and Services for any person or entity other than WLG. The Associate's covenants in the preceding sentence are limited and only apply with respect to any person who is not an Exempt Person and who resided in or engaged in business activities in the geographic area within fifty (50) miles of the location of the Associate's office(s) during the eighteen (18) month period preceding termination of this Agreement. The Associate acknowledges that any violation of this Section D(2) by the Associate with respect to any member of WLG's network of contractually affiliated sales associates (other than Exempt Persons) constitutes wrongful interference with WLG's contractual relationship with such persons and with WLG's and the Preferred Companies' administrative staffs.

3. Non-Disclosure Covenant. The Associate will not use, disseminate or reveal, other than on behalf of WLG as authorized by WLG or the Preferred Companies, while this Agreement is in force, or within two (2) years after Termination of this Agreement, any confidential information or trade secrets of WLG or of the Preferred Companies, which the Associate has or hereafter receives, including any Customer or list of WLG Associates (other than Associate's Exempt Persons), whether obtained from WLG or any other person, or compiled by or on behalf of the Associate; provided, however, that confidential information does not include information which becomes generally available to the public other than as a result of disclosure by the Associate or any member of WLG's network of contractually affiliated sales associates, or information which the Associate can reasonably demonstrate was otherwise known to the Associate prior to its contractual affiliation with WLG. The Associate agrees that immediately upon the Termination of this Agreement he/she will return all documents, files and lists containing any confidential information or trade secrets to WLG and the same shall not be copied or duplicated. For purposes of this Agreement the term "confidential information" means any and all confidential and proprietary data and information created by or belonging to WLG which has value to and are not generally known by the competitors or potential competitors of WLG now or hereafter acquired or disclosed to the Associate.

4. Covenants of Other Associates and Harm to WLG. The Associate acknowledges that all members of WLG's network of contractually affiliated sales associates/representatives have executed agreements with WLG containing covenants identical or similar to the Covenants and that any act by the Associate to induce or attempt to induce any member to breach any portion of his/her agreement with WLG would constitute wrongful interference with the contractual rights of WLG with such member. The Associate acknowledges that WLG would suffer extremely costly and irreparable harm, loss and damage if, during the term of the Covenants, the Associate should violate any of said Covenants.

5. Equitable Relief. The Associate acknowledges and agrees that, in the event that he/she were to violate or threaten to violate any of the Covenants, WLG's recovery of damages would be inadequate to protect WLG. Accordingly, the Associate agrees that, in the event of a violation, actual or threatened, of any such Covenants, WLG shall be entitled to injunctive relief and specific performance, notwithstanding any other provision of this Agreement to the contrary. The Associate acknowledges and agrees that injunctive relief and specific performance are appropriate and necessary in the event of a violation, actual or threatened, of such covenants because there may be no adequate remedy at law for violation of any of such Covenants in that, among other reasons, the property rights of WLG which are protected by such covenants are unique assets which cannot be readily replaced in any reasonable period of time or in any other way adequately protected.

7. Reasonableness and Severability. The Associate acknowledges that the Covenants do not restrict the geographic areas in which the Associate may have Downline Associates and in which the Associate or such Downline Associates may solicit for the sale of Products and Services and that members of WLG's network of contractually affiliated sales associates frequently share offices with and have access to Customer information of other members, whether or not in the Associate's hierarchy. Accordingly, the Associate acknowledges and agrees that the Covenants would be reasonable even with a much broader geographical limitation. The Associate understands that these Covenants constitute consideration for payment of any commissions, including Override Compensation. The Associate agrees that the Covenants are reasonable as to the Associate

and necessary to protect the interest of WLG and that WLG would not associate with the Associate unless he/she entered into these Covenants. The Covenants and the acknowledgments and agreements contained in this Section D are severable and separate, and should a court determine any covenant or portion thereof to be unenforceable, it shall not affect the validity of any other paragraph of this Agreement or portion thereof. The Covenants and the acknowledgments and agreements in this Section D shall be construed as independent of any other provision in this Agreement, except (notwithstanding Article IX(G)) accrual and payment of commissions and Override Compensation. The existence of any other claim or cause of action of the Associate, whether predicated on this Agreement or otherwise, shall not constitute a defense to these Covenants or the acknowledgments.

8. Collateral Consequences. In addition to the rights WLG has to enforce the Covenants, the Associate agrees and understands that in the event of any breach by him/her of any of the Covenants or the provisions of this Section D, whether during the term of or after the Termination of this Agreement, no further commissions shall accrue or be payable to Associate by WLG or any WLG Affiliate, or shall be accrued or paid to reduce any Debit Balance, and any Debit Balance shall thereafter be immediately due and payable by the Associate. Compliance with each of the Covenants is an express condition for the accrual, earning or payment of any commissions and Override Compensation by WLG or any WLG Affiliate and the parties do not intend for any payment provisions under this Agreement to be enforceable by the Associate independent of his/her observance of these Covenants.

E. "Customers". Any person, or entity, from whom Associate, or any of Associate's Downline Associates solicits or attempts to solicit applications for new applications for Products and Services.

F. "Debit Balance". The balance remaining from time to time after subtracting the commissions and earned commissions actually earned but unpaid, which are due and payable by WLG or a WLG Affiliate to Associate, from any money and value owed (regardless of whether it is then due or not) by Associate to WLG or to any WLG Affiliate, including but not limited to expenses; license fees; commissions, and expenses that Associate is required to refund to WLG or a WLG Affiliate because of Customer or customer cancellations, rights of withdrawal, non-renewals, terminations, lapses or otherwise; Advance Commissions; Debit Balances of Associate's Downline Associate(s); expenses and fees incurred by WLG or any WLG Affiliate in attempting to register prospective downline Associates of Associate; WLG or any WLG Affiliate claims for indemnification against Associate; and other claims by WLG or any WLG Affiliate against Associate; and any and all money and value which may be paid, advanced, or credited by or on behalf of WLG or any WLG Affiliate, to, or for the benefit of, Associate.

G. "Divestiture". Notwithstanding anything in this Agreement to the contrary, upon the termination of this Agreement by WLG "for cause" (as defined in Section S of this Glossary) or, if Associate's termination is not "for cause" but Associate subsequently violates or fails to comply with any promise, obligation, covenant, warranty or representation contained in this Agreement or in any Associate Agreement Guideline or Rule that survives the termination of this Agreement, such violation or failure will result in the automatic forfeiture by Associate of Associate's right to receive any unpaid commissions earned by Associate as of the effective date of Termination.

H. "Downline Associate". Any Associate of WLG or of any WLG Affiliate upon whose sales, fees or revenue production Associate is entitled to earn Override Compensation.

I. "Exempt Persons." Exempt Persons shall consist of: (i) any persons, identified by name and city and state of residence, and with respect to whom Associate provides written documentation as of the date of execution of this Agreement establishing that such persons are existing customers of Associate , and (ii) any persons, identified by name and city and state of residence, and with respect to whom Associate provides written documentation as of the date of execution of this Agreement establishing that such persons are contractually affiliated with Associate, and who thereafter become Associates of WLG within thirty (30) days from the date of this Agreement.

J. "Good Faith Arbitration". The procedures set forth in this Section J to resolve all Grievances, unresolved in the normal course of business, to the extent that any Party wishes to pursue the matter further.

1. General. All Grievances shall be resolved by Good Faith Arbitration in accordance with the Rules, except that, or in addition to such Rules: i) the Parties may be entitled to such discovery and protective orders as provided herein; ii) the locale where the arbitration shall be held is the principal head office of WLG in Atlanta, Georgia or, if that location is not convenient for all Parties, they shall try to devise a way so that it is convenient, or if that location cannot be made convenient, at such other place as the Parties may agree, or, if they cannot agree, then as may be set by the Rules, as the case may be; iii) a transcript shall be made on the proceeding; and iv) the arbitrator's(s') award shall state their findings of fact and conclusions of law.

2. Judicial Review of Award. The award, including such findings and conclusions may be reviewed, vacated, modified or corrected upon application or petition of any Party brought within thirty (30) days after the date of the award, by a court of competent jurisdiction, provided that in addition to the grounds stated in applicable law or statute, the court may also vacate, modify or correct the award if the conclusions of law are contrary to law, or if the findings of fact are not supported by the facts (as determined by whether there was any pertinent and material evidence to support the findings). Otherwise, or in compliance with the court's review, the decision of the arbitrator(s) shall be final and binding. Judgment upon the award rendered by the arbitrator(s), or judgment upon the award as reviewed by the court, may be entered in any court having jurisdiction thereof.

3. Discovery. Protective Orders. Discovery (in the form of production of documents and depositions) of evidence pertinent and material to the Grievance, may be ordered by the arbitrator(s). The discovery shall be on such terms and at such times and locations as ordered by the arbitrator(s) and their orders may be enforced by courts of competent jurisdiction. In connection with all discovery and hearings regarding Good Faith Arbitration, the arbitrator(s) shall have the power to enter such protective orders as are proper under the circumstances, and the protective orders may be enforced by courts of competent jurisdiction.

4. Waiver of Litigation. The Parties acknowledge and agree that, except as specifically provided to the contrary in this Agreement, this Section J is and shall be the Parties' exclusive remedy for any Grievance arising out of or relating to this Agreement, or the breach thereof. It is the intent of the Parties that, except as specifically provided to the contrary in this Agreement, to the fullest extent allowed by law all Grievances, including any claim or defense (whether created or governed by federal, state or local law, rule or regulation) shall be resolved in an arbitral rather than a judicial forum. It is understood by the Parties that it is to their mutual benefit to submit Grievances that they are unable to resolve themselves for resolution by a neutral referee in an arbitral rather than a judicial forum. Those Parties recognize that by choosing Good Faith Arbitration as the mechanism for resolving Grievances, each Party expects to ensure a more expeditious and economical resolution of their Grievances than is available in most cases in a judicial forum. Accordingly, except as specifically provided to the contrary in this Agreement, the Parties expressly waive the right to litigate in a judicial forum all Grievances and waive the right to trial by jury. The Parties further agree that the findings of fact issued by the arbitrator(s), as reviewed, if applicable, shall be binding on them in any subsequent arbitration, litigation or other proceeding.

5. No Condition Precedent to Action and Power of Arbitrators. Anything herein or elsewhere contained to the contrary notwithstanding, WLG shall not be required to negotiate, arbitrate or litigate as a condition precedent to taking any action under this Agreement. The Parties expressly authorize the arbitrator(s) to fashion and award any type of remedy that could be awarded by a court, including such equitable or extraordinary remedies as temporary and permanent injunctive relief.

6. Extraordinary Relief. The Parties agree that WLG has the right to seek preliminary and temporary restraining orders, injunctions and other extraordinary relief (such orders, injunctions and other relief referred to as "Extraordinary Relief") under Article VI of this Agreement without complying with Article V of the Agreement or this Section J. Without limitation, the Parties agree that the requirements for Good Faith Arbitration under Article V of the Agreement or this Section do not preclude WLG from seeking in an arbitral or in a judicial forum, or in both, Extraordinary Relief to protect its rights under Article VI of the Agreement. Neither Article V of the Agreement or this Section J shall be deemed to preclude or narrow the judicial or arbitral powers regarding Extraordinary Relief.

7. Statute of Limitations. Unless otherwise tolled or satisfied with respect to Good Faith Arbitration, a demand for arbitration must be filed under the Rules within the time prescribed by the applicable statutes of limitations.

8. Beneficiaries. The Associate and WLG intend and agree that all of the Corporate People shall be Beneficiaries of all of the provisions of this Section J and that as Beneficiaries and as Parties, they, or any of them shall have the right to enforce all provisions of this Section J to the same extent as WLG and the Associate.

J. "Grievance". Any controversy, claim or dispute arising out of or relating to this Agreement, between the Associate, on the one part, and WLG and/or any of the Corporate People, or any of them, on the other part.

K. "Indemnified Loss". Any and all liability, claims, demands, proceedings, obligations, assessments, loss, cost, damage and expense, of any nature whatsoever, contingent or otherwise (including, without limitation, any and all judgments, decrees, equitable relief, extraordinary relief, settlements, awards, attorney's fees, court costs, punitive damage and arbitration costs including arbitrators' fees).

L. "Indemnified Party". WLG and the Corporate People.

M. "Override Compensation". Those commissions that are earned by an Associate from sales of Products and Services made by other WLG Associates and those commissions that are earned by an Associate from sales of products and services made by sales representatives or contractors of any WLG Affiliate, in accordance with commission schedules, rules and regulations issued by WLG or any WLG Affiliate from time to time. Override Compensation is earned only by the faithful performance of Associate's obligations under this Agreement, including, but not limited to, those obligations relating to Associate's Downline Associates.

N. "Preferred Companies". Those companies with whom WLG has established a contractual relationship authorizing Associates of WLG to solicit sales of Products and Services for such companies; and those companies with whom any WLG Affiliate has established a contractual relationship authorizing sales representatives or contractors of any WLG Affiliate to solicit sales of products and services for such companies.

O. "Products and Services". Those products and services selected, approved and designated from time to time by WLG for which Associate may solicit applications.

P. "Prohibited Actions". Associate is prohibited from, and agrees that Associate shall not: i) collect from Customers, in payment of the purchase of Products and Services, cash, or checks made payable other than to the appropriate Preferred Company, custodian bank or transfer agent relating to such purchases, all as designated by WLG; (ii) offer or sell any Products and Services unless there exists at the time of such offer or sale an effective agreement between WLG and the Preferred Company, if any, making available such services; iii) make, alter or discharge on behalf of WLG any contract or investment, or waive any provision other than in strict compliance with the terms and conditions of all applicable laws and in accordance with this Agreement and the procedures, manuals, guidelines, rules and regulations with this Agreement and of WLG; or iv) make any misrepresentation, or improperly induce a Customer to purchase Products and Services.

Q. "Roll Up". The transfer, with recourse, of the Debit Balance of a downline Associate to that downline Associate's first above Upline Associate. The term Roll Up includes the transfer, with recourse, from a Downline Associate to Associate, and also from Associate to the first above Upline Associate. All Roll Ups are with full recourse and the Associate (including the Associate from whom the Debit Balance is Rolled Up) shall remain liable for the Debit Balance, and all interest and liability in connection therewith, to both WLG or any WLG Affiliate and to all upline Associates (including Upline Associates) who suffer the Roll Up. In the event that any portion of a Downline Associate's Debit Balance is Rolled-Up to the Associate in accordance with the terms of Associate's Associate Membership Agreement, including the Associate Agreement Guidelines or Rules, or Associate's agreements with WLG Affiliates, and WLG or any WLG Affiliate directly or indirectly collects said Debit Balance from the Associate, then WLG or any WLG Affiliate may authorize in writing the Associate to collect the Debit Balance from the Downline Associate. If said Downline Associate repays his/her Debit Balance to WLG or a WLG Affiliate, then the Associate will be credited for the amount repaid; if the Associate collects any portion of the Debit Balance from the Downline Associate, such portion must be remitted to WLG or a WLG Affiliate by the Associate and the Associate will be credited the amount remitted. If such Rolled Up Debit Balance is not paid by Associate within ninety (90) days, such Rolled Up Debit Balance shall be Rolled Up from Associate to Associate's Upline Associate who shall become liable therefore to WLG or the WLG Affiliate, as the case may be. In the event the Associate's Debit Balance is Rolled-Up to an Upline Associate and WLG or a WLG Affiliate collects said Debit Balance from the Upline Associate, then such Upline Associate shall have all the legal rights and remedies WLG or the WLG Affiliate would have to require the Associate to repay his/her Debit Balance. Anything herein contained to the contrary notwithstanding, in any case where Associate or an Upline Associate suffers a Roll Up, the liability for payment of that Roll Up by Associate or Upline Associate shall be limited to deduction by WLG or a WLG Affiliate from amounts owed by WLG or a WLG Affiliate to Associate and Upline Associate, and to the Downline Associates who caused the Roll Up.

R. "Rules". Where required to be applied, the Commercial Arbitration Rules of the American Arbitration Association, as in effect at the time of the occurrence of any Grievance.

S. "Termination". The occurrence of any of the following: i) the automatic termination, without notice, upon: the death of Associate; or the revocation, termination or non-renewal of any of the Associate's licenses and registrations with any regulatory agencies, ii) the termination by Associate at any time, without any reason or any cause, effective upon the delivery of written notice to WLG, or iii) the termination by WLG at any time for "cause", effective upon the delivery of written notice to Associate. For purposes of this Agreement, Associate agrees and acknowledges that any of the following will be "cause" for termination of this Agreement by WLG: Associate's violation of any federal or state law or regulation; Associate becomes

subject to sanctions or censure by any state or federal regulatory agency or body; Associate becomes temporarily or permanently enjoined from acting as a sales associate of WLG or conducting his/her business or performing any of his or her duties under this Agreement or from acting in any of the various capacities relating to the Associate's business; Associate is censured, suspended or disciplined in respect to the violation of any law, rule, or regulation regarding the purchase or sale of any products and services, including the Products and Services; misappropriation or commingling of payments for any Products and Services; engaging in a fraudulent act or misrepresenting characteristics or benefits of the Products and Services; Associate violates any law or regulation that governs the conduct of any part of Associate's business; Associate is indicted or subject to trial for any crime involving moral turpitude; Associate breaches any provision of, or fails to perform or observe any obligation under, this Agreement, including but not limited to Associate's violation of the Covenants or the Associate engaging in any Prohibited Actions, or any other agreement that the Associate may have, now or hereafter, as a member of "World Leadership Group"; Associate fails to timely discharge any monetary obligations to WLG or any WLG Affiliate; Associate engages in any activity which, in the sole opinion and discretion of WLG, may adversely affect the good name and reputation of WLG; any act or condition of Associate that, in the sole opinion and discretion of WLG, may cause professional, business, or financial instability of Associate; Associate's failure to comply with the procedures, manuals, rules, and regulations promulgated from time to time by WLG, including the Associate Agreement Rules and other instructions and procedures of WLG; Associate's admitting in writing Associate's inability to pay debts as they become due, executing an assignment or similar document for the benefit of Associate's creditors, or the appointment of a receiver or trustee or similar officer regarding Associate's property; any false or incorrect statements made by Associate in any application to a regulatory authority; termination for any reason of any agreement between Associate and any WLG Affiliate or Preferred Company; the failure of Associate to meet levels of sales or other standards of performance issued by WLG from time to time; or the failure of Associate to comply with WLG's annual compliance review and review procedure. At WLG's discretion, instead of immediately terminating this Agreement, WLG may impose suspension of Associate's benefits and rights and privileges, including suspension of rights to solicit for Products and Services and suspension and loss of commissions, and may impose other disciplinary action, without liability to Associate for loss or otherwise. Suspension or disciplinary action shall not in any way preclude or diminish WLG's rights to terminate this Agreement at any time. In the event of termination of this Agreement by either party, WLG shall be entitled to notify the Preferred Companies to terminate the Associate's contract(s) if any, with the Preferred Companies, and Associate acknowledges and agrees that neither WLG nor the Preferred Companies shall have any liability for any loss, damage or otherwise resulting from such termination by the Preferred Companies or notice from WLG.

T. "Upline Associate". Any Associate of WLG or any WLG Affiliate entitled to earn Override Compensation upon the sales activities of Associate.

U. "WLG Affiliate". Any legal entity which is under common control with WLG. Common control for this purpose shall mean ultimate stock ownership of 20% or more by the same person(s).

# WORLD LENDING GROUP, INC.
## MORTGAGE LOAN ORIGINATOR EMPLOYMENT AGREEMENT

This Mortgage Loan Originator Employment Agreement ("Agreement"), made and entered into effective as of the date of execution by the parties hereto, is by and between World Lending Group, Inc., a Georgia corporation (hereinafter "WLG"), and the undersigned individual (hereinafter "Loan Originator");

## R E C I T A L S

WHEREAS, WLG is engaged in the activity of originating loans evidenced by notes ("Notes") and secured by mortgages ("Mortgages") on real property (hereinafter the Mortgages and Notes are collectively referred to as "Loans") for mortgage lenders and is desirous of employing Loan Originator to obtain and prepare loan applications and other materials from prospective borrowers ("Applicants");

WHEREAS, Loan Originator is desirous of becoming employed by WLG to assist WLG in obtaining and preparing loan applications and other materials from Applicants;

NOW, THEREFORE, in consideration of mutual promises of and benefits to be derived by the parties WLG, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, WLG hereby agrees to employ Loan Originator, and Loan Originator hereby agrees to be employed by WLG, subject to the following terms and conditions:

1.  Loan Originator's Duties, Responsibilities, Limitations on Authority.

1.1 Generally. Loan Originator shall use his or her best efforts to originate real estate loans on WLG's behalf by contacting the public and members of the real estate profession. All originations shall be done in a prudent manner and shall conform to the standards required by WLG as well as all state, federal and local regulations and statutes. In particular, Loan Originator covenants that he or she shall comply with the Federal Equal Credit Opportunity Act and its Regulation B, the Fair Housing Act, the Home Mortgage Disclosure Act and its Regulation C, the Federal Truth-in-Lending Act and Regulation Z, and the Real Estate Settlement Procedures Act and its Regulation X. Loan Originator understands and agrees that Loan Originator has an obligation to all Applicants to ensure that Applicants are fully advised of the various loan options available to them prior to obtaining and submitting an application to WLG. Loan Originator shall counsel each Applicant by analyzing the Applicant's income and debt and pre-qualifying the Applicant to determine what the Applicant can afford; consulting with the Applicant about home financing, including advising Applicant about different loan products, closing costs, and monthly payments; assisting in collecting from Applicant financial information (including tax returns and bank statements) necessary for the application process; maintaining regular contact with Applicant, WLG and others between the time the application is submitted to WLG and the loan closing in order to apprise Applicant of the status of the application and to gather any additional information as needed. As to all applications which are accepted for processing, Loan Originator voluntarily agrees to complete the application (including taking information from Applicants and assisting Applicants in filling out the application), submit the application to WLG, and assist in attaining such supplementary information as may be requested of Loan Originator by the processing agent in the event the Applicant does not respond to the processing agent's information requests in a timely manner.

1.2 Compliance With WLG Rules and Guidelines. The Loan Originator agrees to comply with all rules and guidelines set forth in the Mortgage Loan Originator Agreement Rules and Guidelines ("Rules and Guidelines") and other written policies, instructions and procedures, either now existing or as issued from time to time by WLG, which by this reference are made part of this Agreement. The Rules and Guidelines are those rules and guidelines published in writing from time to time by WLG to its Loan Officers containing certain additional requirements imposed on WLG Loan Officers as part of their contractual relationship with WLG and other matters affecting WLG Loan Officers. WLG also publishes policies and procedures of WLG and the operational rules and regulations required by the various regulatory agencies.

1.3 Business Cards, Advertising. Loan Originator shall have the authority to represent through business cards, announcements, or other documents, that Loan Originator is an employee of WLG performing mortgage loan origination services. WLG will provide such advertising and promotional materials as it deems appropriate. Loan Originator shall not engage in any additional advertising or use any marketing materials that are not approved in advance shall first submit such advertising or marketing materials to WLG for approval before circulating them to the public.

GEL-021

1.4 <u>Other Contractual Affiliations</u>. Subject to the provisions of this Paragraph 1.4, Loan Originator may engage in other business activities to the extent such other activities do not interfere or conflict with Loan Originator's employment duties hereunder. Notwithstanding the foregoing, during the term of this Agreement, Loan Originator shall not, except with respect to Exempt Business Activities (as defined in Section 6.4 hereof), if any: i) be associated with, be a representative of, or enter into a contractual agreement of any kind with any other mortgage brokerage or mortgage banking firm; ii) maintain any mortgage broker license; or iii) originate any real estate loans except on behalf of WLG. Loan Originator agrees to immediately notify WLG in writing if Loan Originator acquires or obtains any interest in or affiliation with any other mortgage brokerage or mortgage banking firm, or engages in any employment relating to the origination of real estate loans, either directly or indirectly, whether alone or with any person or entity other than WLG. Loan Originator shall immediately notify WLG if Loan Originator becomes involved in any activity that would create the possibility of a conflict of interest on the part of Loan Originator with respect to WLG or any services offered by or on behalf of WLG.

1.5 <u>No Other Authority</u>. Except as set forth in this Paragraph 1, Loan Originator shall not have any authority, and shall under no circumstances hold himself or herself out to any person as having any authority, to represent or obligate WLG in any manner.

2. <u>Compensation</u>. For all services to be rendered hereunder, Loan Originator shall be paid on a commission basis only, in the amounts and at the times set forth on WLG's published commission schedules as amended from time to time. Loan Originator's compensation shall be paid in accordance with WLG's normal commission payroll practices in effect from time to time and shall be reported on Federal form W-2 as employee compensation, subject to FICA, FUTA, and income tax withholding as required by federal, state, and local laws. Loan Originator agrees that, where required by law, he or she shall disclose to customers all the fees that Loan Originator will be paid for services rendered in connection with this Agreement in a form approved by WLG and in accordance with state and federal regulations. WLG shall, in its sole and absolute discretion, have the right to change, modify, alter, or decrease any commissions payable pursuant to this Agreement; provided, however, that any changes, modifications, alterations, or decreases shall be effective only on a prospective basis. Except as set forth above, Loan Originator shall not be entitled to receive any other compensation or benefits from WLG of any kind or nature.

3. <u>Term and Termination</u>. This Agreement shall commence on the date of execution of this Agreement and shall continue until it is terminated in accordance with the provisions hereof. This written Agreement is terminable at will by either party upon advance written notice of seven (7) days. This Agreement shall also terminate by operation of law or upon the death or disability of Loan Originator. Upon termination of this Agreement, except as otherwise provided hereunder and except as to commissions earned by Loan Originator prior to the effective date of termination, which shall be paid by WLG to Loan Originator within a reasonable period of time, the parties shall have no further rights or obligations with respect to each other.

4. <u>Loan Applications, Programs</u>. WLG, in its sole discretion, may reject any application for reasons of its own business convenience, and nothing herein shall be construed to require the processing of any loan application presented by Loan Originator. WLG shall have the sole discretion of determining what loan programs it will offer and what Loans it will make. All Loans shall be closed in the name of WLG or such other names as WLG shall determine.

5. <u>Representations</u>. Loan Originator agrees that at all times during the term of this Agreement that Loan Originator shall devote such time and effort as are necessary to faithfully perform to the best of Loan Originator's ability Loan Originator's duties and responsibilities hereunder. Loan Originator specifically represents to WLG that by entering into this Agreement, Loan Originator does not and will not conflict with or violate any other agreement or understanding to which the Loan Originator is a party, or any law, regulation, or order, including but not limited to any disciplinary orders or requirements of any regulatory agency to which the Loan Originator is subject. Loan Originator agrees that Loan Originator is and will continue to be in compliance with all applicable state and federal laws, rules and regulations governing the business contemplated by this Agreement.

6. <u>Covenants</u>.

6.1 <u>General</u>. Loan Originator acknowledges and agrees that WLG is the owner of the rights to all Applicants placing Loans through WLG, and that these Applicants comprise a substantial part of the goodwill of WLG. To protect the business and goodwill of WLG and all confidential information belonging to WLG, the parties have agreed to a limited period of non-competition, non-solicitation, and to a nondisclosure of confidential information following termination of this Agreement. Such limitations relate solely to the business of WLG, and to WLG's Applicants, however, and are not

intended to prevent Loan Originator from rendering mortgage origination services, if Loan Originator so desires.

6.2  Non-Competition.  Upon termination of this Agreement, Loan Originator agrees that for a period of one (1) year following such termination Loan Originator will not, without the written consent of WLG, directly or indirectly solicit or accept loan applications from, or perform any of the services Loan Originator performed within the scope of this Agreement for, any Applicant or WLG employee (other than Loan Originator's Exempt Persons as hereinafter defined) with whom Loan Originator had personal contact or established a business relationship during the term of this Agreement.  Exempt Persons shall consist of: (i) any persons, identified by name and city and state of residence, and with respect to whom Loan Originator provides written documentation as of the date of execution of this Agreement establishing that such persons are existing customers of Loan Originator, and (II) any persons, identified by name and city and state of residence, and with respect to whom Loan Originator provides written documentation as of the date of execution of this Agreement establishing that such persons are contractually affiliated with Loan Originator, and who thereafter become Loan Originators of WLG within thirty (30) days from the date of this Agreement.

6.3  Confidential and Proprietary Information.  Loan Originator acknowledges that, in the course of Loan Originator's employment with WLG pursuant to this Agreement, Loan Originator will become acquainted with confidential information belonging to WLG.  This information relates to persons, firms, and corporations that are or may become customers, financing entities, or accounts of WLG during the term of this Agreement; this provision includes the names of all customers, lenders, rates, and requirements.  Loan Originator will not, without the written consent of WLG, disclose or make any use of such confidential information.  All Loans placed and all WLG records of Applicants or of any company business, whether prepared by Loan Originator during the term of this Agreement or otherwise coming into Loan Originator's possession and control, shall remain and be the exclusive property of WLG and be surrendered to WLG upon termination of this Agreement.  Loan applications, files, forms and other documentation procured during the term of this Agreement are the property of WLG and shall not be removed from the present premises or control of WLG without its express written consent.  Any such loan application, files, or documents, shall be surrendered to WLG immediately upon the termination of this Agreement.

6.4  Organizing Competitive Business/Soliciting WLG Originators or Employees.  Except for an Exempt Business Activity, Loan Originator agrees that during the term of this Agreement, Loan Originator will not directly or indirectly undertake the planning or organizing of any business activity competitive with the work Loan Originator performs as an employee pursuant to the terms of this Agreement.  Loan Originator agrees that Loan Originator will not, for a period of two (2) years following termination of this Agreement, directly or indirectly, solicit any of WLG's independent contractors, loan officers or employees, with whom Loan Originator during the term of this Agreement had personal contact (but excluding any of Loan Originator's Exempt Persons) to work for Loan Originator or any other competitive company. "Exempt Business Activity" shall mean any business activity with respect to which Loan Originator provides written documentation as of the date of execution of this Agreement establishing that Loan Originator is already engaged in such business activity, and that, to the reasonable satisfaction of WLG, in such business activity Loan Originator does not originate the types of Loans offered by WLG.

6.5  Indemnification.  Loan Originator shall indemnify WLG for and hold it harmless from and against any and all claims, losses, liabilities, damages, taxes, penalties, fines, forfeitures, reasonable legal fees and expenses, judgments, and other costs and expenses that WLG may sustain arising and/or resulting from any claim, demand, defense or assertion based on or grounded upon, or resulting from a breach of any representation, warranty, or covenant by Loan Originator under this Agreement. This indemnity shall survive the termination of this Agreement.

7.  Arbitration of Grievances.

7.1  General. The Parties agree that, except as specifically provided to the contrary in this Agreement, any controversy, claim or dispute arising out of or relating to this Agreement ("Grievance"), between the Loan Originator, on the one part, and WLG and/or any of its officers and employees, or any of them, on the other part shall be resolved exclusively by arbitration in accordance with this Paragraph 7.  For purposes of this Paragraph 7, the terms "Party" and "Parties" include WLG, the Loan Originator and other officers and employees of WLG.  All Grievances, unresolved in the normal course of business, to the extent that any Party wishes to pursue the matter further, shall be resolved by arbitration in accordance with the Commercial Arbitration Rules ("Rules") of the American Arbitration Association then in effect, except that, or in addition to such Rules: i) in order to assure neutrality and impartiality of the arbitrator(s), and to preserve the confidentiality of proprietary information, the arbitrator(s) shall not be any present or past owner, officer, director, employee, consultant, contractor, agent, attorney or other representative of any mortgage company, mortgage broker, mortgage banker, or of any affiliate of any of them; ii) the locale where the arbitration shall be held is the principal business location of WLG in Norcross, Georgia; iii) a transcript shall be made on the proceeding; and iv) the

arbitrator's(s') award shall state their findings of fact and conclusions of law. The award, including such findings and conclusions may be reviewed, vacated, modified or corrected upon application or petition of any Party brought within thirty (30) days after the date of the award, by a court of competent jurisdiction, provided that in addition to the grounds stated in the United States Arbitration Code, 9 U.S.C. § 1, and following, or in any other applicable law or statute, the court may also vacate, modify or correct the award if the conclusions of law are contrary to law, or if the findings of fact are not supported by the facts (as determined by whether there was any pertinent and material evidence to support the findings). Otherwise, or in compliance with the court's review, the decision of the arbitrator(s) shall be final and binding. Judgment upon the award rendered by the arbitrator(s), or judgment upon the award as reviewed by the court, may be entered in any court having jurisdiction thereof.

    7.2  Waiver of Litigation.  The Parties acknowledge and agree that they are engaged in, and that this Agreement evidences transactions involving, interstate commerce and that, except as specifically provided to the contrary in this Agreement, this Paragraph 7 is and shall be the Parties' exclusive remedy for any Grievance arising out of or relating to this Agreement, or the breach thereof.  Except as specifically provided to the contrary in this Agreement, the Parties expressly waive the right to litigate in a judicial forum all Grievances and waive the right to trial by jury.  The Parties further agree that the findings of fact issued by the arbitrator(s), as reviewed, if applicable, shall be binding on them in any subsequent arbitration, litigation or other proceeding.

    7.3  No Condition Precedent to Action and Power of Arbitrators.  Anything herein or elsewhere contained to the contrary notwithstanding, WLG shall not be required to negotiate, arbitrate or litigate as a condition precedent to taking any action under this Agreement.  The Parties expressly authorize the Arbitrator(s) to fashion and award any type of remedy that could be awarded by a court, including such equitable or extraordinary remedies as temporary and permanent injunctive relief.

    7.4  Extraordinary Relief.  The Parties agree that WLG has the right to seek preliminary and temporary restraining orders, injunctions and other extraordinary relief (such orders, injunctions and other relief referred to as "Extraordinary Relief") under Paragraph 6 of this Agreement without complying with this Paragraph 7. Without limitation, the Parties agree that the requirements for good faith arbitration under this Paragraph 7 do not preclude WLG from seeking in an arbitral or in a judicial forum, or in both, Extraordinary Relief to protect its rights under Paragraph 6 of this Agreement. This Paragraph 7 shall not be deemed to preclude or narrow the judicial or arbitral powers regarding Extraordinary Relief.

    8.  Assignment.  This Agreement may be assigned by WLG in the event of a bona fide sale or transfer of ownership or control of the business to another person or entity; provided however, that the assignee shall assume all obligations of WLG herein, in which case WLG shall be released of any further liability to the Loan Originator hereunder.  The personal character and skill of the Loan Originator are a material inducement to WLG to enter into this Agreement, and any attempt by Loan Originator to assign this Agreement or to assign any rights (including the right to receive commissions) which Loan Originator may have hereunder shall be null and void, and such attempt to assignment shall be considered a repudiation and termination of this Agreement by Loan Originator.

    9 . Amendment.  This is the entire Agreement of the parties and any amendment or modification thereof shall be in writing and signed by both parties.  This Agreement is binding upon the parties, their heirs and assigns.

    10.  Waiver.  The waiver by WLG of any breach or default by Loan Originator shall not operate or be construed as waiver of any subsequent breach or default by Loan Originator.

    11.  Governing Law.  The enforcement of this Agreement shall be governed by the laws of the State of Georgia and venue shall be in Cobb County or Gwinnett County Superior Court, State of Georgia.

    12.  Severability.  The provisions of this Agreement are severable, and if one or more provisions thereof are found to be unenforceable in whole or in part, the remaining provisions and any partially enforceable provisions will nevertheless be binding and enforceable to the full extent of the law.

    13.  Fiduciary Obligation.  Loan Originator acknowledges that WLG, as a licensed mortgage lender/broker, may bear the responsibility to third parties for all actions of its employees.  Loan Originator hereby acknowledges and agrees that Loan Originator is responsible for the content and quality of each application taken and each Loan submitted to WLG. Loan Originator understands that the submission of a loan application containing false information is a crime and that loan fraud includes, but is not limited to submission of inaccurate information, including false statements on loan

application(s) and falsification of documents purporting to substantiate credit, employment, deposit and asset information, personal information including identity, ownership/non-ownership of real property; forgery of partially or predominantly accurate information; incorrect statements regarding current occupancy or intent to maintain minimum occupancy as stated in the security instrument; lack of due diligence by Loan Originator, including failure to obtain all information required by the application and failure to request further information as dictated by borrower's response to other questions; unquestioned acceptance of information or documentation which is known, should be known, or should be suspected to be inaccurate; simultaneous or consecutive processing of multiple owner occupied loans from one applicant supplying different information on each application; allowing an applicant or interested third-party to "assist" with the processing of the loan; Loan Originator's non-disclosure of relevant information.  Loan Originator acknowledges that fraudulent loans cannot be sold into the secondary market and, if sold, will require repurchase by WLG and fraudulent loans damage WLG's contractual agreements with its investors and mortgage insurance providers.  If Loan Originator participates in loan fraud of any kind, the following is a list of a few of the potential consequences that may result to Loan Originator: criminal prosecution; immediate termination of this Agreement; loss of lender access due to exchange of information between lenders, mortgage insurance companies, including submission of information to investors (FHLMC/FNMA), police agencies, and the Department of Financial Institutions; civil action by WLG; civil action by applicant/borrower or other parties to the transaction.

14. <u>Previous Agreements</u>. This Agreement supersedes any and all previous agreements between the parties hereto.

IN WITNESS WHEREOF, the parties have executed this Agreement by affixing their signatures thereto.

New Loan Originator's Acknowledgments

**You must check the following acknowledgments to continue:**

A.    My becoming an employee of World Lending Group will not violate the terms of or interfere with any contract, agreement or business relationship that I have or have had with any third party, including without limitation, World Financial Group, Inc..

B.    Upon becoming an employee of World Lending Group, I will not engage in any business practice or behavior, nor will I take any action, which will result in any violation of any restrictions or covenants to which I am subject pursuant to any agreement to which I was previously a party, including, without limitation, any agreement with World Financial Group, Inc.

C.    World Lending Group, its officers, directors, shareholders and employees have not induced me in any way whatsoever to terminate any contract, agreement or business relationship that I presently have or have had with any third party, including without limitation, any agreement with World Financial Group, Inc.

D.    I understand that these acknowledgments constitute a part of my World Lending Group, Inc., Mortgage Loan Originator Employment Agreement to which I am bound and are material representations upon which World Lending Group shall rely in its acceptance of my Mortgage Loan Originator Employment Agreement.

**ASSOCIATE:**                                                      **WORLD LENDING GROUP, INC.**

_Delores Arreguin_                                             By: _____
Print Name

_(signature)_
Signature

Date: _7 - 1 9 - 02_

GEL-025

# World Lending Group, Inc.
## NEW EMPLOYEE INFORMATION FORM

AF0099

### *** All information MUST be complete in order to be processed***

Social Security #: _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_    Date of Birth: _7-6-48_

Name : _Dolores Arreguin_ Spouse's Name: _____

Address: _6526 Main St_

City: _Orangevale_    State: _Ca_    Zip Code: _95662_

Home Phone:( _916_ ) _224-3227_

**EMPLOYEE DATA:**

Date of Hire:_____    Original Hire Date if Rehire:_____

**EMERGENCY INFORMATION:**
_Anita Arreguin_                          _Daughter_
Name: _Michael Arreguin_    Relationship: _Son_

Address: _6526 Main Ave_

Home Phone:( _916_ ) _989-8100_    Work Phone:( _916_ ) _342-0397_

\* Recruiter ID: _AA 1411_


**SIGNATURE:**

Employee: _Dolores Arguy_    Date: _19 July 02_


**FOR USP USE ONLY:**

Employee File # :_____    Employee Client/Dept #:_____

GEL-026

**EMPLOYEE ACKNOWLEDGMENT**
**REGARDING WORLD LENDING GROUP**
**EMPLOYEE POLICY MANUAL**

I acknowledge having read the Employee Policy Manual (the "Manual") of World Lending Group (the "Company"). I agree to abide by the rules and instructions contained in the Manual. I will familiarize myself with the information in the Manual, will seek verification or clarification where necessary, and will comply with the policies, benefit requirements, and procedures pertaining to the Company.

I understand and acknowledge that failure to abide by the policies contained herein, including changes, additions, modifications, and/or alterations could result in disciplinary action up to and including termination. I further understand and acknowledge that my continued employment is evidence of my acceptance to abide by any and all changes, additions, modifications, and/or alterations made in the future and presented to employees whether or not I have signed an acknowledgment of such changes.

I have specifically reviewed the following policies, including any reporting requirements:

- ❑ Equal Opportunity
- ❑ Harassment
- ❑ Sexual Harassment
- ❑ Drug/Alcohol Policy
- ❑ FMLA
- ❑ Confidentiality
- ❑ Commissions
- ❑ Professionalism
- ❑ Worker's Comp

I hereby acknowledge my specific understanding and agreement to abide by the terms of these policies in addition to others contained in the Manual.

I understand that the Manual is to be used as a guide to the various policies, benefits, and information pertaining to my employment. **I recognize that no part of the Manual should be construed as any type of contract – formal, informal, or implied.** I recognize the Company's right to make unilateral changes in the content, interpretation, or application of the Manual at any time the Company deems appropriate, even if the changes to be implemented have not been communicated, reprinted, or substituted in the Manual or elsewhere.

**Furthermore, I understand and acknowledge that absent a written contract to the contrary, signed by the President or other authorized officer and me, my employment is terminable at the will of either the Company or me at any time for any reason or no reason and without notice.**

I agree that this Manual is Company property. I agree to return this Manual and all other Company property upon leaving the employ of the Company for any reason.

_____    Dolores Arreguin
Employee's Signature                Employee's Printed Name

7-19-02
Date

## EMPLOYEE INSURANCE ACKNOWLEDGMENT

I the undersign do voluntarily understand, acknowledge, and agree that the following qualifications are met and are true:

I am at least 18 years of age;

**Initial**

I have a current valid driver's license issued by the state in which I reside;

I have had no major violations in the past three (3) years;

I have no restrictions on my license that would prohibit me from performing the essential functions of my job, with or without a reasonable accommodation;

I have had no alcohol- or drug-related violations in the last three (3) years; and

I have a current inspection sticker and vehicle liability insurance in the minimum amounts of 100/300/50 as described below:

a.    $100,000 - bodily injury per person.

b.    $300,000 - bodily injury per accident.

c.    $50,000 - property damage per accident.

**Initial**    If I do not have all of the above items, I will not drive while in the course and scope of my duties for World Lending Group.

_____
Employee's Signature

_____
Employee's Printed Name

_____
Date

Form #607

GEL-028

**World Lending Group, Inc.**

BACKGROUND INVESTIGATION CONSENT

I, _Dolores Arregun_, hereby authorize World Lending Group, Inc. and/or its agents to make an independent investigation of my background, references, character, past employment, education, credit history, criminal or police records, including those maintained by both public and private organizations and all public records for the purpose of confirming the information contained on my Application and/or obtaining other information which may be material to my qualifications for employment now and, if applicable, during the tenure of my employment with Company.

I release World Lending Group, Inc. and/or its agents and any person or entity, which provides information pursuant to this authorization, from any and all liabilities, claims or law suits in regards to the information obtained from any and all of the above referenced sources used.

The following is my true and complete legal name and all information contained herein is true and correct to the best of my knowledge:

_____        7-19-02
Applicant/Employee Name and Signature        Date

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        7-6-48
Social Security Number *        Date of Birth *

*NOTE: The above information is required for identification purposes only, and is in no manner used as qualifications for employment. World Lending Group, Inc. is an Equal Opportunity Employer, and does not discriminate on the basis of Sex, Race, Religion, Age (40 and over), Handicap or National Origin.

**Oklahoma Residents please note:** Under Oklahoma law, you have the right to receive a free copy of your consumer report.

____ YES, I am an Oklahoma resident and would like a free copy of my consumer report.

Printed Name _____

Street Address_____

City, State, Zip _____

GEL-029

# Form W-4 (2002)

**Purpose.** Complete Form W-4 so your employer can withhold the correct Federal income tax from your pay. Because your tax situation may change, you may want to refigure your withholding each year.

**Exemption from withholding.** If you are exempt, complete only lines 1, 2, 3, 4, and 7 and sign the form to validate it. Your exemption for 2002 expires February 16, 2003. See **Pub. 505,** Tax Withholding and Estimated Tax.

**Note:** You cannot claim exemption from withholding if **(a)** your income exceeds $750 and includes more than $250 of unearned income (e.g., interest and dividends) and **(b)** another person can claim you as a dependent on their tax return.

**Basic instructions.** If you are not exempt, complete the **Personal Allowances Worksheet** below. The worksheets on page 2 adjust your withholding allowances based on itemized deductions, certain credits, adjustments to income, or two-earner/two-job situations. Complete all worksheets that apply. However, you **may claim fewer (or zero) allowances.**

**Head of household.** Generally, you may claim head of household filing status on your tax return only if you are unmarried and pay more than 50% of the costs of keeping up a home for yourself and your dependent(s) or other qualifying individuals. See line E below.

**Tax credits.** You can take projected tax credits into account in figuring your allowable number of withholding allowances. Credits for child or dependent care expenses and the child tax credit may be claimed using the **Personal Allowances Worksheet** below. See Pub. 919, How Do I Adjust My Tax Withholding? for information on converting your other credits into withholding allowances.

**Nonwage income.** If you have a large amount of nonwage income, such as interest or dividends, consider making estimated tax payments using Form 1040-ES, Estimated Tax for Individuals. Otherwise, you may owe additional tax.

**Two earners/two jobs.** If you have a working spouse or more than one job, figure the total number of allowances you are entitled to claim on all jobs using worksheets from only one Form W-4. Your withholding usually will be most accurate when all allowances are claimed on the Form W-4 for the highest paying job and zero allowances are claimed on the others.

**Nonresident alien.** If you are a nonresident alien, see the Instructions for Form 8233 before completing this Form W-4.

**Check your withholding.** After your Form W-4 takes effect, use Pub. 919 to see how the dollar amount you are having withheld compares to your projected total tax for 2002. See Pub. 919, especially if you used the **Two-Earner/Two-Job Worksheet** on page 2 and your earnings exceed $125,000 (Single) or $175,000 (Married).

**Recent name change?** If your name on line 1 differs from that shown on your social security card, call 1-800-772-1213 for a new social security card.

---

**Personal Allowances Worksheet** (Keep for your records.)

A   Enter "1" for **yourself** if no one else can claim you as a dependent . . . . . . . . .   A ____

B   Enter "1" if:
- You are single and have only one job; or
- You are married, have only one job, and your spouse does not work; or
- Your wages from a second job or your spouse's wages (or the total of both) are $1,000 or less.   B ____

C   Enter "1" for your **spouse.** But, you may choose to enter "-0-" if you are married and have either a working spouse or more than one job. (Entering "-0-" may help you avoid having too little tax withheld.) . . . . . . .   C ____

D   Enter number of **dependents** (other than your spouse or yourself) you will claim on your tax return . . . . .   D ____

E   Enter "1" if you will file as **head of household** on your tax return (see conditions under Head of household above)   E ____

F   Enter "1" if you have at least $1,500 of **child or dependent care expenses** for which you plan to claim a credit . .   F ____
(**Note:** Do not include child support payments. See Pub. 503, Child and Dependent Care Expenses, for details.)

G   **Child Tax Credit** (including additional child tax credit):
- If your total income will be between $15,000 and $42,000 ($20,000 and $65,000 if married), enter "1" for each eligible child plus **1 additional** if you have three to five eligible children **or 2 additional** if you have six or more eligible children.
- If your total income will be between $42,000 and $80,000 ($65,000 and $115,000 if married), enter "1" if you have one or two eligible children, "2" if you have three eligible children, "3" if you have four eligible children, or "4" if you have five or more eligible children.   G ____

H   Add lines A through G and enter total here. **Note:** This may be different from the number of exemptions you claim on your tax return. ▶   H ____

For accuracy, complete all worksheets that apply.
- If you plan to **itemize** or claim **adjustments to income** and want to reduce your withholding, see the **Deductions and Adjustments Worksheet** on page 2.
- If you have **more than one job** or **are married and you and your spouse both work** and the combined earnings from all jobs exceed $35,000, see the **Two-Earner/Two-Job Worksheet** on page 2 to avoid having too little tax withheld.
- If **neither** of the above situations applies, **stop here** and enter the number from line H on line 5 of Form W-4 below.

---
Cut here and give Form W-4 to your employer. Keep the top part for your records.
---

Form **W-4**
Department of the Treasury
Internal Revenue Service

**Employee's Withholding Allowance Certificate**

▶ For Privacy Act and Paperwork Reduction Act Notice, see page 2.

OMB No. 1545-0010

**2002**

1   Type or print your first name and middle initial *Delores*   Last name *Arregui*   2 Your social security number *547 62 682 7*

Home address (number and street or rural route) *0526 Main Street*

City or town, state, and ZIP code *Orange Vale, Ca 95662*

3   ☐ Single ☐ Married ☐ Married, but withhold at higher Single rate.
Note: If married, but legally separated, or spouse is a nonresident alien, check the "Single" box.

4   If your last name differs from that on your social security card, check here. You must call 1-800-772-1213 for a new card. ▶ ☐

5   Total number of allowances you are claiming (from line H above or from the applicable worksheet on page 2)   5 ____

6   Additional amount, if any, you want withheld from each paycheck . . . . . . . . .   6 $ ____

7   I claim exemption from withholding for 2002, and I certify that I meet **both** of the following conditions for exemption:
- Last year I had a right to a refund of **all** Federal income tax withheld because I had **no** tax liability **and**
- This year I expect a refund of **all** Federal income tax withheld because I expect to have **no** tax liability.
If you meet both conditions, write "Exempt" here . . . . . . ▶   7 ____

Under penalties of perjury, I certify that I am entitled to the number of withholding allowances claimed on this certificate, or I am entitled to claim exempt status.
Employee's signature (Form is not valid unless you sign it.) ▶ *Delores Arregui*   Date ▶ *7-19-02*

8   Employer's name and address (Employer: Complete lines 8 and 10 only if sending to the IRS.)   9 Office code (optional)   10 Employer identification number

Cat. No. 10220Q

GEL-030



**Employment
Development
Department**

State of California

## EMPLOYEE'S WITHHOLDING ALLOWANCE CERTIFICATE | DE 4 |

| Type or Print Your Full Name | Your Social Security Number |
|---|---|
| *Dolores Arreguin* | *547-162-6827* |
| Home Address (Number and Street or Rural Route) | Status Withholding Allowances |
| *10526 Main St* | ☒ SINGLE or MARRIED (with two or more incomes) |
| City, State and ZIP Code | ☐ MARRIED (one income) |
| *Orangevale, Ca 95662* | ☐ HEAD OF HOUSEHOLD |

1. Number of allowances you are claiming for this job from the Regular Withholding Allowances
   Worksheet A ............................................................................................ 1 ⃝ *0*

2. Number of allowances from the Estimated Deductions Worksheet B ...................................... 2 _____

3. Additional amount to be withheld each pay period (if employer agrees) Worksheet C .................. 3 _____

   If employer does not agree, you may file quarterly estimates on Form 540ES with the Franchise Tax Board.

*Under the penalties of perjury, I certify that the number of withholding allowances claimed on this certificate does not exceed the number to which I am entitled or, if claiming exemption from withholding, that I am entitled to claim the exempt status.*

Signature _____ Date *7-19-02*

| Employer's Name and Address | California Employer Account Number |
|---|---|
| | |

- - - - - - - - - - - - - - - - - - - - - - - - - - cut here - - - - - - - - - - - - - - - - - - - - - - - - - -

Give the top portion of this page to your employer and keep the remainder for your records.

## YOUR CALIFORNIA PERSONAL INCOME TAX MAY BE UNDERWITHHELD IF YOU DO NOT FILE THIS DE 4 FORM

*IF YOU RELY ON THE FEDERAL W-4 FOR YOUR CALIFORNIA WITHHOLDING ALLOWANCES, YOUR CALIFORNIA STATE PERSONAL INCOME TAX MAY BE UNDERWITHHELD AND YOU MAY OWE MONEY AT THE END OF THE YEAR.*

**PURPOSE:** This certificate, DE 4, is for **California personal income tax** withholding purposes only.

You should complete this form if either:

(1) You claim a different marital status, number of regular allowances, or different additional dollar amount to be withheld for California personal income tax withholding than you claim for federal income tax withholding or,

(2) You claim additional allowances for estimated deductions.

The DE 4 should be used to properly compute the amount of taxes to be withheld from your wages to accurately reflect your state tax situation.

THIS FORM WILL NOT CHANGE YOUR **FEDERAL** WITHHOLDING ALLOWANCES.

The Federal Form W-4 is applicable for California withholding purposes if you wish to claim the same marital status, number of regular allowances, and/or the same additional dollar amount to be withheld for state and federal purposes. However, federal tax brackets and withholding methods do not reflect state personal income tax withholding tables.

**If you rely on the number of withholding allowances you claim on your Federal W-4 withholding allowance certificate for your state income tax withholding, you may be significantly underwithheld.** This is particularly true if your household income is derived from more than one source.

**CHECK YOUR WITHHOLDING:** After your W-4 and/or DE 4 takes effect, compare the dollar amounts that are being withheld with your estimated total annual tax. You can use the worksheets in this DE 4 for California withholding and the Internal Revenue Service (IRS) Publication 919 for federal withholding calculations.

**EXEMPTION FROM WITHHOLDING:** If you wish to claim exempt, complete the federal Form W-4. You may only claim exempt from withholding California income tax if you did not owe any federal income tax last year and you do not expect to owe any federal income tax this year. The exemption automatically expires on February 15 of the next year unless submitted again on a new W-4 before that date. If you are not having federal income tax withheld this year but expect to have a tax liability next year, the law requires you to give your employer a new Form W-4 by December 1.

DE 4 Rev. 27 (1-02) (INTERNET)                    Page 1 of 4                                    CU

GEL-031

**IF YOU NEED MORE DETAILED INFORMATION, SEE THE INSTRUCTIONS THAT CAME WITH YOUR LAST CALIFORNIA INCOME TAX RETURN OR CALL YOUR LOCAL FRANCHISE TAX BOARD OFFICE.**

| | | |
|---|---|---|
| IF YOU ARE CALLING FROM WITHIN THE UNITED STATES | | 1-800-852-5711 |
| IF YOU ARE CALLING FROM OUTSIDE THE UNITED STATES | (Not Toll Free) | (916) 845-6500 |
| FOR THE HEARING IMPAIRED | | 1-800-822-6268 |

**NOTIFICATION:** Your employer is required to send a copy of your DE 4 to the Employment Development Department (EDD) with his or her next quarterly tax return if Form W-4 is not reportable to the IRS **and** you claim more than 10 withholding allowances on the DE 4.

IF THE IRS INSTRUCTS YOUR EMPLOYER TO WITHHOLD FEDERAL INCOME TAX BASED ON A CERTAIN WITHHOLDING STATUS, YOUR EMPLOYER IS REQUIRED TO USE THE SAME WITHHOLDING STATUS FOR STATE INCOME TAX WITHHOLDING IF YOUR WITHHOLDING ALLOWANCES FOR STATE PURPOSES MEET THE REQUIREMENTS LISTED UNDER "NOTIFICATION." IF YOU FEEL THAT THE FEDERAL DETERMINATION IS NOT CORRECT FOR STATE WITHHOLDING PURPOSES, YOU MAY REQUEST A REVIEW.

To do so, write to:

Franchise Tax Board
Sacramento CA 95867

Your letter should contain the basis of your request for review. You will have the burden of showing the federal determination incorrect for state withholding purposes. The Franchise Tax Board (FTB) will limit its review to that issue. FTB will notify both you and your employer of its findings. Your employer is then required to withhold state income tax as instructed by FTB. In the event FTB or IRS finds there is no reasonable basis for the number of withholding exemptions that you claimed on your W-4/DE 4, you may be subject to a penalty.

**PENALTY:** You may be fined $500 if you file with no reasonable basis a DE 4 that results in less tax being withheld than is properly allowable. In addition, criminal penalties apply for willfully supplying false or fraudulent information or failing to supply information requiring an increase in withholding. This is provided for by Section 19176 of the California Revenue and Taxation Code.

DE 4 Rev. 27 (1-02) (INTERNET)

CU

GEL-032

## AUTHORIZATION FOR DIRECT DEPOSIT

**This form supplies USP with pertinent information and authorization
for directly depositing the employee's payroll check to his/her bank
account.  The employee must complete all blanks and sign/date this
form.**

I, _Dolores Arreguin_, authorize USP to directly deposit my payroll check
into the following account until otherwise notified:

| ABA Routing # | Account Number | Checking /Savings | Financial Institution |
|---|---|---|---|
| 121137506 | 241711204 | Checki | First Bank & Trust |

♦ Attach a **voided check** for the checking account to which you wish to have
commissions deposited.

**OR**

♦ Attach a **deposit slip** for the savings account to which you wish to have commissions
deposited.

_(signature)_
(Employee Signature)

___World Lending Group___
(Client Company Name)

_7-19-02_
(Date)

---

DOLORES A. ARREGUIN
4868 A SUNSET TERR.
FAIR OAKS, CA 95628

551

90-3750/1211
417

Pay to the
Order of _____  $

_____ DOLLARS

**FIRST BANK**
First Bank & Trust
1625 Douglas Blvd.
Roseville, CA 95661
1-800-760-BANK
www.firstbanks.com

For _____

⑆121137508⑆  241711204⑆ 0551

GEL-033

U.S. Department of Justice
Immigration and Naturalization Service

OMB No. 1115-0136
**Employment Eligibility Verification**

Please read instructions carefully before completing this form. The instructions must be available during completion of this form. **ANTI-DISCRIMINATION NOTICE:** It is illegal to discriminate against work eligible individuals. Employers CANNOT specify which document(s) they will accept from an employee. The refusal to hire an individual because of a future expiration date may also constitute illegal discrimination.

**Section 1. Employee Information and Verification.** To be completed and signed by employee at the time employment begins.

| Print Name: Last *Arreguin* | First *Dolores* | Middle Initial | Maiden Name *Martinez* |
|---|---|---|---|

Address (Street Name and Number) *6526 Main St*    Apt. #    Date of Birth (month/day/year) *1-6-48*

City *Orangevale*    State *Ca*    Zip Code    Social Security # *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*

I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form.

I attest, under penalty of perjury, that I am (check one of the following):
- ☑ A citizen or national of the United States
- ☐ A Lawful Permanent Resident (Alien # A_____
- ☐ An alien authorized to work until ___/___/___
  (Alien # or Admission #)

| Employee's Signature *Dolores Arreguin* | Date (month/day/year) *3-19-02* |
|---|---|

**Preparer and/or Translator Certification.** (To be completed and signed if Section 1 is prepared by a person other than the employee.) I attest, under penalty of perjury, that I have assisted in the completion of this form and that to the best of my knowledge the information is true and correct.

Preparer's/Translator's Signature

Print Name

Address (Street Name and Number, City, State, Zip Code)

Date (month/day/year)

**Section 2. Employer Review and Verification.** To be completed and signed by employer. Examine one document from List A OR examine one document from List B and one from List C, as listed on the reverse of this form, and record the title, number and expiration date, if any, of the document(s)

| List A | OR | List B | AND | List C |
|---|---|---|---|---|
| Document title: _____ | | *P0592957* | | *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* |
| Issuing authority: _____ | | *07-06-06* | | |
| Document #: _____ | | | | |
| Expiration Date (if any): ___/___/___ | | ___/___/___ | | ___/___/___ |
| Document #: _____ | | | | |
| Expiration Date (if any): ___/___/___ | | | | |

**CERTIFICATION** - I attest, under penalty of perjury, that I have examined the document(s) presented by the above-named employee, that the above-listed document(s) appear to be genuine and to relate to the employee named, that the employee began employment on (month/day/year) *7/19/02* and that to the best of my knowledge the employee is eligible to work in the United States. (State employment agencies may omit the date the employee began employment.)

| Signature of Employer or Authorized Representative | Print Name *T. Koultgohann* | Title *HR Cons.* |
|---|---|---|

| Business or Organization Name *For WLG* | Address (Street Name and Number, City, State, Zip Code) | Date (month/day/year) *7/19/02* |
|---|---|---|

**Section 3. Updating and Reverification.** To be completed and signed by employer.

| A. New Name (if applicable) | B. Date of rehire (month/day/year) (if applicable) |
|---|---|

C. If employee's previous grant of work authorization has expired, provide the information below for the document that establishes current employment eligibility.

Document Title:_____    Document #:_____    Expiration Date (if any): ___/___/___

I attest, under penalty of perjury, that to the best of my knowledge, this employee is eligible to work in the United States, and if the employee presented document(s), the document(s) I have examined appear to be genuine and to relate to the individual.

| Signature of Employer or Authorized Representative | Date (month/day/year) |
|---|---|

Form I-9 (Rev. 11-21-91)N Page 2

GEL-034

EXHIBIT 5

Filed 2/29/08; pub. order 4/1/08 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

SAMUEL METTERS,

    Plaintiff and Respondent,

        v.

RALPHS GROCERY COMPANY et al.,

    Defendants and Appellants.

G038380

(Super. Ct. No. 06CC10397)

O P I N I O N

        Appeal from an order of the Superior Court of Orange County, Michael Brenner, Judge. Affirmed.

        Littler Mendelson, Henry D. Lederman and Lauren D. Hymes for Defendants and Appellants.

        Pedersen Law & Dispute Resolution Corp., Neil Pedersen and Dan E. Heck for Plaintiff and Respondent.

\*        \*        \*

        Ralphs Grocery Company appeals from the order denying its motion to compel arbitration of the action for discrimination and harassment filed against it by its employee, Samuel Metters. It claims the trial court erred in finding there was no valid agreement to arbitrate. We affirm.

## FACTS

        Sam Metters sued his employer, Ralphs Grocery Company, and his store manager, Bill Frigo, (collectively, Ralphs) for racial discrimination and harassment in

violation of the California Fair Employment and Housing Act (Gov. Code, § 12940 et seq.) (FEHA). Ralphs moved to compel arbitration, claiming Metters had entered into a binding arbitration agreement when he filled out a dispute resolution form.

Ralphs set forth evidence showing that Metters answered "yes" to the question: "Do you . . . have any complaints or incidents of unlawful harassment, discrimination or retaliation that you want to report?" on his annual evaluation form in early 2005. On March 9, 2005, Bonnie Franco, the manager of employee relations, sent Metters a letter. Franco's letter advised she was enclosing the "Notice of Dispute & Request for Resolution form ('Dispute Form'), the Company's Policy Against Unlawful Harassment, Discrimination and Retaliation, and a copy of the most recent version of the Policy referenced on page 2 of the Dispute Form, all of which address the means by which you may provide us with detailed information about your dispute and your desired resolution." Franco asked Metters to return the information about his dispute within 15 days. "The information you provide on the Dispute Form or otherwise will be used to conduct a reasonable review of your dispute and to respond to your desired resolution." Franco continued, "If, within 15 days from the date of this letter, we do not (1) receive the requested information back from you, or (2) hear from you further about your dispute, we will review your dispute based on the information you have already provided us about it." Metters did not respond.

In August 2005, Metters called the "Ask Dave" hotline about his dispute. In response, Franco sent Metters another letter virtually identical to the first, referencing the same enclosures. A month later, Metters signed and submitted the two-page Dispute Form claiming harassment and discrimination based on race, color, and national origin/ancestry from "June 2004 to present."

The Dispute Form is entitled "Notice of Dispute & Request for Resolution." On the lower half of the second page of the Dispute Form, the heading "IV. Mediation & Binding Arbitration." appears, followed by this sentence: "The

2

Company's Dispute Resolution Program includes a Mediation & Binding Arbitration Policy (the 'Policy'). The Policy provides for one day of <u>voluntary</u> mediation (*only if both you and the Company agree*) of 'Covered Disputes' (as defined in the Policy) with a neutral third-party mediator at the Company's expense, and <u>requires</u> the resolution of such Covered Disputes <u>only</u> through <u>mandatory</u> final & binding arbitration by a neutral third-party arbitrator (instead of a judge or jury) if they are not or cannot be resolved through mediation pursuant to the Policy or other informal dispute resolution efforts."

After a space, the form states, "I hereby submit this dispute for informal resolution directly by the Company's management." Then follows a rectangle with black background and white lettering, which says, "By submitting the foregoing dispute for resolution, I hereby acknowledge, understand, and agree that (1) a copy of the most recent version of the Policy (as described above) has been made available to me through the Company's Manager of Employee Relations (contact information below) prior to submitting the dispute for resolution, (2) I have received, read, understand, and will fully comply with the most recent version of the Policy, (3) if any of my Covered Disputes under the Policy are not resolved directly with the Company's management and I wish to pursue them further, I must resolve them <u>only</u> through <u>voluntary</u> mediation and/or <u>mandatory</u> final and binding arbitration pursuant to the most recent version of the Policy, and (4) I have not been required to complete, sign or return this form to make a complaint under the Company's policies against unlawful harassment, discrimination and retaliation or to have such complaints investigated or remedied by the Company."

In opposition to the motion to compel arbitration, Metters declared he started complaining about harassment, discrimination and retaliation in August 2004. At that time, he "contacted the district manager of Ralphs as well as Bonnie Franco at labor relations and the 'Dave Hirsch' phone line to complain . . . . The district manager responded by advising me to take vacation time. While on vacation, in the beginning of September, my doctor placed me on stress leave. During my leave I contacted Ralphs

3

and asked them to investigate my claims . . . ." Metters claimed in September 2005 he made "more than a dozen attempts to contact Bonnie Franco in the department of labor relations and have her address my complaints. At the same time I made numerous attempts to have the matter resolved by Dave Hirsch, the president of the company."

Metters claimed he got the Dispute Form after he contacted the human resources department, but never received a copy of the Policy. After he got the Dispute Form, he contacted Bonnie Franco, and she "instructed [him] to fill out the form and submit it to Ralph's legal office without any further explanation." Metters understood he needed to complete, sign, and submit the Dispute Form before his claims would be investigated. Neither Franco nor anyone else told Metters about arbitration, and he was unaware he had signed an arbitration agreement. He claimed he never agreed to arbitrate his claims against Ralphs.

In response to Metters' declaration, Franco filed a supplemental declaration stating she was "not aware of any attempts by Samuel Metters to contact me during September 2005." She claimed "[a] copy of Ralphs' Mediation & Binding Arbitration Policy was available to Mr. Metters prior to him signing the DRP form At no time did Plaintiff request I provide him with another copy of the Policy." Franco denied instructing Metters to submit the form. "If an employee calls with questions regarding the DRP form, my standard response is 'it is helpful if you fill out the DRP form, however, you are not required to do so."

After hearing argument, the trial court found there was no meeting of the minds and therefore no valid arbitration agreement. The court observed, "It could be that a transactional attorney sitting in an office somewhere could have this form, start kind of pulling on the string and follow it back somehow and maybe figure out what it meant, if that is possible. . . .  [¶] . . . [¶]  [I]t does appear to be an attempt to sort of backdoor . . . this employee through this kind of ambiguous, nebulous form and say, well, if you want your . . . complaint investigated, just sign this and life will be good.  [¶] I

4

don't think I can find there is . . . in the real world a meeting of the minds between Mr. Metters and Ralphs based on this."

DISCUSSION

Ralphs contends the agreement to arbitrate is valid and Metters is bound by it. There is no dispute that Metters signed the agreement, which states he received and read the arbitration policy; thus, Ralphs argues, it must be presumed he had done so. Ralphs contends its burden to establish a valid agreement to arbitrate is met by supplying a copy of the agreement and showing that Metters signed it.

The Federal Arbitration Act (9 U.S.C.A. § 1 et seq.) (FAA) provides that a written arbitration clause "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." (FAA, § 2) The FAA was "designed to overrule the judiciary's long-standing refusal to enforce agreements to arbitrate, and to place such agreements upon the same footing as other contracts." (*Volt Information Sciences v. Board of Trustees* (1989) 489 U.S. 468, 478, internal quotations omitted.) This federal policy in favor of arbitration does not come into play, however, until a court has found the parties entered into a valid contract under state law. "'There is no public policy favoring arbitration of disputes which the parties have not agreed to arbitrate.'" (*Cione v Foresters Equity Services, Inc.* (1997) 58 Cal.App.4th 625, 634.)

Ralphs urges us to perform a de novo review of the trial court's finding that there was no arbitration agreement, claming the issue is a question of law. But the trial court properly considered extrinsic evidence and made factual determinations; accordingly, we review the record for substantial evidence to support the finding. (*City of Vista v. Sutro & Co.* (1997) 52 Cal.App.4th 401, 407.)

Ralphs relies on the general rule that "ordinarily one who signs an instrument which on its face is a contract is deemed to assent to all its terms. A party cannot avoid the terms of a contract on the ground that he or she failed to read it before

5

signing. [Citations.]" *Marin Storage & Trucking, Inc. v. Benco Contracting & Engineering, Inc.* (2001) 89 Cal.App.4th 1042, 1049.) This is so even where the contracting party relied on misrepresentations by the other party that it was not necessary to read the contract before signing. "[O]ne party's *unreasonable* reliance on the other's misrepresentations, resulting in a failure to read a written agreement before signing it, is an insufficient basis, under the doctrine of fraud in the execution, for permitting that party to avoid an arbitration agreement contained in the contract." (*Rosenthal v. Great Western Financial Securities Corp.* (1996) 14 Cal.4th 394, 423.)

But if the one who signs the instrument is unaware of the contractual provisions, he cannot be said to have agreed to them. Thus, "[a]n exception to [the] general rule exists when the writing does not appear to be a contract and the terms are not called to the attention of the recipient. In such a case, no contract is formed with respect to the undisclosed term. [Citations.]" (*Marin Storage & Trucking, Inc. v. Benco Contracting & Engineering, Inc., supra,* 89 Cal.App.4th at pp. 1049-1059.) In *Windsor Mills, Inc. v. Collins and Aikman Corp.* (1972) 25 Cal.App.3d 987, the court found an arbitration provision unenforceable because it was buried in small print on the reverse side of a form on which a carpet manufacturer acknowledged receipt of yarn shipments from the yarn distributor. The court found an offeree was not bound by "inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious. [Citations.] [¶] This principle of knowing consent applies with particular force to provisions for arbitration." (*Id.* at p. 993.)

Here, the trial court found the Dispute Form did not look like a contract and did not alert Metters that he was agreeing to binding arbitration. It was entitled "Notice of Dispute & Request for Resolution." According to Metters' declaration, he was told to fill out the form in order to submit his dispute for resolution. He had tried telephone calls to both Franco and the company president; neither had produced results. The letters he received from Franco as well as his conversation with her strongly suggested the form

6

was the only vehicle by which he could have his claims reviewed, and no one told him if he did so, he would automatically agree to arbitration.

Ralphs argues Metters should have known he could have submitted his dispute without filling out the Dispute Form because Franco's letters said Ralphs would investigate his dispute based on "[t]he information you provide on the Dispute Form or otherwise . . . ." (Emphasis added.)  But Metters had provided information by other means, apparently with no results.  Had Ralphs wanted to clarify, rather than obfuscate, the grievance procedure, it would have told Metters to either fill out the Dispute Form, under which he would agree to binding arbitration, or write a letter detailing his dispute.

The arbitration provisions of the Dispute Form are similarly confusing and full of legalistic references to the unattached Policy.  The form explains that the Policy applies to "Covered Disputes," but fails to define such disputes.  It further explains that Covered Disputes will be resolved through "voluntary mediation and/or mandatory final and binding arbitration" if not resolved by informal means.  The form then states its ostensible purpose on the employee's behalf:  "I hereby submit this dispute for informal resolution directly by the Company's management."  Between this statement of purpose and the employee's signature line is the black box containing the employee's promise to follow the terms of the Policy.

Ralphs argues the Dispute Form incorporates the Policy by reference, thus Metters is presumed to know its terms, which define "Covered Disputes" and explain that participation in formal dispute resolution requires binding arbitration.  Ralphs cites *Spellman v. Securities, Annuities & Ins. Services, Inc.* (1992) 8 Cal.App.4th 452 in support of its contention that Metters is bound by the terms of the Policy.

In *Spellman,* a seller of securities brought an action for wrongful termination against his employer, a securities dealer.  The employer moved to compel arbitration pursuant to the employment contract.  The contract expressly required arbitration of disputes between the employee and employer as provided in the

7

organizations' "rules, constitutions, or by-laws . . . ." (*Id.* at p. 458.) The court found that the documents to which the contract referred, which contained the arbitration clause, were properly incorporated by reference because they were "'clearly referred to and identified.'" (*Ibid.*) It also noted the employee's agreement to arbitrate "appear[ed] on the signature page of [the] form under the bold face heading warning applicants that they must read the paragraphs on that page 'Very Carefully.'" (*Ibid.*)

Metters received no such warning on the Dispute Form. Furthermore, the agreement to arbitrate was not contained in an employment contract, where it might have been expected, but in a form on which Metters was directed to submit his grievance. The context of this form did not alert him he was agreeing to anything, let alone arbitration.

Metters claimed he never received the Policy. But had he done so, he would have learned that although the Policy does not prevent an employee from "pursuing an informal resolution of [Covered D]isputes," it requires the employee to sign and submit a Dispute Form to do so. In other words, an employee has no real choice to avoid arbitration if he wants some action taken on his complaint. When, as here, the complaint is for discrimination under the FEHA, the employer's duty to investigate promptly is "affirmative and mandatory," not dependent on whether the employee agrees to arbitration. (*Northrop Grumman Corp. v. Workers' Comp. Appeals Bd.* (2002) 103 Cal.App.4th 1021, 1035-1036; Gov. Code, § 12940, subds. (j)(1) & (k).)

## DISPOSITION

The record contains substantial evidence to support the trial court's finding that there was no valid agreement to arbitrate Metters' discrimination claim. The order denying the motion to compel arbitration is affirmed. Respondent is entitled to costs on appeal.

SILLS, P. J.

WE CONCUR:


ARONSON, J.


FYBEL, J.

Filed 4/1/08

## CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| SAMUEL METTERS, | |
| Plaintiff and Respondent, | G038380 |
| v. | (Super. Ct. No. 06CC10397) |
| RALPHS GROCERY COMPANY et al., | O R D E R |
| Defendants and Appellants. | |

Respondent has requested that our opinion, filed February 29, 2008, be certified for publication. It appears that our opinion meets the standard set forth in California Rules of Court, rule 8.1105(c). The request is GRANTED.

The opinion is ordered published in the Official Reports.


SILLS, P. J.

WE CONCUR:


ARONSON, J.



FYBEL, J.